

1   ROBBINS GELLER RUDMAN
       & DOWD LLP
2   FRANK J. JANECEK, JR. (156306)
    CHRISTOPHER COLLINS (189093)
3   655 West Broadway, Suite 1900
    San Diego, CA  92101-8498
4   Telephone:  619/231-1058
    619/231-7423 (fax)
5   fjanecek@rgrdlaw.com
    ccollins@rgrdlaw.com
6      – and –
    STUART A. DAVIDSON
7   MARK J. DEARMAN
    CHRISTOPHER C. MARTINS
8   120 East Palmetto Park Rd., Suite 500
    Boca Raton, FL 33432
9   Telephone:  561/750-3000
    561/750-3364 (fax)
10  sdavidson@rgrdlaw.com
    mdearman@rgrdlaw.com
11  cmartins@rgrdlaw.com

12  Attorneys for Plaintiff

13  [Additional counsel appear on signature page.]

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

17  JERALD FRIEDMAN, Individually and )   **VIA FAX**
18  on Behalf of All Others Similarly    )
    Situated,                            )   CV14-0034 DDP(PLAx)
19                                       )
                      Plaintiff,         )   CLASS ACTION
20                                       )
              vs.                        )   COMPLAINT FOR:
21                                       )
    AARP, INC., AARP SERVICES INC.,      )   (1)  VIOLATIONS OF THE
22  AARP INSURANCE PLAN,                 )        UNFAIR COMPETITION LAW,
    UNITEDHEALTH GROUP, INC. and         )        CALIFORNIA BUSINESS &
23  UNITEDHEALTHCARE INSURANCE           )        PROFESSIONS CODE §17200,
    COMPANY,                             )        et seq.;
24                                       )
25                                       )   (2)  MONEY HAD AND
                                         )        RECEIVED; and
26                    Defendants.        )
                                         )   (3)  CONVERSION
27
                                             DEMAND FOR JURY TRIAL
28

FILED
CLERK, U.S. DISTRICT COURT

JAN 2 - 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

1    Plaintiff Jerald Friedman ("Plaintiff"), individually and on behalf of all others
2    similarly situated, brings this Class Action Complaint against the herein-named
3    defendants, and upon information and belief, except as to the allegations within
4    Plaintiff's personal knowledge, alleges as follows:

5    ### JURISDICTION AND VENUE

6    1.      This Court has jurisdiction over this action pursuant to 28 U.S.C.
7    §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at
8    least one member of the Class, as defined below (the "Class"), is a citizen of a
9    different state than defendants, there are more than 100 members of the Class, and the
10   aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

11   2.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because many
12   of the acts and transactions giving rise to this action occurred in this District, the
13   named plaintiff resides in this District, and because defendants:

14   (a)     are authorized to conduct business in this District and have
15   intentionally availed themselves of the laws and markets within this District through
16   the promotion, marketing, distribution, and sale of "AARP-branded" Medicare
17   supplement insurance policies ("AARP Medigap") in this District;

18   (b)     conduct substantial business in this District; and

19   (c)     are subject to personal jurisdiction in this District.

20   ### SUMMARY OF THE ACTION

21   3.      This is a consumer class action seeking to recoup millions of dollars on
22   behalf of a class of senior citizens and disabled individuals residing in the State of
23   California who, by the deceptive practices and unlawful acts alleged herein, were
24   fooled into paying artificially inflated insurance charges for Medicare supplemental
25   health insurance policies so that defendants could use the inflated portion of the
26   payment for illegal purposes – namely the payment of insurance commissions to an
27   unlicensed entity.

28

4.     Defendant AARP, Inc., along with its subsidiaries (collectively, "AARP"), formerly known as the American Association of Retired Persons, is a tax-exempt, "non-profit" membership organization for seniors aged 50 years and older. AARP has long been regarded as a protector and advocate of the nation's senior community, and today AARP is reported to have over 40 million members – about half of whom are over the age of 65, and all of whom recognize and trust the AARP name.

5.     Despite its "non-profit" status, however, AARP reaps substantial income through business partnerships with large insurance companies like defendants UnitedHealth Group, Inc. and UnitedHealthcare Insurance Company (collectively, "UnitedHealth") in the form of commissions.

6.     As alleged herein, defendants AARP and UnitedHealth, together and through their respective subsidiaries (collectively, "Defendants"), have orchestrated an elaborate scheme where AARP, as the de facto agent of UnitedHealth, helps market, solicit and sell or renew AARP Medigap policies on behalf of UnitedHealth, and also collects and remits insurance premiums and generally administers the AARP Medigap program for UnitedHealth, in exchange for a 4.95% commission from each new policy or renewal.

7.     While Defendants disclose the existence of a payment in general that goes from UnitedHealth to AARP, which they call a "royalty" for the use of AARP's intellectual property, Defendants hide the fact that the payment to AARP is actually a percentage of premium commission that is charged to unsuspecting seniors and the disabled in addition to their insurance premium paid to UnitedHealth for coverage.

8.     Defendants' motive to term a commission payment a "royalty" is two-fold: it allows AARP to avoid oversight by insurance regulators, and it allows AARP to avoid paying taxes on the income it generates through insurance sales. Calling the commission payment a "royalty" is merely a fiction created by Defendants to further their illegal scheme.

9.     Indeed, other associations similar to AARP do the right thing and acquire a license to act as an agent, subjecting themselves to regulatory oversight, and paying taxes.[1]

10.     In California, if AARP did acquire a license to solicit insurance, they would be subject to all of the California Insurance Code ("Code") provisions governing licensed agent conduct, including but not limited to agent fiduciary obligations while holding premiums prior to remittance to an insurer as is governed by Cal. Ins. Code §§1733, 1734 and 1734.5.

11.     As detailed herein, Defendants' acts are unlawful because they violate the Code, and concomitantly violate the California Unfair Competition Law ("UCL"). For example, AARP is not licensed as an insurance agent in the State of California; however, it regularly acts as the de facto agent for UnitedHealth by helping market, solicit and sell AARP Medigap policies in exchange for a 4.95% commission from every policy sold or renewed, acts that UnitedHealth appointed AARP to perform – both clear violations of the Code. *See* Cal. Ins. Code §1631 ("Unless exempt by the provisions of this article, a person shall not solicit, negotiate, or effect contracts of insurance, or act in any of the capacities defined in Article 1 (commencing with Section 1621) unless the person holds a valid license from the commissioner authorizing the person to act in that capacity."); Cal. Ins. Code §10112.5(a)(1) ("Notwithstanding any other provision of law, every policy or certificate of health insurance marketed, issued, or delivered to a resident of this state, regardless of the situs of the contract or master group policyholder, shall be subject to all provisions of this code.").

12.     Because AARP is not licensed as an insurance agent, it is self-evident that AARP may not collect a commission for its marketing, soliciting or selling/renewing of AARP Medigap policies on behalf of UnitedHealth.

---

[1]     The automobile club AAA, for example, is licensed to sell insurance.

13.     In addition, Defendants' intentional deception is an unfair and deceptive business practice under Cal. Ins. Code §§790.02 and 790.03(a) and (b), which prohibit any entities engaged in the business of insurance from knowingly or negligently making any "untrue, deceptive or misleading" statement in any advertising or solicitation with respect to the business of insurance.

14.     The end result of Defendants' violations of the Code is that consumers are charged an artificially inflated amount for insurance coverage that is prohibited by law. Put differently, Plaintiff was injured by the actual loss of the 4.95% commission payment and paid more for his AARP Medigap policy because of Defendants' challenged conduct.

15.     If Defendants' had acted within the bounds of the law, Plaintiff would have only been charged for Medigap insurance coverage from UnitedHealth, rather than Medigap coverage plus an illegal 4.95% commission.

16.     To be sure, similar Medigap policies offered without the "AARP brand" offer identical benefits often at a lower cost in part because those insurers do not secretly charge unlawful insurance agent commissions to consumers.

17.     Ultimately, Defendants' deceptive and unlawful scheme takes advantage of unsuspecting senior citizens and the disabled who, unfortunately, put their trust in the AARP name.

18.     Taking unfair advantage of California's senior citizens constitutes a violation of Cal. Ins. Code §10192.55, which places a duty on Medigap insurers and their agents to act honestly and in good faith.

19.     But for Defendants' deceptive and unlawful acts, Plaintiff and the other members of the Class would not have agreed to pay the 4.95% illegal insurance commission secretly charged on top of their insurance premiums.

20.     Plaintiff and the Class were injured by the actual loss of the 4.95% commission payment and paid more for AARP Medigap insurance because of Defendants' challenged conduct.

21.     Plaintiff brings this action on behalf of the Class for equitable relief and to recover damages and restitution under California Business & Professions Code §17200, *et seq.*, resulting from Defendants' misconduct under the Code, and under the California common law for money had and received, and conversion.

## PARTIES

**Plaintiff**

22.     Plaintiff Jerald Friedman is a resident of Beverly Hills, California, and purchased an AARP Medigap policy in 2011 in California.  But for Defendants' deceptive and unlawful acts, as alleged herein, Mr. Friedman would not have agreed to pay 4.95% above the premiums due to UnitedHealth for an AARP Medigap policy.

**Defendants**

23.     Defendant AARP, Inc. is a non-profit corporation organized under the laws of the District of Columbia and maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049.  AARP, Inc. conducts substantial business in the State of California.

24.     Defendant AARP Services, Inc. ("ASI") is a wholly-owned subsidiary of AARP, organized under the laws of Delaware.  ASI maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049.  ASI conducts substantial business in the State of California.  ASI is AARP's taxable "for-profit" division that negotiates, oversees, and manages lucrative contracts with AARP's insurance business partners.  AARP created ASI in 1999 pursuant to a settlement agreement with the U.S. Internal Revenue Service ("IRS") resulting from an investigation by the IRS into the large amount of income that AARP, Inc., a "non-profit" tax-exempt organization, earned through its "endorsement" deals.  This settlement was one of several that AARP, Inc. entered into with the IRS and other entities, such as the U.S. Postal Service and the tax authorities of the District of Columbia, all relating to AARP, Inc.'s failure to fully pay unrelated business income tax on its commercial activities, as well as improperly mailing health insurance solicitations at non-profit rates.

25.   Defendant AARP Insurance Plan ("AARP Trust") is a grantor trust organized by AARP, Inc. under the laws of the District of Columbia and maintains its primary place of business at 601 E Street, NW, Washington, D.C. 20049.   AARP Trust is the vehicle through which AARP, Inc. collects, invests and remits premium payments for AARP Medigap policies and collects its unlawful 4.95% commission. AARP Trust conducts substantial business in the State of California.

26.   At all material times, defendant AARP, Inc. dominated and controlled defendants ASI and AARP Trust.

27.   Defendants AARP, Inc., ASI and AARP Trust are collectively referred to herein as "AARP."

28.   Defendant UnitedHealth Group, Inc. ("UnitedHealth Group") is an insurance corporation organized under the laws of the State of Minnesota and maintains its corporate headquarters in Minnetonka, Minnesota.  UnitedHealth Group conducts substantial business in the State of California.  UnitedHealth Group is the largest single health insurer in the United States.

29.   Defendant UnitedHealthcare Insurance Company is an operating division and wholly owned subsidiary of UnitedHealth Group and maintains its corporate headquarters in Hartford, Connecticut.   UnitedHealthcare Insurance Company conducts substantial business in the State of California.  AARP Medigap plans are insured by UnitedHealthcare Insurance Company.

30.   Defendants UnitedHealth Group and UnitedHealthcare Insurance Company are collectively referred to herein as "UnitedHealth."

### FACTUAL ALLEGATIONS

31.   Defendant AARP, formerly known as the American Association of Retired Persons, is a tax-exempt, non-profit membership organization for seniors aged 50 years and older.  AARP has long been regarded as a protector and advocate of the nation's senior community, and today AARP is reported to have over 40 million

members – about half of whom are over the age of 65, and all of whom recognize and trust the AARP name.

32.     By any measure, AARP is a large, complex, and sophisticated enterprise with over $3 billion in total assets and operating revenues of over $1.3 billion in 2012.

33.     Despite its "non-profit" status, however, AARP earns substantial revenue through business partnerships with large insurance companies, like defendant UnitedHealth, to sell its own "AARP-branded" insurance policies.

34.     Among other products, AARP endorses three types of Medicare-related insurance: Part D prescription drug insurance, Medicare Advantage, and Medigap.

35.     Medigap plans offer extra coverage to Medicare beneficiaries (*i.e.*, seniors and the disabled) enrolled in traditional Medicare, such as first-dollar coverage and reduced co-payment and deductibles.  In addition, all Medigap plans provide coverage for hospital stays and reduce seniors' out-of-pocket costs for physician office visits.  Medigap enrollees must pay a monthly premium that exceeds their Medicare premium in order to receive these additional benefits.  In 2012, over 10 million Americans were enrolled in a Medigap plan to supplement their traditional Medicare coverage.

36.     AARP Medigap is the dominant player in the Medigap market. Nationwide, AARP Medigap has over three times as many Medigap enrollees as its closest competitor, Mutual of Omaha.  As of December 2012, 32% of all Medicare beneficiaries enrolled in a Medigap insurance plan were in enrolled in AARP Medigap.

37.     The only Medigap plans insured by UnitedHealth, again the largest health insurer in the country, are AARP Medigap plans. Any consumer who wants to purchase Medigap coverage from UnitedHealth must purchase the AARP Medigap plan, and thereby unknowingly fund the 4.95% illegal commission to AARP.

38.    In 2012, AARP generated $704 million in revenues from its so called "royalties," which is nearly three times higher than income generated from membership dues, and makes up 52% of AARP's 2012 total operating revenue.

39.    Of the $704 million in total "royalty" income generated by AARP across all of its product offerings in 2012, $458 million (65%) came from UnitedHealth insurance products.

40.    In 2012 and 2011, the AARP Trust processed $7.8 billion and $7.5 billion, respectively, in insurance premiums from all sources. In 2012 and 2011, $376 million and $359 million, respectively, was paid to AARP as "royalties" from AARP Trust.

41.    Because of its tax-exempt status, the substantial income that AARP generates has drawn the attention of the IRS and the tax authorities of the District of Columbia on more than one occasion.

42.    In 1999, AARP entered into a settlement agreement with the IRS due to AARP's failure to fully pay unrelated business income tax on its commercial activities. As part of that settlement, AARP created ASI to act as AARP's "for-profit" arm. Even with the creation of ASI as a taxable entity, however, AARP still retains the vast majority of its income, tax-free.

**AARP and UnitedHealth's Scheme to Defraud Senior Citizens**

43.    According to AARP's 2010, 2011 and 2012 financial statements, UnitedHealth is AARP's largest business partner – 65% of AARP's "royalty" income is consistently derived from the sale or renewal of UnitedHealth insurance products. AARP's current AARP Medigap business relationship with UnitedHealth began on February 26, 1997, when AARP and UnitedHealth entered into a joint venture agreement entitled the "AARP Health Insurance Agreement" (the "Agreement").[2]

---

[2]    A true and correct copy of the Agreement with all publicly available amendments is attached hereto as Exhibit "A."

44.     Under the terms of the Agreement, AARP would: (1) market, solicit, sell and renew AARP Medigap policies with UnitedHealth; (2) collect and remit premium payments on behalf of UnitedHealth; (3) generally administer the AARP Medigap program; and (4) otherwise act as UnitedHealth's agent.

45.     In exchange for its services, the Agreement provided AARP with a 4% "allowance" for every dollar received from the sale or renewal of an AARP Medigap policy, as well as an additional 2.5% for each dollar over $1 billion:

ARTICLE 6

ALLOWANCES AND COMPENSATION

6.1 AARP ALLOWANCE.  AARP shall be entitled to receive an allowance for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith.  ***For each Policy Year, this allowance shall be equal to the sum of (i) four percent of the first $1 billion in Member Contributions plus (ii) two and one-half percent of the Member Contributions in excess of $1 billion.***  This allowance shall be payable in accordance with Section 6.7 hereof.  (Emphasis added).

46.     The Agreement was amended in December 28, 1999 in connection with AARP's settlement with the IRS.  The 1999 amendment, *inter alia*, renamed AARP's "allowance" a "royalty" and directed 8% of AARP's "royalty" to its taxable subsidiary, ASI:

It is intent [sic] of the parties hereto that the payment made by United to AARP pursuant to the United Agreement and referred to as an allowance is a royalty and pursuant to this Assignment and the agreement referred to in this paragraph, the royalty is to be bifurcated into a payment to AARP Services for Quality Control and monitoring and to AARP for use of the AARP Marks. AARP shall grant United an exclusive license to use the AARP Marks by separate agreement. Such separate agreement

1    shall obligate United to compensate AARP for the use of its intangible

2    property by the payment of a royalty.

3        47.   The Agreement was amended again on December 23, 2002 to increase

4    the amount of AARP's "royalty":

5        1.   Subsection 6.1 of the Agreement is amended by deleting

6    this subsection in its entirety and replacing it with (sic) following:

7        6.1 AARP Royalty. AARP shall be entitled to receive a royalty for

8    AARP's sponsorship of the SHIP and the license to use the AARP Marks

9    in connection therewith. This royalty shall be 3.25% of Member

10   Contribution for Policy Year 2002 and 3.75% of Member Contributions

11   for Policy Year 2003. For Policy Years 2004 through 2007, the royalty

12   shall be 4% of Member Contribution, with a review of the increased

13   royalty amount on rates and competitive position prior to

14   implementation.

15       48.   In 2007, the parties extended the Agreement through to December 31,

16   2014, as explained in UnitedHealth's quarterly report, filed with the U.S. Securities

17   and Exchange Commission ("SEC") on May 9, 2007:

18       On April 13, 2007, we entered into an agreement to extend and

19   expand our relationship with AARP through December 31, 2014. The

20   agreement was expanded to give us a right to use the AARP brand on

21   our Medicare Advantage offerings and to ***extend our arrangement to***

22   ***use the AARP brand on our Medicare Supplement products and***

23   ***services*** and Medicare Part D offerings. (Emphasis added.)

24       49.   Six months later, the parties further extended the Agreement for an

25   additional three years through to December 31, 2017, as explained in UnitedHealth's

26   2007 yearly report filed with the SEC:

27       On October 3, 2007, we entered into four agreements with AARP

28   that amended our existing AARP arrangements and incorporated many

- 10 -

of the terms of the April 13, 2007 AARP agreement. These agreements extended our arrangements with AARP on the Supplemental Health Insurance Program [AARP Insurance] to December 31, 2017, extended our arrangement with AARP on the Medicare Part D business to December 31, 2014, and gave us an exclusive right to use the AARP brand on our Medicare Advantage offerings until December 31, 2014, subject to certain limited exclusions.

50.    On October 15, 2013, AARP and UnitedHealth announced that they were extending the Agreement to run through December 2020.   Stephen J. Hemsley, president and CEO of UnitedHealth Group, noted that "'We are honored to build upon our unique and innovative relationship with AARP, which has helped both UnitedHealthcare and AARP provide better support and value to the consumers we serve.'"[3]

51.    Under the terms of the current Agreement, in exchange for AARP's administering of the insurance program and the  marketing, soliciting, and selling or renewing AARP Medigap policies on behalf of UnitedHealth, as well as its collecting and remitting insurance premiums on behalf of UnitedHealth, AARP earns a 4.95% commission, disguised as a "royalty," on each policy sold or renewed.

52.    The Agreement's terms require AARP to aid in the solicitation of the sale of insurance and to generally act as the insurance agent of UnitedHealth.

53.    The Agreement also specifically notes that AARP owns all solicitation materials related to the AARP Medigap program:

7.2    MEMBER COMMUNICATIONS.

. . . AARP OWNERSHIP. All communications to AARP members pertaining to the SHIP [AARP Medigap included], including without limitation scripts, solicitation materials and other written materials

---

[3]    *See* http://www.unitedhealthgroup.com/Newsroom/Articles/Feed/UnitedHealth%20Group/2013/1015BroadenAARP.aspx.

1      mailed on behalf of AARP to any members, shall be the property of

2      AARP, to the extent specifically identified by United or AARP, as the

3      case may be, as developed and used exclusively for the SHIP. AARP

4      shall have the sole right to copyright all or any of such pieces as it

5      considers appropriate to the fullest extent permitted by law; provided,

6      however, that AARP shall not have the right to copyright the United

7      Marks.

8           54.    The Agreement as of 2011 was reviewed by Congressional staff members

9      from the House Committee on Ways and Means as part of its investigation into

10     AARP's tax status. AARP's obligations under the Agreement were described in a

11     December 21, 2011 letter from the Ways and Means Committee to the IRS as follows:

12          Congressional staff recently had the opportunity to review three redacted

13          contracts between AARP and AARP Services, Inc. (ASI) and United.

14          The contracts covered United's marketing and sale of AARP branded

15          Medigap, Medicare Advantage, and Medicare Part D policies.    The

16          contracts raised a number of issues related to AARP's involvement in

17          for-profit business activities and governance issues among the various

18          AARP entities.

19              The three contracts, signed in January 2008 and which are still in

20          effect, detail AARP and ASI's extensive influence over United's

21          operations, most notably in the Medigap business, and several instances

22          in which United is required to take specific actions, beyond making

23          "royalty" payments, to the benefit of AARP.  The contracts include the

24          following provisions that raise numerous questions about AARP's

25          involvement in for profit activities:

26              a.    ASI is placed in the role of quality control contractor and

27          overseer of United's operations, as it relates to Medigap, Medicare

28          Advantage, and Medicare Part D.

b.     The contracts create a "Senior Leaders" team that oversees all aspects of performance under the contracts.  Both United and ASI each have two officials appointed to the "Senior Leaders" team, which coordinates all aspects of contract performance and must consent to any action under the contract.  At least one United and one ASI "Senior Leader" must consent to any decision. Further demonstrating AARP's active role in directing the decisions of the insurer, ASI must approve United's appointments to the "Senior Leaders" team.

c.     ASI has authority over United's "Operating Plan" and may "approve, modify on a line by line basis, or provide specific direction to United," regarding the plan.

d.     ASI is given prior review and approval authority over all proposed electronic, print, verbal, or scripted communication regarding AARP-endorsed Medigap plans directed at both AARP members and non-AARP members.

e.     United is responsible for marketing campaign audits and analysis, but all strategy developments and modifications must be made in collaboration with AARP.

f.     ASI oversees and monitors the agent certification process and must approve the agent compensation program.

g.     ASI has consultation, review, and consent rights related to any proposed plan design changes including, but not limited to, annual budgets, premium levels and rates, and sales and distribution plans.

h.     United is barred from directly or indirectly marketing or offering products or programs that compete with AARP-endorsed Medigap plans.

i.     ASI has review and modification authority over United's Medigap-related contracts with third-party vendors exceeding $250,000.

- 13 -

j.      United must submit to ASI a detailed projection of policy financials, including recommended member premiums for the coming year. ASI may object to the premium levels, and if no agreement is reached the issue goes to dispute resolution.

k.      United may contract with ASI separately to perform consulting and marketing services in connection with the sale of AARP-endorsed Medigap plans. Such agreements are separate from the primary contract but indicate the possibility of the AARP subsidiary's further involvement in business operations.

l.      United's annual incentive program for senior executives is, in part, dependent on meeting the "transformational" goals established by AARP and ASI.

m.      Any expenditure of Medigap funds not addressed in the contract requires the prior written approval of ASI.

55.     UnitedHealth compensates AARP to act as its agent in connection with the marketing, solicitation, sale and administration of the AARP Medigap group insurance program.

56.     AARP actively helps solicit and market AARP Medigap for UnitedHealth through television commercials, its website, and advertisements in various periodicals and publications.

57.     AARP is engaged in actively soliciting consumers to purchase AARP Medigap and is thus acting as an unlicensed insurance agent of UnitedHealth. Examples of this active solicitation include, but are not limited to, the following:

- www.aarphealthcare.com advertises details of AARP Medigap insurance and explicitly states, **"This is a solicitation of insurance."** (Emphasis in original.)

- www.aarphealthcare.com explains some of the terms of the policies that are offered: "A Medicare Supplement Insurance Plan, such as an AARP Medicare Supplement Insurance Plan insured by UnitedHealthcare Insurance Company, may help pay some of the health care costs that Medicare Parts A and B don't cover like copayments, coinsurance and deductibles for Medicare approved services. Your coverage travels with you throughout the U.S. and there are virtually no claim forms to file. Medicare Supplement Insurance plans also let you keep your own doctors and specialists who accept Medicare patients – *and you never need to get a referral!*" (Emphasis in original.)

- www.aarpmedicareplans.com provides even greater detail about the AARP Medigap plans that are offered and allows users to enter their California zip code to "View Plans & Pricing."

- www.aarpmedicareplans.com also explicitly states, "**This is a solicitation of insurance.**" (Emphasis in original.)

- AARP television and Internet video advertisements promoting the AARP Medigap plans also display the same language, "**This is a solicitation of insurance.**" (Emphasis in original.)

- Print advertisements for the AARP Medigap plans in the *AARP Bulletin* magazine note: "This is a solicitation of insurance." (Emphasis in original.)

- These same print advertisements provide a toll free phone number, 1-866-314-8679, to call "AARP Health" in order to receive a free information kit to "Tell me more about AARP Medicare Supplement Insurance Plans." The reader is also encouraged to "Call to receive

complete information including benefits, costs, eligibility requirements, exclusions and limitations."

- AARP Member Advantages (formerly AARP Health) is "a collection of products, services and insurance programs made available by AARP." The page also notes that "AARP knows you want quality, affordable health care. And through relationships with leading companies, AARP makes available a range of health products, services and discounts." See www.aarphealthcare.com ("About Us").

58.   For every AARP Medigap policy sold/renewed, AARP collects insureds' premium payments, plus the 4.95% commission, through the AARP Trust on behalf of UnitedHealth.

59.   After deducting the 4.95% commission from the consumers' payment and remitting this amount to AARP, Inc. and ASI, AARP then invests the insurance premiums that it collects for UnitedHealth in a wide range of securities. *UnitedHealth gives AARP the right to retain any gains on those investments, in addition to its 4.95% commission.* In 2009, 2010, 2011 and 2012, AARP earned $89,985,195, $56,668,525, $14,484,000 and $59,191,000, respectively, on the investment of premiums that it held in the AARP Trust prior to remittance of the premiums due to UnitedHealth.

60.   As premium payments become due, the AARP Trust remits the premiums to UnitedHealth.

61.   The 4.95% commission amount paid to AARP from the AARP Trust is bifurcated, with 8% going to ASI and 92% going to AARP, Inc. The left side of a chart from the House Ways and Means Committee members' report, *Behind the Veil: The AARP America Doesn't Know*, demonstrates how AARP receives its commissions from the AARP Trust:



CHART 5: Flow of AARP Medicare-Related Royalty Payments

62.     Contrary to the above chart, however, AARP's 4.95% commission is not deducted from the actual insurance premiums paid by consumers.  According to the Agreement, *AARP's commission is charged to consumers __on top of__ the premiums paid for the actual insurance coverage:* "SHIP GROSS PREMIUMS for a Policy Year means the amount of Member Contributions minus the AARP allowance determined under Section 6.1 hereof for such policy year." The Agreement distinguishes between the amount actually billed to and paid by consumers (*i.e.*, "Member Contributions") and the insurance premiums themselves.

63.     Consistent with this provision in the Agreement, Barry Rand, the CEO of AARP, testified before the House Ways and Means Committee on April 1, 2011, that "royalties have nothing to do with the premiums of beneficiaries.  Nothing to do with the premiums."  Mr. Rand also testified that "[a]ll of the money that we have that

comes out of the trust in interest goes to our mission.  None of the money is taken out of any of the premiums."[4]

64.    In addition, AARP's then President, W. Lee Hammond, testified the royalty payment was in addition to the premiums for insurance coverage: "We do take royalty payments from that money that comes in, and then, as requested by the insurance companies *to cover their products*, we return the balance of that money to them."[5]

65.    Mr. William Josephson, Of Counsel at Fried, Frank, Harris, Shriver and Jacobsen, LLP, and former Assistant Attorney General-in-Charge of the New York State Law Department's Charities Bureau, testified at the hearing that the evidence may suggest "the amounts characterized by AARP as royalty really are closer to insurance commissions, which I believe would be subject to unrelated business income tax.  This is a factual inquiry that is not necessarily resolved by questions of law."[6]

66.    Thus, while Defendants disclose the existence of a payment in general to AARP which they term a "royalty" paid for the use of AARP's intellectual property, Defendants hide the fact that the cost of AARP Medigap insurance includes a percentage-based commission to AARP that is funded by consumers, *in addition to the insurance premium paid to UnitedHealth for coverage.*

67.    Defendants affirmatively state in their AARP Medigap disclaimer language the following:

Premiums are collected from you on behalf of the trustees of the [AARP] Trust.  These premiums are used to pay expenses incurred by the Trust in connection with the insurance programs and to pay the

---

[4]    *See* http://waysandmeans.house.gov/news/documentsingle.aspx?DocumentID=261747.

[5]    *Id.*

[6]    *Id.*

insurance company for your insurance coverage.  Income earned from the investment of premiums while on deposit with the Trust is paid to AARP and used for the general purposes of AARP and its members.

68.     This statement is highly misleading and deceptive in that Defendants do not disclose that in addition to paying for the actual insurance coverage, and the administrative expenses incurred by the AARP Trust, 4.95% of the insured's payment is diverted to AARP as an illegal commission.

69.     Defendants' misrepresentations and omissions regarding AARP Medigap constitute an unfair, deceptive, and misleading practice in violation of Cal. Ins. Code §790.02, and further breach Defendants' statutory duties of "honesty, . . . good faith and fair dealing" under §10192.55 of the Code.

**Defendants' Conduct Is an Unlawful Act or Method in Violation of the California Insurance Code**

70.     Defendants' acts are unlawful because they violate the Code.

71.     At all material times, UnitedHealth authorized AARP to act as its agent in the marketing, solicitation and sale of AARP Medigap policies.

72.     At all material times, AARP acted as the authorized agent of UnitedHealth in the transaction of health insurance, pursuant to Cal. Ins. Code §§35, 1622(a)(2) and 1626(a)(2).

73.     As the authorized agent of UnitedHealth, AARP engaged in the following acts, *inter alia*:

(a)     solicited the sale and renewal of insurance on behalf of UnitedHealth;

(b)     solicited an application for insurance on behalf of UnitedHealth;

(c)     received, collected, and/or transmitted an insurance premium to UnitedHealth; and

(d)     generally aided in the transaction of the business of insurance.

74.   While AARP acts as an insurance agent, it is not licensed to act as such in the State of California – a clear violation of the Code. *See* Cal. Ins. Code §1631. And UnitedHealth has also violated the Code by authorizing AARP to act as its agent while knowing that AARP is not duly licensed. *See id.*

75.   Because AARP is not licensed as an insurance agent, it is therefore self-evident that AARP may not collect a commission for its marketing, solicitation or sale/renewal of AARP Medigap policies on behalf of UnitedHealth, and UnitedHealth may not pay such an illegal commission when it knows AARP is unlicensed.

**Defendants' Scheme Has Caused Injury to Plaintiff and the Class**

76.   The end result of Defendants' violations of the Code (which are not disclosed to consumers) is that consumers are charged an artificially inflated insurance price, above and beyond the premiums remitted to UnitedHealth for coverage, that is prohibited by law, and which therefore should not be charged.

77.   Other Medigap policies offered without the highly regarded "AARP brand" offer ***identical*** benefits often at a lower cost in part because those insurers do not secretly charge unlawful insurance agent commissions to consumers.

78.   Defendants' deceptive and unlawful scheme takes advantage of unsuspecting senior citizens who all put their trust in the AARP name, in violation of §10192.55 of the Code, which places a duty of "honesty, . . . good faith and fair dealing" on Defendants in connection with their transactions of Medigap insurance.

79.   As a result of Defendants' unlawful acts and conduct, consumers are harmed financially in that they are paying 4.95% above the actual cost of insurance coverage so that UnitedHealth and AARP can secretly divert this 4.95% illegal commission to the unlicensed AARP.

80.   But for Defendants' deceptive and unlawful acts, Plaintiff and the other members of the Class would not have paid the illegal commission as part of their purchase and/or renewal of their AARP Medigap policies.

81.     Put simply, Plaintiff and the Class were injured by the actual loss of the 4.95% commission payments and paid more for AARP Medigap because of Defendants' challenged conduct.

### CLASS ALLEGATIONS

82.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, individually, and on behalf of the following Class:

> All persons in the State of California who purchased or renewed an AARP Medigap policy.

83.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

84.     Specifically excluded from the Class are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

85.     *Numerosity.*  The members of the Class are geographically dispersed throughout the State of California and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of members in the Class.  Although the precise number of Class members is unknown to Plaintiff, the true number of Class members is known by Defendants.  More specifically, UnitedHealth maintains databases that contain the following information: (i) the name of each Class member enrolled in an AARP Medigap policy; (ii) the address of each Class member; and (iii) each Class member's payment information related to AARP Medigap.  Thus, Class members may be

1  identified and notified of the pendency of this action by first class mail, electronic

2  mail, and/or published notice, as is customarily done in consumer class actions.

3       86.   ***Existence and predominance of common questions of law and fact.***

4  Common questions of law and fact exist as to all members of the Class and

5  predominate over any questions affecting only individual Class members.  These

6  common legal and factual questions include, but are not limited to, the following:

7            (a)     whether AARP solicited an application for insurance in the State of

8  California and/or aided in the transaction of the business of an insurer without a

9  license in violation of Cal. Ins. Code §1631;

10           (b)     whether AARP acted as an authorized agent of an insurer without a

11 license in violation of Cal. Ins. Code §1631;

12           (c)     whether UnitedHealth appointed AARP to act as its authorized

13 agent while AARP did not hold a license to do so in violation of Cal. Ins. Code §1631;

14           (d)     whether UnitedHealth paid, and AARP accepted, a commission for

15 services performed by AARP as an agent in the State of California while AARP did

16 not hold a license to act as an agent in violation of §1631;

17           (e)     whether AARP transacted or solicited insurance,  or collected a

18 payment in connection with an application for insurance or the issuance of a policy,

19 other than one allowed by the Code;

20           (f)     whether Defendants' misrepresentations and omissions regarding

21 AARP Medigap constitute an unfair, deceptive, and misleading practice in violation of

22 Cal. Ins. Code §§790.02 and 790.03(a) and (b);

23           (g)     whether Defendants breached their duties of "honesty, . . . good

24 faith and fair dealing" in transacting Medigap insurance with Plaintiff and the Class,

25 which is prohibited by Cal. Ins. Code §10192.55;

26           (h)     whether Defendants are liable to Plaintiff and the Class for money

27 had and received;

28

1     (i)  whether Defendants have unlawfully converted money from

2 Plaintiff and the Class;

3     (j)  whether Plaintiff and the Class have sustained monetary loss and

4 the proper measure of that loss;

5     (k)  whether Plaintiff and Class are entitled to declaratory and

6 injunctive relief; and

7     (l)  whether Plaintiff and the Class are entitled to restitution and

8 disgorgement from Defendants.

9   87.  ***Typicality.*** Plaintiff's claims are typical of the claims of the other

10 members of the Class in that Defendants deceived Plaintiff in the very same manner as

11 they deceived each member of the Class.

12   88.  ***Adequacy of Representation.*** Plaintiff will fairly and adequately protect

13 the interests of the Class.  Plaintiff has retained counsel that is highly experienced in

14 complex consumer class action litigation, and Plaintiff intends to vigorously prosecute

15 this action on behalf of the Class.  Furthermore, Plaintiff has no interests that are

16 antagonistic to those of the Class.

17   89.  ***Superiority.*** A class action is superior to all other available means for the

18 fair and efficient adjudication of this controversy.  The damages or other financial

19 detriment suffered by individual Class members is relatively small compared to the

20 burden and expense of individual litigation of their claims against Defendants.  It

21 would, thus, be virtually impossible for the Class, on an individual basis, to obtain

22 effective redress for the wrongs committed against them.  Furthermore, even if Class

23 members could afford such individualized litigation, the court system could not.

24 Individualized litigation would create the danger of inconsistent or contradictory

25 judgments arising from the same set of facts.  Individualized litigation would also

26 increase the delay and expense to all parties and the court system from the issues

27 raised by this action.  By contrast, the class action device provides the benefits of

28 adjudication of these issues in a single proceeding, economies of scale, and

1  comprehensive supervision by a single court, and presents no unusual management

2  difficulties under the circumstances.

3      90.    In the alternative, the Class may also be certified because:

4      (a)    the prosecution of separate actions by individual Class members

5  would create a risk of inconsistent or varying adjudication with respect to individual

6  Class members that would establish incompatible standards of conduct for the

7  Defendants;

8      (b)    the prosecution of separate actions by individual Class members

9  would create a risk of adjudications with respect to them that would, as a practical

10  matter, be dispositive of the interests of other Class members not parties to the

11  adjudications, or substantially impair or impede their ability to protect their interests;

12  and/or

13      (c)    Defendants have acted or refused to act on grounds generally

14  applicable to the Class as a whole, thereby making appropriate final declaratory and/or

15  injunctive relief with respect to the members of the Class as a whole.

## COUNT I

**Unlawful Business Acts and Practices in Violation of
California Business & Professions Code §17200, *et seq.***

16

17

18
    91.    Plaintiff repeats and realleges each and every allegation above, as though

19
fully set forth herein.

20
    92.    California Business & Professions Code §17200 prohibits any "unlawful

21
. . . business act or practice."   Defendants violated §17200's prohibition against

22
engaging in unlawful acts and practices by, *inter alia*, taking actions and making the

23
representations and omissions of material facts, as set forth more fully herein, and

24
violating Cal. Ins. Code. §§332, 790.02, 790.03(a) and (b), 10192.55 and 1631; Cal.

25
Bus. & Prof. Code §17200, *et seq.*; and the common law.

26

27

28

93. Plaintiff reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

94. California Business & Professions Code §17200 also prohibits any "unfair or fraudulent business act or practice."

95. Defendants' acts, omissions, misrepresentations, practices and non-disclosures alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code §17200, *et seq.*, in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

96. As stated in this Complaint, Plaintiff alleges violations of unfair competition and insurance laws in California resulting in harm to consumers. Plaintiff asserts violations of the public policy of engaging in false and misleading advertising, unfair competition and deceptive conduct towards consumers. The conduct constitutes violations of the unfair prong of California Business & Professions Code §17200, *et seq.*

97. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

98. Business & Professions Code §17200 also prohibits any "fraudulent business act or practice."

99. Defendants' misleading statements, non-disclosures and omissions of material fact as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §17200.

100. Defendants' conduct caused and continues to cause substantial injury to Plaintiff and the other Class members. Plaintiff has suffered injury in fact and has lost money as a result of Defendants' unfair conduct; *to-wit*: Plaintiff and the Class were

1   injured by the actual loss of the 4.95% commission payment and paid more for AARP

2   Medigap insurance because of Defendants' challenged conduct.

3       101.   Defendants have thus engaged in unlawful, unfair and fraudulent

4   business acts and practices.  The above-described unlawful, unfair and fraudulent

5   business acts and practices by Defendants present a threat to Plaintiff and members of

6   the Class.  As a result of the conduct described above, Defendants have been and will

7   be unjustly enriched at the expense of Plaintiff and the members of the Class.

8   Specifically, Defendants have been unjustly enriched by the receipt of millions of

9   dollars in monies and profits from the illegal payment and connection of commissions

10  from the sale and renewal of AARP Medigap, which product was promoted and sold

11  through solicitations and advertisements which made the following misleading

12  omissions of material fact: that the rate charged for their AARP Medigap policies was

13  artificially inflated, as it included an unlawful 4.95% commission payment to AARP

14  funded directly by consumers for its marketing, solicitation and sale/renewal of AARP

15  Medigap policies on behalf of UnitedHealth, as well as its services in administering

16  the AARP Medigap program for UnitedHealth. The 4.95% illegal commission funded

17  by consumers is in addition to the cost of actual insurance coverage provided by

18  UnitedHealth. Due to these material omissions, affirmative statements made by AARP

19  and UnitedHealth such as "UnitedHealthcare Insurance Company pays royalty fees to

20  AARP for the use of its intellectual property," and "[p]remiums are collected from

21  you on behalf of the trustees of the [AARP] Trust[, which] premiums are used to pay

22  expenses incurred by the Trust in connection with the insurance programs and to pay

23  the insurance company for your insurance coverage," are rendered false, misleading

24  and deceptive.

25      102.   Pursuant to Business & Professions Code §§17203 and 17535, Plaintiff

26  and the members of the Class seek an order disgorging Defendants' ill-gotten gains,

27  awarding Plaintiff and the members of the Class full restitution of all monies

28  wrongfully acquired by Defendants by means of such acts of unlawful, unfair and

fraudulent business acts and practices, plus interest and attorneys' fees pursuant to, *inter alia*, California Code of Civil Procedure §1021.5, so as to restore any and all monies to Plaintiff and the members of the Class which were acquired and obtained by means of such unlawful, unfair and fraudulent business acts and practices, and which ill-gotten gains are still retained by Defendants.

103.    Plaintiff additionally requests that such funds be impounded by the Court or that an asset freeze or trust be imposed upon such revenues and profits to avoid dissipation and/or fraudulent transfers or concealment of such monies by Defendants. Plaintiff and the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

104.    Additionally, pursuant to Business & Professions Code §17203, Plaintiff seeks an order requiring Defendants to cease their solicitation activities and violating the Code with respect to AARP Medigap so as to not mislead or deceive consumers.

## COUNT II

### Money Had and Received

105.    Plaintiff repeats and realleges each and every allegation above, as though fully set forth herein.

106.    Plaintiff and the Class gave Defendants a sum certain in the form of payments for AARP Medigap insurance.

107.    Defendants charged Plaintiff and the Class 4.95% on top of the premiums paid for the actual insurance coverage, and diverted such 4.95% to AARP as an illegal commission.

108.    Defendants are indebted to Plaintiff and the Class in the certain sum of 4.95% of the payments illegally diverted to AARP for money had and received by Defendants for the use of Plaintiff and the Class.

109.    Defendants have received money belonging to Plaintiff and the Class which equity and good conscience require should be paid by to Plaintiff and the Class.

## COUNT III

### Conversion

110.   Plaintiff repeats and realleges each and every allegation above, as though fully set forth herein.

111.   Plaintiff and the Class have an ownership right to the 4.95% of their payments illegally diverted to AARP.

112.   Plaintiff and the Class had ownership right to the 4.95% of the payments illegally diverted to AARP at the time such monies were converted by Defendants.

113.   Defendants converted the 4.95% of the payments made by Plaintiff and the Class by illegally diverting such monies to AARP by the wrongful acts set forth above.

114.   As a direct and proximate cause of Defendants' conversion, Plaintiff and the Class suffered damages in the amount of the 4.95% of the payments for insurance illegally diverted to AARP.

### DISGORGEMENT

115.   Defendants' assets are subject to the equitable remedy of disgorgement, which is the forced relinquishment of all benefits that would be unjust for Defendants to retain, including all ill-gotten gains and benefits or profits that result from Defendants' fraudulent actions. Defendants should be ordered to disgorge all monies fraudulently taken from individuals and businesses together with all of the proceeds, profits, income, interest and accessions thereto. Such disgorgement should be for the benefit of victimized Class members and the Plaintiff.

### APPLICATION FOR TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

116.   Because Defendants have engaged in the unlawful acts and practices described above, Defendants have violated and will continue to violate the law as alleged in this Complaint.  Unless immediately restrained by this Honorable Court, Defendants will continue to violate the laws of the State of California and cause

immediate, irreparable injury, loss and damage to the Plaintiff and Class.  Therefore Plaintiff requests a Temporary Injunction and Permanent Injunction as indicated below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief in his favor and in favor of the Class, and against Defendants as follows:

A.    That Defendants be cited according to law to appear and answer herein; that after notice and hearing, a TEMPORARY INJUNCTION be issued; and upon final hearing a PERMANENT INJUNCTION be issued, restraining and enjoining Defendants, Defendants' successors, assigns, officers, agents, servants, employees and attorneys and any other person in active concert or participation with Defendants, from engaging in the acts or practices complained of herein;

B.    For an Order requiring Defendants to restore all money or other property taken from identifiable persons by means of unlawful acts or practices and award judgment for damages and restitution in an amount within the jurisdictional limits of this Court to compensate for such losses;

C.    For an Order requiring the disgorgement of all sums taken from consumers by means of deceptive practices, together with all proceeds, interest, income, profits and accessions thereto;

D.    That the Court certify this action and the Class as requested herein, appointing Plaintiff as Class Representative, and appointing Robbins Geller Rudman & Dowd LLP as Class Counsel;

E.    Award Plaintiff and the Class members court costs and reasonable and necessary attorneys' fees in relation to the amount of work expended, and any other relief the Court determines is proper; and

F.    Provide such other and further relief as the Court may deem just and proper.

1          **JURY DEMAND**

2          Plaintiff demands trial by a jury on all issues so triable.

3    DATED:  January 2, 2014                    ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
4                                               FRANK J. JANECEK, JR.
                                                CHRISTOPHER COLLINS
5

6

7                                               CHRISTOPHER COLLINS

8                                               655 West Broadway, Suite 1900
                                                San Diego, CA  92101
9                                               Telephone:  619/231-1058
                                                619/231-7423 (fax)
10                                              frankj@rgrdlaw.com
                                                chrisc@rgrdlaw.com
11
                                                ROBBINS GELLER RUDMAN
12                                                 & DOWD LLP
                                                STUART A. DAVIDSON
13                                              MARK J. DEARMAN
                                                CHRISTOPHER C. MARTINS
14                                              120 East Palmetto Park Rd., Suite 500
                                                Boca Raton, FL 33432
15                                              Telephone:  561/750-3000
                                                561/750-3364 (fax)
16                                              sdavidson@rgrdlaw.com
                                                mdearman@rgrdlaw.com
17                                              cmartins@rgrdlaw.com

18                                              SEAN K. COLLINS, ATTY. AT LAW
                                                SEAN K. COLLINS
19                                              77184 High Street, Suite 503
                                                Boston, MA 02110
20                                              Telephone: 617/939-9731
                                                617/227-2843 (fax)
21                                              sean@neinsurancelaw.com

22                                              GHOZLAND LAW FIRM
                                                MICHAEL F. GHOZLAND
23
                                                555 West Fifth Street, Suite 3100
24                                              Los Angeles, CA 90013
                                                Telephone: 213/996-8327
25
                                                |213/402-5147 (fax)
26                                              michael@ghozlandlawfirm.com

27                                              Attorneys for Plaintiff and the Class

28

                                   - 30 -

# EXHIBIT A

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(P)
<SEQUENCE>2
<DESCRIPTION>EXHIBIT 10(P)
<TEXT>

<PAGE>
```

AARP  HEALTH  INSURANCE  AGREEMENT

BY  AND  AMONG

AMERICAN  ASSOCIATION  OF  RETIRED  PERSONS,

TRUSTEES  OF  THE  AARP  INSURANCE  PLAN

AND

UNITED  HEALTHCARE  INSURANCE  COMPANY

DATED  AS  OF  FEBRUARY  26,  1997

Pursuant to Rule 24b-2 of the Securities Exchange Act of 1934,
as amended, confidential portions of this Exhibit have been
deleted and filed separately with the Securities and Exchange
Commission pursuant to a request for confidential treatment.
The omitted material in the body of this Exhibit
has been replaced by three asterisks.

```
<PAGE>
```

TABLE  OF  CONTENTS

Page

---

ARTICLE 1
DESCRIPTION OF AGREEMENT . . . . . . . . . .

2

1.1     CONTRACT DOCUMENTS . . . . . . . . . . . . . . . . . . . 2

1.2     ENTIRE AGREEMENT; AMENDMENT. . . . . . . . . . . . . . . 2

1.3     CORRELATION AND INTENT . . . . . . . . . . . . . . . . . 2

1.4     SCOPE OF SERVICES. . . . . . . . . . . . . . . . . . . . 2


                         ARTICLE 2
                         DEFINITIONS . . . . . . . . . . . . . . 3

2.1     AARP . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.2     AARP MARKS . . . . . . . . . . . . . . . . . . . . . . . 3

2.3     AARP TRUST . . . . . . . . . . . . . . . . . . . . . . . 3

2.4     AARP'S REPRESENTATIVE. . . . . . . . . . . . . . . . . . 3

2.5     ACTIVE LIFE RESERVES . . . . . . . . . . . . . . . . . . 3

2.6     ADMINISTRATIVE SERVICE FEE . . . . . . . . . . . . . . . 3

2.7     AMORTIZATION INTEREST RATE . . . . . . . . . . . . . . . 3

2.8     APPLICABLE LAWS. . . . . . . . . . . . . . . . . . . . . 3

2.9     ASSOCIATED AGREEMENTS. . . . . . . . . . . . . . . . . . 3

2.10    BASIC PERCENTAGE . . . . . . . . . . . . . . . . . . . . 4

2.11    BUSINESS DAY . . . . . . . . . . . . . . . . . . . . . . 4

2.12    CHANGE OF LAW. . . . . . . . . . . . . . . . . . . . . . 4

2.13    CLAIMS DATABASES . . . . . . . . . . . . . . . . . . . . 4

2.14    CODE . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2.15    COMMENCEMENT DATE. . . . . . . . . . . . . . . . . . . . 4

2.16    COMPENSATION PERCENTAGE. . . . . . . . . . . . . . . . . 4

2.17    CONTRACT DOCUMENTS . . . . . . . . . . . . . . . . . . . 4

2.18    CPI. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2.19    CPR MODEL. . . . . . . . . . . . . . . . . . . . . . . . 5

2.20    CPR RULES. . . . . . . . . . . . . . . . . . . . . . . . 5

2.21    DAC TAX. . . . . . . . . . . . . . . . . . . . . . . . . 5

2.22    DATABASES. . . . . . . . . . . . . . . . . . . . . . . . 5

2.23   DEFICIT CARRYFORWARD . . . . . . . . . . . . . . . . . 5

2.24   DEFICIT CARRYFORWARD ACCOUNT . . . . . . . . . . . . . 5

2.25   DEVELOPED MARKS. . . . . . . . . . . . . . . . . . . . 5

2.26   DEVELOPED SYSTEMS. . . . . . . . . . . . . . . . . . . 5

2.27   DISCLOSER. . . . . . . . . . . . . . . . . . . . . . . 5

2.28   EVENT OF FORCE MAJEURE . . . . . . . . . . . . . . . . 5

2.29   EXISTING PROGRAM . . . . . . . . . . . . . . . . . . . 5

i

&lt;PAGE&gt;

2.30   EXPENSE INCURRED TYPE PLAN . . . . . . . . . . . . . . 5

2.31   FIXED OVERHEAD COSTS . . . . . . . . . . . . . . . . . 5

2.32   FUTURE PRODUCTS. . . . . . . . . . . . . . . . . . . . 5

2.33   GHIP . . . . . . . . . . . . . . . . . . . . . . . . . 5

2.34   GHIP VENDORS . . . . . . . . . . . . . . . . . . . . . 5

2.35   GROSS UP . . . . . . . . . . . . . . . . . . . . . . . 6

2.36   GROWTH FACTOR. . . . . . . . . . . . . . . . . . . . . 6

2.37   GROWTH INCENTIVE PERCENTAGE. . . . . . . . . . . . . . 6

2.38   INCENTIVE PERCENTAGE . . . . . . . . . . . . . . . . . 6

2.39   INCURRED CLAIMS. . . . . . . . . . . . . . . . . . . . 6

2.40   INCURRED PREMIUM REFUNDS . . . . . . . . . . . . . . . 6

2.41   INCURRED TAX ITEMS . . . . . . . . . . . . . . . . . . 6

2.42   INDEMNITY TYPE PLAN. . . . . . . . . . . . . . . . . . 6

2.43   INVESTMENT INCOME CREDIT . . . . . . . . . . . . . . . 6

2.44   INVESTMENT INCOME CREDIT RATE. . . . . . . . . . . . . 6

2.45   LOSS ADJUSTMENT EXPENSE RESERVE. . . . . . . . . . . . 7

2.46   LOSS RATIO . . . . . . . . . . . . . . . . . . . . . . 7

2.47   MANAGING REPRESENTATIVE. . . . . . . . . . . . . . . . 7

2.48    MEMBER CONTRIBUTIONS . . . . . . . . . . . . . . . . . .
7
2.49    MEMBER SERVICES AGREEMENT. . . . . . . . . . . . . . . .
7
2.50    MEMBER SERVICES VENDOR . . . . . . . . . . . . . . . . .
7
2.51    OPERATING EXPENSES . . . . . . . . . . . . . . . . . . .
7
2.52    OPERATING PLAN . . . . . . . . . . . . . . . . . . . . .
7
2.53    OPERATIONAL ISSUE. . . . . . . . . . . . . . . . . . . .
7
2.54    PASS-THROUGH EXPENSES. . . . . . . . . . . . . . . . . .
7
2.55    PERFORMANCE EXPERIENCE . . . . . . . . . . . . . . . . .
9
2.56    POLICY YEAR. . . . . . . . . . . . . . . . . . . . . . .
9
2.57    PROCEDURES . . . . . . . . . . . . . . . . . . . . . . .
9
2.58    PROGRAM AGREEMENT. . . . . . . . . . . . . . . . . . . .
9
2.59    PROGRAM ISSUE. . . . . . . . . . . . . . . . . . . . . .
9
2.60    PROJECTED MEMBERSHIP . . . . . . . . . . . . . . . . . .
9
2.61    PROPRIETARY INFORMATION. . . . . . . . . . . . . . . . .
9
2.62    PROPRIETARY SYSTEMS. . . . . . . . . . . . . . . . . . .
9
2.63    PRUDENTIAL . . . . . . . . . . . . . . . . . . . . . . .
9
2.64    PRUDENTIAL AGREEMENT . . . . . . . . . . . . . . . . . .
9
2.65    PRUDENTIAL'S AARP OPERATIONS . . . . . . . . . . . . . .
9
2.66    RECIPIENT. . . . . . . . . . . . . . . . . . . . . . . .
9
2.67    REINSURANCE AGREEMENT. . . . . . . . . . . . . . . . . .
9
2.68    RECORDS. . . . . . . . . . . . . . . . . . . . . . . . .
9
2.69    RELATED PLAN . . . . . . . . . . . . . . . . . . . . . .
9
2.70    REPRESENTATIVES. . . . . . . . . . . . . . . . . . . . .
9
2.71    RESOLUTION PROCEDURE . . . . . . . . . . . . . . . . . .
10

ii

<PAGE>

2.72    RETENTION. . . . . . . . . . . . . . . . . . . . . . . .
10
2.73    RSF. . . . . . . . . . . . . . . . . . . . . . . . . . .
10

2.74   RSF BALANCE. . . . . . . . . . . . . . . . . . . . . . 10

2.75   RSF BALANCE PERCENTAGE . . . . . . . . . . . . . . . . 10

2.76   SALES AND MARKETING AGREEMENT. . . . . . . . . . . . . 10

2.77   SALES AND MARKETING VENDOR . . . . . . . . . . . . . . 10

2.78   SERVICE ENHANCEMENT. . . . . . . . . . . . . . . . . . 10

2.79   SERVICES . . . . . . . . . . . . . . . . . . . . . . . 10

2.80   SHIP . . . . . . . . . . . . . . . . . . . . . . . . . 10

2.81   SHIP DATABASES . . . . . . . . . . . . . . . . . . . . 10

2.82   SHIP EMPLOYEES . . . . . . . . . . . . . . . . . . . . 11

2.83   SHIP GROSS PREMIUMS. . . . . . . . . . . . . . . . . . 11

2.84   SHIP INSURED . . . . . . . . . . . . . . . . . . . . . 11

2.85   SHIP NET PREMIUMS. . . . . . . . . . . . . . . . . . . 11

2.86   SHIP PLAN. . . . . . . . . . . . . . . . . . . . . . . 11

2.87   SHIP PORTFOLIO . . . . . . . . . . . . . . . . . . . . 11

2.88   SHIP PRODUCTS. . . . . . . . . . . . . . . . . . . . . 11

2.89   START-UP COSTS . . . . . . . . . . . . . . . . . . . . 11

2.90   TARGET AARP ALLOWANCE. . . . . . . . . . . . . . . . . 12

2.91   TARGET INCURRED CLAIMS . . . . . . . . . . . . . . . . 12

2.92   TARGET LOSS RATIO. . . . . . . . . . . . . . . . . . . 12

2.93   TARGET MEMBER CONTRIBUTIONS. . . . . . . . . . . . . . 12

2.94   TARGET PREMIUM REFUNDS . . . . . . . . . . . . . . . . 12

2.95   TARGET RETENTION . . . . . . . . . . . . . . . . . . . 12

2.96   TARGET RSF FUNDING . . . . . . . . . . . . . . . . . . 12

2.97   TAX BASE . . . . . . . . . . . . . . . . . . . . . . . 12

2.98   TAX BENEFIT. . . . . . . . . . . . . . . . . . . . . . 12

2.99   TAX REIMBURSEMENT. . . . . . . . . . . . . . . . . . . 12

2.100  TAX RETURN . . . . . . . . . . . . . . . . . . . . . . 12

2.101  TAX TIMING EXPENSES. . . . . . . . . . . . . . . . . . 12

2.102    TAXES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
12
2.103    TERMINATION COSTS. . . . . . . . . . . . . . . . . . . . . . . . . .
13
2.104    TRANSFER AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . .
14
2.105    TRANSFERRED ASSETS . . . . . . . . . . . . . . . . . . . . . . . . .
14
2.106    TRANSFERRED ASSETS GROSS UP. . . . . . . . . . . . . . . . . . . . .
14
2.107    TRANSFERRED EQUIPMENT. . . . . . . . . . . . . . . . . . . . . . . .
14
2.108    TRANSFERRED EMPLOYEES. . . . . . . . . . . . . . . . . . . . . . . .
14
2.109    TRUE-UP INTEREST RATE. . . . . . . . . . . . . . . . . . . . . . . .
14
2.110    UNITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
14
2.111    UNITED'S AARP OPERATIONS . . . . . . . . . . . . . . . . . . . . . .
14
2.112    UNITED'S MARKS . . . . . . . . . . . . . . . . . . . . . . . . . . .
14
2.113    UNITED'S REPRESENTATIVE. . . . . . . . . . . . . . . . . . . . . . .
14


                                        iii
<PAGE>

2.114    UNITED'S TAX RATE. . . . . . . . . . . . . . . . . . . . . . . . . .
14
2.115    VENDOR OPERATING EXPENSES. . . . . . . . . . . . . . . . . . . . . .
15
2.116    VENDOR PASS-THROUGH EXPENSES . . . . . . . . . . . . . . . . . . . .
15


                                ARTICLE 3
                        RESPONSIBILITIES OF UNITED . . . . . . . . .
15
3.1     SERVICES PRIOR TO THE COMMENCEMENT DATE. . . . . . . . . . . . . . .
15
        3.1.1    DESIGNATION OF UNITED'S REPRESENTATIVE . . . . . . . . .
15
        3.1.2    PROCEDURES . . . . . . . . . . . . . . . . . . . . . . .
16
        3.1.3    DEDICATED STAFF. . . . . . . . . . . . . . . . . . . . .
16
        3.1.4    ACCEPTANCE AND ENHANCEMENT OF SYSTEMS AND DATABASES,
                 ETC. . . . . . . . . . . . . . . . . . . . . . . . . . .
18
        3.1.5    ACCEPTANCE TESTING . . . . . . . . . . . . . . . . . . .
18
        3.1.6    EQUIPMENT AND SUPPLIES . . . . . . . . . . . . . . . . .
18
        3.1.7    PRUDENTIAL AGREEMENTS. . . . . . . . . . . . . . . . . .
18

3.1.8    TRANSFER OF EXISTING BUSINESS. . . . . . . . . . . .
19

3.2    SERVICES AFTER THE COMMENCEMENT DATE. . . . . . . . . . . .
20

3.2.1    COMPLETION AND CONTINUATION OF INITIAL SERVICES. . . .
20

3.2.2    UNDERWRITING OF SHIP . . . . . . . . . . . . . . . .
20

3.2.3    PRODUCT DEVELOPMENT. . . . . . . . . . . . . . . . .
21

3.2.4    FUTURE PRODUCTS. . . . . . . . . . . . . . . . . . .
22

3.2.5    SERVICE STANDARDS. . . . . . . . . . . . . . . . . .
22

3.2.6    OPERATING PLAN . . . . . . . . . . . . . . . . . . .
23

3.2.7    FINANCIAL BOOKS AND RECORDS. . . . . . . . . . . . .
23

3.2.8    REPORTS. . . . . . . . . . . . . . . . . . . . . . .
24

3.2.9    AUDITS AND INSPECTION. . . . . . . . . . . . . . . .
24

3.3    MEMBER CONTRIBUTION RATE ADJUSTMENTS . . . . . . . . . . . .
25

3.3.1    PROJECTED MEMBERSHIP; TARGET AARP ALLOWANCE. . . . . .
25

3.3.2    TARGET OPERATING EXPENSES. . . . . . . . . . . . . .
25

3.3.3    TARGET INCURRED CLAIMS . . . . . . . . . . . . . . .
26

3.3.4    TARGET PREMIUM REFUNDS . . . . . . . . . . . . . . .
26

3.3.5    TARGET RSF FUNDING . . . . . . . . . . . . . . . . .
27

3.3.6    TARGET RETENTION . . . . . . . . . . . . . . . . . .
27

3.3.7    DETERMINATION OF MEMBER CONTRIBUTION RATES . . . . . .
27

3.3.8    RATE APPROVAL AND IMPLEMENTATION . . . . . . . . . .
28

3.3.9    SPECIFICATION OF TARGET LOSS RATIO . . . . . . . . .
28

3.3.10   STATE MANDATED RATE ADJUSTMENTS. . . . . . . . . . .
29

3.4    COMPLIANCE WITH LAW. . . . . . . . . . . . . . . . . . . .
29

3.4.1    GENERAL. . . . . . . . . . . . . . . . . . . . . . .
29

3.4.2    NOTICE . . . . . . . . . . . . . . . . . . . . . . .
29

3.5    SALE OF ASSETS; SUBCONTRACTS, ETC. . . . . . . . . . . . .
29

3.5.1    ASSET SALES. . . . . . . . . . . . . . . . . . . . .
29

iv

<PAGE>

          3.5.2    SUBCONTRACTS . . . . . . . . . . . . . .
29
   3.6    TAXES    . . . . . . . . . . . . . . . . . . .
30
          3.6.1    GENERAL. . . . . . . . . . . . . . . . .
30
          3.6.2    TAX REIMBURSEMENT. . . . . . . . . . . .
30
          3.6.3    TAX BENEFIT FROM DEPRECIATION AND AMORTIZATION . . . .
31
          3.6.4    TAX EFFECT OF DISPOSAL OF TRANSFERRED ASSETS . . . . .
31
   3.7    EXCLUSIVITY. . . . . . . . . . . . . . . . . .
31
   3.8    CONFLICTING APPROVALS. . . . . . . . . . . . .
31
   3.9    AARP EVALUATIONS . . . . . . . . . . . . . . .
32
   3.10   CESSATION OF BUSINESS. . . . . . . . . . . . .
32
   3.10.1  GENERAL . . . . . . . . . . . . . . . . . .
32
   3.10.2  PROCEDURE . . . . . . . . . . . . . . . . .
32
   3.11   RELATED PLANS. . . . . . . . . . . . . . . . .
32

                       ARTICLE 4
          RESPONSIBILITIES OF AARP AND AARP TRUST . . . . . .
33
   4.1    AARP'S REPRESENTATIVE. . . . . . . . . . . . .
33
   4.2    GRANT OF RIGHT TO USE AARP MARKS . . . . . . . . .
33
          4.2.1    GRANT. . . . . . . . . . . . . . . . . .
33
          4.2.2    NOTATIONS. . . . . . . . . . . . . . . .
33
          4.2.3    APPROVAL RIGHTS. . . . . . . . . . . . .
33
          4.2.4    OWNERSHIP OF MARKS . . . . . . . . . . .
34
          4.2.5    PROTECTION OF AARP MARKS . . . . . . . .
34
          4.2.6    INFRINGEMENTS. . . . . . . . . . . . . .
34
   4.3    EQUIPMENT TRANSFER . . . . . . . . . . . . . .
34
   4.4    DATABASE AND SYSTEMS TRANSFER. . . . . . . . .
34
   4.5    EMPLOYEE HIRE. . . . . . . . . . . . . . . . .
34
   4.6    OTHER ASSETS AND INFORMATION . . . . . . . . .
35

4.7    PRUDENTIAL AGREEMENTS. . . . . . . . . . . . . . . .
35
4.8    COOPERATION OF THIRD PARTIES . . . . . . . . . . . .
35
4.9    OVERSIGHT. . . . . . . . . . . . . . . . . . . . . .
35
4.10   AARP EVALUATIONS . . . . . . . . . . . . . . . . . .
35
4.11   OTHER PROGRAMS . . . . . . . . . . . . . . . . . . .
35
4.12   INSPECTION . . . . . . . . . . . . . . . . . . . . .
35

                         ARTICLE 5
               REPRESENTATIONS AND WARRANTIES . . . . . .
36
5.1    REPRESENTATIONS AND WARRANTIES OF UNITED . . . . . . . . .
36
       5.1.1   ORGANIZATION AND OUTSTANDING . . . . . . . . . .
36
       5.1.2   AUTHORIZATION. . . . . . . . . . . . . . . . .
36
       5.1.3   CONSENTS AND APPROVALS . . . . . . . . . . . .
36
       5.1.4   ACTIONS PENDING. . . . . . . . . . . . . . . .
36

v

<PAGE>

       5.1.5   NO CONFLICT OR VIOLATION . . . . . . . . . . .
36
       5.1.6   LICENSES AND PERMITS . . . . . . . . . . . . .
37
       5.1.7   COMPLIANCE WITH LAWS . . . . . . . . . . . . .
37
       5.1.8   DISCLOSURE . . . . . . . . . . . . . . . . . .
38
       5.1.9   FINANCIAL CONDITION. . . . . . . . . . . . . .
38
5.2    REPRESENTATIONS AND WARRANTIES OF AARP AND AARP TRUST. . . . .
38
       5.2.1   ORGANIZATION AND STANDING. . . . . . . . . . .
38
       5.2.2   AUTHORIZATION. . . . . . . . . . . . . . . . .
38
       5.2.3   CONSENTS AND APPROVALS . . . . . . . . . . . .
39
       5.2.4   ACTIONS PENDING. . . . . . . . . . . . . . . .
39
       5.2.5   NO CONFLICT OR VIOLATION . . . . . . . . . . .
39
       5.2.6   COMPLIANCE WITH LAWS . . . . . . . . . . . . .
40
       5.2.7   FINANCIAL CONDITION. . . . . . . . . . . . . .
40

5.3     SURVIVAL OF REPRESENTATIONS AND WARRANTIES . . . . . . . . . .
40

ARTICLE 6
ALLOWANCES AND COMPENSATION . . . . . . . .
40
6.1     AARP ALLOWANCE . . . . . . . . . . . . . . . . . . . . . . .
40
6.2     UNITED ADMINISTRATION CHARGES. . . . . . . . . . . . . . .
40
        6.2.1   ADMINISTRATIVE SERVICE FEE . . . . . . . . . . . . . .
40
        6.2.2   CHANGES IN ADMINISTRATIVE SERVICE FEE. . . . . . . .
41
        6.2.3   PASS-THROUGH EXPENSES. . . . . . . . . . . . . . . .
42
        6.2.4   START-UP COSTS . . . . . . . . . . . . . . . . . . .
42
        6.2.5   PERFORMANCE CHARGES. . . . . . . . . . . . . . . . .
42
6.3     UNITED RISK AND PROFIT CHARGES . . . . . . . . . . . . . .
43
        6.3.1   BASIC PERCENTAGE . . . . . . . . . . . . . . . . . .
43
        6.3.2   INCENTIVE PERCENTAGE . . . . . . . . . . . . . . . .
44
        6.3.3   TAX CHANGES. . . . . . . . . . . . . . . . . . . . .
45
6.4     INVESTMENT INCOME CREDITS. . . . . . . . . . . . . . . . .
45
        6.4.1   SHIP PORTFOLIO . . . . . . . . . . . . . . . . . . .
45
        6.4.2   CASH TRANSFERS . . . . . . . . . . . . . . . . . . .
45
        6.4.3   INVESTMENT INCOME CREDIT CALCULATION . . . . . . . .
46
        6.4.4   INVESTMENT INCOME CREDIT RATE. . . . . . . . . . . .
46
        6.4.5   INVESTMENT STRATEGY. . . . . . . . . . . . . . . . .
47
        6.4.6   INVESTMENT MANAGER . . . . . . . . . . . . . . . . .
47
        6.4.7   INVESTMENT PERFORMANCE; OWNERSHIP. . . . . . . . . .
47
6.5     TAX-TIMING EXPENSE . . . . . . . . . . . . . . . . . . . .
47
6.6     TAX REIMBURSEMENT. . . . . . . . . . . . . . . . . . . . .
47
        6.6.1   IN ORDINARY COURSE . . . . . . . . . . . . . . . . .
47
        6.6.2   AUDIT ADJUSTMENTS. . . . . . . . . . . . . . . . . .
48
        6.6.3   GROSS UP . . . . . . . . . . . . . . . . . . . . . .
48
        6.6.4   VALUATION OF TRANSFERRED ASSETS. . . . . . . . . . .
48

vi

<PAGE>

    6.6.5   UPON TERMINATION . . . . . . . . . . . . . . .
48

6.7   PAYMENT OF ALLOWANCES AND COMPENSATION . . . . . . . . . .
49

6.8   REGULATORY IMPACT . . . . . . . . . . . . . . . . . . . .
49

6.9   OWNERSHIP OF FUNDS . . . . . . . . . . . . . . . . . . .
49


ARTICLE 7
PROPERTY RIGHTS IN AND CONFIDENTIALITY OF INFORMATION . . .
49

7.1   MEMBER INFORMATION . . . . . . . . . . . . . . . . . . .
49

    7.1.1   CLAIMS DATABASES . . . . . . . . . . . . . . . .
49

    7.1.2   OTHER INFORMATION . . . . . . . . . . . . . . .
49

7.2   MEMBER COMMUNICATIONS . . . . . . . . . . . . . . . . . .
50

    7.2.1   AARP OWNERSHIP . . . . . . . . . . . . . . . . .
50

    7.2.2   AARP APPROVAL . . . . . . . . . . . . . . . . .
50

7.3   RETURN UPON TERMINATION . . . . . . . . . . . . . . . . .
50

7.4   UNITED MARKS AND MARKS DEVELOPED FOR THE SHIP . . . . . . .
51

    7.4.1   UNITED MARKS . . . . . . . . . . . . . . . . . .
51

    7.4.2   DEVELOPED MARKS . . . . . . . . . . . . . . . .
51

7.5   SECURITY ARRANGEMENTS . . . . . . . . . . . . . . . . . .
52

7.6   PROPRIETARY INFORMATION . . . . . . . . . . . . . . . . .
52

    7.6.1   PROPRIETARY INFORMATION . . . . . . . . . . . .
52

    7.6.2   COVENANTS . . . . . . . . . . . . . . . . . . .
53

7.7   PROPRIETARY AND DEVELOPED SYSTEMS . . . . . . . . . . . .
54

7.7.1   PROPRIETARY SYSTEMS . . . . . . . . . . . . . . . . . .
54

7.7.2   DEVELOPED SYSTEMS . . . . . . . . . . . . . . . . . . .
54


ARTICLE 8
RESERVE REQUIREMENTS;
RATE STABILIZATION FUND . . . . . . . . . .
55

8.1   PURPOSE OF RESERVES . . . . . . . . . . . . . . . . . . .
55

8.2     RATE STABILIZATION FUND. . . . . . . . . . . . . . . .
55
8.3     EXPERIENCE RATING. . . . . . . . . . . . . . . . . . .
55
        8.3.1   EXPERIENCE RATING DEFICIT. . . . . . . . . . .
55
        8.3.2   EXPERIENCE RATING GAIN . . . . . . . . . . . .
56
8.4     MONTHLY REVIEW AND INTERIM ADJUSTMENT. . . . . . . . .
56
8.5     ANNUAL REVIEW AND RECONCILIATION . . . . . . . . . . .
56
8.6     DISPOSITION UPON TERMINATION . . . . . . . . . . . . .
56


                        ARTICLE 9
                INTERACTION WITH OTHER GHIP VENDORS . . . . . . .
56
9.1     GENERAL. . . . . . . . . . . . . . . . . . . . . . . .
56
9.2     MEMBER SERVICES VENDOR . . . . . . . . . . . . . . . .
57
        9.2.1   RESPONSIBILITIES . . . . . . . . . . . . . . .
57


                        vii
<PAGE>

        9.2.2   AGREEMENT. . . . . . . . . . . . . . . . . . .
57
9.3     SALES AND MARKETING VENDOR . . . . . . . . . . . . . .
57
        9.3.1   RESPONSIBILITIES . . . . . . . . . . . . . . .
57
        9.3.2   AGREEMENT. . . . . . . . . . . . . . . . . . .
58
        9.3.3   AARP APPROVAL RIGHTS . . . . . . . . . . . . .
58
9.4     VENDOR INTERACTION . . . . . . . . . . . . . . . . . .
58
        9.4.1   DEFAULTS BY OTHER GHIP VENDORS . . . . . . . .
58
        9.4.2   ACCESS TO INFORMATION. . . . . . . . . . . . .
59
9.5     GOVERNANCE OF INTERVENDOR DISPUTES . . . . . . . . . .
59
        9.5.1   GENERAL. . . . . . . . . . . . . . . . . . . .
59
        9.5.2   VENDOR REPRESENTATIVES . . . . . . . . . . . .
59
        9.5.3   INFORMAL DISPUTE RESOLUTION. . . . . . . . . .
60
        9.5.4   MEDIATION. . . . . . . . . . . . . . . . . . .
60
        9.5.5   ARBITRATION. . . . . . . . . . . . . . . . . .
61

9.5.6    MISCELLANEOUS. . . . . . . . . . . . . . . .    63

9.6    TERMINATION OF OTHER GHIP VENDORS. . . . . . . . . . .    63

9.7    COMPENSATION OF OTHER GHIP VENDORS . . . . . . . . . .    63

9.7.1    VENDOR OPERATING EXPENSES. . . . . . . . . . .    63

9.7.2    VENDOR PASS-THROUGH EXPENSES . . . . . . . . .    63


ARTICLE 10
TERM AND TERMINATION. . . . . . . . . .    64

10.1    TERM    . . . . . . . . . . . . . . . . . . . . .    64

10.2    TERMINATION. . . . . . . . . . . . . . . . . . . . .    64

10.3    NOTICES AND EFFORTS TO CURE. . . . . . . . . . . . .    66

10.4    TERMINATION WITH SUCCESSOR CARRIER . . . . . . . . .    66

10.4.1    TRANSFER OF SHIP PLANS . . . . . . . . . . .    66

10.4.2    CLAIMS LIABILITY . . . . . . . . . . . . . .    66

10.4.3    TRANSFER OF RESERVES . . . . . . . . . . . .    67

10.4.3.1    TRANSFER OF RESERVES . . . . . . . . .    67

10.4.3.2    PROVISIONAL SETTLEMENT . . . . . . . .    67

10.4.3.3    FINAL SETTLEMENT . . . . . . . . . . .    67

10.4.3.4    UNSCHEDULED TERMINATION. . . . . . . .    68

10.4.3.5    VENDOR EXPENSES. . . . . . . . . . . .    69

10.4.3.6    BENEFITS EXPECTATION . . . . . . . . .    69

10.4.3.7    REQUIRED RSF BALANCE . . . . . . . . .    69

10.4.4    PERMITTED PARTIAL TRANSFERS. . . . . . . . .    70

10.4.5    TRANSFER OF DATABASES. . . . . . . . . . . .    70

10.4.6    TRANSFER OF APPLICATIONS SYSTEMS . . . . . .    70

10.4.7    TRANSFER OF DEVELOPED SYSTEMS. . . . . . . .    70

10.4.8    OBLIGATIONS OF UNITED PRIOR TO TERMINATION . . . . . .    71

10.4.9    COOPERATION. . . . . . . . . . . . . . . . .    71

viii

<PAGE>

      10.4.10 REMOVAL OF CERTAIN UNITED MARKS. . . . . . . . . . .
71

10.5    TERMINATION WITHOUT SUCCESSOR CARRIER. . . . . . . . . . .
71

      10.5.1  RSF BALANCE. . . . . . . . . . . . . . . . . . .
72

      10.5.2  PAYMENT. . . . . . . . . . . . . . . . . . . . .
72

      10.5.3  RATE ACTIVITY. . . . . . . . . . . . . . . . . .
72

      10.5.4  SALE PROHIBITED. . . . . . . . . . . . . . . . .
72

      10.5.5  PROVISIONAL AND FINAL SETTLEMENT . . . . . . . .
72

10.6    RIGHTS AND OBLIGATIONS OF PARTIES UPON TERMINATION . . . . . .
73

      10.6.1  TERMINATION COSTS. . . . . . . . . . . . . . . .
73

      10.6.2  POST-TERMINATION REPORTS . . . . . . . . . . . .
73

      10.6.3  DISPOSITION OF EMPLOYEES . . . . . . . . . . . .
73


ARTICLE 11
DISPUTE RESOLUTION . . . . . . . . .
73

11.1    INFORMAL PROCEDURES. . . . . . . . . . . . . . . . . . .
73

11.2    FORMAL PROCEDURES. . . . . . . . . . . . . . . . . . . .
74

      11.2.1  MEDIATION. . . . . . . . . . . . . . . . . . . .
74

      11.2.2  ARBITRATION. . . . . . . . . . . . . . . . . . .
74

11.3    COSTS AND FEES . . . . . . . . . . . . . . . . . . . . .
75

11.4    SPECIFIC PERFORMANCE . . . . . . . . . . . . . . . . . .
75

11.5    JURISDICTION . . . . . . . . . . . . . . . . . . . . . .
75

11.6    LIABILITY LIMITATION . . . . . . . . . . . . . . . . . .
75


ARTICLE 12
RELATIONSHIP OF THE PARTIES . . . . . . . . .
75

12.1    INDEPENDENT CONTRACTORS. . . . . . . . . . . . . . . . .
75

12.2    NOT LEGAL REPRESENTATIVES. . . . . . . . . . . . . . . .
76

      12.2.1 UNITED. . . . . . . . . . . . . . . . . . . . .
76

      12.2.2 AARP AND AARP TRUST . . . . . . . . . . . . . .
76

ARTICLE 13
INDEMNIFICATION . . . . . . . . . . . .
76

13.1    INDEMNIFICATION BY UNITED. . . . . . . . . . . . . . .
76

13.2    INDEMNIFICATION BY AARP. . . . . . . . . . . . . . . .
77

13.3    NOTICE; DEFENSE OF CLAIM . . . . . . . . . . . . . . .
77

13.4    FAILURE TO DEFEND ACTION . . . . . . . . . . . . . . .
78

13.5    SURVIVAL OF INDEMNITIES. . . . . . . . . . . . . . . .
78

13.6    INSURANCE. . . . . . . . . . . . . . . . . . . . . . .
78

ix

<PAGE>

ARTICLE 14
GENERAL PROVISIONS . . . . . . . . . . .
79

14.1    FORCE MAJEURE. . . . . . . . . . . . . . . . . . . . .
79

        14.1.1   EVENTS . . . . . . . . . . . . . . . . . . .
79

        14.1.2   NOTICE AND CURE. . . . . . . . . . . . . . .
79

        14.1.3   TERMINATION. . . . . . . . . . . . . . . . .
80

14.2    FURTHER ASSURANCES . . . . . . . . . . . . . . . . . .
80

14.3    NO THIRD PARTY BENEFICIARIES . . . . . . . . . . . . .
80

14.4    GOVERNING LAW. . . . . . . . . . . . . . . . . . . . .
80

14.5    NOTICES. . . . . . . . . . . . . . . . . . . . . . . .
80

14.6    NO WAIVER, ETC.. . . . . . . . . . . . . . . . . . . .
81

14.7    AMENDMENT. . . . . . . . . . . . . . . . . . . . . . .
82

        14.7.1   GENERAL. . . . . . . . . . . . . . . . . . .
82

        14.7.2   ANCILLARY AGREEMENTS . . . . . . . . . . . .
82

        14.7.3   RENEGOTIATION. . . . . . . . . . . . . . . .
82

        14.7.4   CONFLICTS AMONG AGREEMENTS . . . . . . . . .
82

14.8    EXPERIENCE/RESERVE ACCOUNTING. . . . . . . . . . . . .
82

14.9    HEADINGS . . . . . . . . . . . . . . . . . . . . . . .
82

14.10   BINDING EFFECT . . . . . . . . . . . . . . . . . . . . . . . .
82
14.11   ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . .
82
14.12   COUNTERPARTS . . . . . . . . . . . . . . . . . . . . . . . . .
83
14.13   CERTAIN CALCULATIONS . . . . . . . . . . . . . . . . . . . . .
83
14.14   ACKNOWLEDGEMENT. . . . . . . . . . . . . . . . . . . . . . . .
83
14.15   RELATED PLANS. . . . . . . . . . . . . . . . . . . . . . . . .
83

x

<PAGE>

AARP HEALTH INSURANCE AGREEMENT


    This AARP HEALTH INSURANCE AGREEMENT (this "Agreement") dated as of
February 26, 1997, by and among the American Association of Retired Persons,
a
District of Columbia not-for-profit corporation ("AARP"), the Trustees of the
AARP Insurance Plan ("AARP Trust," as hereinafter more fully defined), and
United HealthCare Insurance Company, a Connecticut stock insurance company
("United").

                    W I T N E S S E T H:

    WHEREAS, AARP is a nonprofit, nonpartisan membership corporation for
persons of age 50 and over whose goals include the advancement of the
education, well-being and social welfare of its members and older persons
generally;

    WHEREAS, AARP, through extensive research, has determined that the
social
welfare of its members will benefit from access to a group health insurance
program (the "GHIP," as hereinafter more fully defined) sponsored by AARP and
provided by independent insurers and other contractors;

    WHEREAS, AARP is the sole and exclusive owner of all proprietary and
other
property rights and interest in the name, acronym and symbol "AARP" under
which
services to its membership are known and identified;

    WHEREAS, AARP and its independent consultants have determined that
United
is qualified to offer the health insurance program component of the GHIP
comprised of group Medicare supplement, hospital indemnity and certain other
medical insurance coverages and other products as agreed to by the parties
(the
"SHIP," as hereinafter more fully defined) and certain related services
described herein (the "Services," as hereinafter more fully defined) to
participants in the GHIP and other AARP members; and

WHEREAS, United desires to offer the SHIP and related Services to participants in the GHIP and other AARP members;

NOW, THEREFORE, in consideration of the premises and the material representations, warranties, conditions, covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

<div align="center">1</div>

<PAGE>

<div align="center">ARTICLE 1<br>DESCRIPTION OF AGREEMENT</div>

1.1   CONTRACT DOCUMENTS.  As used herein, "Contract Documents" means this Agreement, written modifications of this Agreement and the following exhibits and schedules, which are attached hereto and are specifically made a part of this Agreement:

| | | |
|---|---|---|
| Exhibit 2.90 | -- | United's Start-Up Personnel |
| Exhibit 3.1.3(a) | - | Dedicated United Personnel |
| Exhibit 3.1.5 | - | Software Acceptance Test Standards |
| Exhibit 3.2.4 | - | Future Products |
| Exhibit 3.2.5 | -- | Administrative Services Performance Standards |
| Exhibit 3.2.8(a) | - | Reporting Standards |
| Exhibit 4.2.1 | - | AARP Marks |
| Exhibit 5.1 | - | United Disclosure Schedule |
| Exhibit 5.1.9 | - | Agency Ratings of United |
| Exhibit 5.2 | - | AARP/AARP Trust Disclosure Schedule |
| Exhibit 6.2.1(b) | - | Analysis for Administrative Functions |
| Exhibit 6.5 | -- | Tax Timing Expense |
| Exhibit 7.4.2 | -- | Developed Marks |
| Exhibit 7.7.2 | - | Developed Systems |
| Exhibit 9.5.2 | - | Vendor Managing Representatives |

1.2   ENTIRE AGREEMENT; AMENDMENT.  The Contract Documents collectively set forth the full and complete understanding of the parties with respect to

the subject matter thereof, and supersede any and all negotiations, agreements or representations made or dated prior thereto. Each of the Contract Documents may only be amended by written instruments executed by

each party to such Contract Document.

1.3   CORRELATION AND INTENT.  It is the intent of the Contract Documents that

United undertake to provide the SHIP and the Services.  If there is any inconsistency among this Agreement and the Exhibits hereto, the terms of

this Agreement, as and if amended, shall govern.

1.4   SCOPE OF SERVICES.  The description of the SHIP and the Services set

forth herein and in the Exhibits hereto is not intended to list every element and detail to be provided by United, AARP and AARP Trust.  If necessary, United, AARP and AARP Trust shall propose and implement modifications to the Contract Documents as are reasonably necessary to reflect additional elements and details.

2

<PAGE>

## ARTICLE 2
## DEFINITIONS

Words and abbreviations that have well-known technical or trade meanings are used in the Contract Documents in accordance with such recognized meanings.
The following terms are used in the Contract Documents with the following respective meanings.

2.1    AARP has the meaning set forth in the first paragraph of this Agreement.

2.2    AARP MARKS has the meaning set forth in Section 4.2.1 hereof.

2.3    AARP TRUST means the trust created and existing under the laws of the District of Columbia pursuant to that certain Restatement of Agreement and Declaration of Trust dated as of February, 1980 among AARP and the several trustees named therein, as amended.

2.4    AARP'S REPRESENTATIVE means the person designated by AARP and AARP Trust
       from time to time in accordance with Section 4.1 hereof.

2.5    ACTIVE LIFE RESERVES means, for any SHIP Plan, the reserves established to cover the excess in the value of future benefits and expenses over the
       value of future premiums.

2.6    ADMINISTRATIVE SERVICE FEE has the meaning set forth in Section 6.2.1(a)
       hereof.

2.7    AMORTIZATION INTEREST RATE means the yield on the three-year Treasury securities at constant maturity, as published in Federal Reserve Statistical Release H.15 (or any successor publication), for the month in
       which an expense would have been charged in the absence of amortization,
       plus fifty hundredths of one percent.  The rate so defined is a semiannually compounded rate that will be converted to an effective annual rate for the purpose of any calculation.

2.8    APPLICABLE LAWS means all laws, ordinances, judgments, decrees, injunctions, writs and orders of any court or governmental agency or authority, and all codes, rules, regulations and orders applicable  to

the performance of the Services or the provision of the SHIP.

2.9   ASSOCIATED AGREEMENTS means the AARP GHIP Management Agreement among
      AARP, AARP Trust and Hartford Fire Insurance Company; the AARP Sales and

      Marketing Agreement among AARP, AARP Trust and Seabury & Smith, Inc.; the

      AARP Long Term Care Insurance Agreement among AARP, AARP Trust and
      Metropolitan Life Insurance Company; and all other agreements pertaining

      to the GHIP that may from time to time be entered into between United and

      any other GHIP Vendor relating to the

                                        3


<PAGE>

      subject matter of this Agreement; as each such agreement may be amended
      from time to time.

2.10  BASIC PERCENTAGE means a percentage determined as set forth in Section
      6.3.1 hereof.

2.11  BUSINESS DAY means every day other than the Friday after Thanksgiving and

      any other day on which commercial banks are not authorized to conduct
      business, or are required to close, in the District of Columbia or the
      State of New York.  In the event that an obligation to be performed under

      this Agreement falls due on a day which is not a Business Day, the
      obligation shall be deemed due on the next Business Day thereafter.

2.12  CHANGE OF LAW means any change in, or change in the interpretation of, or

      adoption of, any Applicable Law, or other legislative or administrative
      action of the United States of America, any state, territory or the
      District of Columbia or any agency, department, authority, political
      subdivision or other instrumentality thereof, or a final decree, judgment

      or order of a court, including temporary restraining orders, or a final
      decree, judgment or order of any arbitrator or a court interpreting this

      Agreement or any other Contract Document which occurs subsequent to the
      date hereof.

2.13  CLAIMS DATABASES means all of the computer databases containing
      information pertaining to the administration of claims made under the
      SHIP Plans, and any data repository or file subsequently developed to
      replace any of the foregoing.

2.14  CODE means the Internal Revenue Code of 1986, as amended, and the
      Treasury Regulations from time to time promulgated thereunder.

2.15  COMMENCEMENT DATE means January 1, 1998.

2.16   COMPENSATION PERCENTAGE means a percentage determined pursuant to Section
       6.3 hereof.

2.17   CONTRACT DOCUMENTS means this Agreement and the other documents
       referenced in Section 1.1 hereof, collectively.

2.18   CPI means with respect to any particular Policy Year, the Consumer Price
       Index for Urban Wage Earners and Clerical Workers (CPI-W), All Items
       (1982-84 = 100) (All Cities), published by the United States Department
       of Labor, Bureau of Labor Statistics, for the month of December preceding
       the commencement of that Policy Year.  If the name of the index as
       described above is changed, or a similar index is substituted by the
       United States Government, all references in this Agreement to the CPI
       shall be deemed to refer to the renamed or substituted index.  If the
       publication of the index described above is discontinued and no similar
       index is substituted by the United States Government, then the parties
       shall substitute a comparable index by agreement.

4

<PAGE>

2.19   CPR MODEL means the CPR Model Mediation Procedure for Business Disputes.

2.20   CPR RULES means the CPR Rules for Nonadministered Arbitration of Business
       Disputes.

2.21   DAC TAX means deferred acquisition cost tax, as defined in section 848 of
       the Code.

2.22   DATABASES means the Claims Databases and the SHIP Databases,
       collectively.

2.23   DEFICIT CARRYFORWARD has the meaning set forth in Section 8.3.1 hereof.

2.24   DEFICIT CARRYFORWARD ACCOUNT means an account to be maintained by United
       to track the amount of the net cumulative Deficit Carryforward from time
       to time.

2.25   DEVELOPED MARKS has the meaning set forth in Section 7.4.2 hereof.

2.26   DEVELOPED SYSTEMS has the meaning set forth in Section 7.7.2 hereof.

2.27   DISCLOSER has the meaning set forth in Section 7.6.2(a) hereof.

2.28   EVENT OF FORCE MAJEURE has the meaning set forth in Section 14.1.1

hereof.

2.29   EXISTING PROGRAM means the AARP group health insurance program provided by Prudential as of the date hereof, including without limitation the health insurance component thereof.

2.30   EXPENSE INCURRED TYPE PLAN means any SHIP Plan which is not an Indemnity
       Type Plan.  An Expense Incurred Type Plan includes both standard and nonstandard policies.

2.31   FIXED OVERHEAD COSTS means, exclusively, expenses for real estate leases.

2.32   FUTURE PRODUCTS has the meaning set forth in Section 3.2.4 hereof.

2.33   GHIP means the AARP group health and long-term care insurance plans and all related benefits and services as provided under this Agreement and the agreement among AARP, AARP Trust and the vendor for the AARP long-term care insurance program, excluding the dental and vision policies.

2.34   GHIP VENDORS means, collectively, the Member Services Vendor, the Sales and Marketing Vendor and United and its permitted successors and assigns
       pursuant to this Agreement as the GHIP health insurance vendor.

5

<PAGE>

2.35   GROSS UP means the amount of Taxes subject to reimbursement pursuant to Section 6.6.1 hereof multiplied by [[1/(1-United's Tax Rate)]-1].

2.36   GROWTH FACTOR means a percentage determined by dividing the number of SHIP Insureds for a Policy Year by the number of SHIP Insureds for the preceding Policy Year less 100 percent.  In making the determination of the number of SHIP Insureds for all affected Policy Years, the reference
       shall be to the number of SHIP Insureds at the end of each applicable Policy Year, and shall only apply to SHIP Insureds with Medicare supplement coverage hereunder.

2.37   GROWTH INCENTIVE PERCENTAGE means a percentage determined as set forth in
       EXHIBIT 3.2.5 hereto.

2.38   INCENTIVE PERCENTAGE means a percentage determined as set forth in Section 6.3.2 hereof.

2.39   INCURRED CLAIMS means, for a Policy Year, the sum of (i) claims paid by United under the SHIP Plans, (ii) the Active Life Reserves at the end of
       the Policy Year and (iii) the amount of the reserves established by United to cover claims incurred but not yet paid as of the end of such

Policy Year (including claims incurred but not yet reported, claims in course of settlement and claims incurred under extension of benefit provisions); less the amount of the corresponding reserves established at

the beginning of such Policy Year.

2.40   INCURRED PREMIUM REFUNDS means, for a Policy Year, the individual member
refunds of SHIP Net Premium paid during the Policy Year, whether provided
pursuant to legal requirements or otherwise, plus the amount of reserves
established for such payments as of the end of such Policy Year less the
amount of the corresponding reserves established at the beginning of such
Policy Year; provided, however, that such Incurred Premium Refunds relate
only to SHIP Net Premiums earned by United.

2.41   INCURRED TAX ITEMS means, with respect to a Policy Year, the costs incurred by United with respect to the SHIP for (i) state and local premium and franchise taxes, (ii) retaliatory taxes, (iii) insurance department expense assessments (iv) guaranty fund assessments and (v) state and health pool assessments.

2.42   INDEMNITY TYPE PLAN means any SHIP Plan which solely provides benefits in
a fixed amount for the occurrence of the covered event.

2.43   INVESTMENT INCOME CREDIT  has the meaning set forth in Section 6.4 hereof.

2.44   INVESTMENT INCOME CREDIT RATE has the meaning set forth in Section 6.4.4
hereof.

6

<PAGE>

2.45   LOSS ADJUSTMENT EXPENSE RESERVE means the reserves established to cover the costs of processing claims incurred but not yet paid.

2.46   LOSS RATIO for a Policy Year means the quotient obtained by dividing the
Incurred Claims by the Member Contributions for that Policy Year.

2.47   MANAGING REPRESENTATIVE has the meaning set forth in Section 9.6.2 hereof.

2.48   MEMBER CONTRIBUTIONS for a Policy Year means the sum of the monthly amounts earned for that Policy Year in respect of the SHIP from each SHIP
Insured during that Policy Year.

2.49   MEMBER SERVICES AGREEMENT means that certain AARP GHIP Management Agreement, to be entered into among AARP, AARP Trust and the Member Services Vendor pertaining to member services for the GHIP.

2.50   MEMBER SERVICES VENDOR means Hartford Fire Insurance Company, and its permitted successors and assigns from time to time as the provider of member services for the GHIP, as more fully described in Section 9.2 hereof.

2.51   OPERATING EXPENSES means, for any Policy Year, the sum of (i) the Administrative Service Fee for such Policy Year, and (ii) the Pass-Through Expenses for such Policy Year.

2.52   OPERATING PLAN means the operating plan pertaining to the delivery of the

Services and the SHIP to be developed by United as more fully set forth in Section 3.2.6 hereof.

2.53   OPERATIONAL ISSUE has the meaning set forth in Section 9.6.3 hereof.

2.54   PASS-THROUGH EXPENSES means all reasonably incurred and documented costs

incurred by United from and after the Commencement Date for the following items:

(i)      postage costs;

(ii)     Medicare carrier crossover fees;

(iii)    product development costs approved by AARP;

(iv)     costs relating to the elimination of leases and empty space resulting from re-engineering following transfer of the SHIP from

Prudential to United;

7

<PAGE>

(v)      employee severance costs arising from implementation of the new business model (but excluding any costs subject to United's indemnification obligation pursuant to Section 13.1(iv) hereof);

(vi)     costs of relocating systems from the Prudential data center, or otherwise relating to disconnecting from Prudential systems, in connection with the transfer of the SHIP from Prudential to United, which costs are not paid by the Member Services Vendor;

(vii)    costs of year 2000 changes to the SHIP systems, which costs are not paid by Prudential or the Member Services Vendor;

(viii)   costs of changes to SHIP systems required by the new business model;

(ix)   costs relating to any claims backlog issues existing as of the Commencement Date or arising within 15 days thereafter;

(x)   payments to Prudential pursuant to Section 3.1.8(d) hereof; and

(xi)   other costs approved by AARP.

The foregoing costs will be determined based on any agreed upon accrual accounting principles consistently applied, subject to the following:

(A)   time of individuals will be charged at PER DIEM rates equal to their respective PER DIEM salaries; provided that the applicable rates will include a load of 75 percent for systems personnel and of 55 percent for all other personnel to cover other directly related costs (such load factors to be adjusted to the extent that the underlying expenses already are being recovered as Operating Expenses);

(B)   travel expenses will be charged as reasonably incurred and documented; and

(C)   equipment expenses will be charged as reasonably incurred and documented; provided, however, that no such expense for a single item of equipment in excess of $100,000 may be charged without the prior approval of AARP, which approval will not be unreasonably withheld.

Pass-Through Expenses shall not include expenses relating to the following, which shall be solely for the account of United:  (x) fees and expenses of in-house and outside legal counsel; and (y) fees and expenses of consultants; except in each case as approved in advance by AARP.

8

<PAGE>

2.55   PERFORMANCE EXPERIENCE means the difference (whether positive or negative) between the Loss Ratio and the Target Loss Ratio.

2.56   POLICY YEAR means January 1 through December 31 inclusive.

2.57   PROCEDURES means the systems, schedules and procedures established by United pursuant to Section 3.1.2 hereof required to be followed by United in the performance of the Services and the provision of the SHIP.

2.58   PROGRAM AGREEMENT has the meaning set forth in Section 9.6.1 hereof.

2.59   PROGRAM ISSUE has the meaning set forth in Section 9.6.3 hereof.

2.60   PROJECTED MEMBERSHIP  has the meaning set forth in Section 3.3.1 hereof.

2.61   PROPRIETARY INFORMATION has the meaning set forth in Section 7.6.1 hereof.

2.62   PROPRIETARY SYSTEMS has the meaning set forth in Section 7.7.1 hereof.

2.63   PRUDENTIAL means The Prudential Insurance Company of America.

2.64   PRUDENTIAL AGREEMENT means that certain Extended and Restated Agreement among AARP, AARP Trust and Prudential dated as of January 1, 1992, as amended.

2.65   PRUDENTIAL'S AARP OPERATIONS means the AARP operations of Prudential headquartered in Ft. Washington, Pennsylvania and conducted at certain other locations throughout the country, as more fully defined in Section 7 of the Prudential Agreement.

2.66   RECIPIENT has the meaning set forth in Section 7.6.2(a) hereof.

2.67   REINSURANCE AGREEMENT has the meaning set forth in Section 3.1.7(a) hereof.

2.68   RECORDS means data stored in any form whatsoever, including, but not limited to, hard copies, computer tapes and disk drives, CD-ROM or other physical or electronic media.

2.69   RELATED PLAN means any policy that Prudential was required to issue to any person who was not an AARP member either (i)  pursuant to the insurance laws or regulations of any state in order for Prudential to make the SHIP available in that state or (ii) which AARP and Prudential otherwise agreed to include, in whole or in part, in the experience rating for the SHIP.

2.70   REPRESENTATIVES has the meaning set forth in Section 9.5.2 hereof.

9

<PAGE>

2.71   RESOLUTION PROCEDURE has the meaning set forth in Section 11.1 hereof.

2.72   RETENTION means, for any Policy Year, the sum of the following items: (***)

2.73   RSF has the meaning set forth in Section 8.2 hereof.

2.74   RSF BALANCE means the amount held under the RSF from time to time.

2.75   RSF BALANCE PERCENTAGE for any Policy Year means the RSF Balance at the end of such Policy Year, divided by the amount of Member Contributions

for that Policy Year.

2.76   SALES AND MARKETING AGREEMENT means that certain Sales and Marketing
Agreement to be entered into among AARP, AARP Trust and the Sales and
Marketing Vendor pertaining to sales and marketing services for the
GHIP.

2.77   SALES AND MARKETING VENDOR means Seabury & Smith, Inc. and its
permitted
successors and assigns from time to time as the provider of the sales
and
marketing services for the GHIP, as more fully described in Section 9.3
hereof.

2.78   SERVICE ENHANCEMENT means a change in the services provided hereunder
which has the impact of decreasing the Incurred Claims under the SHIP
Plans.

2.79   SERVICES means the services to be performed by United pursuant to and
in
accordance with Article 3 hereof.

2.80   SHIP means the SHIP Plans and the related Services that United is
obligated to provide hereunder, but excluding (i) any dental or vision
insurance coverages and (ii) any Related Plan, except as otherwise
agreed.

2.81   SHIP DATABASES means all computer databases to the extent they contain
information pertaining to the SHIP and SHIP Plans other than as to the
administration of claims thereunder, and any data repository or file
subsequently developed to replace any of the foregoing.

*** Denotes confidential information that has been omitted from the exhibit
and filed separately accompanied by a confidential treatment request with
the Securities and Exchange Commission (the "SEC") pursuant to Rule 24b-2
of the Securities and Exchange Act of 1934, as amended (the "Exchange
Act").

10

<PAGE>

2.82   SHIP EMPLOYEES has the meaning set forth in Section 3.1.3(b) hereof.

2.83   SHIP GROSS PREMIUMS for a Policy Year means the amount of Member
Contributions minus the AARP allowance determined under Section 6.1
hereof for such Policy Year.

2.84   SHIP INSURED means an individual who is a insured under any SHIP Plan.

2.85   SHIP NET PREMIUMS for a Policy Year means the amount of Member
Contributions minus the sum of Vendor Operating Expenses, Vendor
Pass-Through Expenses and the AARP allowance determined under Section
6.1
hereof for such Policy Year.

2.86  SHIP PLAN means any health insurance plan underwritten by United pursuant
     to this Agreement, including without limitation any such plan described
     by any master group insurance policy issued to AARP Trust by United (or
     its affiliates) and insured or reinsured by United (or its affiliates) at
     any time during the term of this Agreement.

2.87  SHIP PORTFOLIO has the meaning set forth in Section 6.4.1 hereof.

2.88  SHIP PRODUCTS means the SHIP Plans and the Future Products,
collectively.

2.89  START-UP COSTS means all reasonably incurred and documented costs
     incurred by United during the period from September 9, 1996 until the
     Commencement Date, in connection with the provision of the Services for
     time, travel and equipment purchases (subject to the limitations set
     forth below).  Such costs will be determined based on agreed upon accrual
     accounting principles consistently applied, subject to the following:

     (i)      the individuals whose time may be charged as Start-Up Costs are
              identified on EXHIBIT 2.89 hereto (which EXHIBIT 2.89 may be
              amended from time to time by United to include additional
              personnel);

     (ii)     time of individuals will be charged at PER DIEM rates equal to
              their respective PER DIEM salaries; provided that the applicable
              hourly rates will include a load of 75 percent for systems
              personnel and of 55 percent for all other personnel to cover
              other directly related costs (such load factors to be adjusted to
              the extent that the underlying expenses already are being
              recovered as Operating Expenses);

     (iii)    travel expenses will be charged as reasonably incurred and
              documented; and

     (iv)     equipment expenses will be charged as reasonably incurred and
              documented, provided, however, that no such expense for a single
              item of equipment in

                                    11

<PAGE>

          excess of $100,000 may be charged without the prior approval of
          AARP, which approval shall not be unreasonably withheld.

     Start-Up Costs shall not include expenses relating to the following,
     which shall be solely for the account of United: (A) fees and expenses of
     in- house legal counsel; (B) fees and expenses of outside legal counsel

except for services related to regulatory filings pertaining to the transfer of the SHIP to United or as approved in advance by AARP; and

(C)

fees and expenses of consultants not approved in advance by AARP.

2.90  TARGET AARP ALLOWANCE has the meaning set forth in Section 3.3.1 hereof.

2.91  TARGET INCURRED CLAIMS has the meaning set forth in Section 3.3.3(b) hereof.

2.92  TARGET LOSS RATIO means the quotient obtained by dividing the Target Incurred Claims by the Target Member Contributions for a Policy Year.

2.93  TARGET MEMBER CONTRIBUTIONS means the amount needed to fund the Target AARP Allowance, Target Retention, Target Incurred Claims, Target Premium Refunds and Target RSF Funding, and recognizing Projected Membership.

2.94  TARGET PREMIUM REFUNDS has the meaning set forth in Section 3.3.4 hereof.

2.95  TARGET RETENTION has the meaning set forth in Section 3.3.6(b) hereof.

2.96  TARGET RSF FUNDING has the meaning set forth in Section 3.3.5 hereof.

2.97  TAX BASE has the meaning set forth in Section 3.6.2 hereof.

2.98  TAX BENEFIT has the meaning set forth in Section 3.6.3 hereof.

2.99  TAX REIMBURSEMENT has the meaning set forth in Section 3.6.2 hereof.

2.100 TAX RETURN means any return, report, information return or other document filed or required to be filed or supplied as part of any such filing to any authority with respect to Taxes.

2.101 TAX TIMING EXPENSES  has the meaning set forth in Section 6.5 hereof.

2.102 TAXES means all taxes, duties, charges, fees, levies or other assessments, however denominated, including any interest or additions, but excluding any fines or penalties, attributable thereto, imposed by any foreign or United States federal, state or local taxing authority, including but not limited to, income, payroll, withholding, unemployment

<PAGE>

insurance, social security, sales, use, excise, franchise, premium, gross receipts, occupation, real and personal property, stamp, transfer, ad valorem, workers' compensation, profits, license, employment, estimated,

severance and other taxes, duties, fees, assessments or charges of any kind whatever in respect of the SHIP.

2.103 TERMINATION COSTS means all reasonably incurred and documented costs incurred by United during the period from the date upon which it is notified that this Agreement will not be renewed or that it has been terminated until the date upon which United has performed all of its obligations pursuant to Article 10 hereof, for the following items:

 (i)  costs of termination related services for time and travel;

 (ii)  employee severance costs (subject to the limitations of Section 10.4.6 hereof);

 (iii) costs of unexpired leases (but only in the event of an unscheduled termination);

 (iv) capital losses, if any, realized on liquidation of the SHIP Portfolio (but only in the event of an unscheduled termination);

 (v)  Tax costs pertaining to the period prior to the date of termination which would otherwise be subject to reimbursement hereunder but for the termination; and

 (vi) write-off of undepreciated assets or unamortized costs.

The foregoing costs will be determined based on agreed upon accrual accounting principles consistently applied, subject to the following:

 (A)  time of individuals will be charged at PER DIEM rates equal to their respective PER DIEM salaries; provided that the applicable hourly rates will include a load of 75 percent for systems personnel and 55 percent for all other personnel to cover other directly related costs (such load factors to be adjusted to the extent that the underlying expenses already are being recovered as Operating Expenses); and

 (B)  travel expenses will be charged as reasonably incurred and documented.

Termination Costs shall not include expenses relating to the following, which shall be solely for the account of United: (x) fees and expenses of in-house and outside legal counsel; and (y) fees and expenses of consultants not approved in advance by AARP.

13

<PAGE>

2.104 TRANSFER AGREEMENT means a certain Transfer Agreement that may be entered into among Prudential and the several GHIP Vendors providing for the

early transfer of the GHIP from Prudential to the GHIP Vendors.

2.105 TRANSFERRED ASSETS means all assets, tangible or intangible, transferred
by Prudential to United which had been utilized in the performance of
Prudential's AARP Operations, including, but not limited to, Transferred
Equipment transferred pursuant to Section 4.3 hereof, Databases and
systems described in Section 4.4 hereof, workforce in place described in
Section 4.5 hereof, state and local licenses, and leases.

2.106 TRANSFERRED ASSETS GROSS UP means, in connection with the computation of
the Tax Reimbursement provided in Section 3.6.2 hereof, the amount of
Taxes that would be due on the Tax Base described in Section 3.6.2
hereof, calculated as follows:

$$\text{Gross Up} = [[(1/(1 \text{ Tax Rate}))(\text{Tax Base})]-(\text{Tax Base})].$$

For this purpose, "Tax Rate" means the highest rate of income tax
applicable from federal, state and local taxing authorities on the income
recognized by United from the acquisition of the Transferred Assets.

2.107 TRANSFERRED EQUIPMENT means all furniture, fixtures and equipment
transferred to United by Prudential as contemplated by Section 4.3
hereof.

2.108 TRANSFERRED EMPLOYEES has the meaning set forth in Section 3.1.3(b)
hereof.

2.109 TRUE-UP INTEREST RATE means the yield on one-year Treasury securities at
constant maturity, as published in Federal Reserve Statistical Release
H.15 (or any successor publication), for the month in which this
Agreement is terminated, plus twenty-five hundredths of one percent. The
rate so defined is a semiannually compounded rate that will be converted
to an effective annual rate for the purpose of any calculation.

2.110 UNITED has the meaning set forth in the first paragraph hereof.

2.111 UNITED'S AARP OPERATIONS means the AARP operations of United, as more
fully described herein.

2.112 UNITED'S MARKS has the meaning set forth in Section 7.4.1 hereof.

2.113 UNITED'S REPRESENTATIVE means the person designated by United from time
to time in accordance with Section 3.1.1 hereof.

2.114 UNITED'S TAX RATE has the meaning set forth in Section 6.5 hereof.

<PAGE>

2.115 VENDOR OPERATING EXPENSES for a Policy Year means the total of the
      operating expenses incurred by the Member Services Vendor, the Sales
and
      Marketing Vendor and other vendors approved by AARP Trust pursuant to
the
      annual budgeting process for the SHIP for that Policy Year (including
      amortization of such GHIP Vendors' respective start-up costs).

2.116 VENDOR PASS-THROUGH EXPENSES means, for any Policy Year, the total of
the
      operating expenses incurred by the Member Services Vendor, the Sales
and
      Marketing Vendor and other vendors approved by AARP Trust outside the
      annual budgeting process for the SHIP and chargeable to the SHIP for
that
      Policy Year (subject to the limitations set forth in Section 9.7
hereof).


                          ARTICLE 3
                    RESPONSIBILITIES OF UNITED

3.1   SERVICES PRIOR TO THE COMMENCEMENT DATE. Prior to the Commencement
Date,
      United shall provide the following services (collectively with the
      services described in this Article 3, the "Services"):

      3.1.1   DESIGNATION OF UNITED'S REPRESENTATIVE. Simultaneous with the
              execution hereof, United shall appoint an individual ("United's
              Representative") who shall have authority to act on its behalf
              under this Agreement, except that such representative shall
have
              no authority to amend this Agreement.  United promptly shall
              notify AARP and AARP Trust of such appointment.  The
appointment
              of United's Representative, and any successor thereto, shall be
              subject to AARP's approval, which shall not be unreasonably
              withheld.  The direct operational management of the Services
              shall be the responsibility of United's Representative.
              United's Representative will represent United to AARP and AARP
              Trust with respect to all operational matters.  United may,
upon
              30 days' (or such lesser period as may be reasonable under the
              circumstances) prior written notice to AARP, change United's
              Representative.  If requested by AARP for good cause, United
              shall change United's Representative as soon as practicable.
All
              communications, notices and instructions given in writing to
              United's Representative shall have the same effect as if given
to
              United hereunder, except where expressly indicated otherwise
              herein. United's Representative will be charged with: (i)
              ensuring performance of the Services in accordance with
annually

established service and quality objectives; (ii) maintaining
liaison with AARP; and (iii) attending such periodic meetings
of

AARP Trust to which he or she may be invited, at which meetings
he or she will to report on material developments affecting the
status of the SHIP.

15

<PAGE>

    3.1.2   PROCEDURES.  As outlined in the Exhibits hereto, United has
            delivered to AARP information setting forth in reasonable
detail
            the procedures and schedules United will follow in performing
the
            Services and providing the SHIP hereunder (together with the
            procedures contained in the Exhibits hereto, the "Procedures").
            Such Procedures are (i) in material compliance with all
            Applicable Laws; (ii) in accordance with the Contract
Documents;
            and (iii) consistent with those requirements relating to
            accounting, reporting and other administrative matters as may
be
            reasonably requested by AARP.  United shall prepare and deliver
            to AARP from time to time any proposed amendment or
modification
            to the Procedures that United reasonably may deem necessary,
            advisable or desirable in the performance of the Services and
            provision of the SHIP.  AARP shall notify United within 30 days
            of receipt of any Procedures, or amendments or modifications
            thereto, if it objects to any such Procedures, or amendments,
or
            modifications thereto, which notice shall describe in
appropriate
            detail the reasons for such objection. AARP may from time to
time
            request United to, and United shall, either (a) amend or modify
            the Procedures as reasonably requested by AARP, or (b) use it
            best efforts to resolve AARP's objections to the amendments or
            modifications to the Procedures reasonably proposed by United.

    3.1.3   DEDICATED STAFF.

            (a)   From and after the date hereof, United shall make
available
                  the personnel identified in EXHIBIT 3.1.3(a) hereto to
                  manage as appropriate the Services and the SHIP, and
shall
                  undertake commercially reasonable efforts to ensure that
                  such persons remain available to manage as appropriate
the
                  Services and the SHIP until at least June 30, 1998.

            (b)   As required by Section 10.2(a)(i) of the Prudential

persons                    Agreement, United shall offer to employ all of the
                           who are serving in positions principally related to the
                           Services to be provided by United hereunder and (i) who
are
                           actively employed by Prudential immediately prior to the
                           Commencement Date, with such employment to commence no
                           later than the Commencement Date, (ii) who are on an
                           approved leave of absence from the SHIP-related
activities
                           of Prudential's AARP Operations on the Commencement Date
                           and who are prepared to return to work within 12 weeks
                           after the date of the commencement of the leave of
absence,
                           with such employment to commence promptly following any
                           such person's return from such a leave of absence, or
(iii)
                           who United is required to offer to employ under
Applicable
                           Law, with such employment to commence when and as
required
                           by Applicable Law.  United shall not be required to offer
                           employment to any employee or former employee of

                                          16

<PAGE>

                           Prudential except as provided in this Section 3.1.3(b).
                           The persons who are offered and who accept said
employment
                           are referred to collectively herein as the "SHIP
                           Employees."

          (c)    United shall offer employment, salary and benefits to the
                 persons identified in paragraph (b) above that, taken as
a
                 whole, are substantially similar to the employment,
salary
                 and benefits provided by Prudential to such persons when
                 such offer of employment is made.  United shall credit
each
                 SHIP Employee with prior years of service at Prudential
for
                 purposes of eligibility and vesting in any of the
qualified
                 employee retirement and welfare plans offered by United.

          (d)    United shall permit any SHIP Employee who is entitled to
                 receive a distribution of a vested account balance in
                 Prudential's defined contribution plan to make a direct
                 rollover of the distribution to a qualified plan
sponsored
                 by United. United shall permit any SHIP Employee who

benefit       receives a distribution from the Prudential defined

pension plan to make a direct rollover of the
distribution

to a qualified plan approved by United.

(e)   The SHIP Employees shall be employees at will of United,
and nothing herein shall be construed to create any
employment agreement or right to continue as employees of
United.  As of the Commencement Date, the SHIP Employees
will be covered by and subject to the employment policies
and procedures of United.  If United terminates or lays

off

any SHIP Employee on or after the Commencement Date,
United

shall be responsible for compliance with all Applicable
Laws pertaining thereto, including all federal, state and
local labor and employment laws.

(f)   United shall hire or otherwise make available all
administrative and other personnel in addition to the
personnel referred to in the preceding subsections (a)
and

(b) above which, in United's reasonable judgment, are
necessary for the orderly and efficient performance of
the

Services from and after the date hereof in accordance
with

all standards set forth in the Contract Documents.

(g)   All personnel assigned to United's AARP Operations who
are

to interact on a regular basis with AARP and/or its
members

shall undergo a training period (unless they previously
shall have been so trained) at United's expense to
familiarize them with the special needs of AARP members
and

the manner in which to communicate with older persons.

17

<PAGE>

     3.1.4   ACCEPTANCE AND ENHANCEMENT OF SYSTEMS AND DATABASES, ETC.
United

shall accept the Databases and all related applications systems
software to be transferred to it by Prudential as contemplated
by

Section 4.4 hereof.  In addition, United, in concert with the
Member Services Vendor, shall make any changes and enhancements
to the foregoing as may be necessary for the orderly and
efficient provision of the SHIP and the Services beginning on
the

Commencement Date.

3.1.5   ACCEPTANCE TESTING.  United, in concert with the other GHIP
Vendors, shall perform tests of the Databases and related
applications systems software as described in EXHIBIT 3.1.5
hereto to ensure that the performance and other testing
criteria
set forth therein are satisfied prior to the Commencement Date.

3.1.6   EQUIPMENT AND SUPPLIES.  United shall accept the Transferred
Equipment from Prudential (by sale or other means) as
contemplated by Section 4.3 hereof.  In addition, throughout
the
term hereof, United shall procure and maintain all materials,
supplies, equipment and consumables which are reasonably
necessary or advisable for the performance of the Services in
accordance with this Agreement.  In the event that the
equipment
transfer contemplated by Section 4.3 hereof is not completed
prior to the Commencement Date, United shall procure materials,
supplies, equipment and consumables as set forth above, for
which
it shall be reimbursed as Start-Up Costs or through a charge
made
in the retrospective experience rating for the SHIP as
described
in Section 8.3 hereof.

3.1.7   PRUDENTIAL AGREEMENTS.

(a)   United shall undertake commercially reasonable efforts to
enter into an agreement or agreements with Prudential
(collectively the "Reinsurance Agreement") whereby United
shall assume liability for all SHIP Plans as of the
Commencement Date. United shall not be obligated,
directly
or through reinsurance, for any person covered under the
Existing Program who rejects, or is deemed to have
rejected
pursuant to Applicable Law, coverage as a SHIP Insured.

(b)   United shall undertake commercially reasonable efforts to
enter into such other agreements and arrangements with
Prudential as may be necessary and appropriate to
effectuate the orderly transfer of the Services and the
SHIP from Prudential to United, including without
limitation the Transfer Agreement.

18

<PAGE>

(c)   Notwithstanding any other provision hereof to the
contrary,
the failure of United fully and timely to perform any of
its obligations hereunder as a result of the failure or

refusal of Prudential fully and timely to cooperate in the
transfer of the SHIP to United as contemplated hereby shall
not give rise to a breach by United of its obligations
hereunder and shall not entitle AARP or AARP Trust to
receive any damages from United hereunder or expose United
to any financial penalty hereunder (including any penalty
set forth in Section 6.2.5 hereof).  Notwithstanding
Prudential's failure or refusal to cooperate in the
transfer of the SHIP to United as contemplated hereunder,
United shall be required, after reasonable consultation
with AARP and after reaching agreement with AARP on
appropriate compensation therefor, to undertake any
commercially reasonable action that might enable it to
perform the Services and provide the SHIP as contemplated
hereunder.

3.1.8   TRANSFER OF EXISTING BUSINESS.

(a)   In the event that the SHIP business is transferred from
Prudential to United prior to the Commencement Date,
United, subject to the terms of the Transfer Agreement,
shall maintain the premium rates then in effect for the
remainder of the applicable premium rate guarantee periods;
provided, however, that United may pursue regulatory
approval of any rate authorized by AARP Trust.

(b)   United shall develop rates effective for Policy Year 1998
and obtain rate approval from AARP Trust and appropriate
state regulatory authorities in accordance with the
procedures set forth in Section 3.3 hereof.

(c)   As soon after the date hereof as reasonably practicable,
and in any event not later than March 31, 1997, United
shall prepare and file in the District of Columbia and in
all other jurisdictions where required by Applicable Laws
for the continuance of the SHIP Plans (i) certificates
and/or policies for all pre-standard Expense Incurred Type
Plan policies maintained by Prudential pursuant to the
existing SHIP and (ii) certificates and/or new policies on
terms substantially identical to (A) all standard Expense
Incurred Type Plan certificates and (B) all Indemnity Type
Plan policies maintained by Prudential pursuant to the
existing SHIP; provided, however, that United shall not
file any such policies in any jurisdiction other than the
District of Columbia, Connecticut, Florida and New York
without the prior approval of AARP, which shall not be
unreasonably withheld.  The benefits and rates (if any)
contained in all such filings shall be subject to the prior
approval of AARP Trust.

19

<PAGE>

        (d)   United hereby assumes and agrees to pay Prudential when and as due (\*\*\*) in respect of the health insurance component of the Existing Program; provided, however, that (i) United shall not pay or be obligated to pay any amount to Prudential by reason of this Section 3.1.8(d) unless and until such time as AARP notifies United that Prudential has cooperated fully in the smooth transfer of the GHIP to the successor carriers pursuant to the Prudential Agreement, (ii) any such payments by United shall be included in Retention for the Policy Year in which made, and (iii) if this Agreement is terminated when all such payments required to be made by United under this clause (d) have not been made, United shall have no further obligations in respect thereof.

3.2    SERVICES AFTER THE COMMENCEMENT DATE. From and after the Commencement Date, United shall provide the following Services:

    3.2.1    COMPLETION AND CONTINUATION OF INITIAL SERVICES.  United shall promptly perform all Services required to be performed under Section 3.1 hereof which are not fully performed as of the Commencement Date, and shall continue to perform those Services set forth in Section 3.1 hereof which are to continue after the Commencement Date, including but not limited to the hiring of employees.

    3.2.2    UNDERWRITING OF SHIP.  United shall serve as the underwriter of the SHIP Plans as such SHIP Plans may be modified from time to time in accordance with this Agreement.  In furtherance and not in limitation of the foregoing, United shall be responsible for the following functions:

    (a)   United shall be responsible for policy underwriting, actuarial review and analysis, trend analysis, pricing and reserving for all SHIP Plans.

    (b)   United shall be responsible for claims review, adjudication (including confirmation of eligibility and other applicable limits), appeals, payment, review to minimize fraud and abuse and utilization review for all SHIP Plans.

    (c)   United shall continue on a regular and timely basis to

prepare and timely file with all regulatory agencies with
which it shall be necessary so to do, such group health
insurance policies, certificates, forms, advertising
materials and other materials to be used in connection
therewith as shall be necessary to provide, without
interruption of coverage or benefit, entitlement of
insured

members to the SHIP Plans (provided, that United shall
not

file any policies in any jurisdiction other than the
District of

\*\*\* Denotes confidential information that has been omitted from the exhibit
and filed separately accompanied by a confidential treatment request with
the SEC pursuant to Rule 24b-2 of the Exchange Act.

20

<PAGE>

Columbia, Connecticut, Florida and New York without the
prior approval of AARP, which approval shall not be
unreasonably withheld).

(d)    United shall, as long as the appropriate premiums are
paid therefor, do all things reasonably necessary to keep
the SHIP Plans, as they may be modified from time to
time, in full force and effect and in compliance with all
pertinent statutes and regulations, state and federal.
Without limiting the generality of the foregoing, United
shall make or cause to be made any filings required by
Applicable Law, attend any hearings  or conferences
necessary to providing and servicing the SHIP Plans and
respond to any written or oral communications regarding
the SHIP, whether such communications are directed to
AARP, AARP Trust or United, and shall provide prompt
notice to AARP of the foregoing; provided that  AARP and
AARP Trust shall notify United promptly in writing of any
such hearings, conferences or communications of which
they

become aware.

(e)    United shall delete from the SHIP any SHIP Plan or other
Service which is no longer warranted in view of changes
in Applicable laws or which AARP advises United is no
longer necessary or appropriate to service the continuing
social welfare needs of the AARP members as they relate
to

group health insurance.

3.2.3   PRODUCT DEVELOPMENT.

(a)    To enhance the value of the SHIP to AARP members, United,
in consultation with AARP and AARP Trust, shall use its
best efforts to offer group health insurance products
that, together with the other value-added features,

differentiate the SHIP from insurance programs offered by other vendors.  United shall use its best efforts to offer products having a competitive benefit and cost structure, determined on a basis that includes due consideration of the method of distribution and product design.  The design and development of the SHIP by United shall take into account the social welfare needs of AARP members and of older persons generally.

(b)    United and AARP shall to continue to improve benefits and maintain premiums at competitive levels under the existing SHIP, to continue to modify the SHIP with a view towards providing for AARP members the best program of group health insurance available to older persons including for AARP members who do not yet have or are not eligible for Medicare, to supplement the coverage available to them under Medicare,

21

<PAGE>

to broaden the insurance options available to them and to make available coverage where none may otherwise be generally available or may be unaffordable because of age or health status. Accordingly, United periodically will review and recommend to AARP Trust such modifications, changes and revisions in, of and to the SHIP as United shall deem to be in the best social welfare interests of AARP members. The terms and conditions associated with United's offering of any Service Enhancements shall be documented in appropriate amendments or exhibits to this Agreement.

(c)    United will annually review the benefits and premiums for existing and proposed SHIP products and services and prepare recommendations to AARP Trust.  In conjunction with AARP, United shall engage in new AARP product development focused on meeting members' changing social welfare needs as they relate to group health insurance and providing increased access, in a financially prudent manner, to SHIP Products.  All changes or enhancements to services, plans or products are subject to prior approval by AARP and AARP Trust.  AARP and AARP Trust will reasonably cooperate with United in the development, pricing and testing of such proposed new products and Services.

3.2.4   FUTURE PRODUCTS.

(a)    From and after the Commencement Date (or the date hereof if agreed to by the parties), United, in consultation with AARP, shall undertake the product development activities described in Section 3.2.3 hereof with respect to the additional products and services listed in EXHIBIT

3.2.4 hereto (collectively, the "Future Products").

(b)   The terms and conditions associated with United's offering of any new or Future Products, including but not limited to the terms relating to the services to be provided, implementation, performance standards, timing and compensation, will be documented in amendments or exhibits to this Agreement.

3.2.5   SERVICE STANDARDS.   United, in  conjunction with AARP, AARP Trust and the other GHIP Vendors, and subject to the approval of AARP and AARP Trust, annually shall establish service and quality standards for specific administrative functions such as determining eligibility where underwriting is applicable, claim processing, handling telephone calls transferred from the Member Services Vendor, complaints, requests for information and general correspondence.  United shall undertake commercially reasonable efforts to attain the agreed upon

22

<PAGE>

service and quality standards and will report the results to AARP and AARP Trust pursuant to Section 3.2.8 hereof.   The initial service and quality standards are set forth in EXHIBIT 3.2.5 hereto.

3.2.6   OPERATING PLAN.  United shall prepare and update annually a comprehensive Operating Plan which shall include planning and budgetary projections for the coming Policy Year and for the succeeding five Policy Years (or for the subsequent term of this Agreement, if shorter).  The Operating Plan shall be prepared after consultation with the Member Services Vendor and the Sales and Marketing Vendor and shall give due consideration to their recommendations, and shall be subject to the approval of AARP and AARP Trust.  To enable evaluation of cost effectiveness and other criteria as reasonably specified from time to time by AARP, the Operating Plan and budget at a minimum shall set forth United's:  (i) service and quality objectives; (ii) staffing goals; (iii) projection of the anticipated participation in the SHIP by the AARP membership and the expected transactions of the SHIP participants for the coming year; (iv) for transaction driven services the fee per transaction and the expected total fees; (v) response to regulatory and governmental developments and other external environmental matters which are material to the SHIP; (vi) relevant developments in United's own corporate environment appropriate for disclosure which are material to the SHIP; (vii) description of how the SHIP is addressing the social welfare needs of the AARP members; and (viii) issues or concerns regarding the actuarial sustainability of the SHIP. The Operating Plan also shall track the results of the implementation of the Operating Plans for preceding Policy Years and provide an analysis of the Operating Plan compared to actual performance.

3.2.7   FINANCIAL BOOKS AND RECORDS.

(a)   In addition to the other record keeping requirements set forth in the Contract Documents, United, the Member Services Vendor, and the Sales and Marketing Vendor as appropriate, shall prepare and maintain, on a current basis, in accordance with accrual accounting principles consistently applied, accurate and complete financial books and records and accounts of all transactions related to the Services and the SHIP including such information as may be necessary to verify calculations made pursuant to the Contract Documents, the Member Services Agreement and the Sales and Marketing Agreement. United shall maintain accurate cost ledgers and accounting records regarding the Services and the SHIP, in accordance with accrual accounting principles consistently applied.  United shall establish and maintain an information system to provide storage and ready retrieval of operating data pertaining to the Services and the SHIP,

23

<PAGE>

including such information necessary to verify calculations, if any, made pursuant to this Agreement and the Associated Agreements.  United shall furnish to AARP and AARP Trust, on an annual basis, an audit report as to the financial books and records maintained by United hereunder.

(b)   United shall prepare and maintain, on a current basis, adequate documentation of all applications and operating systems and programs with respect to the SHIP Databases and the provision of the Services and the SHIP by United hereunder.

3.2.8   REPORTS.

(a)   All reports to be prepared by United pursuant to this Agreement shall be prepared in accordance with the reporting requirements set forth in EXHIBIT 3.2.8(a) hereto.

(b)   United will provide to AARP the management and other reports reasonably requested by AARP from time to time.

(c)   United shall provide the Member Services Vendor with not less than monthly updates with respect to all SHIP Products and pricing specifications therefor in electronic form as requested by the Member Services Vendor.

(d)   United will render such other reports as AARP shall reasonably request from time to time.

      (e)    All reports provided by United to AARP or AARP Trust relating to the experience rating of the SHIP Plans or the RSF shall be on a consolidated basis.

3.2.9   AUDITS AND INSPECTION.

      (a)    Subject only to the limitations of Section 3.2.9(b) hereof, during normal business hours and upon reasonable notice, United shall permit AARP, AARP Trust and their respective authorized representatives to inspect and audit all records reasonably related to the operation of the GHIP in the possession of United as they from time to time may reasonably request. Such access shall be reasonable in scope, frequency and duration and, to the extent commercially reasonable, shall be via electronic data transfer.

24

<PAGE>

      (b)    Neither AARP nor AARP Trust shall have access to AARP members' claim files (other than paid claim data) or medical information unless the express written consent of the AARP member has been secured, or such access is necessary to comply with Applicable Law.

3.3   MEMBER CONTRIBUTION RATE ADJUSTMENTS.

3.3.1   PROJECTED MEMBERSHIP; TARGET AARP ALLOWANCE.

      (a)    On or prior to March 31 of each year, United, in consultation with the Member Services Vendor and the Sales and Marketing Vendor, will advise AARP Trust as to its preliminary projection for the enrolled SHIP population for the coming Policy Year.

      (b)    On or prior to July 15 of each Year, United in consultation with the Member Services Vendor and the Sales and Marketing Vendor, will advise AARP Trust as to its final projection for the enrolled SHIP population for the coming year, and as to its final projection of the amount of the allowance to be payable to AARP pursuant to Section 6.1 hereof for the coming year.

      (c)    On or prior to August 15 of each year, AARP Trust will advise United whether it approves of its projection for the enrolled SHIP population and AARP allowance pursuant to Section 6.1 hereof for the coming Policy Year. The projected SHIP enrollment approved by AARP Trust pursuant to this Section 3.3.1 is herein referred to as the "Projected Membership," and the projected AARP allowance approved by AARP Trust pursuant to this Section 3.3.1 is herein referred to as the "Target AARP Allowance."

3.3.2   TARGET OPERATING EXPENSES.

    (a)   On or prior to March 31 of each year, (i) pursuant to the Associated Agreements the Member Services Vendor and Sales and Marketing Vendor each will submit to AARP Trust and United preliminary estimates as to their respective Vendor Operating Expenses for the coming Policy Year, and (ii) United then shall submit to AARP Trust its preliminary estimates as to its Operating Expenses for the coming Policy Year.

    (b)   Following the submission of the pricing estimates pursuant to subsection (a), United shall negotiate in good faith with the other GHIP Vendors making such submissions with a view to resolving any differences as to

<div align="center">25</div>

<PAGE>

       such pricing estimates and giving due consideration to the social welfare needs to the AARP membership.

    (c)   On or prior to June 1 of each Policy Year, (i) pursuant to the Associated Agreements the Member Services Vendor and Sales and Marketing Vendor each will submit to AARP Trust and United their final estimates as to their respective Vendor Operating Expenses for the coming Policy Year, and (ii) United shall submit to AARP Trust its final estimate as to its Operating Expenses for the coming Policy Year.

    (d)   On or prior to June 15 of each year, AARP Trust will advise (i) the Member Services Vendor, the Sales and Marketing Vendor and United whether it approves of their final Vendor Operating Expense estimates pertaining to the SHIP for the coming Policy Year submitted pursuant to paragraph (c) above and (ii) United whether it approves of its final Operating Expenses estimate submitted pursuant to paragraph (c) above.

3.3.3   TARGET INCURRED CLAIMS.

    (a)   On or prior to April 15 of each Policy Year, United shall report to AARP Trust its incurred and paid claims experience for the preceding Policy Year based on the best information then available. United shall furnish one report including claims information by paid month and incurred month for the period of time beginning with plan inception (whether or not the date of plan inception occurs prior to the Commencement Date) and continuing through March 31 of such Policy Year (but in no event shall this period of time exceed 63 months). A second report shall include claims information in the aggregate for the period in excess of 63 months.

    (b)    On or prior to June 1 of each Policy Year, United shall submit to AARP Trust its projected Incurred Claims experience (including projected changes in Active Life Reserves) for the next Policy Year, and all other relevant factors.  The projected Incurred Claims approved by AARP Trust pursuant to this paragraph (b) are herein referred to as the "Target Incurred Claims."

3.3.4    TARGET PREMIUM REFUNDS.

    (a)    On or prior to June 15 of each year, United will advise AARP Trust of its projected Incurred Premium Refunds for the coming Policy Year.

26

<PAGE>

    (b)    On or prior to August 15 of each year, AARP Trust will advise United whether it approves of its projection for the Incurred Premium Refunds for the coming Policy Year. The projected Incurred Premium Refunds approved by AARP Trust pursuant to this Section 3.3.4 are herein referred to as the "Target Premium Refunds."

3.3.5    TARGET RSF FUNDING.

    (a)    On or prior to June 15 of each year, United will advise AARP Trust of its recommended RSF funding level for the coming Policy Year.

    (b)    On or prior to August 15 of each year, AARP Trust will advise United whether it approves of its recommendation for the RSF funding level for the coming Policy Year. The projected RSF funding level approved by AARP Trust pursuant to this Section 3.3.5 is herein referred to as the "Target RSF Funding."

3.3.6    TARGET RETENTION.

    (a)    On or prior to June 15 of each year, United shall submit to AARP Trust its estimate as to its Retention for the coming Policy Year.

    (b)    On or prior to August 15 of each year, AARP Trust will advise United if it approves its estimated Retention for the following Policy Year.  The estimated Retention approved by AARP Trust pursuant to this Section 3.3.6(b) is herein referred to as "Target Retention."

3.3.7    DETERMINATION OF MEMBER CONTRIBUTION RATES.

    (a)    On or prior to July 15 of each Policy Year, United shall submit to AARP Trust a detailed projection of the financial position of the SHIP for the coming Policy Year, including its recommended Member Contribution

levels by geographic area and SHIP Plan and projected aggregate Member Contributions for the coming Policy Year.  Such projection shall be based on Target Membership, Target Retention, Target Incurred Claims, Target Premium Refunds, Target AARP Allowance and Target RSF Funding, an allowance for employee severance costs and such other adjustments as agreed to by AARP Trust.

(b)   AARP Trust, with the assistance of its independent actuaries, shall review the final estimates and projections submitted by United pursuant to the preceding paragraph (a).  On or prior to August 15 of each Policy Year,

27

<PAGE>

AARP Trust will advise United if it approves of such final estimates and projections, which approval shall not be unreasonably withheld if such items are based on actuarial principles and related standards.

(c)   The Target Member Contribution rates by geographic area and plan approved by AARP Trust shall be the rates applicable to SHIP Products for the next Policy Year, subject to such modifications, if any, as may be made pursuant to paragraph (e) below.

(d)   The Member Contribution rates generally will be set to achieve a RSF Balance Percentage of (***) or of such other percentage as may be agreed by the parties.  The parties may agree to increase the RSF Balance Percentage as reasonably required to ensure the financial stability of the SHIP, to protect SHIP Insureds in case of termination of this Agreement without a successor carrier and to provide for development of new products.

(e)   United may periodically propose for approval by AARP Trust (which approval shall not be unreasonably withheld) such interim Member Contribution rate or benefit adjustments as are reasonably warranted by virtue of changes in, but not limited to, interest rates, lapses, and death rates, expense charges, Medicare benefit, coinsurance or deductible amounts and demonstrable trends in medical care costs, material changes in AARP members' health care utilization, or  changes in Medicare or other present or future governmental programs or in regulations having a material bearing on benefits payable under the program.  In each such instance, United shall first demonstrate to the reasonable satisfaction of AARP Trust that failure to approve the premium rate or benefit adjustments so proposed by United would render it materially more difficult to maintain the stability of the SHIP.

3.3.8   RATE APPROVAL AND IMPLEMENTATION.  Upon receiving AARP Trust approval of the recommended Member Contribution rates, United shall immediately undertake to obtain any and all necessary regulatory approvals of such rates.  On the first day of each month thereafter, United shall provide progress reports to AARP Trust summarizing the approval or disapproval of such rates by state regulatory agencies, including the nature of any ongoing discussions with such agencies regarding rate approval issues.

3.3.9   SPECIFICATION OF TARGET LOSS RATIO.  On or prior to September 1 of each Policy Year, United and AARP Trust shall agree on the specification of a Target Loss Ratio for the next Policy Year. The Target Loss Ratio shall be determined by

\*\*\* Denotes confidential information that has been omitted from the exhibit and filed separately accompanied by a confidential treatment request with the SEC pursuant to Rule 24b-2 of the Exchange Act.

28

<PAGE>

dividing the Target Incurred Claims by the Target Member Contributions. United will undertake its best efforts to cause the Loss Ratio for the SHIP Plans to be not less than (\*\*\*) for any Policy Year.

3.3.10  STATE MANDATED RATE ADJUSTMENTS.  United will utilize all commercially reasonable means at its disposal to assist states in their review of rate submissions and to encourage adoption of recommended rates. If, however, if individual states mandate other than the recommended rates, United will implement the mandated rates and  will immediately report the same to AARP and AARP Trust.

3.4   COMPLIANCE WITH LAW.

3.4.1   GENERAL.  United shall comply in all material respects with all Applicable Laws in connection with the provision of the SHIP and the performance by it of the Services, including but not limited to obtaining any necessary regulatory approvals of marketing materials and policy certificates and rates.

3.4.2   NOTICE.  Within ten Business Days of the receipt by United of notification from any federal or state agency with jurisdiction over the licensure or operation of United of noncompliance with any Applicable Law, United shall provide AARP with a copy of such notification, together with information regarding any corrective action it has taken to comply with such law.

3.5   SALE OF ASSETS; SUBCONTRACTS, ETC.

3.5.1   ASSET SALES.  Except as provided in this Section 3.5 and in Section 10.5.6 hereof, United shall not sell or transfer all or any material portion of the business or assets (other than invested assets of the SHIP Portfolio) comprising the SHIP without the prior consent of AARP, which consent shall not be unreasonably withheld. United may sell all or any portion of

the equipment (i) which constitute Transferred Assets or (ii) the purchase price of which is otherwise chargeable to the SHIP, provided that in either case that such sale will not adversely affect United's ability to perform the Services and that the sale proceeds are credited against other amounts payable to United pursuant to Section 6.3 hereof.

3.5.2   SUBCONTRACTS.  United may subcontract all or any portion of the Services or the SHIP to any direct or indirect wholly-owned subsidiary of United without the approval of AARP.  Except as provided in the preceding sentence United may not enter into any subcontract involving the payment in any Policy Year of an amount exceeding $250,000 without first notifying AARP thereof, or in excess

*** Denotes confidential information that has been omitted from the exhibit and filed separately accompanied by a confidential treatment request with the SEC pursuant to Rule 24b-2 of the Exchange Act.

29

<PAGE>

of $500,000 without obtaining the prior approval of AARP and AARP Trust; provided, however, that in the event of an emergency, United may enter into subcontracts to deal with such emergency without AARP's consent, and provided further that United promptly notifies AARP of any such action.  In the event that United subcontracts any work under this Section 3.5, United shall be solely responsible for such subcontracted Services, AARP will look solely to United as if the services were performed by United, and United will require each such subcontractor to comply with the security arrangements and confidentiality provisions appropriate to this Agreement. Notwithstanding the foregoing, United may not enter into any reinsurance arrangement in respect of the SHIP, other than ordinary course coinsurance, indemnity reinsurance or stop loss reinsurance arrangements, with any party other than a direct or indirect-majority owned subsidiary of United without the prior consent of AARP, which consent shall not be unreasonably withheld.  Nothing herein shall establish any contractual relationship between AARP or AARP Trust and any subcontractor or supplier, and neither AARP nor AARP Trust shall have any obligation to pay or cause the payment of any moneys to any subcontractor or supplier.  Any subcontract pertaining to the provision of Services (whether or not approved by AARP) shall not relieve United of its contractual obligations hereunder pertaining to the delivery of such Services.

3.6   TAXES.

3.6.1   GENERAL.  Except as otherwise expressly provided by any Contract Document or Associated Agreement, United shall pay all Taxes imposed on United pursuant to Applicable Law that are incurred by it by reason of or result from its performance of the Services and provision of the SHIP, provided that United shall be entitled to recover such Taxes to the extent expressly provided by this Agreement or by the applicable provisions of

any other Contract Document or Associated Agreement.

3.6.2 TAX REIMBURSEMENT. Notwithstanding any provision to the contrary in Section 3.6.1 hereof, United shall be reimbursed, in the manner contemplated by Section 6.6 hereof, for the (***). United shall be reimbursed, in the manner contemplated by Section 6.6 hereof, for costs associated with any audit examination by any governmental taxing authority or administrative or judicial proceedings resulting therefrom, which arise in conjunction with such income

*** Denotes confidential information that has been omitted from the exhibit and filed separately accompanied by a confidential treatment request with the SEC pursuant to Rule 24b-2 of the Exchange Act.

30

<PAGE>

recognition. The amount of any Tax Reimbursement shall be excluded from the determination of Start-Up Costs.

3.6.3 TAX BENEFIT FROM DEPRECIATION AND AMORTIZATION. To the extent that United receives any reduction of taxes ("Tax Benefit") from the subsequent depreciation and amortization of the Transferred Assets, AARP Trust shall be entitled to receive annually this Tax Benefit and the associated gross up, computed under the same principles as the Tax Reimbursement, based on the federal, state and local income tax rates applicable to United in effect in the applicable year. Such Tax Benefit shall be credited against United's compensation described in Article 6 hereof.

3.6.4 TAX EFFECT OF DISPOSAL OF TRANSFERRED ASSETS. United shall be reimbursed, in the manner described in Section 6.6 hereof, for the effect (federal, state or local), including tax reimbursement and the associated gross up, computed under the same principles as the Tax Reimbursement, based on the federal, state and local income tax rates applicable to United in effect in the applicable year, of the gain on disposition of a component of the Transferred Assets. Alternatively, to the extent of a loss on the disposition of a component of the Transferred Assets, AARP Trust shall be entitled to the reduction of taxes and the associated gross up, computed under the same principles as the Tax Reimbursement, based on the federal, state and local income tax rates applicable to United in effect in the applicable year. Such further Tax Reimbursement or Tax Benefit shall be added to or credited against United's compensation described in Article 6 hereof.

3.7 EXCLUSIVITY. United shall not market group health insurance products or programs comparable to those offered pursuant to the SHIP to any other nonemployer group without the prior consent of AARP and AARP Trust; provided, however, that United may continue to offer all of its health insurance products and programs existing as of the date of this

Agreement and any health insurance products and programs offered by any other entity as of the date of its acquisition by United, in each case without regard to the comparability of such products to those offered pursuant to the SHIP.  This Section 3.7 also shall not preclude United from directly or indirectly offering any products which it presently offers or from developing any products for sale through its affiliated health maintenance organizations.

3.8     CONFLICTING APPROVALS.  To the extent that United is required hereby to obtain approvals, consents, directions or recommendations from any party other than AARP or AARP Trust with respect to the Services or the SHIP, in the event of any inconsistency between any such approval, consent, direction or recommendation receival from AARP or AARP

31

<PAGE>

Trust, on the one hand, and another party, on the other hand, the approval, consent, direction or recommendation issued by AARP or AARP Trust shall be controlling.

3.9     AARP EVALUATIONS.  United will use its best efforts to remedy any deficiencies set forth in the evaluations delivered to United pursuant to Section 4.10 hereof.

3.10    CESSATION OF BUSINESS.

        3.10.1  GENERAL.  If United determines that the SHIP is not or will not be financially sustainable, it may terminate this Agreement as provided in, and subject to the terms and conditions of, this Section 3.10.

        3.10.2  PROCEDURE.  During the January of any Policy Year or during the 30-day period following a Change of Law which has either a material adverse effect on United's ability to perform its obligations under the Contract Documents or a material adverse economic effect on United's provision of the SHIP or the Services, United may notify AARP and AARP Trust that it has concluded that the SHIP is not or will not be financially sustainable.  If AARP disagrees with United's conclusion, AARP shall provide United with written notice thereof within 30 days of receipt of United's notice and the parties shall promptly select a mutually agreed upon actuarial firm to which, the sole of which shall be paid equally by United and Hartford and not charged to the SHIP, shall provide a recommendation as to whether United's conclusion is reasonable. If the parties are unable to agree upon an actuarial firm within 30 days of AARP's receipt of United's notice, then the actuarial firm shall be selected in accordance with the CPR Rules.  The actuarial firm shall be directed to reach a conclusion within 90 days of its appointment.  The recommendation of the actuarial firm shall be binding on the parties.  If the actuarial firm concludes that United's conclusion is not reasonable, then United shall not be entitled to cease writing new SHIP business.  If the actuarial firm concludes that United's determination is reasonable,

United shall be authorized to terminate this Agreement pursuant to Section 10.2(i) hereof.

3.11  RELATED PLANS.  The terms and conditions of any services to be provided in connection with any Related Plan shall be set forth in separate agreements among AARP, AARP Trust and United.


32

<PAGE>


ARTICLE 4
RESPONSIBILITIES OF AARP AND AARP TRUST

4.1  AARP'S REPRESENTATIVE.  Simultaneously with the execution hereof, AARP and AARP Trust jointly shall appoint an individual ("AARP's Representative") who shall have authority to act on their behalf under this Agreement, except that such representative shall have no authority to amend this Agreement.  AARP and AARP Trust promptly shall notify United of such appointment.  AARP may, upon 30 days' (or such lesser period as may be reasonable under the circumstances) prior written notice to United, change AARP's Representative.  All communications, requirements and instructions given in writing to AARP's Representative shall have the same effect as if given to AARP hereunder, except where expressly indicated otherwise herein.

4.2  GRANT OF RIGHT TO USE AARP MARKS.

   4.2.1  GRANT.  For the term of this Agreement, AARP hereby grants to United the exclusive, nonassignable right to use the AARP name, symbol, acronym and marks set forth in EXHIBIT 4.2.1 hereto as from time to time amended (collectively, the "AARP Marks") solely in connection with the provision of the SHIP and the Services and as reasonably required for the performance by it of its post-termination obligations in accordance herewith; provided, however, that such grant is subject to compliance by United with the obligations and covenants set forth in this Section 4.2.  AARP may unilaterally amend EXHIBIT 4.2.1 hereto, upon 30 days' notice to United, to include any new AARP Mark.

   4.2.2  NOTATIONS.  At the request of AARP, United shall apply the notice (E.G., the "-REGISTERED TRADEMARK" symbol, the "SM"
symbol
        (SM) or the "TM" symbol (TM)) specified by AARP.  AARP will provide United with written notice of changes to the notation requirements for the AARP Marks.  United shall implement such changes as soon as reasonably practicable, provided that United shall not be required to remove, replace or reprint any advertising, promotional materials, paper goods and any other materials and supplies that contain the AARP Marks with the former notations, except as would be necessary in the ordinary course of United's business.

   4.2.3  APPROVAL RIGHTS.  Use of the AARP Marks by United, including

their use in United generated direct mailings, advertisements, brochures or any other form of contact with AARP members initiated by or on behalf of United or its agents, will be subject to the prior approval of AARP.

33

<PAGE>

4.2.4   OWNERSHIP OF MARKS.  AARP owns the AARP Marks and United recognizes their substantial value and associated goodwill. United will not alter, modify, dilute or misuse the AARP Marks, bring them into disrepute, or challenge AARP's rights in them.

4.2.5   PROTECTION OF AARP MARKS.  United will not attempt to register the AARP Marks, and, at AARP's expenses, will reasonably cooperate with AARP in protecting, defending and registering them as they relate to the SHIP.

4.2.6   INFRINGEMENTS.  United will promptly advise AARP of any infringements of the AARP Marks known to United.  AARP will have the sole right to take legal action with regard to any such infringements.

4.3   EQUIPMENT TRANSFER.  Within a reasonable time after the execution hereof, AARP will request that Prudential transfer to United (by sale or other means) the equipment used by Prudential's AARP Operations in performing the services comparable to the Services described herein, for use by United, and that such transfer be effective on the Commencement Date.

4.4   DATABASE AND SYSTEMS TRANSFER.  Within a reasonable time after the execution hereof, AARP will request that Prudential transfer to United (by sale or other means) copies of the Databases, SHIP administration computer files and all related applications systems (i) as of May 1, 1997 for testing and development review, (ii) as of August 1, 1997 for regulatory review and (iii) with the final transfer to occur on or before the Commencement Date.  AARP shall request that Prudential provide the Databases and applications systems to United scrubbed and cleaned in a computer readable format on or before the Commencement Date.  AARP will also request that Prudential grant United access to the Databases, SHIP administration computer files and all related applications systems to assist in the transition processes contemplated under this Agreement, including but not limited to Sections 3.1.4 and 3.1.5 hereof.

4.5   EMPLOYEE HIRE.  Within a reasonable time after the execution hereof, AARP will request that Prudential encourage all of the persons who are to receive an offer of employment from United as provided in Section 3.1.3(b) hereof to accept such offer. AARP shall request Prudential to take all appropriate action to cause such hire of employees to be effective no later than the Commencement Date.  AARP also shall request that Prudential, as promptly as possible after the date hereof, (i) grant United access to its personnel currently involved with the SHIP-related activities of Prudential's AARP Operations in order to assist in the transition processes contemplated under this Agreement,

(ii) provide United with copies of any and all records pertaining to the SHIP Employees (including personnel, payroll and benefits received, in whatever format) that United shall reasonably request in order to meet its obligations hereunder in respect of

34

<PAGE>

the SHIP Employees and (iii) otherwise cooperate with United to effectuate the orderly transition of the employment of the SHIP Employees from Prudential to United as contemplated hereby.  AARP also shall request that Prudential, on the Commencement Date, provide United with the original copies of any and all Records pertaining to the SHIP Employees, including without limitation the Records described in clause (ii) above.

4.6    OTHER ASSETS AND INFORMATION.  AARP will transfer or undertake commercially reasonable efforts to cause to be transferred (by sale or other means) to United (by AARP, its representatives or other GHIP Vendors) such other information as United from time to time may reasonably require in order to perform the Services and provide the SHIP.

4.7    PRUDENTIAL AGREEMENTS.  AARP and AARP Trust shall undertake commercially reasonable efforts to enter into such agreements and arrangements with Prudential as may be necessary and appropriate to effectuate the orderly transfer of the Services and SHIP from Prudential to United, including without limitation the Transfer Agreement.

4.8    COOPERATION OF THIRD PARTIES.  AARP will undertake commercially reasonable efforts to obtain the cooperation of Prudential, the Member Services Vendor and the Sales and Marketing Vendor  in effectuating all of the transactions contemplated hereby.

4.9    OVERSIGHT.  AARP will oversee the operations of the GHIP to monitor whether it (i) satisfies the needs of the AARP members and (ii) supports the social welfare mission of the AARP.  AARP also will facilitate cooperation among the GHIP Vendors.

4.10   AARP EVALUATIONS.  For each Policy Year, in connection with the Operating Plans and premium rate related proposals submitted by United under Sections 3.2.6 and 3.3 hereof, AARP shall evaluate whether or not United has adequately performed the Services and is adequately satisfying the health insurance needs and promoting the social welfare of AARP's members.  AARP shall deliver in writing AARP's evaluation of United's provision of the Services within 90 days after the end of the applicable evaluation period.

4.11   OTHER PROGRAMS.  AARP and AARP Trust intend to sponsor health care choices for AARP members in an educational manner, giving appropriate consideration to all available options.

4.12   INSPECTION.  During normal business hours and upon reasonable notice,

AARP Trust shall permit United to inspect all Records reasonably related to the operation of the SHIP maintained by or on behalf of AARP Trust as United may from time to time reasonably request.  Such access shall be reasonable in scope, frequency and duration and, to the extent commercially reasonable, shall be via electronic data transfer.

35

<PAGE>

ARTICLE 5
REPRESENTATIONS AND WARRANTIES

5.1   REPRESENTATIONS AND WARRANTIES OF UNITED.  United hereby represents and warrants to AARP and AARP Trust as follows as of the date hereof.

5.1.1   ORGANIZATION AND OUTSTANDING.  United is a stock insurance company duly organized, validly existing and in good standing under the laws of the State of Connecticut and has the corporate power and authority to own, lease and operate its assets and to carry on its business as it is now being conducted.

5.1.2   AUTHORIZATION.  United has the full corporate power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution and delivery of this Agreement and the performance by United of its obligations under this Agreement have been duly and validly authorized and approved by all requisite corporate action of United and no other acts or proceedings on its part, including approvals, consents or authorizations by any of its policyholders, are necessary to authorize the execution, delivery and performance of this Agreement or the transactions contemplated hereby. This Agreement constitutes the legal, valid and binding obligation of United and is enforceable in accordance with its terms, except to the extent that enforcement may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights and the obligations of debtors generally and by general principles of equity, regardless of whether considered in a proceeding at law or in equity.

5.1.3   CONSENTS AND APPROVALS.  Except as set forth in EXHIBIT 5.1 hereto, no consent, approval, non-disapproval, authorization, ruling, order of, notice to or registration with, any governmental or regulatory authority or any person, partnership, corporation, firm, trust or other entity is required on the part of United in connection with the execution and delivery of this Agreement or the consummation by United of the transactions contemplated hereby.

5.1.4   ACTIONS PENDING.  There is no action, suit, investigation or proceeding pending or, to the knowledge of United, threatened against United or any properties or rights of United, by or before any court, arbitrator or administrative or governmental body, which action, suit, investigation or proceeding could reasonably be expected to impair the ability of United to

perform its obligations under this Agreement.

5.1.5   NO CONFLICT OR VIOLATION.  Except as disclosed in EXHIBIT 5.1 hereto, the execution, delivery and performance of this Agreement and any other

36

<PAGE>

agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby by United in accordance with the respective terms and conditions hereof and thereof will not (i) violate any provision of United's articles of incorporation, bylaws or other charter or organizational document, (ii) violate, conflict with or result in the breach of any of the terms of, result in any modification of, accelerate or permit the acceleration of the performance required by, otherwise give any other contracting party the right to terminate, or constitute (with notice or lapse of time, or both) a default under, any contract or other agreement to which United is party or by or to which it or any of its assets or properties may be bound or subject, (iii) violate any order judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, any governmental or regulatory body, foreign or domestic, binding upon United, or upon the assets, operations or business of United, (iv) violate any Applicable Law that relates to United or to the assets, operations or business of United, which violation might result in any adverse change in the GHIP or impair the ability United to perform its obligations under this Agreement, (v) result in the creation of any lien, charge or encumbrance on any of the assets or properties of United which assets or properties relate to the ability of United to perform its obligations under this Agreement, or (vi) result in the breach of the terms and conditions or cause an impairment of any license or government authorization relating to the policies to be issued by United in connection with the GHIP; which, in any of the cases referred to the preceding clauses (i) through (vi) would materially adversely affect the ability of United to perform its obligations under this Agreement.

5.1.6   LICENSES AND PERMITS.  Except as disclosed in EXHIBIT 5.1 hereto, United is duly qualified, has all necessary governmental licenses and permits, and is in good standing in every jurisdiction where the nature of the administration and servicing of the GHIP requires it to be qualified or licensed. There are no pending, or to the knowledge of United, threatened, suits or proceedings with respect to the suspension, revocation, restriction, amendment or nonrenewal of any such governmental license or permit, and no event which (whether with notice or lapse of time or both) will or could result in a suspension, revocation, restriction, amendment or nonrenewal of any such governmental license or permit has

occurred.  United is not operating under any agreement with the insurance regulatory authority of any state which restricts its authority to do business or requires it to take, or refrain from taking, any action that could adversely impact the administration and servicing of the GHIP.

5.1.7  COMPLIANCE WITH LAWS.  United is in compliance with all Applicable Laws in all jurisdictions in which United is presently doing business, except where the

37

<PAGE>

failure to be in compliance with such Applicable Laws would not impair in any material respect United's ability to perform its obligations hereunder.

5.1.8  DISCLOSURE.  No document, certificate or schedule provided by United in connection with this Agreement or the transactions contemplated hereby contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

5.1.9  FINANCIAL CONDITION.  United is not insolvent, has not filed or had filed against it a petition in bankruptcy, has not made an assignment for the benefit of creditors or otherwise had a receiver or trustee appointed with respect to its properties or affairs and has not incurred any obligations, contingent or otherwise, which would cause it to become insolvent. EXHIBIT 5.1.9 hereto sets forth United's current ratings by the two rating agencies identified therein.

5.2  REPRESENTATIONS AND WARRANTIES OF AARP AND AARP TRUST.  AARP and AARP Trust hereby jointly and severally represent and warrant to United as follows as of the date hereof.

5.2.1  ORGANIZATION AND STANDING.  AARP is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the District of Columbia and has the power and authority to own, lease and operate its assets and to carry on its activities as it is now being conducted.  AARP Trust is a trust duly organized, validly existing and in good standing under the laws of the District of Columbia and has the power and authority to own, lease and operate its assets and to carry on its activities as it is now being conducted.

5.2.2  AUTHORIZATION.  AARP and AARP Trust each has the full power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution and delivery of this Agreement and the performance by AARP and AARP Trust of their respective obligations under this Agreement have been duly and validly authorized and approved by all requisite action of AARP

and AARP Trust and no other acts or proceedings on their part,
including approvals, consents or authorizations by any of its
members, are necessary to authorize the execution, delivery and
performance by AARP and AARP Trust of this Agreement or the
transactions contemplated hereby.  This Agreement constitutes
the legal, valid and binding obligation of AARP and AARP Trust
and is enforceable against them in accordance with its terms,
except to the extent that enforcement may be limited by
bankruptcy, insolvency, reorganization or similar laws
affecting creditors' rights and the obligations of

<div align="center">38</div>

<PAGE>

debtors generally and by general principles of equity,
regardless of whether considered in a proceeding at law or in
equity.

5.2.3   CONSENTS AND APPROVALS.  No consent, approval, non-disapproval,
authorization, ruling, order of, notice to or registration
with, any governmental or regulatory authority or any person,
partnership, corporation, firm, trust, or other entity is
required on the part of AARP or AARP Trust in connection with
the execution and delivery of this Agreement or the
consummation by AARP and AARP Trust of the transactions
contemplated hereby.

5.2.4   ACTIONS PENDING.  Except as set forth in EXHIBIT 5.2 hereto,
there is no action, suit, investigation or proceeding pending,
or to the knowledge of AARP or AARP Trust threatened, against
AARP or AARP Trust or any properties or rights of AARP or AARP
Trust, by or before any court, arbitrator or administrative or
governmental body, which could reasonably be expected to impair
the ability of AARP or AARP Trust to perform their respective
obligations under this Agreement.

5.2.5   NO CONFLICT OR VIOLATION.  The execution, delivery and
performance of this Agreement and any other agreements
contemplated hereby and the consummation of the transactions
contemplated hereby and thereby by AARP in accordance with the
respective terms and conditions hereof and thereof will not (i)
violate any provision of the articles of association, bylaws,
trust agreement or other charter or organizational document of
AARP or AARP Trust, (ii) violate, conflict with or result in
the breach of any of the terms of, result in any modification
of, accelerate or permit the acceleration of the performance
required by, otherwise give any other contracting party the
right to terminate, or constitute (with notice or lapse of
time, or both) a default under, any contract or other agreement
to which AARP or AARP Trust is a party or by or to which they
or any of their assets or properties may be bound or subject,
(iii) violate any order, judgment, injunction, award or decree
of any court, arbitrator or governmental or regulatory body
against, or binding upon, or any agreement with, or condition

imposed by, any governmental or regulatory body, foreign or domestic, binding upon AARP or AARP Trust, or upon the assets or operations of AARP or AARP Trust, (iv) violate any statute, law or regulation of any jurisdiction as each statute, law or regulation relates to AARP or AARP Trust or to the assets or operations of AARP or AARP Trust, which violation might result in any adverse change in the GHIP or impair the ability of AARP or AARP Trust to perform their respective obligations under this Agreement, or (v) result in the creation of any lien, charge or encumbrance on assets or properties of AARP or AARP Trust which assets or properties relate to the ability of AARP or AARP Trust to perform

39

\<PAGE\>

their respective obligations under this Agreement; which, in any of the cases referred to in the preceding clauses (i) through (vi) would materially adversely affect the ability of AARP or AARP Trust to perform its obligations under this Agreement.

5.2.6   COMPLIANCE WITH LAWS.   AARP and AARP Trust each are in compliance with all Applicable Laws in all jurisdictions in which they are presently doing business, except where the failure to be in compliance with such Applicable Laws would not impair in any material respect AARP's or AARP Trust's ability to perform its obligations hereunder.

5.2.7   FINANCIAL CONDITION.   Neither AARP nor AARP Trust is insolvent, nor has either filed or had filed against it a petition in bankruptcy, made an assignment for the benefit of creditors or otherwise had a receiver or trustee appointed with respect to its properties or affairs or incurred any obligations, contingent or otherwise, which would cause it to become insolvent.

5.3   SURVIVAL OF REPRESENTATIONS AND WARRANTIES.   All representations and warranties made by the parties in this Agreement shall survive the termination hereof for a period of two years.

ARTICLE 6
ALLOWANCES AND COMPENSATION

6.1   AARP ALLOWANCE.   AARP shall be entitled to receive an allowance for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith. For each Policy Year, this allowance shall be equal to the sum of (i) four percent of the first $1 billion in Member Contributions plus (ii) two and one-half percent of the Member Contributions in excess of $1 billion.   This allowance shall be payable in accordance with Section 6.7 hereof.

6.2   UNITED ADMINISTRATION CHARGES.

6.2.1   ADMINISTRATIVE SERVICE FEE.

     (a)   For all Services other than those services for which specific reimbursement is made pursuant to this Agreement, United shall receive a fee (the "Administrative Service Fee") per SHIP Insured per calendar month in amounts determined as provided in this Section 6.2.1.

<div align="center">40</div>

&lt;PAGE&gt;

     (b)   On or prior to October 15, 1997, United will submit for approval by AARP Trust its projected Administrative Service Fees in the form of a cost accounting budget for the provision of the Services to apply to Policy Year 1998.  United's submission will be at a sufficient level of detail for AARP Trust to understand and approve expenses by category, substantially as reflected in EXHIBIT 6.2.1(b) hereto.  The expenses approved by AARP Trust will constitute the Administrative Service Fees for Policy Year 1998.

     (c)   On or prior to October 15, 1998, United will submit for approval by AARP Trust its projected Administrative Service Fees in the form of per member, per month charges, to apply to Policy Years 1999 through 2001. These per member, per month charges may depend on a specific anticipated enrollment level and variables including without limitation key levels of service, such as member enrollment, number of claims per member and changes in the CPI.  The expenses approved by AARP Trust will constitute the Administrative Service Fees for Policy Year 1999 through 2001.  United's submission will be at a sufficient level of detail for AARP Trust to understand and approve expenses by category, substantially as reflected in EXHIBIT 6.2.1(b) hereto.

     (d)   Notwithstanding the foregoing provisions of this Section 6.2, in the event that early transfer occurs and United's administration of the SHIP commences prior to January 1, 1998, then on or prior to October 15, 1997 United may propose for approval by AARP Trust an administrative budget in the form of per member, per month charges to apply in Policy Years 1998 through 2000.  United's submission will be at a sufficient level of detail for AARP Trust to understand and approve expenses by category, substantially as reflected in EXHIBIT 6.2.1(b) hereto.

6.2.2   CHANGES IN ADMINISTRATIVE SERVICE FEE.  The parties agree to adjust the Administrative Service Fee payable for any Policy Year if in that Policy Year there occurs any material increase in United's costs resulting from (i) a Change of Law, (ii) an

Event of Force Majeure, (iii) a change in the Services or any
SHIP Plan made at the request, or with the approval, of AARP or
AARP Trust, (iv) a change in the services or products provided
by any other GHIP Vendor or (v) any restructuring or
reengineering of the manner whereby the Services or any SHIP
Plan are provided; provided, that any adjustment in the
Administrative Service Fee for any Policy Year made pursuant to
this sentence shall be consistent in magnitude with the impact
on United's costs of the cause giving rise to the adjustment.
The Administrative Service Fee and each factor

<div style="text-align:center">41</div>

&lt;PAGE&gt;

contributing thereto shall, as appropriate, be calculated on an
interpolated basis to the nearest one thousandth of one
percent.

6.2.3   PASS-THROUGH EXPENSES.  United will provide AARP Trust with a
budget for Pass-Through Expenses pursuant to Section 3.3.2
hereof.  United's budget proposal will be at sufficient level
of detail to enable AARP Trust to understand and approve
specific items.  United shall be reimbursed for all
Pass-Through Expenses through a charge made in the
retrospective experience rating for the SHIP pursuant to
Section 8.3 hereof for the Policy Year in which the
Pass-Through Expense is incurred.  Notwithstanding the
foregoing, AARP Trust may require that specific Pass-Through
Expenses identified in clauses (iii), (v), and (xi) of the
definition thereof be capitalized and included in Retention
over a period of years specified by AARP Trust, which shall be
no longer than that which is consistent with the expected
useful life of the item, provided, however, that the
capitalization period shall not extend beyond the term of this
Agreement.  Any such Pass-Through Expenses, together with
interest at the Amortization Interest Rate, shall be charged
over the specified term in equal annual installments.

6.2.4   START-UP COSTS.  AARP shall request Prudential to pay United
for any Start-Up Costs and shall authorize Prudential to pay
such Start-Up Costs. United shall provide Prudential with an
itemized statement of such Start-Up Costs for the period ending
December 31, 1996 and for each calendar quarter (or portion
thereof) through and including the Commencement Date.  AARP
shall request Prudential to pay the invoiced amounts within 30
days of receipt.  Any such Start-Up Costs which are either (i)
not billed to Prudential as of the Commencement Date or (ii)
billed to Prudential as of the Commencement Date but not paid
in due course shall be charged to the experience rating for the
SHIP pursuant to Section 8.3 hereof. Notwithstanding the
foregoing, AARP Trust may require that specific Start-Up
Expenses be capitalized and included in Retention over a period
of years specified by AARP Trust, which shall be no longer than
that which is consistent with the expected useful life of the

item, provided, however, that the capitalization period shall not extend beyond the term of this Agreement. Any such Start-Up Cost, together with interest at the Amortization Interest Rate, shall be charged over the specified term in equal annual installments.

6.2.5   PERFORMANCE CHARGES.  United shall be accountable for the attainment of standards of performance described in EXHIBIT 3.2.5 hereto.  If United fails to satisfy the applicable performance standards, it shall be subject to the charges specified in EXHIBIT 3.2.5 hereto.  United shall measure performance against these standards on a continuous basis and shall report to AARP quarterly.  As

42

<PAGE>

part of the preparation of the annual accounting, United shall prepare a report showing actual performance for the Policy Year compared with the agreed standards, and the amount of penalty owing (if any).  United's Administrative Service Fees will be adjusted by the amount of any charges payable for the Policy Year.  The maximum charge that shall be payable with respect to any Policy Year will be (***) of United's Administrative Service Fees for the year.  AARP will have the right to conduct an independent audit of United's reporting and administration to verify the charges payable.

6.3   UNITED RISK AND PROFIT CHARGES.  United shall be entitled to receive compensation for assuming the risk associated with the SHIP.  Such compensation payable to United for a Policy Year shall equal the product of the Compensation Percentage multiplied by the SHIP Net Premiums for such Policy Year.  The Compensation Percentage shall equal the sum of the Basic Percentage (determined pursuant to Section 6.3.1 hereof) and the Incentive Percentage (determined pursuant to Section 6.3.2 hereof); provided, however, that in no event shall the Compensation Percentage be less than (***) for any Policy Year.

6.3.1   BASIC PERCENTAGE.  The Basic Percentage for a Policy Year will be determined by reference to the RSF Balance Percentage (determined as of the end of the previous Policy Year) in accordance with the following table:

Basic Percentage
---------------------------------------------------------------
--

| FIRST POLICY YEAR | SECOND POLICY YEAR | THIRD POLICY YEAR | FOURTH POLICY YEAR | FIFTH AND FOLLOWING POLICY |
|---|---|---|---|---|
YEARS

----     ----     ----     ----     -----------
--

(***)

*** Denotes confidential information that has been omitted from the exhibit
    and filed separately accompanied by a confidential treatment request with
    the SEC pursuant to Rule 24b-2 of the Exchange Act.

43

<PAGE>

BASIC PERCENTAGE

--

| FIRST POLICY YEAR | SECOND POLICY YEAR | THIRD POLICY YEAR | FOURTH POLICY YEAR | FIFTH AND FOLLOWING POLICY |
|---|---|---|---|---|

YEARS

--

(***)

Coincident with any adjustment in the (***) agreed to by the
parties pursuant to (***) hereof, the foregoing table will be
realigned such that the applicable (***) for the new (***) will
be

the same as the (***) for the (***) level above.  The (***)
shall

be interpolated to the nearest one-thousandth of (***) if
the (***) falls between any of the (***) specified in the
foregoing table.

6.3.2   INCENTIVE PERCENTAGE.  The Incentive Percentage for a Policy
        Year will be based on the Performance Experience for such
        Policy Year in accordance with the following table:

INCENTIVE  PERCENTAGE

| PERFORMANCE EXPERIENCE | FIRST TWO POLICY YEARS | THIRD AND FOLLOWING POLICY YEARS |
|---|---|---|

(***)

The Incentive Percentage shall be interpolated to the nearest
one-thousandth of one percent if the Performance Experience
falls between the ranges specified in the foregoing table.  The
Incentive Percentage applicable at any time during

*** Denotes confidential information that has been omitted from the exhibit
    and filed separately accompanied by a confidential treatment request with
    the SEC pursuant to Rule 24b-2 of the Exchange Act.

44

&lt;PAGE&gt;

a Policy Year shall be determined by reference to United's best estimate of the year-to-date Performance Experience.

6.3.3   TAX CHANGES.  The Risk and Profit Charge has been negotiated on the basis of the federal income Tax rates and methodologies currently applicable to United with respect to its ordinary income.  If such rates or methodologies are changed, other than as a result of a voluntary change by United, AARP Trust or United may propose for approval by the other, which approval shall not be unreasonably withheld, that the Risk and Profit Charge set forth in this Section 6.3 be changed so as to yield United the same rate of return as would have applied had there been no such change in such Tax rates or methodologies.

6.4   INVESTMENT INCOME CREDITS.  As a part of the retrospective experience rating for the SHIP (as described in Section 8.3 hereof), the Retention for the SHIP for each Policy Year shall include a credit for the amount of United's investment income (the "Investment Income Credit") that is deemed to be associated with the SHIP, in accordance with the following provisions.

6.4.1   SHIP PORTFOLIO.  For the purpose of determining the Investment Income Credit, United will maintain for the SHIP separate accounting for a distinct portfolio or portfolios of assets (the "SHIP Portfolio") associated with the SHIP.  Such assets shall be owned by and shall remain part of the general account of United.  The assets of the SHIP Portfolio shall be credited with investment income from the date of deposit to the date of withdrawal.

6.4.2   CASH TRANSFERS.  Cash transfers shall be made to and from the SHIP Portfolio with respect to the following items:

(a)   SHIP Net Premiums received.

(b)   Claims paid.

(c)   Amounts Paid with respect to Incurred Premium Refunds.

(d)   Target Retention:  One-twelfth of the Target Retention, gross to the Investment Income Credit and net of Vendor Operating Expenses and Vendor Pass-Through Expenses, for the Policy Year, which transfer shall be made on the fifteenth day of each calendar month (or next following Business Day).

45

&lt;PAGE&gt;

(e)   Annual Accounting Settlement:  A transfer will be made to

reflect the difference between the Target Retention gross to the Investment Income Credit and net of the Vendor Operating Expenses and the Vendor Pass-Through Expenses and the actual Retention gross to the Investment Income Credit and net of the Vendor Operating Expenses and the Vendor Pass-Through Expenses.  The transfer identified in the immediately preceding sentence will be made as soon as possible after the review pursuant to Section 8.5 hereof has been completed, and will include interest accrued at the Investment Income Credit Rate for that Policy Year from the midpoint of the Policy Year to the time at which the transfer occurs.

(f)     Any other credits or charges made under this Agreement or otherwise agreed to by United, AARP and AARP Trust, including without limitation any charges made pursuant to Section 6.4.3(c) hereof.  If the credit does not result from an identifiable cash flow item, then the cash transfer in respect of any such item will be made at the time the credit or charge becomes effective, or at such other time as is agreed to by United, AARP and AARP Trust.

6.4.3   INVESTMENT INCOME CREDIT CALCULATION.  The Investment Income Credit for a given Policy Year shall be equal to the sum of the following:

(a)     the interest and dividend income earned on the assets of the SHIP Portfolio during that Policy Year, as determined according to the accounting principles underlying United's statutory annual statement (the "statutory accounting rules"), plus

(b)     the capital gains and losses realized on the assets of the SHIP Portfolio during that Policy Year, as determined according to statutory accounting rules then in effect, less

(c)     investment management fees and corporate accounting and other portfolio administration costs payable to United, each in such amounts as may be agreed among the parties from time to time.

6.4.4   INVESTMENT INCOME CREDIT RATE.  The Investment Income Credit Rate for a given Policy Year shall be calculated as follows:

(a)     the amount of the Investment Income Credit for that Policy

        Year, divided by

46

<PAGE>

(b)     the amount, determined as nearly as practicable, of the

average invested assets in the SHIP Portfolio during that
Policy Year, with appropriate adjustment for interest and
dividends received.

6.4.5   INVESTMENT STRATEGY.  The funds in the SHIP Portfolio shall be
invested according to a written investment strategy.  The
investment strategy shall be proposed by United, and shall be
subject to approval by AARP Trust.

6.4.6   INVESTMENT MANAGER.  The investments held in the SHIP Portfolio
shall be managed by employees of United or its affiliates, or
by another investment manager or managers selected by United
and approved by AARP Trust.  If at any time United and AARP
Trust shall not have agreed to any investment manager, United
may employ for this purpose any investment manager or managers
that at that time each manage at least ten percent of the
admitted invested assets of United's combined insurance
companies, or ten percent of the consolidated invested assets
of United and its affiliates (exclusive of the assets of the
SHIP Portfolio) determined as of the December 31 last
preceding.

6.4.7   INVESTMENT PERFORMANCE; OWNERSHIP.  United does not guarantee
the preservation of the principal amount of the assets
comprising the SHIP Portfolio, and does not guarantee the
achievement of any specific rate of return on the assets
comprising the SHIP Portfolio.  United shall not impose any
investment liquidation charge in connection with the scheduled
termination of this Agreement.  The SHIP Portfolio shall not
constitute an asset of AARP or AARP Trust, nor shall AARP or
AARP Trust have any interest in the income derived therefrom.

6.5   TAX-TIMING EXPENSE.  United shall be compensated for the tax-timing
costs identified in EXHIBIT 6.5 hereto (collectively the "Tax-Timing
Expenses") through a charge made in the retrospective experience rating
for each of the items described in EXHIBIT 6.5 hereto.  The charges
will generally be a function of United's marginal federal and state
income Tax rate for the rating period ("United's Tax Rate") and the
Investment Income Credit Rate for that period.

6.6   TAX REIMBURSEMENT.

6.6.1   IN ORDINARY COURSE.  United shall be entitled to charge or
credit the retrospective experience rating for the SHIP (as
described in Section 8.3 hereof) for any costs, losses,
damages, liabilities, amounts paid in settlement, and
out-of-pocket costs and expenses (including reasonable fees,
charges and expenses of outside attorneys and other outside .
experts and advisors, but excluding any penalties or fines
except as expressly provided in clause (iv) below) incurred by

47

<PAGE>

United and its affiliates with respect to the following: (i) a Change of Law with respect to Taxes; (ii) Taxes payable by United in respect of its receipt of the Transferred Assets (as more fully provided in Sections 3.6.2 to 3.6.4 hereof); (iii) any Taxes arising from audit adjustment of any Tax Return of United, including any carryover adjustments; or (iv) penalties or fines on any Taxes to the extent caused by the action or inaction of Prudential or any GHIP Vendor other than United, or to the extent arising from a position taken at the direction of or with the express consent of AARP or AARP Trust; provided, however, that nothing herein shall entitle United to recover more than once for any item hereunder.

6.6.2   AUDIT ADJUSTMENTS.   To the extent that United's Tax Returns are adjusted upon examination so as to eliminate, reduce, increase or create tax timing costs for prior periods, the charges for prior tax-timing costs shall be recalculated to be consistent with such adjustment including any carryover adjustments.   The difference between the charge previously made and the recalculated charge shall be reflected in the retrospective experience rating of the SHIP (as described in Section 8.3 hereof) for the Policy Year in which such adjustment is agreed to by United and such taxing authority.   United shall notify AARP Trust concerning the existence of any audit of its Tax Returns having a potential impact upon the SHIP, and shall consult with AARP Trust regarding its strategy and position with regard to any such audit.

6.6.3   GROSS UP.   United shall be entitled to make a change in the retrospective experience rating of the SHIP (as described in Section 8.3 hereof) for any Gross Up related to any tax reimbursement amount to which United is entitled pursuant to clauses (ii) and (iv) of Section 6.6.1 hereof.

6.6.4   VALUATION OF TRANSFERRED ASSETS.   United shall employ a qualified valuation expert to determine the value of the Transferred Assets.   The cost of such valuation shall constitute a Pass-Through Expense.

6.6.5   UPON TERMINATION.   In the event of a termination with a successor carrier under Section 10.4 hereof:   (i) AARP shall cause such successor carrier to reimburse and indemnify United for items contained in Sections 6.6.1, 6.6.2 and 6.6.3 hereof to the extent United has been unable to recover such items prior to termination pursuant to such Sections 6.6.1, 6.6.2 and 6.6.3; and (ii) United shall credit to the final accounting any DAC Tax gain that results from the recording of reinsurance premiums payable to a successor carrier at termination as negative considerations.

48

<PAGE>

6.7   PAYMENT OF ALLOWANCES AND COMPENSATION.   The Vendor Operating Expenses and Vendor Pass-Through Expenses payable to the GHIP Vendors other than

United, the SHIP Net Premiums payable to United and the allowances payable to AARP described in this Article 6 shall be paid monthly out of the Member Contributions actually received by the Member Services Vendor on behalf of AARP Trust, on the tenth day of the month following the month for which the Member Contributions apply.

6.8     REGULATORY IMPACT.  In the event of the occurrence of a Change of Law having a material cost impact upon the provision of the SHIP and delivery of the Services by United hereunder, the parties agree promptly and in good faith (i) to renegotiate the compensation provisions hereof and (ii) to review the adequacy of the Member Contributions then in effect and to revise the Member Contribution rates and Target Loss Ratio as reasonably appropriate.

6.9     OWNERSHIP OF FUNDS.  AARP Trust shall hold title to all funds held in AARP Trust accounts.


ARTICLE 7
PROPERTY RIGHTS IN AND CONFIDENTIALITY OF INFORMATION

7.1     MEMBER INFORMATION.

7.1.1   CLAIMS DATABASES. From and after the Commencement Date, United shall maintain the Claims Databases, which will be transferred to United as provided in Sections 3.1.4 and 4.4 above.  Subject to the provisions of Section 7.3 hereof, all information contained in the Claims Databases is and at all times shall remain the exclusive property of United.  Notwithstanding the foregoing, United and its affiliates may not utilize any information contained in the Claims Databases except (i) in connection with provision of the SHIP and the performance of the Services in the manner contemplated hereby, (ii) for research, analysis and valuation purposes, (iii) for incorporation and use in their normative databases, (iv) for regulatory reporting and reinsurance purposes, (v) as required by law, (vi) for reporting to management and (vii) in external or internal audits.  Any use of Claims Database information for the purposes specified in clauses (ii) and (iii) of the preceding sentence shall not be directly or indirectly identifiable to AARP, AARP Trust or any AARP member.

7.1.2   OTHER INFORMATION.  United and its affiliates will have access, on terms easonably acceptable to AARP and AARP Trust, to the SHIP Databases and to such other Records containing AARP member names and addresses as reasonably required in order to enable United to communicate information

49

<PAGE>

concerning the SHIP and related matters to AARP members.  In addition, subject to prior approval by AARP, United may have access to other Records concerning the AARP membership for the operation of the SHIP and performance of United's obligations hereunder.  Subject to the provisions of Section 7.2 hereof,

all such Records, including the names and addresses of AARP members, mailing lists, inquiry lists and buyers lists, are and at all times shall remain the exclusive property of AARP.  At any time upon request by AARP, United shall return to AARP all Records pertaining to such information; provided, however, that United may retain such Records as are necessary for the continued servicing of the SHIP for as long as reasonably required for such purpose.  The use of all such Records by United will be restricted exclusively to the provision of the SHIP and the performance of the Services in the manner contemplated hereby.

7.2    MEMBER COMMUNICATIONS.

7.2.1   AARP OWNERSHIP.  All communications to AARP members pertaining to the SHIP, including without limitation scripts, solicitation materials and other written materials mailed on behalf of AARP to any members, shall be the property of AARP, to the extent specifically identified by United or AARP, as the case may be, as developed and used exclusively for the SHIP. AARP shall have the sole right to copyright all or any of such pieces as it considers appropriate to the fullest extent permitted by law; provided, however, that AARP shall not have the right to copyright the United Marks. United acknowledges that it has no proprietary or ownership rights in any of such materials except to the extent that AARP shall authorize United to use them in connection with assisting AARP in informing the membership of availability of coverage under the SHIP.  AARP acknowledges that it has no proprietary or ownership rights or copyright rights with respect to any materials that were developed by United prior to the date hereof or are hereafter developed by United other than for use in connection with the SHIP.

7.2.2   AARP APPROVAL.  All written communications and all scripted oral communications specifically directed to AARP members, whether insured or uninsured members, and all other written communications sent on behalf of AARP to any of such persons, shall be submitted by United to AARP for AARP's approval in advance of dissemination which approval shall not be unreasonably withheld with respect to any communication required by Applicable Law.

7.3    RETURN UPON TERMINATION.  Upon termination of this Agreement and at AARP's direction, United shall turn over to AARP and/or to any person designated by AARP (or

50

<PAGE>

required by Applicable Law) all records specified in Sections 7.1 and 7.2 hereof then in the possession or control of United or its agents, and shall retain no such information, other than (i) Records relating to persons who remain covered by insurance policies issued by United, if any, (ii) records relating to claims still being processed by United

(which shall be transferred as provided in this Section 7.3 upon the completion of such processing), (iii) Records utilized for the purposes described in clauses (ii) through (vii) of the third sentence of Section 7.1.1 hereof (provided such information is not directly or indirectly identifiable to AARP, AARP Trust or any AARP member) and (iv) Records that United is required to maintain pursuant to Applicable Laws or for reinsurance purposes.  Upon AARP's request, United shall delete from its Records all AARP-specific information, including without limitation AARP membership names, addresses and numbers, except to the extent United is required to retain any such Records by Applicable Law.  AARP shall retain inspection rights as reasonably required to verify the deletions, subject to such limitations as reasonably required by United to maintain the confidentiality of its business records.

7.4    UNITED MARKS AND MARKS DEVELOPED FOR THE SHIP.

      7.4.1    UNITED MARKS.  AARP and AARP Trust acknowledge that many of the materials to be used in connection with the SHIP may contain some or all of the trademarks, service marks, logos, slogans and other intellectual property which are the property of United and which have been duly registered or identified to AARP by United for United's exclusive use (collectively, the "United Marks").  AARP and AARP Trust agree that they do not have, and by reason of this Agreement will not acquire, any property right or rights to use such United Marks without United's prior written consent.  In the event of termination of this Agreement, AARP and AARP Trust will not use such United Marks without the express written consent of United.  AARP, at United's expense, will reasonably cooperate with United in protecting, defending and registering the United Marks.

      7.4.2    DEVELOPED MARKS.  As used herein, "Developed Marks" means marks, names and/or slogans which are developed by AARP, AARP Trust and one or more GHIP Vendors to be used in conjunction with the GHIP which do not include the United name or logo. The Developed Marks shall be as from time to time set forth in EXHIBIT 7.4.2 hereto.  Either AARP or United may unilaterally amend EXHIBIT 7.4.2 hereto, upon 30 days' notice to the other, to include any new Developed Mark.  United agrees that it has no property or other rights in any Developed Mark and in the event of termination of this Agreement will not use the Developed Marks without the express written consent of AARP.

<div align="center">51</div>

&lt;PAGE&gt;

7.5    SECURITY ARRANGEMENTS.  United shall not give any lists, information, data or other materials referred to in Sections 7.1 and 7.2 hereof (except as expressly permitted thereby or as requested by regulators pursuant to Applicable Laws) to any person not a party to this Agreement (other than other GHIP Vendors as contemplated hereby and the parties referred to in Section 7.6.2(b) hereof) except another GHIP Vendor and any direct or indirect affiliate or majority-owned subsidiary of United without the prior written consent of AARP and

without the execution by such other GHIP Vendor or person of a security and confidentiality agreement, drafted by and/or acceptable to AARP, to safeguard the  confidentiality of such lists, information, data or other materials and to protect against unauthorized access to data stores across transmission facilities.  United will develop and test on an ongoing basis disaster recovery and business resumption plans to maintain both systems and operations to ensure that: (i) if provision of the Services is interrupted, the Services will be resumed within 48 hours, and (ii) if the Records containing AARP membership lists, information, data or other materials concerning AARP members that United has in its possession be destroyed or damaged, such lists, information and data shall be recovered by United within seven business days.  United will submit both such plans to AARP for its approval within 90 days of the Commencement Date.  United will submit updated versions of both such plans to AARP for its approval by March 31 of each year commencing 1998.  United will test the disaster recovery plan annually, and will test the business resumption plan biannually, and will submit the results of such testing to AARP, commencing with 1998.

7.6     PROPRIETARY INFORMATION.

        7.6.1   PROPRIETARY INFORMATION.  As used herein, "Proprietary
                Information" means information relating to the business or
                affairs of any party hereto which has been identified as
                confidential, or which from the circumstances in good faith
                should be treated as confidential, including, but not limited
                to, (a) commercial, technical, contractual and financial
                information, (b) descriptions, know-how and marketing plans
                with respect to the Services, the GHIP and United, (c)
                software, firmware, computer programs and elements of design
                relating thereto, and strategic information systems plans and
                applications, data and technology architectures related
                thereto, (d) information regarding trade secrets, (e) patents,
                service marks and trademarks, (f) customer and member
                information, (g) procedures, manual and guides, (h) information
                regarding the present or future business or products of any
                party hereto, charges for services, products and other items
                provided by such party to patients, other pricing information
                and contract terms between such party and health maintenance
                organizations, preferred provider organizations, insurance
                companies and other third party payors, (i) this Agreement, the
                other Contract Documents and the Associated Agreements and (j)
                all notes, analyses, compilations, studies, plans or other
                documents prepared by a party which contain or otherwise
                directly reflect any

                                        52

<PAGE>

                Proprietary Information.  Notwithstanding the above definition
                of Proprietary Information, information received from a party
                hereto shall not be deemed to be Proprietary Information and
                the Recipient shall have no confidentiality obligations with
                respect to such information which is: (i) already known to the
                Recipient from sources other than the Discloser provided that
                such source is not known by the Recipient to be bound by a

confidentiality agreement with the Discloser or otherwise to be prohibited from disclosing such information to the Recipient by a contractual, legal or fiduciary obligation; (ii) publicly known through no wrongful act of the Recipient; (iii) received by the Recipient from a third party without similar restriction and without breach of this Agreement; (iv) independently developed by the Recipient; (v) approved for release to a third party by written authorization of the Discloser; or (vi) disclosed pursuant to the lawful requirement of a court of competent jurisdiction or government or regulatory agency or authority.

7.6.2   COVENANTS.

(a)   Each party hereto acknowledges and agrees that from time to time in connection with such party's obligations under this Agreement or the other Contract Documents, such party will be given or have access to certain Proprietary Information.  All Proprietary Information is and shall remain exclusively the property of the party disclosing such Proprietary Information (the "Discloser") and the Discloser shall retain all right, title and interest therein.  The party hereto receiving such Proprietary Information (the "Recipient") shall hold in confidence and safeguard all such Proprietary Information and the Recipient shall make use of any such Proprietary Information solely for the purposes of performing its obligations under the Contract Documents or any Associated Agreement.  Each Recipient shall use all reasonable efforts not to disclose, reveal or communicate any Proprietary Information to any other party except subcontractors, consultants, auditors, reinsurers, representatives and agents and parents, subsidiaries, affiliates, successors and assigns, and each of their respective officers, directors and employees, who need the information to accomplish purposes permitted by this Agreement or the other Contract Documents and who have been properly advised of the obligations of the Recipient hereunder.

(b)   Each party agrees to take all action reasonably necessary or appropriate to maintain the confidentiality of the Proprietary Information.  Each party shall be responsible for the compliance by its officers, directors, partners, employees, consultants, agents and any other individuals in privity with

53

<PAGE>

Agreement

such party with each and every provision of this

applicable to such party.

(c)   No other rights or obligations other than those expressly recited herein are to be implied by this Agreement with respect to trademarks, service marks, patents, inventions, copyrights and other Proprietary Information.

(d)   Each party acknowledges and agrees that, except as expressly recited herein, no license under any patents, licenses, service marks or trademarks of any party is granted by this Agreement or by any disclosure of Proprietary Information hereunder.

(e)   Each party agrees that it shall not use (including, but not limited to, using the Proprietary Information to replicate the business systems, procedures or processes used by United or AARP with respect to the GHIP), copy, reproduce, distribute or disseminate in whole or in part, any Proprietary Information of another party or GHIP Vendor other than as contemplated hereunder.

(f)   In the event that any Recipient is required to disclose Proprietary Information under clause (vi) of Section 7.6.1 above, such party shall notify the Discloser of such Proprietary Information as soon as practicable and in any event prior to any actual disclosure taking place so that AARP and/or the Discloser may seek an appropriate protective order or other appropriate remedy.  In the event that such protective order or other remedy is not obtained, the Recipient may only furnish that portion (and only that portion) of the Proprietary Information, which in the opinion of the Recipient's counsel, the Recipient is legally compelled to disclose.

7.7    PROPRIETARY AND DEVELOPED SYSTEMS.

    7.7.1   PROPRIETARY SYSTEMS.  The entire right, title and interest in all business systems, procedures, processes, inventions, discoveries, improvements or other technology owned by United as of the dated hereof or developed solely by or on behalf of United after the date hereof other than in connection with the Services and the SHIP (collectively, the "Proprietary Systems") shall be owned by United.

    7.7.2   DEVELOPED SYSTEMS.  Subject to such rights set forth herein, the entire right, title and interest in all business systems, procedures, processes, inventions, discoveries, improvements or other technology related to the SHIP or the Services and all processes or uses relating thereto, whether or not patentable,

<div align="center">54</div>

&lt;PAGE&gt;

jointly developed by United, its contractors, one or more GHIP Vendors and/or AARP hereunder or in connection with Services and the SHIP, including for such purpose any otherwise

Proprietary System which is modified for use in connection with the SHIP where the cost of such modifications is charged to the SHIP (collectively, the "Developed Systems") shall be owned as agreed among the parties developing the same.  The Developed Systems shall be as from time to time set forth on EXHIBIT 7.7.2 hereto.  Either AARP or United unilaterally may amend EXHIBIT 7.7.2 hereto, upon 30 days' notice to the other, to include any new Developed System. Deletion of any Developed System from EXHIBIT 7.7.2 hereto shall require the approval of both AARP and United.

ARTICLE 8
RESERVE REQUIREMENTS;
RATE STABILIZATION FUND

8.1   PURPOSE OF RESERVES.  United shall establish and maintain in accordance with Applicable Laws all reserves which United reasonably determines are necessary to meet United's obligations under the SHIP, including but not limited to claim reserves, Loss Adjustment Expense Reserves, Active Life Reserves, extension-of-benefits reserves and the RSF. Reserves established by United for the pricing and experience rating of the SHIP shall be subject to review by an AARP Trust consulting actuary.

8.2   RATE STABILIZATION FUND.  To maximize rate stability, to fulfill risk-sharing objectives and to protect the interests of SHIP Insureds, a rate stabilization fund (the "RSF") like that referenced in Code section 807(c)(6) shall be established and maintained in connection with the SHIP Plans.  On or about the Commencement Date, United will accept transfer from Prudential of the funds comprising the then existing rate stabilization fund for the health insurance plans under the Existing Program, which funds will initially comprise the RSF. United will seek to maintain the RSF Balance Percentage within (***) of the target RSF Balance Percentage determined pursuant to Section 3.3.7(d) hereof.  To the extent that the RSF Balance Percentage exceeds the applicable target RSF Balance Percentage, United shall be required to submit to AARP Trust recommendations for reducing the excess through premium holidays for SHIP Insureds or by other means.

8.3   EXPERIENCE RATING.  Periodically, but at least annually after the end of each Policy Year, United shall determine the retrospective experience rating for the SHIP (including any SHIP Policy reinsured by United, in whole or in part) in accordance with this Section 8.3.

8.3.1   EXPERIENCE RATING DEFICIT.  A Policy Year results in a deficit if for such year the SHIP Gross Premiums are less than the sum of (i) Retention, (ii) Incurred

*** Denotes confidential information that has been omitted from the exhibit and filed separately accompanied by a confidential treatment request with the SEC pursuant to Rule 24b-2 of the Exchange Act.

55

<PAGE>

Claims and (iii) Incurred Premium Refunds.  Any such deficit shall be charged to the RSF; provided, however, that in no event shall the RSF Balance be less than zero.  Any deficit not chargeable to the RSF shall be treated as a deficit carryforward (a "Deficit Carryforward") and credited to the Deficit Carryforward Account.

8.3.2   EXPERIENCE RATING GAIN.  A Policy Year results in a gain if for such year and for such policy, the SHIP Gross Premiums exceed the sum of (i) Incurred Claims, (ii) Retention and (iii) Incurred Premium Refunds.  Any portion of the gain up to (***) of the gain shall be applied to reduce the Deficit Carryforward Account balance (but not below zero).  Any remaining portion of the gain shall be credited to the RSF.

8.4   MONTHLY REVIEW AND INTERIM ADJUSTMENT.  Following the end of each month, United shall estimate, and report to AARP, the retrospective experience rating for the SHIP Plans reflecting the experience through the month just ended.  United may from time to time make interim Policy Year adjustments to the RSF following the same principles described in Section 8.3 hereof.

8.5   ANNUAL REVIEW AND RECONCILIATION.  Following the end of each Policy Year, AARP Trust and United shall perform an annual review and reconciliation of the RSF.  The review process shall determine the actual experience of the SHIP for the Policy Year.  The reconciliation process shall compare the actual experience for the Policy Year most recently ended with the target experience for that year, taking into account any interim policy year RSF adjustments described in Section 8.4 hereof, and make a final adjustment to the RSF in accordance with the provisions of Section 8.3 hereof.  The annual review and reconciliation shall be completed by June 30 of the year following the Policy Year.

8.6   DISPOSITION UPON TERMINATION.  Upon termination of this Agreement, United shall dispose of the RSF Balance and other SHIP related reserves as provided in Section 10.4 or 10.5 hereof, as applicable.

ARTICLE 9
INTERACTION WITH OTHER GHIP VENDORS

9.1   GENERAL.  Certain services necessary for the provision of the SHIP will be provided by the Member Services Vendor and the Sales and Marketing Vendor.  To operate effectively within the GHIP business model, United shall interact with such other GHIP Vendors, as more fully provided in this Article 9.  United's Representative shall act as the principal liaison between United and the other GHIP Vendors.

*** Denotes confidential information that has been omitted from the exhibit and filed separately accompanied by a confidential treatment request with the SEC pursuant to Rule 24b-2 of the Exchange Act.

56

<PAGE>

9.2   MEMBER SERVICES VENDOR.

9.2.1   RESPONSIBILITIES.  The Member Services Vendor generally will be responsible for the following four primary functions with respect to all SHIP Products:

    (a)   centralized billing and collection support for the generation of individual and combined billing statements for all SHIP Products and collection, allocation and transfer of all funds received;

    (b)   enrollment processing for all SHIP Products (excluding eligibility determination, which shall be the responsibility of United);

    (c)   fulfillment of AARP requests for information regarding SHIP Products, transmission of enrollment materials and printing in support of billing and marketing activities;

    (d)   maintenance of a member call center to provide centralized level one support to AARP members for all SHIP Products; and

    (e)   a telemarketing program to cover telemarketing activities for SHIP products.

9.2.2   AGREEMENT.  Prior to the Commencement Date, United shall use commercially reasonable efforts to enter into an agreement with the Member Services Vendor in a form approved by AARP, which approval shall not be unreasonably withheld, which shall govern the relationship between United and the Member Services Vendor. United shall provide AARP with a copy of the agreement proposed to be entered into between it and the Member Services Vendor not less than 20 Business Days prior to its proposed execution date.  AARP shall use commercially reasonable efforts to provide comments on such proposed agreement to United within 15 Business Days of AARP's receipt thereof.  The agreement shall incorporate performance standards applicable to the relationship between United and the Member Services Vendor reasonably acceptable to AARP and United and insurance requirements comparable to those applicable to United pursuant to Section 13.6 hereof, and shall be consonant with existing performance standards among AARP and the several GHIP Vendors.

9.3   SALES AND MARKETING VENDOR.

9.3.1   RESPONSIBILITIES.  The Sales and Marketing Vendor generally will be responsible for the following three primary functions with respect to all SHIP Products:

<PAGE>

    (a)   general analysis and planning for marketing;

and

      (b)    creative development of multimedia marketing materials;

      (c)    production and fulfillment of direct mail marketing campaigns.

9.3.2    AGREEMENT.  Prior to the Commencement Date, United shall use commercially reasonable efforts to enter into an agreement with the Sales and Marketing Vendor, in a form approved by AARP, which shall govern the relationship between United and the Sales and Marketing Vendor.  United shall provide AARP with a copy of the agreement proposed to be entered into between it and the Sales and Marketing Vendor not less than 20 Business Days prior to its proposed execution date.  AARP shall use commercially reasonable efforts to provide comments on such proposed agreement to United within 15 Business Days of AARP's receipt thereof.  The agreement shall incorporate performance standards applicable to the relationship between United and the Sales and Marketing Vendor reasonably acceptable to AARP and United and insurance requirements comparable to those applicable to United pursuant to Section 13.6 hereof, and shall be consonant with existing performance standards among AARP and the several GHIP Vendors.

9.3.3    AARP APPROVAL RIGHTS.  United and the Sales and Marketing Vendor shall make available to AARP for AARP's review and approval prior to distribution to AARP members all communications pertaining to the SHIP.  United, AARP and the Sales and Marketing Vendor will cooperate in coordinating the review of proposed communication materials so that any applicable regulatory requirements and agreed-upon release dates can be met.

9.4    VENDOR INTERACTION.

9.4.1    DEFAULTS BY OTHER GHIP VENDORS.  Notwithstanding any other provision hereof to the contrary, the failure of United timely to perform any of its obligations hereunder as a result of the failure or refusal of any other GHIP Vendor to perform its obligations under any Associated Agreement shall not give rise to a breach by United of its obligations hereunder and shall not entitle AARP and AARP Trust to receive any damages from United hereunder (including any penalty set forth in Section 6.2.5 hereof) or expose United to any financial penalty hereunder.

58

<PAGE>

9.4.2    ACCESS TO INFORMATION.

      (a)    The GHIP Vendors other than United shall have the right to inspect and audit the Records maintained by United pertaining to the Services and the SHIP (excluding

information contained in the Claims Databases (other than paid claim data) which is and shall remain the property of United as a more fully provided in Article 7 hereof) which are material to the performance by any GHIP Vendor of its obligations relating to the GHIP; provided, however, that the foregoing rights to audit and inspect shall not apply to any Records relating to the compensation of United, provided that such Records are subject to annual independent audit, a copy of which is timely provided to the other GHIP Vendors.

(b) AARP shall cause the Associated Agreements between it and each GHIP Vendor to grant United the right to inspect and audit all Records maintained by any other GHIP Vendor pertaining to the GHIP which are material to the performance by United of its obligations hereunder (including without limitation Records pertaining to satisfaction of service standards or performance standards); provided, however, that the foregoing rights to inspect and audit shall not apply in respect of any Records relating to the compensation of another GHIP Vendor, provided that such Records are subject to annual independent audit, a copy of which audit is timely provided to United.

(c) The rights to inspect and audit granted to any person pursuant to clauses (a) or (b) above shall be during normal business hours, upon reasonable notice and reasonable in scope, frequency and duration, and shall be subject to confidentiality requirements comparable to those of Section 7.6.2 hereof.

9.5   GOVERNANCE OF INTERVENDOR DISPUTES.

9.5.1   GENERAL.  The GHIP Vendors shall in good faith attempt to resolve any dispute or claim arising out of or relating to the GHIP, including, but not limited to, the interpretation of agreements between GHIP Vendors (for the purposes of this section, individually, a "Program Agreement").  In order to resolve matters that the parties are unable to resolve in the ordinary course of business, each Program Agreement will incorporate the provisions of this Section 9.5.

9.5.2   VENDOR REPRESENTATIVES.  Resolution of all Program Issues is the primary responsibility of the GHIP Vendors representatives appointed from time to time (the "Representatives").  EXHIBIT 9.5.2 hereto, shall identify a Managing

59

<PAGE>

Representative (the Managing Representative) for each GHIP Vendor.  Each of the foregoing shall have authority to bind his principal in connection with the resolution of the Program

Issue.  EXHIBIT 9.5.2 hereto shall be deemed modified to reflect any changes in the Managing Representative of any GHIP Vendor as to which such GHIP Vendor may notify the parties hereto from time to time.

9.5.3   INFORMAL DISPUTE RESOLUTION.  By entering into a Program Agreement, each GHIP Vendor agrees that all disagreements, claims, controversies or disputes not resolved in the ordinary course of business arising in connection with or under the GHIP or any Associated Agreement (individually, a "Program Issue" and collectively, "Program Issues") shall be resolved in accordance with the provisions of this Section 9.5 and subject to the following principles:

(a)   all Program Issues shall be resolved as informally and expeditiously as possible giving greatest consideration to the orderly and efficient operation of the GHIP;

(b)   to the extent that any Program Issue involves a matter that may have an adverse effect on the operation of the SHIP (such portion of the Program Issue being hereinafter referred to as an "Operational Issue"), each affected GHIP Vendor shall use its best efforts to remedy the Operational Issue on a first priority basis in a manner which preserves the orderly and efficient operation of the GHIP on an interim and permanent basis; and

(c)   each affected GHIP Vendor shall promptly inform AARP, United and the Member Services Vendor of the existence and nature of any Program Issue, and shall consult with AARP, AARP Trust and the Member Services Vendor (unless the Member Services Vendor is an affected vendor with respect to the Program Issue) regarding the status of the Program Issue until the same is resolved.

9.5.4   MEDIATION.

(a)   Any GHIP Vendor which determines that a Program Issue exists shall promptly provide written notice of the Program Issue to the Managing Representative of each other GHIP Vendor who is reasonably likely to be affected by the Program Issue, to AARP and to the Member Services Vendor.  The Representatives of the affected GHIP Vendors who have experience in the functional area that is the subject of the Program Issue shall meet promptly and use commercially reasonable efforts to resolve the Program Issue.

60

<PAGE>

(b)   Should the Representatives be unable to resolve the Program Issue within ten days of the date notice is first sent, the Program Issue shall be referred for resolution to the Managing Representatives of the affected GHIP

Vendors.

(c)   Should the Managing Representatives of the affected GHIP Vendors be unable to resolve the Program Issue within the next five days after the Program Issue is referred to them, then any affected GHIP Vendor may elect by written notice to each other affected GHIP Vendor to submit the Program Issue to mediation in Washington, D.C. under the CPR Model, except as expressly modified by the provisions hereof.  There shall be one mediator, who shall be jointly selected by all the affected GHIP Vendors.  In the event the affected GHIP Vendors fail to agree on the mediator within three days after the date notice is given to all affected GHIP Vendors submitting the Program Issue to mediation, the mediator shall be appointed by AARP. If the mediator shall not have been appointed within five days after the date notice is given to all affected GHIP Vendors submitting the Program Issue to mediation, the mediator shall be selected in accordance with the CPR Model.  The mediator shall be disinterested in the subject matter of the Program Issue, shall have appropriate qualifications and experience with respect to mediation of business disputes, and shall possess relevant industry expertise.  The mediator shall attempt to reconcile and mediate the positions of the affected GHIP Vendors.  If that effort does not result in resolution of the Program Issue within ten days after the selection of the mediator, the mediator shall render to affected GHIP Vendors his written opinion and recommendation for resolution within five days after the matter was referred to mediation. If the Program Issue has not been resolved pursuant to this clause (c) within five days after receipt of the mediator's opinion and recommendation, then the affected GHIP Vendors shall submit the Program Issue to binding arbitration pursuant to Section 9.5.5 below. Each affected GHIP Vendor shall bear its own costs and expenses in connection with any mediation pursuant to this Section 9.5.4.  All costs and attorneys fees incurred by the affected GHIP Vendors in connection with any such mediation that are not attributable to each affected GHIP Vendor individually shall be shared equally by the affected GHIP Vendors, and shall not be charged to the GHIP.

9.5.5   ARBITRATION.

(a)   If the Program Issue has not been resolved in accordance with Section 9.5.4(c) above within 45 days after the dispute arises (or such

61

<PAGE>

longer period as to which the parties to the dispute may agree), then the Program Issue shall be submitted to binding arbitration in Washington, D.C. pursuant to the

CPR Rules,  except as expressly modified by the provisions hereof.  The arbitration shall be governed by the United States Arbitration Act, 9 U.S.C. SECTIONS 1-16, notwithstanding the choice of law provision in Section 14.4 hereof.  There shall be one arbitrator, who shall be jointly selected by all the affected GHIP Vendors.  In the event the affected GHIP Vendors fail to agree on the arbitrator within ten days after the Program Issue is submitted to arbitration, the arbitrator shall be appointed by AARP.  If an arbitrator shall not have been selected within 15 days after the Program Issue is submitted to arbitration, the arbitrator shall be selected in accordance with the CPR Rules.  The arbitrator shall be disinterested in the subject matter of the Program Issue, shall not have been employed or engaged at any time within the last five years by any party to the dispute, shall have appropriate qualifications and experience with respect to arbitration of business disputes and shall possess relevant industry expertise.  The decision of the arbitrator shall be based upon Applicable Law, the relevant GHIP contracts and reliable evidence in the record of the proceedings.  The prevailing GHIP Vendor in the arbitration shall be entitled to recover all reasonable costs incurred by such GHIP Vendor in connection with such arbitration proceeding, including without limitation all reasonable attorneys' fees.  In the event the arbitrator reaches a split decision, each affected GHIP Vendor shall bear its own costs and attorneys' fees in connection with such arbitration, and all costs and attorneys' fees incurred by the affected GHIP Vendors that are not attributable to each affected GHIP Vendor shall be shared equally by the affected GHIP Vendors.

(b)     The decision of the arbitrator shall be final, conclusive and binding upon the GHIP Vendors.  Judgment may be entered on the arbitrator's award in any court of competent jurisdiction.

(c)     The parties recognize that damages at law would not be an adequate remedy for the breach of many provisions of the Agreement and that prompt, equitable relief, prohibitory or mandatory, may be appropriate in many circumstances. In the event of any arbitration arising out of or relating to this Agreement or the Contract Documents, the arbitrator is encouraged to take account of this recognition and seek to fashion appropriate relief when the circumstances warrant.

(d)     The parties hereto consent to personal jurisdiction over them in the federal courts of the District of Columbia in connection with any application to

62

<PAGE>

compel arbitration pursuant to this Section 9.5.5 or for the entry of judgment upon any arbitration award. Service of process upon any  party shall be sufficient if made in accordance with the laws of the District of Columbia or in accordance with the notice provision of Section 14.5 hereof.

(e)   In no event shall the arbitrators in any arbitration pursuant to this Section 9.5 be authorized (i) to award any punitive damages or (ii) to award consequential or special damages in excess of $35 million in the aggregate (or such lower amount as to which the parties may agree).

9.5.6   MISCELLANEOUS.

(a)   The GHIP Vendors shall continue to perform all of their respective obligations under this Agreement and the Program Agreements pending the final resolution of any Program Issue, including, without limitation, during the pendency of any mediation pursuant to Section 9.5.4(c) hereof or any arbitration pursuant to Section 9.5.5 hereof.

(b)   By mutual written agreement, the GHIP Vendors may extend any applicable time period or waive all or any procedures or proceedings required under Section 9.5.4(c) hereof and commence arbitration pursuant to Section 9.5.5 hereof.

9.6   TERMINATION OF OTHER GHIP VENDORS.  AARP and AARP Trust shall notify United as soon as reasonably possible of the termination or proposed termination of any GHIP Vendor other than United.  Upon such termination United may recover its reasonably incurred and documented costs arising directly from such termination and the substitution of any successor vendor as Pass-Through Expenses pursuant to the annual budgeting process as described in Article 3 hereof.  In addition, at the request of United, AARP and AARP Trust will review any performance standard applicable to United affected by such termination, and will not unreasonably withhold their consent to any change thereto proposed by United.

9.7   COMPENSATION OF OTHER GHIP VENDORS.

9.7.1   VENDOR OPERATING EXPENSES.  Vendor Operating Expenses shall be payable out of SHIP Gross Premiums to the parties entitled thereto during the Policy Year in which such Vendor Operating Expenses are incurred.

9.7.2   VENDOR PASS-THROUGH EXPENSES.  Vendor Pass-Through Expenses shall be payable out of SHIP Gross Premiums to the parties entitled thereto; provided,

63

<PAGE>

however, that if the RSF Balance Percentage equals or exceeds
(***), Vendor Pass-Through Expenses shall be payable during the
Policy Year in which such Vendor Pass-Through Expenses are
incurred. If the RSF Balance Percentage is less than (***) and
the parties agree that charging the Vendor Pass-Through
Expenses
in a single Policy Year will have a materially adverse effect
on
the SHIP or the RSF, then the specific Vendor Pass-Through
Expenses shall be capitalized over a period of time determined
by
the parties.  Any such Vendor Pass-Through Expenses together
with
interest at the Amortization Interest Rate, shall be charged
over
the specified term in equal annual installments.


ARTICLE 10
TERM AND TERMINATION

10.1   TERM.  The term of this Agreement shall commence on  the date hereof
and shall continue until December 31, 2007.  Not later than December
31, 2005,  the parties shall notify one another as to whether they
intend to enter into negotiations with a view to extending the term of
this Agreement, entering into a new agreement providing for the
continued provision of the SHIP and related Services by United, or
terminating this Agreement.

10.2   TERMINATION.  Anything herein to the contrary notwithstanding, this
Agreement may be terminated prior to the time set forth in Section 10.1
above for any of the following reasons:

(a)     by mutual agreement of the parties;

(b)     by AARP or AARP Trust with respect to United or by United with
respect to AARP or AARP Trust if the nonterminating party
becomes insolvent, assigns all or any part of its assets for
the benefit of creditors, or upon the filing of any petition in
bankruptcy, voluntarily or involuntarily;

(c)     by AARP or AARP Trust with respect to United or by United with
respect to AARP or AARP Trust if the nonterminating party is in
material breach of its obligations under this Agreement and if
such breach continues for more than 90 days following the
breaching party's receipt of a written request for cure from
the nonbreaching party (for purposes of this Section 10.2(c),
United's elimination of any material provision of the SHIP or
the Services or change in any provision of the SHIP or the
Services that materially reduces the appropriateness thereof
for SHIP Insureds shall constitute a material breach, unless
consented to by AARP and AARP Trust, which consent shall not be

*** Denotes confidential information that has been omitted from the exhibit
and filed separately accompanied by a confidential treatment request with
the SEC pursuant to Rule 24b-2 of the Exchange Act.

64

<PAGE>

unreasonably withheld respecting any matter required by Applicable Law); provided, however, that if the nonbreaching party reasonably determines that the breaching party is taking its best efforts to cure the breach, then the breaching party shall be entitled to an additional 90 days within which to effectuate such cure;

(d)     by AARP or AARP Trust with respect to United or by United with respect to AARP or AARP Trust if the nonterminating party is in material breach of its obligations under any Associated Agreement to which it is a party and if such breach continues for more than 90 days following the breaching party's receipt of a written request for cure from a nonbreaching party to such Associated Agreement or AARP; provided, however, that if the nonbreaching party reasonably determines that the breaching party is taking its best efforts to cure the breach, then the breaching party shall be entitled to an additional 90 days within which to effectuate such cure;

(e)     by any party pursuant to and as provided in Section 14.1.3 following the occurrence of an Event of Force Majeure;

(f)     by AARP or AARP Trust if, in AARP's reasonable judgment, United (i) acts in a way materially adverse to the preservation and promotion of  goodwill towards AARP and AARP Trust, or (ii) materially fails to employ such commercial and professional standards as will assist AARP in its goals of advancing the education, well being and social welfare of its members and older persons generally, and such failures continues for more than 90 days following the receipt by United of a written request for cure from AARP; provided, however, that if AARP reasonably determines that United is taking its best efforts to cure the breach, then United shall be entitled to an additional 90 days within which to effectuate such cure;

(g)     by AARP or AARP Trust if United experiences a material adverse change in its financial condition, which will be deemed to have occurred if United's rating is downgraded below the minimum acceptable levels established in EXHIBIT 5.1.9 hereto by both of the two rating agencies identified therein; provided, however, that the parties shall work to develop a plan which satisfactorily addresses any issues related to the downgrade and United shall have 180 days in which to effect such plan, at the end of which period if AARP reasonably determines that United has not satisfactorily effected such plan AARP can terminate this Agreement upon 90 days' notice to United;

(h)     by AARP or AARP Trust if United fails to consent to any material  inter-vendor interaction standards proposed by AARP under this Agreement (or

65

<PAGE>

any of the Associated Agreements) and such failures continues for more than 90 days following United's receipt of a written request for cure from AARP; and provided, however, that if AARP reasonably determines that United is taking its best efforts to cure the breach, then United shall be entitled to an additional 90 days within which to effectuate such cure; and

(i)     by United as provided in Section 3.10 hereof, such termination to be effective on the later of (i) the start of the next Policy Year, or (ii) 180 days after the final actuarial determination pursuant to Section 3.10 hereof.

10.3    NOTICES AND EFFORTS TO CURE.  Each party shall promptly notify the other in writing of the occurrence of any of the events described in Section 10.2 hereof affecting it.  Upon any party's receipt of a request for cure from any other party hereto as provided in Section 10.2 above, the breaching party shall use its best efforts to cure the breach described in such notification.

10.4    TERMINATION WITH SUCCESSOR CARRIER.  The parties shall have the rights and obligations set forth in this Section 10.4 if this Agreement is terminated and AARP and AARP Trust elect to continue to make the SHIP available through a successor carrier.

10.4.1  TRANSFER OF SHIP PLANS.  United shall transfer to any successor carrier the SHIP Plans in effect as of the date of termination of this Agreement.  In connection therewith, United shall enter into commercially reasonable assumption and/or indemnity reinsurance agreements and any related administrative agreements with the successor carrier as reasonably directed by AARP.

10.4.2  CLAIMS LIABILITY.  AARP and AARP Trust will cause any successor carrier to accept liability (or proportional liability as applicable) from United for all of its insurance and related administrative obligations arising out of the SHIP (whether arising before or after the date of termination) and for related costs including reasonable legal fees and expenses; provided, however, that in no event shall the successor carrier be obligated to assume any extra-contractual liability of United.  AARP and AARP Trust will cause the successor carrier to administer payment of claims in accordance with standards at least equal to United's policies and practices then in effect in administering claims under the SHIP.  Notwithstanding the foregoing, by notice to AARP and AARP Trust, United may elect to retain liability for and handle any specific claim itself, in which case AARP and AARP Trust will cause the successor carrier to transmit to United all information and forms in its possession pertaining to such claims.  United will notify AARP and AARP Trust of the amount of any payments made by it in handling and settling any such claim or claims it elects to handle and AARP and AARP Trust will forthwith cause United to

be reimbursed for the

66

<PAGE>

amount so paid plus the amount of any expenses reasonably
incurred by United in connection with the payment (including
attorneys' fees and litigation costs). United shall indemnify
and hold AARP, AARP Trust and the successor carrier harmless
from any costs, expenses and liabilities arising out of
United's own handling of any such claims (except for liability
arising, directly or indirectly, out of the gross negligence or
willful misconduct of AARP or AARP Trust or the negligence or
willful misconduct of the successor carrier).

10.4.3   TRANSFER OF RESERVES.

    10.4.3.1   TRANSFER OF RESERVES.   On the termination date of
this Agreement, United shall transfer to the
successor carrier premium receivables relating to
the SHIP plus cash the sum of which shall be equal
to an estimate of the reserves and liabilities
attributable to the SHIP.   Determination of the
premium receivables and the reserves and liabilities
including the RSF Balance shall be on a basis
consistent with the principles and practices used by
United in experience rating of the SHIP.

    10.4.3.2   PROVISIONAL SETTLEMENT.   On the date 180 days
following the termination date of this Agreement,
United shall prepare a provisional settlement in a
manner consistent with Section 8.5 hereof.   The
provisional settlement shall include United's
charges for Termination Costs incurred by United
through the termination date.   On the date of the
provisional settlement, (i) if such determination
shows that the reserves and liabilities less premium
receivables are in excess of the cash transferred by
United on the date of termination, United shall
immediately pay the difference to the successor
carrier, or (ii) if such determination shows that
the amount of cash transferred by United on the date
of termination was in excess of the reserves and
liabilities less premium receivables, the successor
carrier shall immediately pay the difference to
United.   In either event, any amount so owning to
any party hereto shall include interest on such
amount calculated from the date of termination to
the date of payment at the True-Up Interest Rate.

    10.4.3.3   FINAL SETTLEMENT.   On the date 18 months after the
termination date of this Agreement, United shall
make a proposed final determination of such premium
receivables reserves and liabilities attributable to

the SHIP as of the date of termination.  Such
determination shall be deemed to be final and
conclusive unless

67

<PAGE>

AARP Trust disputes such determination by giving
United notice of such dispute within 30 days after
AARP Trust receives such determination from United.
If AARP Trust so disputes such determination, and
the parties are unable to resolve such dispute
within 30 days after notice thereof is delivered to
United, the parties will refer such dispute to an
actuarial consulting firm mutually acceptable to the
parties (the "Actuarial Consulting Firm").  Within
such time, the parties will instruct the Actuarial
Consulting Firm to resolve such dispute and provide
AARP and United written findings with respect
thereto not more than 45 days after the Actuarial
Consulting Firm receives such instruction.  On the
date the determination referred to in this
subsection becomes final and conclusive (whether
because there was no dispute or because the dispute
was resolved), (i) if such final and conclusive
determination shows that the amount of the reserves
and liabilities less the premium receivables is in
excess of the corresponding amount determined for
the provisional settlement, United shall immediately
pay the difference to the successor carrier, or (ii)
if such final and conclusive determination shows
that the amount of reserves and liabilities less
premium receivables determined for the provisional
settlement was in excess of the amount of the
reserves and liabilities less premium receivables in
the final determination, the successor carrier shall
immediately pay the difference to United.  In either
event, any amount so owing to any party hereto shall
include interest on such amount calculated from the
date of termination to the date of payment at the
True-Up Interest Rate.

10.4.3.4    UNSCHEDULED TERMINATION.  If this Agreement
terminates on a date other than that set forth in
Section 10.1 hereof, the cash to be transferred by
United on the termination date pursuant to Section
10.4.3.1 hereof shall be adjusted by adding the
difference (whether positive or negative) between
(i) United's realizable fair market value of the
invested assets of the SHIP Portfolio, and (ii)
United's statutory carrying value (determined
without consideration of statutory unrealized
capital gains or losses) of such assets as of the
termination date (such difference is "Portfolio
Capital Gain/Loss").  The determination of amounts
to be paid pursuant to Sections 10.4.3.2 and

10.4.3.3 hereof shall be adjusted by adding to the amount of reserves less premium receivables determined on the provisional settlement date and the final settlement date, respectively, the amount of the Portfolio Capital Gain/Loss determined on those respective dates.  For this purpose,

68

<PAGE>

the initial estimate of the Portfolio Capital Gain/Loss shall be subject to true-up.  AARP may require United to use a different method to effect the transfer, including a method involving the transfer of the invested assets of the SHIP Portfolio to the successor carrier in lieu of cash, provided that the method results in the transfer of an equivalent value by United to the successor carrier.

10.4.3.5   VENDOR EXPENSES.  All transfers determined pursuant to this Section 10.4.3 shall be based on the presumption that any change in the amount of Vendor Operating Expenses or Vendor Pass-Through Expenses from the amount used in determining the transfer pursuant to Section 10.4.3.1 hereof has been paid to, or by, United.  If such change has not resulted in a payment to, or by, United, appropriate adjustments shall be made to the determination of this Section 10.4.3 hereof properly to reflect the actual cash flows.

10.4.3.6   BENEFITS EXPECTATION.  The determination of reserves pursuant to this Section 10.4.3 shall be based on the expected benefits resulting from the use of United's provider contracts and networks.  Any increase in the expected level of benefits resulting from the unavailability of those networks to AARP members due to termination of this Agreement shall not be considered in the determinations made pursuant to this Section 10.4.3.

10.4.3.7   REQUIRED RSF BALANCE.  Except as otherwise provided by this Agreement or otherwise agreed to by the parties,  following final settlement pursuant to Section 10.4.3.3 hereof, United shall have no claim for any remaining balance in the Deficit Carryforward Account against AARP, AARP Trust, AARP's members, any successor to United as underwriter of the SHIP or any subsidiary or affiliate of any of the foregoing.  (***)

*** Denotes confidential information that has been omitted from the exhibit and filed separately accompanied by a confidential treatment request with the SEC pursuant to Rule 24b-2 of the Exchange Act.

69

<PAGE>

```
                        MINIMUM
     POLICY YEAR        RSF BALANCE
     OF TERMINATION     REQUIREMENT
     --------------     -----------
```

(***)

10.4.4   PERMITTED PARTIAL TRANSFERS.  In no event shall AARP or AARP
         Trust effectuate a partial transfer of the SHIP to any
         successor carrier if as a result thereof United would be
         required to retain a material portion but less than all of the
         insured risk within any single product line of the SHIP.

10.4.5   TRANSFER OF DATABASES.  United shall transfer to the successor
         carrier, at no cost, all Claims Databases then in its
         possession or control (scrubbed and cleaned, in
         computer-readable format), the documentation related thereto
         and specified in Section 3.2.7 (b) above, and all other Records
         provided to United pursuant to this Agreement in printed or
         computer-readable form; provided, however, that United shall be
         entitled to retain such information contained in the Claims
         Databases as set forth in Section 7.3 hereof.

10.4.6   TRANSFER OF APPLICATIONS SYSTEMS.  United shall transfer to the
         successor carrier, at no cost, all applications systems and
         related Records pertaining to or used in connection with the
         SHIP or the Services, except the Proprietary Systems and those
         systems, if any, which AARP has previously agreed in writing as
         being excluded systems. United shall grant the successor vendor
         a perpetual license, on commercially reasonable terms, to
         utilize all Proprietary Software to the extent reasonably
         required for the continued performance of the Services,
         including the operation of the SHIP Databases and related
         applications systems software.  United shall cause all
         purchased software required for the continued performances of
         the Services and provision of the SHIP, including the operation
         of the SHIP Databases and related applications systems
         software, either to be the licensed to the successor vendor on
         a perpetual, royalty-free basis, or will purchase and transfer
         to the successor vendor at no cost replacement software
         reasonably satisfactory to the successor vendor.

10.4.7   TRANSFER OF DEVELOPED SYSTEMS.  United shall transfer to the
         successor carrier, at no cost, all of United's right, title and
         interest in and to the Developed Systems; provided, however,
         that United shall retain a nonexclusive, perpetual,
         royalty-free, nonassignable license to use the Developed
         Systems.

***  Denotes confidential information that has been omitted from the exhibit
     and filed separately accompanied by a confidential treatment request with
     the SEC pursuant to Rule 24b-2 of the Exchange Act.

70

<PAGE>

10.4.8   OBLIGATIONS OF UNITED PRIOR TO TERMINATION.  United shall use its best efforts to assist in the transfer to the successor carrier contemplated under this Section 10.4 and shall not take any action inconsistent with its obligations under this Section 10.4 or which could reasonably be expected to hinder or delay the transfer.  In furtherance and not in limitation of the foregoing, after notice of termination has been received and prior to the effective date of the termination, United shall (i) dedicate, without additional compensation, appropriate and sufficient management and other personnel to assist AARP and the successor carrier in the transfer (including attending meetings, providing necessary information and performing other necessary acts and services), (ii) confer with and provide access to AARP and the successor carrier in order to permit such successor carrier to analyze the Services and SHIP and on-going operations related thereto and to develop procedures for the transfer of the Services and SHIP as contemplated under this Section 10.4 and (iii) undertake commercially reasonable efforts, as promptly as reasonably possible following the request of AARP, to enter into such other agreements as contemplated by this Section 10.4 with the successor carrier as reasonably directed by AARP and reasonably acceptable to United to authorize the successor carrier to manage the SHIP and related Services and otherwise to effectuate a smooth transfer of the SHIP to the successor carrier.

10.4.9   COOPERATION.  For a period of 18 months after the termination of this Agreement, United shall (i) cooperate fully in an orderly transfer of the SHIP, the Services, the Databases then in its possession, the application systems related thereto and all other SHIP-related assets to the successor carrier, (ii) refer to the successor carrier as promptly as practicable any telephone calls, letters, orders, notices, requests, inquiries and other communications relating to the SHIP and (iii) from time to time, upon AARP's written request, execute, acknowledge and deliver such further documents, instruments or assurances and take such other action as AARP may reasonably request to move, assign, convey and transfer any of the assets, properties, rights or claims of the assets being transferred to such successor carrier and assist in the vesting, collection or reduction to possession of such assets, properties, rights and claims.

10.4.10   REMOVAL OF CERTAIN UNITED MARKS.  At the request of AARP, United shall remove or cause to removed all United Marks from all computer systems that cause the United Marks to be printed or displayed in any medium pertaining to the GHIP.

10.5   TERMINATION WITHOUT SUCCESSOR CARRIER.  The parties shall have the rights and obligations set forth in this Section 10.5 if this Agreement is terminated and AARP Trust elects not to continue to make the SHIP available through a successor carrier.

71

<PAGE>

10.5.1  RSF BALANCE.  Following termination hereof pursuant to this
Section 10.5, United shall retain any RSF Balance for use in
connection with providing continued SHIP coverage.  AARP, AARP
Trust and their authorized representatives may, for a period of
three years, inspect and audit all information in United's
possession reasonably necessary to ensure United's compliance
under this Section.  Such access shall be reasonable in scope
and duration and, to the extent possible, shall be via
electronic data transfer.

10.5.2  PAYMENT.  United shall pay AARP, for a period of three years
following the date of termination, an amount equal to three
percent of the gross premium revenues earned by United for each
such year, from persons insured under SHIP Plans as of the date
of termination; provided, however, that any such amount shall
be payable only if the RSF Balance (or successor reserve
account balance) at the end of the relevant year exceeds four
percent of such gross premium revenues for such year, and then
only to the extent that the payment of the royalty to AARP
would not decrease the RSF Balance (or successor reserve
account balance) to less than four percent of such gross
premium revenues for such year.

10.5.3  RATE ACTIVITY.  Following termination under this Section 10.5,
United shall continue timely to notify AARP and AARP Trust as
to changes in the premiums for the SHIP Plans and other rate
related activity.

10.5.4  SALE PROHIBITED.  Following termination, under this Section
10.5, United shall give AARP 90 days' prior notice of any
proposed transfer of all or any portion of the SHIP business to
another party other than through ordinary course coinsurance,
indemnity reinsurance or stop loss reinsurance arrangements.
Following termination, United may not sell or otherwise
transfer all or any portion of the SHIP business to another
party without the prior approval of AARP (which approval shall
not be unreasonably withheld) except to an insurer whose
ratings equal or exceed the corresponding ratings of United (i)
as of the date hereof set forth in EXHIBIT 5.1.9 hereto or (ii)
as of the date of such transfer, if lower.

10.5.5  PROVISIONAL AND FINAL SETTLEMENT.  United shall prepare a final
accounting for the last full Policy Year, and any subsequent
partial Policy Year prior to termination, and shall deliver
such accounting to AARP not less than 18 months following the
termination of this Agreement.  A provisional settlement shall
be made by making the requisite calculations under Article 8
hereof for the last Policy Year of this Agreement (or any
extension thereof) within six months after the end of such
Policy Year, and completing the RSF credit or withdrawal, as
the case may be, resulting therefrom.  Within 18 months

72

<PAGE>

following the termination of this Agreement, appropriate adjustments shall be made to the RSF and a final settlement made for the last Policy Year of this Agreement (or any extension hereof).

10.6   RIGHTS AND OBLIGATIONS OF PARTIES UPON TERMINATION.   Upon the termination of this Agreement for any reason, the parties shall have the rights and obligations set forth in this Section 10.6.

10.6.1   TERMINATION COSTS.   United shall be entitled to recover its Termination Costs as part of the final settlement pursuant to Section 10.6.2 hereof; provided, however, that United shall not be entitled to recover its Termination Costs (other than any losses realized on liquidation of the SHIP Portfolio and any Taxes payable by United with regard to the SHIP in respect of the period ending upon the termination date of this Agreement) if AARP or AARP Trust terminates this Agreement as a result of a breach by United of its obligations hereunder and an arbitrator confirms that such termination was permitted by this Agreement except to the extent that such Costs exceed (***).

10.6.2   POST-TERMINATION REPORTS.   Until United has delivered the final accounting required pursuant to Section 10.6.2 hereof, completed the processing and disposition of all claims for which United retains liability following the date of termination and paid all amounts due to AARP pursuant to Section 10.5.2 hereof, United shall continue to provide all of the reports that would be required to be provided pursuant to Section 3.2.8 hereof, and AARP and AARP Trust shall continue to have the audit and inspection rights accorded thereto pursuant to Section 3.2.9 hereof, as if such termination had not occurred.

10.6.3   DISPOSITION OF EMPLOYEES.   United shall be compensated for all employment related expenses arising from the termination of this Agreement and the termination of United's employees engaged primarily in its AARP operations, including but not limited to COBRA, long term disability, short term disability and severance; provided, however, that United shall not be entitled to receive any compensation in respect of any United employee who is offered employment by any successor employer.

ARTICLE 11
DISPUTE RESOLUTION

11.1   INFORMAL PROCEDURES.   United shall follow the procedure described in this Section 11.1 (the "Resolution Procedure") to remedy any material failure by United to meet applicable standards set forth in the Contract Documents or to remedy the objections of AARP or

*** Denotes confidential information that has been omitted from the exhibit
    and filed separately accompanied by a confidential treatment request with
    the SEC pursuant to Rule 24b-2 of the Exchange Act.

73

<PAGE>

AARP Trust to United's performance of the Services or provision of the
SHIP. The Resolution Procedure shall include United's design and
implementation of a plan, satisfactory to AARP, to reach a standard or
to remedy an objection, in as timely a manner as possible, and shall
also include the utilization of the resources reasonably needed to meet
the standard or to remedy an objection.  United may suggest for
consideration by AARP and/or AARP Trust the amendment of a standard or
a timetable for meeting a standard or remedying an objection.  Should
United and AARP or AARP Trust, as applicable, fail to agree on the
course of action necessary to meet or modify a standard or to remedy an
objection, the Resolution Procedure requires the retention by and at
the expense of United of a neutral expert, acceptable to AARP, to
recommend a range of options to achieve the standard or remedy the
objection.  Notwithstanding any other provision hereof, the Resolution
Procedure shall not obligate United to (i) assume or undertake any
responsibilities or obligations assigned to any other GHIP Vendor
pursuant to any Associated Agreement or otherwise, (ii) incur
substantial out-of-pocket expenses, (iii) incur substantial
indebtedness or (iv) except as expressly provided herein, institute
litigation or consent generally to service of process in any
jurisdiction.

11.2    FORMAL PROCEDURES.  Any dispute arising out of or relating to this
Agreement, any other Contract Document or the GHIP including, but not
limited to, the interpretation, validity or breach thereof that is not
resolved pursuant to the Resolution Procedure shall be resolved in
accordance with the procedures set forth in this Article 11.

        11.2.1   MEDIATION.  If the parties are unable to resolve a dispute or
        claim pursuant to the Resolution Procedure within thirty 30
        days after the dispute arises (or such longer period as to
        which the parties may agree) the parties shall attempt in good
        faith to resolve the dispute by mediation pursuant to the CPR
        Model.  If the parties are unable to agree on a mediator, the
        mediator shall be selected pursuant to the CPR Rules.

        11.2.2   ARBITRATION.  If the dispute or claim has not been resolved by
        mediation within 30 days of the initiation thereof, the dispute
        shall be resolved by binding arbitration conducted in
        Washington, D.C. by a single arbitrator pursuant to the CPR
        Rules or such other rules as mutually agreed upon by the
        parties. The arbitrator shall be disinterested in the subject
        matter of the dispute, shall not have been employed at any time
        within the past five years by AARP, AARP Trust or United, shall
        have appropriate qualifications and experience with respect to
        arbitration of business disputes and shall possess relevant
        industry expertise.  The arbitration shall be governed by the
        United States Arbitration Act, 9 U.S.C. SECTIONS 1-16.

Judgment upon the award rendered by the arbitrator may be
entered in any court having jurisdiction thereof.

74

<PAGE>

11.3  COSTS AND FEES.  Each party shall bear its own costs and attorneys'
      fees incurred in connection with mediation or arbitration.

11.4  SPECIFIC PERFORMANCE.  The parties recognize that damages at law would
      not be an adequate remedy for the breach of many provisions of the
      Agreement and that prompt, equitable relief, prohibitory or mandatory,
      may be appropriate in many circumstances.  In the event of any
      arbitration arising out of or relating to this Agreement or the
      Contract Documents, the arbitrators are encouraged to take account of
      this recognition and seek to fashion appropriate relief when the
      circumstances warrant.  When consistent herewith and in the best
      interests of the AARP members and GHIP participants, the arbitrators
      may fashion equitable relief in a manner that directly addresses a
      breach, but allows for the continuation of this Agreement.

11.5  JURISDICTION.  The parties hereto consent to personal jurisdiction over
      them in the federal courts of the District of Columbia in connection
      with any application to compel arbitration pursuant to this Article 11
      or for the entry of judgment upon any arbitration award.  Service of
      process upon any  party shall be sufficient if made in accordance with
      the laws of the District of Columbia or in accordance with the notice
      provision of Section 14.5 hereof.

11.6  LIABILITY LIMITATION.  In no event shall the arbitrators in any
      arbitration pursuant to Section 11.2.2 hereof be authorized to award
      any punitive damages or to award consequential or special damages in
      excess of $35 million in the aggregate.


                              ARTICLE 12
                       RELATIONSHIP OF THE PARTIES

12.1  INDEPENDENT CONTRACTORS.  The parties hereto are independent
      contractors and are not joint venturers or partners.  Neither AARP and
      AARP Trust nor United are now, nor shall they become or be considered
      as, principal or agent of the other in connection with the provisions
      of the SHIP or the performance of the related Services by United
      hereunder. United does not have, nor will it become or be considered to
      have, an ownership interest in AARP or AARP Trust.  AARP and AARP Trust
      do not, nor will they become or be considered to have, an ownership
      interest in the SHIP or United (except that AARP is, and shall be, the
      sole and exclusive owner of the AARP Name), and AARP and AARP Trust
      shall not be liable or responsible in any such capacity or capacities.
      AARP and AARP Trust are not, nor will they become or be considered to
      be, providers of insurance services.  Accordingly, AARP, AARP Trust and
      United shall at no time and in no medium or manner state or imply that
      (i) United is the agent of AARP or AARP Trust, (ii) AARP or AARP Trust
      is the agent of United, (iii) AARP or AARP Trust has any

75

<PAGE>

such ownership interest in United or the SHIP or (iv) United has an ownership interest in AARP or AARP Trust.

12.2  NOT LEGAL REPRESENTATIVES.

    12.2.1  UNITED.  United is not and shall not be the legal representative, agent, partner or joint venturer of AARP or AARP Trust and does not and shall not have any authority to enter into, amend, modify, terminate, settle, compromise or otherwise deal with any agreements or disputes on behalf of AARP or AARP Trust.  All agreements, whether written or oral, express or implied, entered into by United in connection with performance of the Services and the provision of the SHIP shall not in any way bind or purport to bind AARP or AARP Trust or any of their respective properties.

    12.2.2  AARP AND AARP TRUST.  Neither AARP nor AARP Trust is or shall be the legal representative, agent, partner or joint venture of United, and AARP and AARP Trust do not and shall not have any authority to enter into, amend, modify, terminate, settle, compromise or otherwise deal with any agreements or disputes on behalf of United.  All agreements, whether written or oral, express or implied, entered into by AARP and/or AARP Trust in connection with the SHIP shall not in any way bind or purport to bind United or any of United's properties.

ARTICLE 13
INDEMNIFICATION

13.1  INDEMNIFICATION BY UNITED.  United shall, at its own expense, defend, hold harmless and indemnify AARP, AARP Trust and each of their respective parents, subsidiaries, affiliates, officers, directors, trustees, employees, members, independent contractors and agents (provided they are acting in the course of their duties with respect to the foregoing) (each an "AARP Indemnified Party") from and against any claims, damages (including consequential and punitive damages), judgments, awards, settlements (consented to by United), costs and expenses (including reasonable fees and expenses of counsel, subject to the procedures and limitations contained in Sections 13.3 and 13.4 hereof), arising, directly or indirectly, from (i) the misuse by United or any of its parents, subsidiaries, affiliates, officers, directors, employees or agents of information provided by AARP or AARP Trust to United, including but not limited to information concerning AARP members and marketing and advertising materials concerning the SHIP, (ii) the breach, negligence or willful misconduct by United with respect to its obligations under this Agreement and the other Contract Documents or under any Associated Agreement to which United is a party, (iii) United's subcontracting any part

76

<PAGE>

or all of the Services or the SHIP under Section 3.5.2 hereof, or arising out of any other agreement between United and any other party relating to the Services or the SHIP, (iv) any claim pertaining to the terms of employment and benefits which are offered by United to any person pursuant to Section 3.1.3(b)-(c) hereof, and (v) any other matter arising out of the performance by United of the Services or provision of the SHIP hereunder; except in each of the cases referred to in the preceding clauses (i) through (v) to the extent that liability therefor arises out of the negligence or willful misconduct of an AARP Indemnified Party or (B) the action or inaction of United (other than as relates to any insurance regulatory matter) taken at the express direction of AARP or AARP Trust. Notwithstanding the foregoing, to the extent United becomes subject to an indemnification obligation under clause (i) or (v) above other than as a result of the negligence or willful misconduct of a United Indemnified Party, its resulting indemnification costs (including reasonable fees and expenses of counsel) may be reimbursed through a charge made in the retrospective experience rating for the SHIP pursuant to Section 8.3 hereof for the Policy Year in which the obligation is incurred. Furthermore, if a claim is asserted against United of the nature subject to indemnification under the preceding clause (iv) for which United is adjudicated not to be liable, then United may be reimbursed for its costs of defending such claim (including reasonable fees and expenses of counsel) through a charge made in the retrospective experience rating for the SHIP pursuant to Section 8.3 hereof for the Policy Year in which the obligation is incurred.

13.2   INDEMNIFICATION BY AARP.  AARP shall, at its own expense, defend, hold harmless and indemnify United and each of its parents, subsidiaries, affiliates, officers, directors, employees and agents (provided they are acting in the course of their duties to the foregoing) (each a "United Indemnified Party") from and against any claims, damages (including consequential and punitive damages), judgments, awards, settlements (consented to by AARP), costs and expenses (including reasonable fees and expenses of counsel subject to the procedures and limitations contained in Sections 13.3 and 13.4 hereof), arising, directly or indirectly, from (i) the misuse by AARP or AARP Trust or any of their respective parents, subsidiaries, affiliates, officers, directors, employees or agents of information provided by United to AARP or AARP Trust, including but not limited to marketing and advertising materials relating to the SHIP for purposes other than as contemplated by this Agreement or any contract document, and (ii) the breach, gross negligence or willful misconduct by AARP or AARP Trust with respect to their respective obligations under this Agreement and the other Contract Documents; except in each of the preceding clauses (i) and (ii) to the extent that liability therefor arises out of (A) the negligence or willful misconduct of a United Indemnified Party or (B) the action or inaction of AARP or AARP Trust taken at the express direction of United.

13.3   NOTICE; DEFENSE OF CLAIM.  An indemnified party shall promptly notify the indemnifying party in writing following the time the indemnified party shall receive notice of any

77

<PAGE>

claims occurring for which indemnification is sought.  The indemnifying party shall assume on behalf of the indemnified party and conduct with due diligence and in good faith the defense thereof with counsel reasonably satisfactory to the indemnified party; provided, that the indemnified party shall have the right to be represented therein by counsel of its own selection and at its own expense; and provided further, that if the defendants in any such action include both the indemnifying party and the indemnified party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it which are different from or additional to, or inconsistent with, those available to the indemnifying party, the indemnified party shall have the right to select separate counsel to participate in the defense of such action on its own behalf at the indemnifying party's expense.  The indemnifying party shall not agree to settle any matter without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld.

13.4   FAILURE TO DEFEND ACTION.  If any claim, action, proceeding or investigation arises s to which the indemnity provided for in Sections 13.1 or 13.2 hereof may apply, nd the indemnifying party fails to assume the defense of such claims within 30 days, hen the indemnified party may at the indemnifying party's expense contest such laim; provided, that no such contest need be made and settlement in full payment of ny such claim may be made without the indemnifying party's consent (with the ndemnifying party remaining obligated to indemnify the indemnified party under ection 13.1 or 13.2 hereof) if, in the written opinion of the indemnified party's utside counsel, such claim is meritorious.

13.5   SURVIVAL OF INDEMNITIES.  The obligations of the parties to indemnify each other and other persons identified in this Agreement shall survive the termination of this Agreement for  a period of two years.

13.6   INSURANCE.

(a)     United shall maintain professional (errors and omissions) liability insurance, standard commercial general liability insurance (or a combination of commercial general liability insurance and excess liability insurance) including contractual liability, and crime/fidelity insurance, with insurance companies rated at least A-1X by A.M. Best.  Such insurance shall contain at least the minimum limits and deductibles or retentions as reasonably necessary for United to meet the most stringent coverage requirements applicable to it under any Associated Agreement to which it is a party.  Except as expressly provided in paragraph (b) below, the premiums for all such insurance coverage shall constitute Pass-Through Expenses.

(b)     United shall be able to charge as Pass-Through Expenses any unreimbursed expenses which are within the deductibles or retention of either its insurance

<PAGE>

policies delineated in Section 13.6(a) above or those of any other GHIP Vendor, subject to a maximum to be agreed by United, AARP, AARP Trust, the Member Services Vendor and the Sales and Marketing Vendor, provided, however, that United shall not be able to charge as a Pass-Through Expense any (i) liabilities for which United provides indemnification under Section 13.1 hereof, or (ii) insurance premiums for insurance pertaining to such liabilities as referred to in the preceding (i), all of which shall be at the sole cost of United.  Upon termination of this Agreement, no such costs shall be recoverable as Pass-Through Expenses to the extent that the expense would cause the RSF Balance to fall below the minimum RSF Balance requirement identified in Section 10.4.3.7 hereof.

ARTICLE 14
GENERAL PROVISIONS

14.1  FORCE MAJEURE.

   14.1.1  EVENTS.  Any delay in or failure of performance by any party hereto, other than the obligations to pay monies hereunder shall not constitute a default hereunder and shall not give rise to an entitlement to monetary damages or equitable relief hereunder, if and to the extent such delays or failures of performance are caused by occurrences which are beyond the control of and the effects of which in the exercise of reasonable care could not have been prevented by the affected party, including, but not limited to: expropriation or confiscation of facilities; act of public enemy; act of war; rebellion or sabotage or damage resulting therefrom; flood; fire; lightning; riots or strikes; Change of Law having a material adverse effect on any party's ability to perform its obligations under the Contract Documents; order of a court, arbitrator or governmental authority; or any causes other than those specified above which are not within the control of, and which are without fault or negligence on the part of a party, and which by the exercise of due diligence the affected Party is unable to overcome (each an "Event of Force Majeure").

   14.1.2  NOTICE AND CURE.  Any party claiming that an Event of Force Majeure has arisen shall immediately notify the other party of the same and shall act diligently to overcome and remove the effects of the Event of Force Majeure, shall notify the other party on a continuing basis of its efforts to overcome the Event of Force Majeure and shall notify the other party immediately when said condition has ceased.

<PAGE>

14.1.3  TERMINATION.  If an Event of Force Majeure continues for more than three months after notice of the Event of Force Majeure is given under Section 14.1.2 above, and the parties are unable to agree upon other remedies, then either AARP or United may terminate this Agreement, in its sole discretion, at any time thereafter prior to any remedying of the adverse effect of the Event of Force Majeure, by giving at least seven calendar days' prior written notice to the other.

14.2  FURTHER ASSURANCES.  The parties shall keep each other informed about legal or any other developments affecting the Services and the GHIP, shall cooperate with one another to carry out and implement the terms and objectives of this Agreement and the Exhibits hereto, and shall perform such further acts, execute such further documents and enter into such further agreements as may be necessary or appropriate to these ends.

14.3  NO THIRD PARTY BENEFICIARIES.  This Agreement confers no rights whatsoever upon any person (including without limitation any AARP members or employees of Prudential or of United) other than the parties hereto.

14.4  GOVERNING LAW.  The Agreement shall be governed by and interpreted in accordance with the laws of the District of Columbia applicable to agreements made and to be performed wholly within the District of Columbia.

14.5  NOTICES.  Notices required or appropriate to be given under the Agreement shall be given by hand delivery or facsimile and by certified mail return receipt requested, as follows or in such other manner as shall be agreed to in writing by the parties:

> To AARP:
> American Association of Retired Persons
> 601 E Street, N.W.
> Washington, DC 20049
> Attention: Executive Director
> Facsimile Number: (202) 434-2320
>
> With copies to both:
>
> The Director, Membership Division
> Facsimile Number: (202) 434-3443
>
> The General Counsel
> Facsimile Number: (202) 434-2339

80

<PAGE>

> To AARP Trust:
> Trustees of the AARP Insurance Plan

American Association of Retired Persons
601 E Street, N.W.
Washington, DC 20049
Attention: Executive Director
Facsimile Number: (202) 434-2320

With copy to:

The General Counsel
Facsimile Number: (202) 434-2339


To United:
United HealthCare Insurance Company
300 Opus Center
9900 Bren Road East
Minnetonka, MN  55343
Attention: Chief Executive Officer, AARP Operations
Facsimile Number:  (612) 936-1396

With copies to:

The General Counsel, United HealthCare Insurance Company
Facsimile Number: (612) 936-0044

14.6  NO WAIVER, ETC.  Whenever possible, each provision of this Agreement
      shall be interpreted in such manner as to be effective and valid under
      the applicable law set forth in Section 14.4 hereof, but if any
      provision of this Agreement shall be held to be prohibited or invalid
      under such applicable law, such provision shall be ineffective only to
      the extent of such prohibition or invalidity, without invalidating the
      remainder of such provision or the remaining provisions of this
      Agreement.  No failure on the part of any party to exercise, and no
      delay in exercising, any right hereunder shall operate as waiver
      thereof, nor shall any single or partial exercise of any right
      hereunder by any party preclude any other or further exercise of any
      other right and no waiver whatever shall be valid unless in a signed
      writing, and then only to the extent specifically set forth in such
      writing.  No waiver of any right hereunder shall operate as a waiver of
      any other or of the same or similar right on another occasion.


                                81

<PAGE>

14.7  AMENDMENT.

      14.7.1  GENERAL.  Except as expressly provided in Sections 2.90, 4.2.1,
              7.4.2, 7.7.2 and 9.5.2 hereof with respect to the amendment of
              EXHIBIT 2.90, EXHIBIT 4.2.1, EXHIBIT 7.4.2, EXHIBIT 7.7.2 and
              EXHIBIT 9.5.2 hereto, respectively, this Agreement may not be
              amended except in a writing executed on behalf of each of the
              parties hereto.

      14.7.2  ANCILLARY AGREEMENTS.  The parties are currently negotiating
              with Prudential and other GHIP Vendors the Transfer Agreement,

the Reinsurance Agreement and other agreements related to the GHIP. The parties will negotiate in good faith with a view to amending this Agreement as appropriate to incorporate any changes necessitated by such agreements, amendments thereto or agreements ancillary thereto.

14.7.3   RENEGOTIATION. If prior to the Commencement Date there occurs any unanticipated fact or circumstance that has a material consequence for the rights and obligations of the parties hereunder, then the parties will negotiate with a view to amend the Contract Documents so as to maintain their respective rights and obligations as presently envisioned.

14.7.4   CONFLICTS AMONG AGREEMENTS. In the event of any conflict between the terms of the Contract Documents and the Transfer Agreement or the Reinsurance Agreement, the terms of the Transfer Agreement or the Reinsurance Agreement, as applicable, shall be controlling. In the event of any conflict between the terms of the Contract Documents and any Associated Agreement, the terms of the Contract Documents shall be controlling.

14.8   EXPERIENCE/RESERVE ACCOUNTING. The parties acknowledge and agree that United will account for the SHIP experience rating and the reserves on a policy-by-policy basis. All accounting provided by United pursuant to this Agreement, however, will be on an aggregate basis for the entire SHIP.

14.9   HEADINGS. The Section headings contained in this Agreement are not part of this Agreement, are for the convenience of reference only and shall not affect the meaning, construction or interpretation of this Agreement.

14.10   BINDING EFFECT. This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective successors and assigns.

14.11   ASSIGNMENT. This Agreement may not be assigned by any party hereto without the prior written permission of the other parties hereto.

82

<PAGE>

14.12   COUNTERPARTS. This Agreement may be executed in counterparts, each of which shall be deemed to be an original.

14.13   CERTAIN CALCULATIONS. In the event that a SHIP Insured shall no longer be a member of AARP, unless and until coverage is terminated, his or her premium and loss experience shall be included in all computations required to be made hereunder, as if he or she had continued to be an AARP member.

14.14   ACKNOWLEDGEMENT. The parties acknowledge that United is not licensed to conduct insurance business in the State of New York and that it intends to use its affiliate, United Healthcare Insurance Company of New York, as underwriter of the SHIP in the State of New York. The

parties shall cooperate and adjust the provisions of this Agreement and the Associated Agreements, as appropriate, to accommodate United's use of this affiliate to underwrite the SHIP in the State of New York and otherwise to effect the purposes and objectives of this Agreement and any Associated Agreement.

14.15 RELATED PLANS.  The parties will take reasonable steps and conform this Agreement or execute additional agreements to address the terms of United's undertaking of any Related Plan.

[SIGNATURES ON THE FOLLOWING PAGE]

83

<PAGE>

`    IN WITNESS WHEREOF, the parties have caused this Agreement to be executed
by their duly authorized officers as of the date first written above.

AMERICAN ASSOCIATION OF RETIRED PERSONS

By:  /s/ Margaret A. Dixon
     --------------------------------------------
Print Name:  Margaret A. Dixon, Ed.D.
             ------------------------------------
Print Title: President
             ------------------------------------

TRUSTEES OF THE AARP INSURANCE PLAN

By:  /s/ C. Keith Campbell
     --------------------------------------------
Print Name:  C. Keith Campbell
             ------------------------------------
Print Title: Chair
             ------------------------------------

UNITED HEALTHCARE INSURANCE COMPANY

By:  /s/ William W. McGuire
     --------------------------------------------
Print Name:   William W. McGuire
             ------------------------------------
Print Title:  President
             ------------------------------------

84

http://www.sec.gov/Archives/edgar/data/731766/0001047469-98-031820.txt

```
- ------------------------------  Officer
    Stephen J. Hemsley


/s/ GREGORY J. SPRINGER          Chief Accounting      Dated: August 14, 1998
- ------------------------------  Officer
    Gregory J. Springer
```

                                     17

<PAGE>

                       UNITED HEALTHCARE CORPORATION
                                  EXHIBITS

```
<TABLE>
<CAPTION>
  EXHIBIT
  NUMBER                                    DESCRIPTION
- --------------      -------------------------------------------------------------
<S>                  <C>
Exhibit 10(a) -   First Amendment to the AARP Health Insurance Agreement by and
                  among American Association of Retired Persons, Trustees of the
                  AARP Insurance Plan and United HealthCare Insurance Company
                  effective January 1, 1998.*

Exhibit 10(b) -   Second Amendment to the AARP Health Insurance Agreement by and
                  among American Association of Retired Persons, Trustees of the
                  AARP Insurance Plan and United HealthCare Insurance Company
                  effective January 1, 1998.*

Exhibit 10(c) -   Employment Agreement, dated as of May 20, 1998, between United
                  HealthCare Services, Inc. and R. Channing Wheeler.

Exhibit 10(d) -   Employment Agreement, dated as of May 19, 1998, between United
                  HealthCare Services, Inc. and Arnold H. Kaplan.

Exhibit 10(e) -   Termination Agreement, dated August 9, 1998, by and among
                  the Company, UH-1 Inc., a wholly owned subsidiary of the
                  Company, and Humana.

Exhibit 15    -   Letter Re Unaudited Interim Financial Information

Exhibit 99    -   Cautionary Statements.
</TABLE>

*  Pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended,
   portions of these amendments have been omitted and filed separately with the
   Securities and Exchange Commission in connection with a confidential
   treatment request.
```

                                     18

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(A)
<SEQUENCE>2
<DESCRIPTION>EXHIBIT 10(A)
<TEXT>
```

<PAGE>

                             First Amendment
                                  to the
                     AARP Health Insurance Agreement
                               by and among
                 American Association of Retired Persons,
                  Trustees of the AARP Insurance Plan
                                   and
                 United HealthCare Insurance Company


The American Association of Retired Persons and the Trustees of the AARP
Insurance Plan hereby agree with the United HealthCare Insurance Company to
the Amendment of the AARP Insurance Agreement, entered into by said parties



http://www.sec.gov/Archives/edgar/data/731766/0001047469-98-031820.txt

and dated as of February 26, 1997, as set forth below:

A.   Section 2.86 of the Agreement is amended to read as follows:

"SHIP PLAN means any health insurance plan, including any Medicare Select plan, underwritten by United pursuant to this Agreement, including without limitation any such plan described by any master group insurance policy issued to AARP Trust by United (or its affiliates) and insured or reinsured by United (or its affiliates) at any time during the term of this Agreement."

B.   Article 2 of the Agreement is amended by the addition of the following Sections 2.117 and 2.118:

"2.117 MEDICARE SELECT means a Medicare Supplement policy or certificate that contains restricted network provisions, and is offered consistent with state law applicable thereto."

"2.118 NETWORK PROVIDER means any health care provider that has agreed to participate in a Medicare Select plan made available under the SHIP."

C.   Section 3.2.2 of the Agreement is amended by the addition of new subsections (f) and (g) to read as follows:

"(f) United shall make available to AARP members Medicare Select plans at such sites and in accordance with such timeframe as may be agreed to by the parties. United shall develop and maintain arrangements with Network Providers providing for the furnishing of the Medicare Select plans. such arrangements shall include payment arrangements which provide cost savings opportunities to SHIP Insureds participating in the Medicare Select plans. United will manage the Network Provider relationships to

<PAGE>

promote network stability and quality improvement and to address service concerns that SHIP Insureds participating in Medicare Select plans may have with Network Providers."

"(g) United will integrate care coordination services into the Medicare Select plans made available under the SHIP. At the outset, the care coordination services will include the NurseLine product, as made available by Optum, a United affiliate which shall be enhanced to address the needs of SHIP Insureds covered by a Medicare Select plan. United will test and evaluate different care coordination models within its Medicare Select plans with the goal of maximizing the effectiveness of the services and SHIP Insureds' satisfaction. United will provide AARP with periodic reports relating to the effectiveness of new care coordination models then being tested or in use. United will not implement any care coordination model materially different from the program then in place, in a test or any other format, without first obtaining the approval of AARP."

D.   EXHIBIT 3.2.4 is revised to read as set forth in the attached EXHIBIT 3.2.4, which is hereby incorporated by reference as the new EXHIBIT 3.2.4.

E.   Article 6 of this Agreement is amended by the addition of the following new Section 6.10:

"6.10 NEW PRODUCT TRANSFER PRICING. United shall be entitled to receive amounts as set forth below in respect of the Medicare Select and care coordination programs provided by United pursuant to Section 3.2.2(f)-(g):

6.10.1 MEDICARE SELECT. United shall be entitled to receive *** of the savings obtained as a result of discounts obtained from Network Providers. Savings obtained means the amount that would have been payable to a Network Provider for covered services by the SHIP Plan, if no discount were available, less the amount that is payable to the Network Provider for covered services by the SHIP Plan, after the discount is taken. United's compensation under this Section 6.10.1 will be recovered in the same manner as United recovers other compensation payable hereunder and no separate charge will be made to any SHIP Insured with respect to any

http://www.sec.gov/Archives/edgar/data/731766/0001047469-98-031820.txt

discount taken. United shall provide AARP with monthly reports of
all savings obtained in connection with the Medicare Select plans
during the month prior to the month in which the report is
generated. The compensation payable under this Section 6.10.1 shall
remain in effect for the duration of the Agreement, except as
otherwise agreed to by the parties and as set

*** Represents text deleted pursuant to a confidentiality treatment request
    filed with the Securities and Exchange Commission pursuant to Rule 24b-2
    under the Securities Exchange Act of 1934, as amended.

<PAGE>

forth below. Any change in the compensation shall
become effective no sooner than January 1, 2002 and
shall require that any party seeking the same
provide the other with at least one hundred and
eighty (180) days notice of the same.

6.10.2  CARE COORDINATION.  United shall be entitled
to receive  ***  per SHIP Insured covered by a
Medicare Select plan per month, for the care
coordination services provided pursuant to Section
3.2.2(g) of this Agreement. In addition to other
provisions of this Agreement, the parties agree to
modify the pricing for these services in the event
that there is a material change in the care
coordination model incorporated as part of the SHIP
Plan. The parties agree that any change in the fees
payable hereunder will be commensurate with the
impact of the change on the costs of providing the
service by United.

Except as otherwise may be agreed to by the
parties, the other compensation provisions of this
Article 6 remain applicable to the products
identified in this Section 6.10."

F.  The provisions of this Amendment shall become effective January 1, 1998.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by
their duly authorized officers as of the date first written above.


AMERICAN ASSOCIATION OF RETIRED PERSONS

By:    /s/ Horace B. Deets
    ------------------------------------

Print Name:  Horace B. Deets
           ------------------------------

Print Title: Executive Director
           ------------------------------


TRUSTEES OF THE AARP INSURANCE PLAN

By:    /s/ Horace B. Deets
    ------------------------------------

Print Name:  Horace B. Deets
           ------------------------------

Print Title: Executive Director
           ------------------------------


UNITED HEALTHCARE INSURANCE COMPANY

By:    /s/ Lois Quam
    ------------------------------------

```
Print Name:  Lois Quam
             -----------------------------

Print Title: Chief Executive Officer,
             AARP Division
             -----------------------------


***  Represents text deleted pursuant to a confidentiality treatment request
     filed with the Securities and Exchange Commission pursuant to Rule 24b-2
     under the Securities Exchange Act of 1934, as amended.

<PAGE>

                            Exhibit 3.2.4

                            FUTURE PRODUCTS


From and after the Commencement Date, United, in consultation with AARP and
consistent with the social welfare purposes of the AARP, shall undertake
product development activities as described in the Agreement with respect to
additional health care insurance products, including without limitation the
following:

-- -- 50 to 64 Group Health Insurance
     Comprehensive insurance coverage for AARP members and their dependent
     children to provide a seamless transition after the loss of job or a career
     change.

-- -- Grandchildren's Health Insurance
     Comprehensive health insurance coverage specially designed for dependent
     grandchildren of AARP members, including indemnity, Preferred Provider
     Organization (PPO), and Health Maintenance Organization (HMO) options.

-- -- EverCare
     Medical care to frail, elderly residents of nursing homes.

-- -- Medical Equipment Service Vendor Arrangements
     Access to vendors, selected by United, who will deliver discounted, high
     quality services and durable medical equipment.

-- -- AARP CareLine
     A telephonic service tailored to the health care information needs of two
     groups of older Americans:

     - Persons newly diagnosed with one of 10 serious or chronic medical
       conditions; and
     - Caregivers including spouses, children, and other loved ones who are
       responsible for the care of a seriously ill or disabled person.

-- -- Foreign Travelers Services
     Instant access to help and advice for policyholders who experience a serious
     health problem while traveling abroad.

-- -- "Ask the Expert" Health Care Information Services
     The latest clinical guidelines for serious and chronic medical conditions,
     to be presented in clear and understandable language. This service
     potentially will be available to all AARP policyholders and members. This
     service will be available in both print and Internet form.

-- -- Transplant Centers of Excellence
     Information and services will be offered to policyholders who need an organ
     or tissue transplant.

<PAGE>

United's product development activities with respect to those additional
products noted above shall be consistent with the commitment made by it in
its Supplemental Health Products Proposal to AARP dated May 15, 1996."
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(B)
<SEQUENCE>3
```



\<DESCRIPTION>EXHIBIT 10(B)
\<TEXT>

\<PAGE>

Second Amendment
to the
AARP Health Insurance Agreement
by and among
American Association of Retired Persons,
Trustees of the AARP Insurance Plan
and
United HealthCare Insurance Company

The American Association of Retired Persons and the Trustees of the AARP Insurance Plan hereby agree with the United HealthCare Insurance Company to the Amendment of the AARP Insurance Agreement, entered into by said parties and dated as of February 26, 1997, as set forth below:

A.  Section 2.86 of the Agreement is amended to read as follows:

   "NETWORK PROVIDER means any health care provider that has agreed to participate in the Medicare Select plan made available under the SHIP, other than a Network Pharmacy, Network Pharmaceutical Manufacturer, or Network Pharmacy Benefit Manager."

B.  Article 2 of the Agreement is amended by the addition of the following Sections 2.119, 2.120, 2.121, 2.122, 2.123, 2.124 and 2.125:

   "2.119  NETWORK PHARMACY means a retail pharmacy or mail order pharmacy, which has agreed with United to participate in the Health Care Options Pharmacy Service.

   2.120  NETWORK PHARMACEUTICAL MANUFACTURERS means a pharmaceutical manufacturer that has agreed to provide rebates or like sums in connection with the Health Care Options Pharmacy Service.

   2.121  NETWORK PHARMACY BENEFIT MANAGER means a pharmacy benefit manager that has agreed to provide on-line point of service prescription processing and other administrative services in connection with the Health Care Options Pharmacy Service.

   2.122  SHIP PHARMACY INSURED means a SHIP Insured that is covered by a SHIP Pharmacy Plan.

   2.123  SHIP PHARMACY PLAN means a Medicare Supplement, pre-standardized Medicare Supplement or Medicare Select policy or certificate offered under the SHIP Plan which provides an outpatient prescription drug benefit.

\<PAGE>

   2.124  HEALTH CARE OPTIONS PHARMACY SERVICE means a service offered by United in connection with any SHIP Pharmacy Plan which (i) offers SHIP Pharmacy Insureds access to Network Pharmacies at which or through which the SHIP Pharmacy Insured may receive discounted pharmaceuticals; (ii) offers SHIP Pharmacy Insureds accessing Network Pharmacies with on-line point of service prescription processing; (iii) includes quality of care mechanisms, including drug utilization review programs; and (iv) includes such other features as may be mutually agreed to by the parties hereto. The service shall only apply to a SHIP Pharmacy Insured during such period in which the outpatient prescription drug benefits of the SHIP Pharmacy Plan have not been exhausted.

   2.125  USUAL AND CUSTOMARY PRICE means the reasonable and customary, non-discounted fee, i.e., the retail price, for a prescription, which is charged by a pharmacy which does not exceed the fee the pharmacy would charge any full-paying customer."

C.  Section 3.2.2 of the Agreement is amended by the addition of new subsection (h) to read as follows:

http://www.sec.gov/Archives/edgar/data/731766/0001047469-98-031820.txt

"(h)  United shall make available to all SHIP Pharmacy Insureds
      access to the Health Care Options Pharmacy Service. United
      shall develop and manage relationships with pharmaceutical
      vendors, including mail service vendors, and pharmaceutical
      manufacturers and/or wholesalers in support of the Health
      Care Options Pharmacy Service. United will manage these
      vendor relationships to promote savings, network stability
      and quality improvement and to address service concerns that
      SHIP Pharmacy Insureds may have with any such vendor."

D.  Article 6 of this Agreement is amended by the addition of the following
    new Sections 6.10.3 and 6.10.3.1.

"6.10.3 HEALTH CARE OPTIONS PHARMACY SERVICE.  United shall be
        entitled to receive   ***   of the savings obtained by the
        Health Care Options Pharmacy Service. For such purposes,
        savings obtained by the service means: (i) the difference
        between the Usual and Customary Price for the prescription
        and the amount that is payable to the Network Pharmacy for
        the prescription by both the SHIP Pharmacy Insured and the
        SHIP Pharmacy plan; plus (ii) the drug formulary rebates
        obtained from Network Pharmacy Manufacturers for prescriptions
        purchased through the Health Care Options Pharmacy Service.
        In no event shall United be entitled, during any one (1)
        calendar year, to receive an amount in excess of

*** Represents text deleted pursuant to a confidentiality treatment
    request filed with the Securities and Exchange Commission pursuant
    to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

<PAGE>

                the amount United received or is expected to receive
                for such calendar year, from Network Pharmaceutical
                Manufacturers in the form of drug formulary rebates
                or like sums. No separate charge will be made to
                any SHIP Pharmacy Insured with respect to any
                discount taken. In the event that the drug
                formulary rebates obtained from Network
                Pharmaceutical Manufacturers for prescriptions
                purchased through the Health Care Options Pharmacy
                Service exceed   ***   of the savings obtained by
                the Health Care Options Pharmacy Service, then
                United shall credit any such excess amount to the
                RSF. United shall provided AARP (i) with written
                quarterly reports of all savings obtained from
                Network Pharmacies in connection with the Health
                Care Options Pharmacy Service during the quarter
                prior to the quarter in which the report is
                generated and (ii) with reports regarding sums
                received from Network Pharmaceutical Manufacturers
                at the end of the calendar quarter following the
                quarter in which such sums were received. The
                compensation payable under this Section 6.10.3
                shall remain in effect for the duration of this
                Agreement, except as otherwise agreed to by the
                parties and as set forth below. Any change in the
                compensation shall become effective no sooner than
                (i) July 1, 2002 and shall require that any party
                seeking the same provide the other with at least
                one hundred and eighty (180) days notice of the
                same; or (ii) in the event of a material change in
                the availability or the amount of drug formulary,
                rebates or like sums provided by Network
                Pharmaceutical Manufacturers or volume discounts or
                like sums provided by Network Pharmacies and shall
                require that any party seeking the same provide the
                other with at least one hundred and eighty (180)
                days notice of the same or in the event of
                circumstances dictating a shorter notice period,
                such shorter period as is reasonable given such
                circumstances.

http://www.sec.gov/Archives/edgar/data/731766/0001047469-98-031820.txt

6.10.3.1  ELECTRONIC PRESCRIPTION PROCESSING.  In addition to
the sum set forth in Section 6.10.3 above, United
shall be authorized to receive  ***  per
prescription that is electronically processed for
the Health Care Options Pharmacy Service. The price
of these services may increase from year to year as
mutually agreed to by the parties hereto. In
addition to other provisions of this Agreement, the
parties agree to modify the Administrative Service
Fee in the event that there is a material change in
the number of claims which United processes. The
parties agree that any change in the fees payable
hereunder will be commensurate with the impact of
the change on the costs of providing the service by
United or its representative."

*** Represents text deleted pursuant to a confidentiality treatment request
filed with the Securities and Exchange Commission pursuant to Rule 24b-2
of the Securities Exchange Act of 1934, as amended.

<PAGE>

E.  Section 7.1.1 of the Agreement is amended by the addition of a new final
sentence to read as follows:

"In establishing and maintaining relationships with
Network Pharmacies, Network Pharmaceutical
Manufacturers, and/or Network Pharmacy Benefit
Managers in connection with the HealthCare Options
Pharmacy Service, United shall be authorized to
disclose to such providers information contained in
the Database relating to such Service and to
authorize such providers to use such information in
connection therewith provided however that no such
use shall be in any manner which directly or
indirectly is identifiable to AARP, AARP Trust or
any AARP members."

F.  The provisions of this Amendment shall become effective January 1, 1998.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by
their duly authorized officers as of the date first written above.


AMERICAN ASSOCIATION OF RETIRED PERSONS

By:    /s/  HORACE B. DEETS
      ------------------------------------

Print Name:  HORACE B. DEETS
            ------------------------------

Print Title: EXECUTIVE DIRECTOR
            ------------------------------


TRUSTEES OF THE AARP INSURANCE PLAN

By:    /s/  HORACE B. DEETS
      ------------------------------------

Print Name:  HORACE B. DEETS
            ------------------------------

Print Title: SECRETARY
            ------------------------------


UNITED HEALTHCARE INSURANCE COMPANY

By:    /s/  LOIS QUAM

---------------------------------------

Print Name:  LOIS QUAM
            --------------------------------

Print Title: CHIEF EXECUTIVE OFFICER,
             AARP DIVISION
            ----------------------------

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.(C)
<SEQUENCE>4
<DESCRIPTION>EXHIBIT 10(C)
<TEXT>

<PAGE>
```

## EMPLOYMENT AGREEMENT

    This Agreement is made effective this 20th day of May 1998 (the
"Effective Date") by and between R. Channing Wheeler ("Executive") and United
HealthCare Services, Inc. ("UHS"). When used in this Agreement, UHS includes
any affiliated entity of UHS. This agreement is for the purpose of setting
forth certain terms and conditions of Executive's employment by UHS and to
protect UHS's knowledge, expertise, customer relationships and the
confidential information UHS has developed about its customers, products,
operations and services. As of the Effective Date, this Agreement supersedes
any prior employment-related agreement or agreements between Executive and
UHS or any subsidiary or affiliate of UHS.

1.  EMPLOYMENT AND DUTIES.

    A.  EMPLOYMENT.  UHS hereby directly or through its subsidiaries employs
Executive. Executive accepts such employment on the terms and conditions set
forth in this Agreement and, except as specifically superseded by this
Agreement, subject to all of UHS's policies and procedures in regard to its
employees.

    B.  DUTIES.  Executive shall perform such duties as are commonly
associated with the position of the chief executive officer of the Strategic
Business Services Division of United HealthCare Corporation ("UHC") reporting
to Stephen Hemsley or another member of the Office of the Chairman or other
comparable senior executive level position plus such other executive level
responsibilities as are reasonably assigned to Executive in connection with
his UHC duties. Executive agrees to devote substantially all of his business
time and energy to the performance of his duties in a diligent and proper
manner.

2.  COMPENSATION.

    A.  BASE SALARY.  Executive shall initially be paid a base annual salary
in the amount of $400,000 payable bi-weekly, less all applicable withholdings
and deductions. Executive shall receive a periodic performance review from
his supervisor and consideration for an increase of such base salary,
provided however that during each year of this Agreement, and subject to
Executive's performance, the Executive will be treated for increases in base
salary in the same manner as other executives at Executive's level are
considered and granted increases in their base salary.

    B.  BONUS AND STOCK PLANS.  Executive shall be eligible to participate in
UHS's incentive compensation plans and its stock option and grant plans, in
accordance with the terms and conditions of those plans and applicable laws
and regulations. Without limiting the generality of the foregoing, Executive
will be entitled to participate in the UHC Management Incentive Program with
a target participation of 85% of Executive's base earnings, and Executive
will also be entitled to participate in the UHC Long Term Incentive Plan,
subject, in each instance, to the terms and conditions of those plans as

```
<PAGE>
```

they may be changed in the future. Any stock options granted to Executive will
provide that upon a UHC or UHS Change of Control (as defined in Section 3D3

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

EXHIBIT 10(s)

Amendment and Assignment

United HealthCare Insurance Company

American Association of Retired Persons

Trustees of the AARP Insurance Plan

AARP Services, Inc.



This ASSIGNMENT is made and entered into as of the 28th day of December, 1999, by and between the American Association of Retired Persons ("AARP"), the Trustees of the AARP Insurance Plan ("AARP Trust"), United HealthCare Insurance Company ("United"), and AARP Services, Inc. ("Services").

WITNESSETH

WHEREAS, AARP has made available to its members a group Medicare supplement, hospital indemnity and certain other medical insurance coverages and other products from United (the "Program"); and

WHEREAS, the Program is presently being made available pursuant to an Agreement between the parties dated as of February 26, 1997 (the "United Agreement"); and

WHEREAS, AARP is desirous of restructuring its operational structure whereby certain activities formerly conducted by AARP, including performance of quality control operations, monitoring of service providers, and granting third parties use of the AARP Mailing List, will in the future be conducted by Services and no longer be conducted by AARP; and

WHEREAS, AARP and United desire to assign certain

of their respective
rights and obligations relating to quality control, monitoring and the AARP Membership Information as set

out in the United Agreement to Services, a wholly-owned subsidiary of AARP, which subsidiary will carry out these activities formerly carried out by AARP.

NOW THEREFORE, IT IS AGREED:

1) Attached hereto as Exhibit A is a copy of the United Agreement between AARP, the AARP Trust, and United effective as of February 26, 1997. By this Assignment, AARP assigns all of its rights, title and interests in such Agreement as they relate to quality control, monitoring and the AARP Membership Information, to Services, saving and excepting to itself those rights, title and interests contained in the Agreement relating to the exclusive right of AARP to its name, symbol, mark, logos, and acronym (the

"AARP Marks") and the right of AARP to receive a royalty for the use of the AARP Marks. The Definitions as set out in Article 2 of the United Agreement are incorporated herein by reference to the extent that such Definitions are applicable. All other provisions of the United Agreement not assigned shall remain as set out in the United Agreement and shall control to the extent consistent with the terms of this Assignment.

2)  The allowances determined in accordance with Section 6.1 of the United Agreement and payable in accordance with Section 6.7 of the United Agreement shall be payable under the same terms and conditions by United to AARP.

3)  AARP hereby assigns and transfers to Services:

a)  All of its rights, title and interests in the United Agreement as they relate to quality control and monitoring of the use by United of the AARP Marks.

(b)  A license to use and sublicense the AARP names, addresses, and member identification number(s) (the "Membership Information").

-2-

c)  Nothing herein shall be interpreted as AARP assigning those rights, title and interests contained in the United Agreement relating to the exclusive right of AARP to the AARP Marks and the right of AARP to receive a royalty for the use of the AARP Marks.

d)  All rights, title and interests not assigned by this Assignment shall remain as set out in the United Agreement and shall control to the extent consistent with the terms of this Assignment.

4)  It is intent of the parties hereto that the payment made by United to AARP pursuant to the United Agreement and referred to as an allowance is a royalty and pursuant to this Assignment and the agreement referred to in this paragraph, the royalty is to be bifurcated into a payment to AARP Services for Quality Control and monitoring and to AARP for use of the AARP Marks. AARP shall grant United an exclusive license to use the AARP Marks by separate agreement. Such separate agreement shall obligate United to compensate AARP for the use of its intangible property by the payment of a royalty. A copy of such separate agreement is attached hereto as Exhibit B.

5)  The quality control, monitoring and AARP Membership Information rights and obligations set out in the United Agreement which are hereby transferred to Services are as follows:

a)  Quality Control: Services shall be responsible for ensuring that United maintains all of the standards and meets all of the requirements set out in the United Agreement. Services shall be subject to the

obligations of AARP contained therein. All reports required of United formerly to have been provided to AARP shall be provided by United to Services.

-3-

b)    Monitoring: An activity of Quality Control consisting of the overseeing of operations as called for in the United Agreement.

c)    Any and all rights of United to the AARP Membership Information are hereby transferred from AARP to Services. AARP has licensed the use of its member mailing list and Membership Information to Services by separate agreement with the right of Services to sublicense such information. Services hereby grants to United all rights to the Membership Information formerly granted to United by AARP pursuant to the United Agreement. Any and all approvals required of AARP as to the use of the Membership Information pursuant to the United Agreement shall be requested by United from Services.

d)    All rights of United as to the Membership Information remain as they are set out in the United Agreement, with such rights to be provided by Services. United acknowledges Services as the successor to AARP for all purposes relating to Membership Information. Nothing in this Assignment Agreement shall grant to Services or United any rights whatsoever as to the AARP Marks.

6)    United shall pay to Services the sum of the following amounts as compensation:

a)    For Membership Information, during the term of this Assignment, United shall pay to Services an amount equal to eight percent (8%) of the amount computed pursuant to Article 6 of the United Agreement.

b)    For Quality Control services, United shall pay to Services an amount equal to Services' costs to perform such services, plus ten percent (10%). Services shall bill United for these services and payment shall be made within thirty (30) days.

-4-

7)    Notices required or appropriate to be given under this Agreement shall be given as set out in the United Agreement, with a copy of all such notices:

To Services:

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

AARP Services, Inc.
601 E Street, N.W.
Washington, D.C. 20049
FACSIMILE NUMBER: (202) 434-2339
Attention: Steven Zaleznick, President

8) All representations, warranties and indemnifications made by the parties to the Agreement being amended are hereby incorporated by reference with modifications as necessary to result in Services assuming those representations, warranties and indemnifications of AARP to the extent they relate to the subject matter of this Amendment and Assignment, and Services being the beneficiary of those representations, warranties and indemnifications of the service provider to the extent they relate to the subject matter of the Amendment and Assignment.

9) This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective successors and assigns.

-5-

10) This Agreement may be executed in counterparts, each of which shall be deemed to be an original.

IN WITNESS WHEREOF, the parties have executed this Agreement this 28th day of December, 1999.

American Association of Retired Persons

By:  /s/ Horace B. Deets
    ---------------------------------------------

    Horace B. Deets, Executive Director

Trustees of the AARP Insurance Plan

By:  /s/ Illegible
    ---------------------------------------------

United HealthCare Insurance Company

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

By:   /s/ Illegible
------------------------------------------------

AARP Services, Inc.

By:   /s/ Steven Zaleznick
------------------------------------------------
      Steven Zaleznick

-6-

ROYALTY AGREEMENT

United HealthCare Insurance Company
American Association of Retired Persons
Trustees of the AARP Insurance Plan

     This AGREEMENT is made and entered into as of the 28th day of December,
1999, by and between the American Association of Retired Persons ("AARP"), the
Trustees of the AARP Insurance Plan ("AARP Trust"), and the United HealthCare
Insurance Company ("Provider").

WITNESSETH

     WHEREAS, AARP, the AARP Trust, and Provider are parties to an agreement
dated as of February 26, 1997 ("Agreement") under which AARP licenses its name,
symbol, mark, logos, service marks and acronym ("AARP Marks") to Provider, and
under which the Provider makes available services to AARP members. AARP receives
an allowance as compensation for such licenses under the Agreement.

     WHEREAS, AARP and the Provider have determined that the allowance for
the licenses is in fact a royalty.

     WHEREAS, AARP Services, Inc. ("Services") is a wholly-owned subsidiary
of AARP that is governed and operated separately and independently from AARP.

     WHEREAS, AARP, the AARP Trust, and the Provider have entered into an
assignment ("Assignment") with Services, under which AARP and the Provider have
assigned to Services certain of their rights, title and interests in the
Agreement, and, pursuant to such Assignment, AARP has reserved unto itself all
of its right, title and interest in the AARP Marks.

     WHEREAS, AARP has entered into an agreement with Services

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

("AARP-Services Agreement"), under which Services will fulfill all of the rights and obligations of AARP as set out in the Agreement.

WHEREAS, AARP and the AARP Trust wish to enter into this royalty agreement ("Royalty Agreement") with Provider, under which AARP solely licenses the AARP Marks to Provider, and receives in return royalties solely for the use of its intangible property.

WHEREFORE, IT IS AGREED:

1) To the extent that this Royalty Agreement modifies provisions of the Agreement, this Royalty Agreement replaces and supersedes such provisions in the Agreement relating to AARP's license to Provider of the AARP Marks, and the right of AARP to receive a royalty for such license. All other provisions of the Agreement shall remain in full force and effect. Should any provision of this Royalty Agreement conflict with a provision of the Agreement and such provision not relate to the license of the AARP Mark or payment therefore, the provision of the Agreement shall control.

2) AARP hereby grants and licenses to Provider the exclusive right to use the AARP Marks, in connection with Provider's operation of the program carried on by Provider as set forth in the Agreement.

3) The license described in par. 2 above shall be for the time period as set out in the Agreement.

4) As payment for the use of the intangible rights described in Par. 2 above, Provider shall pay AARP a royalty fee of the amount as set out in Article 6 of the Agreement as an allowance, modified as follows:

a) During the term of this Royalty Agreement, there shall be deducted by Provider from the amount due to AARP pursuant to Article 6 of the Agreement an amount equal to eight percent (8%) of such amount, plus any amount paid to

AARP Services for its quality control activities carried on to enable it to comply with its rights and obligations set out in the Assignment.

b) It is the intent of the parties to this Royalty Agreement that the amounts due to AARP under this Royalty Agreement plus the amounts paid by Provider to AARP Services to enable it to fulfill its rights and obligations under the Assignment shall equal the amount which would have been paid to AARP under the Agreement.

5) The foregoing royalty constitutes the sole and entire payment AARP is entitled to receive hereunder or otherwise from Provider for the license granted hereunder.

6) Provider shall comply with the provisions of the Assignment; shall

furnish all necessary information to Services on a timely basis; and shall pay Services for Service's activities in assisting Provider to comply with the provisions of the Assignment.

7) Should the Agreement be terminated pursuant to its terms, this Royalty Agreement shall terminate at the same time.

8) Any dispute arising out of or relating to this Royalty Agreement, including, but not limited to, interpretation, validity, or breach of this Royalty Agreement shall be resolved as if this Royalty Agreement was part of the Agreement and the provisions of Article 11 of the Agreement applied.

9) Neither AARP nor Provider are now, nor shall they become or be considered as, either principal or agent of the other in connection with the program as set out in the Agreement, nor shall AARP and Provider be joint venturers or partners either in carrying out their respective duties and obligations under this Royalty Agreement or for any other purpose. AARP is not will it become or be considered, as having an ownership interest in the program as set out in the

Agreement, nor in Provider (except AARP is the sole and exclusive owner of all proprietary and other property rights in interests in and to the AARP Marks) and AARP shall not be liable or responsible in any such capacity or capacities. Accordingly, Provider shall at no time and in no medium or manner state or imply that the AARP has any such interest in or connection with, Provider or the program as set out in the Agreement except that Provider may, in promotional materials, describe or provide information about the license granted hereunder.

10) This Agreement constitutes the entire agreement among the parties with respect to the matters treated herein and supersedes and replaces any prior Agreement between the parties. Modifications or amendments to this Agreement shall be effective only if in writing and signed by the parties.

11) The parties shall keep each other reasonably informed about legal or any other developments affecting the Program, shall cooperate with one another to carry out and implement the terms and objectives of this Agreement and shall perform such further acts, execute such further documents, and enter into such further agreements as may be necessary or appropriate to these ends. Without limiting the foregoing, each shall permit the other party (and its authorized representatives) reasonable access to its files and records and shall make available to the other party (and its authorized representatives)for consultation responsible officials for the purpose of more fully carrying out the terms and objectives of this Agreement, provided that the same be requested during normal business hours and upon reasonable notice

12) Provider may from time to time propose to AARP, for its approval, additional products to include within the program.

13) Notices required or appropriate to be given under this Agreement shall be given as set out in the Agreement.

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

14) Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid, but if any provision of this Agreement shall be held to be prohibited or invalid, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. No failure on the part of any party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder by any party preclude any other or further exercise of any other right and no waiver whatever shall be valid unless in a signed writing, and then only to the extent specifically set forth in such writing. No waiver of any right hereunder shall operate as a waiver of any other or of the same or similar right on another occasion.

15) The Article and Section headings contained in this Agreement are not part of this Agreement, are for the convenience of reference only and shall not affect the meaning, construction or interpretation of this Agreement.

16) This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective successors and assigns.

17) This Agreement may be executed in counterparts, each of which shall be deemed to be an original.

IN WITNESS WHEREOF, the parties have executed this Agreement this 28th day of December, 1999.

American Association of Retired Persons     Trustees of the AARP Insurance Plan

By: /s/ Horace B. Deets                     By:  /s/ Illegible
------------------------------------            ------------------------------------
     Horace B. Deets, Executive Director             Illegible

United HealthCare Insurance Company

By:/s/ Illegible
------------------------------------
     Illegible

FOURTH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT

This Fourth Amendment to the AARP Health Insurance Agreement (this "Amendment"), dated as of December 18, 2001 (the "Effective Date"), is made by and between AARP Services, Inc., a Delaware corporation ("ASI") and United HealthCare Insurance Company, a Delaware corporation ("United"). The parties hereto shall collectively be referred to as the "Parties."

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

RECITALS

A. The AARP, the Trustees of the AARP Insurance Plan, and United are parties to a certain AARP Health Insurance Agreement dated as of February 26, 1997 (the "Original Agreement").

B. The Original Agreement was first amended effective January 1, 1998, to address the Medicare Select product (the "First Amendment").

C. The Original Agreement was also amended effective January 1, 1998, to address the Health Care Options Pharmacy Service offered to SHIP Pharmacy Insureds (the "Second Amendment").

D. By subsequent amendment and assignment on December 28, 1999, AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of certain rights and obligations (the "Third Amendment").

E. The Original Agreement and its subsequent amendments shall hereinafter collectively be referred to as the "Agreement." Capitalized terms not defined in this Amendment but defined in the Agreement shall have the meanings set out therein.

F. Since the execution of the Agreement, United, ASI and its consultants have worked together to develop certain Developed Systems to support the administration of the SHIP

1

Plans and the provision of Services, the costs of which were approved by ASI and charged to the SHIP. The Developed Systems are set forth in more detail on Exhibit 7.7.2 hereto.

G. Section 7.7.2 of the Agreement provides that the Developed Systems are to be owned as agreed among the Parties. In accordance with Section 7.7.2, the Parties desire to provide a clear delineation of the rights of the Parties with respect to the Developed Systems, as more fully set forth in this Amendment.

Now, therefore, the Parties agree as follows:

A. Article 7 of the Agreement is amended by the addition of the following subsections 7.7.2.1 through 7.7.2.5:

7.7.2.1. Approval. United shall not, alone or in conjunction with any other person or entity, license, sell or otherwise utilize the Developed Systems for the purpose of enabling or facilitating the provision of any service or product other than in connection with the SHIP without the prior written approval of ASI, such approval not to be unreasonably withheld.

7.7.2.2. Use of Developed Systems involving a Directly Competitive Service or Product Prohibited. United shall not, alone or in conjunction with any other person or entity, license, sell or otherwise utilize the Developed Systems for the purpose of enabling or facilitating the provision of any Directly Competitive Service or Product, unless the Parties mutually agree otherwise. A "Directly Competitive Service or Product" means the following services and products offered to or through any other

2

group (other than AARP and its subsidiaries): Medicare supplement insurance, supplemental medical insurance, supplemental hospital indemnity insurance, long term care insurance, dental insurance, pharmacy services, vision services and any other services or products upon which the Parties mutually agree.

7.7.2.3. Compensation. The Parties hereby agree that a licensing fee shall be paid for any use, sale or license of the Developed Systems that is approved by ASI. The licensing fee shall be reimbursed to the SHIP in consideration of its capital investment in the Developed Systems. The amount of the licensing fee shall be as the Parties mutually agree and may take into account the following criteria: (a) utilization of hardware capacity (e.g., servers, computer systems, and network hardware) comprising the Developed Systems, (b) utilization of software capacity (e.g., database management systems, and modeling algorithms) comprising the Developed Systems, (c) direct expense of engineering resources comprising the Developed Systems, (d) direct expense of design resources comprising the Developed Systems and (e) consideration of the size or scope of the project involving the Developed Systems.

7.7.2.4. Budgetary Considerations. All costs, fees, and future funding provided with respect to the development of the Developed Systems shall be governed by ASI's budget and approval process for the SHIP; provided, however, that any such costs, fees, and funding which are required for the SHIP due to an Event of Force Majeure shall not be withheld.

3

7.7.2.5. Future Development. United may at any time independently develop systems, notwithstanding any prior exposure by

its engineering team to the Developed Systems. However, unless approved by ASI pursuant to subsection 7.7.2.1 above, United may not utilize the proprietary customized source code and object code, hardware, custom software, copyrighted material and/or patented technology comprising the Developed Systems, except for the know-how, processes, and other intellectual property, including patentable or copyrightable materials developed, owned or possessed by United's contractors and embedded in, underlying or constituting a part of the Developed Systems, the right, title and interest of which did not pass to United.

B. Exhibit 7.7.2 is revised to read as set forth in the attached Exhibit 7.7.2, which is hereby incorporated by reference as the new Exhibit 7.7.2.

C. This Amendment shall survive termination of the Agreement; however, this Amendment does not supercede the termination provisions of Article 10.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized officers as of the date first set forth above.


AARP SERVICES, INC.

By: _____

Print Name: _____

4

Print Title: _____


UNITED HEALTHCARE INSURANCE COMPANY

By: _____

Print Name: _____

Print Title: _____

5

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

EXHIBIT 7.7.2

I. Developed Systems

   Developed Systems are comprised of:

   A. The new SHIP policy administration system, which includes all
portions of the new SHIP policy administration system and any future
enhancements, augmentation or modifications made thereto, including hardware
(servers, desktop machines, and network infrastructure), systems software, and
applications software, developed, licensed or purchased by United, to date or in
the future, as replacement for the current SHIP ADMIN Policy Administration
System, and funded out of the SHIP ("COMPAS"). COMPAS supports or will support
four functional SHIP areas; member enrollment and maintenance; customer service
level II; fulfillment; and billing and collection (including plan and rate
structure, billing and premium calculation, and accounts receivable).

   B. All portions of the SHIP Claims system developed by United and
funded out of the SHIP.

   C. Other Business Transition-Related Systems -- All systems developed
or licensed to support the transition of non-Core SHIP business functions from
the Member Services Vendor to United, and funded by the SHIP.

6

FIFTH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT

   AARP Services, Inc. ("ASI") and United HealthCare Insurance Company
("United") hereby agree to this Fifth Amendment of the AARP Health Insurance
Agreement entered into and dated as of February 26, 1997, and subsequently
amended, as set forth below:



A.      Article 2 of the Agreement is amended by the addition of the following
        Sections 2.126, 2.127 and 2.128:

        "2.126. AARP HealthLine Services means the services offered by United
        to SHIP Medicare Supplement Insureds as described in subsection
        3.2.2(i) and Exhibit 3.2.2(i) of the Agreement.

        2.127. AARP HealthLine Claim Savings means the savings, expressed in
        dollars, derived from SHIP Medicare Supplement Insureds' utilization of
        AARP HealthLine Services. This is calculated using a model described in
        Exhibit 2.127 hereto that is based on differences in level of service

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

between an individual's intention regarding care before calling to the care that the individual actually received after calling, as verified through aggregate reporting to ASI.

2.128. SHIP Medicare Supplement Insured means an individual who is insured under any SHIP Plan that is a Medicare supplement insurance plan, including prestandardized and standardized Medicare Supplement insurance and Medicare Select."

B.      Subsection 3.2.2(g) of the Agreement is deleted in its entirety and replaced with the following:

        "3.2.2(g).  Reserved."

C.      Subsection 3.2.2 of the Agreement is amended by the addition of new subparagraph (i) to read as follows:

        "(i) United shall make available to all SHIP Medicare Supplement Insureds access to the AARP HealthLine Services. The AARP HealthLine Services are set forth in Exhibit 3.2.2(i) which is attached hereto and made a part of the Agreement. Additionally, United agrees to the following:

        (1) Performance Standards. United shall meet or exceed the performance standards and measurements set forth in Exhibit 3.2.2(i)(1) in performing its obligations under this subsection.

1

D.      (2) Program Performance Evaluation. United shall conduct a program performance evaluation beginning at 18 months following the effective date of the Fifth Amendment. The performance evaluation will measure the following program components: utilization of service, including overall utilization and ratio of new users to repeat users; customer service, including average speed of answer, call abandonment rate, member satisfaction and retention, and complaint resolution; projected return on investment based on program usage by SHIP Medicare Supplement Insureds; cross referrals into other AARP Health Care Options products; and clinical call mix. The Parties agree that the results of such evaluation may necessitate changes to the program, which may be made upon mutual agreement except as set forth in subsection 10.2.3 below.

        (3) Training. United shall develop and implement, to the satisfaction of ASI, training for employees supporting the AARP HealthLine Services, which shall address the operation and provision of AARP HealthLine Services and areas of special concern when dealing with senior sensitivity and mature customers.

        (4) Reports. United shall provide monthly and quarterly reports to ASI,

at intervals and in a format and medium to be agreed to by the Parties, to monitor and evaluate program performance. These reports shall include, but are not limited to reports on utilization of service, customer service, satisfaction, marketing results and analysis, and an aggregate report that verifies the elements of the AARP HealthLine Claim Savings Model.

(5) Marketing Communications. United shall develop an annual AARP HealthLine Services marketing plan which shall be submitted to ASI for its review and approval. United shall communicate the availability and benefits of the AARP HealthLine Services in existing AARP member communications. United shall adhere to the then-current AARP Health Care Options review and approval process for all written or scripted oral marketing, promotional, member and all other communications which shall be disseminated to SHIP Medicare Supplement Insureds or the general AARP membership describing the AARP HealthLine Services ("Promotional Materials"). United shall use the product name designated by ASI when providing AARP HealthLine Services under this Agreement.

(6) Additional Promotional Materials. In addition to the communications described in subsection 3.2.2(i)(5) above, United shall communicate in writing the availability and benefits of the AARP HealthLine Services at least two (2) times per year through the following Promotional Materials ("Additional Promotional Materials"): welcome packet and reminder postcards or other mailings. United shall receive *** for each active SHIP Medicare Supplement Insured per month for the term of this Amendment to produce and mail the Additional Promotional Materials. This charge is in addition to the compensation set forth in section 6.11."

(7) Subcontract. Certain of the AARP HealthLine Services shall be provided by Optum pursuant to an agreement between United and Optum, an executed copy of which shall be provided to ASI ("Optum Services Agreement"). ASI shall have the right to review and approve any proposed changes to the Optum Services Agreement.

*** Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

2

E. Section 6.10 of the Agreement is amended by deletion of the reference to "care coordination programs."

F. Article 6 of the Agreement is amended by the deletion of subsection 6.10.2.

G. Article 6 of the Agreement is further amended by the addition of the following new section 6.11, inclusive of subsections 6.11.1 through 6.11.4:

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

"6.11 AARP HealthLine Services. Compensation for the AARP HealthLine Services shall be paid as follows:

6.11.1 For the first year that the Fifth Amendment is in effect ("Year One"), United shall be paid *** for each active SHIP Medicare Supplement Insured per month. If, at the end of Year One, the AARP HealthLine Claim Savings total *** or more, United shall be paid an additional *** for each active SHIP Medicare Supplement Insured per month for Year One. United's compensation under this subsection shall be treated as a Pass-Through Expense. Refer to Exhibit 6.11 for a table that displays United's compensation under this subsection.

6.11.2 For the second year that the Fifth Amendment is in effect ("Year Two"), United shall be paid *** for each active SHIP Medicare Supplement Insured per month. If, at the end of Year Two, the AARP HealthLine Claim Savings total *** or more for Year Two, United shall be paid an additional *** for each active SHIP Medicare Supplement Insured per month for Year Two. United's compensation under this subsection shall be treated as a Pass-Through Expense. Refer to Exhibit 6.11 for a table that displays United's compensation under this subsection.

6.11.3 Utilization. The projected annual utilization rate of the AARP HealthLine Services is *** of the total number of SHIP Medicare Supplement Insureds. In the event that the actual utilization rate for Year Two or any subsequent year is above *** but below ***, United's compensation shall be reduced by *** per active SHIP Medicare Supplement Insured per month for the applicable year. In the event that the actual utilization rate for Year Two or any subsequent year is *** or below, United's compensation shall be reduced by *** per active SHIP Medicare Supplement Insured per month for the applicable year.

6.11.4 Compensation to ASI. In consideration of the services that ASI performs, including administration and oversight responsibilities relating to member communications, marketing and operations, ASI shall be paid as follows: $200,000 per year if there are less than 2,200,000 SHIP Medicare Supplement Insureds eligible for AARP HealthLine Services; $250,000 per year if there are between 2,200,000 and 2,600,000 eligible SHIP Medicare Supplement Insureds; or $300,000 per year if there are 2,600,000 or more eligible SHIP Medicare Supplement Insureds. ASI will be paid one-twelfth of its projected annual compensation by the 15th of each calendar month. Within sixty (60) days after the end of each calendar year, a reconciliation of the prior year's payments will be made. ASI's compensation shall be treated as a Pass-

---

*** Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

3

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

H.        Through Expense."

I.        Article 10 of the Agreement is amended by the addition of the following
          subsection 10.1.1:

          "10.1.1 The provisions of the Fifth Amendment shall become effective on
          January 1, 2002, shall remain in effect until December 31, 2003."

J.        Article 10 of the Agreement is further amended by the addition of the
          following subsections 10.2.1 and 10.2.2:

          "10.2.1 Termination for Breach. Any party may terminate the Fifth
          Amendment upon sixty (60) days prior written notice in the event of a
          material breach by another party, provided that such breach has not
          been cured to the non-breaching party's reasonable satisfaction within
          that sixty (60) day period. United's failure to meet or exceed the
          performance standards and measurements set forth in Exhibit 3.2.2(i)(1)
          for three (3) consecutive months or for three (3) months within any
          twelve (12) month period shall be considered a material breach.

          10.2.2 Termination in the event of Change in Law. The parties shall
          renegotiate the Fifth Amendment of this Agreement if any party would be
          materially adversely affected by continued performance as a result of
          (i) a change in law or regulation or (ii) a compliance requirement
          imposed by a governmental authority. The affected party must promptly
          notify the other parties of the change or compliance requirement, the
          material adverse affect, and its desire to renegotiate. If a new
          amendment is not executed within 60 days of the receipt of the
          renegotiation notice, the party materially adversely affected shall
          have the right to terminate the Fifth Amendment upon thirty (30) days
          prior written notice to the other parties. Any such notice of
          termination must be given within fifteen (15) days of the end of the
          sixty (60) day renegotiation period.

          10.2.3 Termination after Program Performance Evaluation. If the results
          of the Program Performance Evaluation described in subsection
          3.2.2(i)(2) are not satisfactory to ASI, ASI may discontinue the AARP
          HealthLine Services and terminate this amendment effective upon the
          expiration of the initial two-year term. ASI shall provide United
          written notice of this decision at least three (3) months prior to the
          expiration of the initial term."

4

IN WITNESS WHEREOF, the parties have caused this Amendment of the Agreement to be executed by their duly authorized officers.

AARP SERVICES, INC.

By: _____

Print Name: _____

Print Title: _____


UNITED HEALTHCARE INSURANCE COMPANY

By: _____

Print Name: _____

Print Title: _____


5


EXHIBIT 2.127

CONFIDENTIAL AND PROPRIETARY INFORMATION
OF OPTUM

AARP HealthLine Services

OPTUM RETURN ON INVESTMENT (ROI) ESTIMATION MODEL

A comprehensive and yet conservative approach is used to estimate a financial return on investment for purchasers of Optum services. This approach creates a dynamic computer-based actuarial model in spreadsheet format. The model uses both default parameters derived from market segmented analysis of Optum's book

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

of business and customized parameters based upon the specific purchaser's experience. The model's methodology is based on several years of research development including empirical claims, clinical process, and survey studies. Independent industry consultants have favorably reviewed this methodology.

WHAT DOES THE ROI MODEL MEASURE?

There are two principal components of economic return in the model that are relevant to AARP HealthLine Services. These are "Care-path methodology" (referred to as care-path) claims associated outcomes and service intervention values.

1. Care-path Claims Associated Outcomes

This component of the model recognizes that symptom-based triage callers sort into three basic clinical paths as a result of their interaction with Optum. Care-path outcomes are measured using a two part longitudinal methodology. ***

***

***

***

2. Optum Service Intervention Value

This component addresses the value of Optum services that fall outside of claims-associated savings. It is derived from conservative estimates of the cost to provide these services if the customer were to build or buy a capability equivalent to Optum. Types of services include health information nurse, clinical updates, audio library, and administrative assistance and member referrals.

How Valid is the ROI Estimate?

This is an estimation model used as a standardized tool for reporting ROI. Comprehensive investigation of a population's actual health care claims experience is very costly and difficult. Thus, it is not feasible to conduct full-scale empirical investigations of the ROI factors on a routine basis for customers. As an alternative, we use an empirical research base to guide the assumptions underlying ROI estimates. Additionally, most variables in the model can accept customer specific input values. Most importantly, the customer's actual Optum utilization experience and Optum program costs are factored into this ROI estimate.

ROI DATA SOURCES

***

***                                                ***

```
***                              ***
***                              ***
***                              ***
***                              ***
```

***Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

1

EXHIBIT 3.3.2(i)

AARP HealthLine Services

United offers AARP HealthLine Services to SHIP Medicare Supplement Insureds, as described below. United partners with Optum, a division of United HealthCare Services, Inc., to provide the AARP HealthLine Services. Optum shall make Optum staff available to ASI should ASI have any concerns or questions regarding the services.

AARP HealthLine Services exclude the provision of SHIP Plan information, including by way of example SHIP Plan eligibility requirements and insurance benefit information. Callers who inquire about SHIP Plan information will be given the AARP Health Care Options toll-free telephone number.

I. AARP HEALTHLINE PRODUCT DESCRIPTION

NURSE ACCESS FEATURES:

o        "Live answer", toll-free telephone access to registered nurses, 24 hours a day, 365 days a year

o        "Live answer", toll-free access to registered nurses who speak Spanish

o        Calls are handled by qualified nurses with RN certification and ongoing training

o        Help for emergencies, injuries and minor illnesses including immediate guidance and education

o        Wellness tip to all SHIP Medicare Supplement Insureds

o        General medical information for all types of health and medical

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

questions

o     Decision support for certain high-cost, high-practice variation conditions

o     Self-care recommendations and education

o     Approximately 550 clinical guidelines approved by the Medical Director and the Medical Review Panel

o     National relay center for the hearing impaired

o     Computerized record system with online, clinical, administrative and resource data

o     Full-time medical director on staff

o     Comprehensive medical library and medical librarian

o     Language Line with access to over 120 languages

o     Ongoing quality management

o     Quarterly reports measuring utilization, impact and satisfaction of services

o     Information about prescription and over-the-counter medication usage, drug interactions, dosage and precautions

HEALTH INFORMATION LIBRARY FEATURES:

o     Over 1,000 recorded health messages

o     Over 700 topics which are of interest to seniors

7

o     Available 24 hours a day, 365 days a year

o     Toll-free 1-800 service

o     Easy access from any telephone nationwide

o     Ability to listen to an important or a complex topic multiple times

o     Ability to transfer to nurse from the library

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

o        Access to 500 health messages recorded in Spanish


### AARP HEALTHLINE QUALITY STANDARDS

o        Frequent staff training on health and well-being issues specific to
         older callers

o        Ongoing development of medical triage & health information guidelines
         for age 50+ callers

o        Internal publication on health topics which relate to older Americans
         which is routed to all nurses so they are kept abreast of the latest
         news

o        Consulting geriatrician for guidelines and programs

o        AARP Quality Plan which tracks and reports AARP HealthLine program
         quality


8


EXHIBIT 3.2.2(i)(1)


### QUALITY ASSURANCE PROGRAM
### PERFORMANCE STANDARDS AND MEASUREMENTS

In performing United's obligations relating to AARP HealthLine Services, United
shall meet or exceed the following standards:


CUSTOMER SERVICE                                      STANDARD
----------------                                      --------

Average speed of answer                              30 seconds or less
% Calls answered within 30 seconds                   greater than 90%
Abandonment rate                                      5% or less

COMPLAINT RESOLUTION

Member Complaints
% resolved within 10 business days                          Greater than 90%


SATISFACTION

% Satisfied Measured Quarterly                              At least 95%




                                    9



                                                      EXHIBIT 6.11


            COMPENSATION TO UNITED UNDER SUBSECTIONS 6.11.1 AND 6.11.2


| YEAR | AGGREGATE AARP HEALTHLINE CLAIM SAVINGS ("AGGREGATE"*) | COMPENSATION TO UNITED** IF AGGREGATE IS MET | COMPENSATION TO UNITED** IF AGGREGATE IS NOT MET |
|------|-------------------------------------------------------|----------------------------------------------|--------------------------------------------------|
| Year One | *** | *** | *** |
| Year Two | *** | *** | *** |



* Aggregate is defined as the total AARP HealthLine Claim Savings derived from
the total Net Avoided Visits calculated in accordance with the model described
in Exhibit 2.127.

** Compensation shown is on a "per active SHIP Medicare Supplement Insured per
month" basis.

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

\*\*\*    Represents text deleted pursuant to a confidentiality treatment request
       filed with the Securities and Exchange Commission pursuant to Rule 24b-2
       under the Securities Exchange Act of 1934, as amended.

10

## SIXTH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT

This Sixth Amendment to the AARP Health Insurance Agreement (this
"Amendment"), dated as of December 23, 2002 (the "Effective Date"), is made by
and between AARP Services, Inc., a Delaware corporation ("ASI") and United
HealthCare Insurance Company, a Delaware corporation ("United"). The parties
hereto shall collectively be referred to as the "Parties".

### RECITALS

WHEREAS, the AARP, the Trustees of the AARP Insurance Plan, and United
are parties to a certain AARP Health Insurance Agreement dated as of February
26, 1997 (the "Original Agreement").

WHEREAS, by subsequent amendment and assignment on December 28, 1999,
AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of
certain rights and obligations (the "Third Amendment") and, further, United,
AARP and AARP Trust executed a Royalty Agreement dated December 28, 1999
granting United a license to the AARP Marks defined therein and the amended and
assigned agreement is a part thereof. 

WHEREAS, in addition to the Third Amendment, four other amendments have
been made to the Original Agreement (collectively, the "Agreement").

WHEREAS, due to changes in the marketplace and to more adequately
reflect the value of the AARP Marks, thereby creating greater royalty return to
AARP to support its social mission and strategic initiatives for all members,
the Parties now wish to amend

http://secfilings.nyse.com/filing.php?ipage=2065817&DSEQ=7&SEQ=...

the terms of the Agreement to reflect the agreement of the Parties regarding AARP royalty compensation.

NOW, THEREFORE, the Parties agree as follows:

1. Subsection 6.1 of the Agreement is amended by deleting this subsection in its entirety and replacing it with following:

6.1 AARP Royalty. AARP shall be entitled to receive a royalty for AARP's sponsorship of the SHIP and the license to use the AARP Marks in connection therewith. This royalty shall be 3.25% of Member Contribution for Policy Year 2002 and 3.75% of Member Contributions for Policy Year 2003. For Policy Years 2004 through 2007, the royalty shall be 4% of Member Contribution, with a review of the increased royalty amount on rates and competitive position prior to implementation.

2. The Parties agree to execute, no later than February 28, 2003, a Seventh Amendment to the Original Agreement to reflect the recent agreement of the Parties regarding United compensation.

3. Except as amended hereby, all other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the Parties have executed this Sixth Amendment as of the date and year first above written.

------------------------------          ------------------------------
AARP Services, Inc.                     United HealthCare Insurance
                                        Company

SEVENTH AMENDMENT TO THE AARP HEALTH INSURANCE

AGREEMENT

This Seventh Amendment to the AARP Health Insurance Agreement (this "Amendment"), effective as of December 23, 2002 (the "Effective Date"), is made by and between AARP Services, Inc., a Delaware corporation ("ASI") and United HealthCare Insurance Company, a Delaware corporation ("United"). The parties hereto shall collectively be referred to as the "Parties".

RECITALS

WHEREAS, the AARP, the Trustees of the AARP Insurance Plan, and United are parties to a certain AARP Health Insurance Agreement dated as of February 26, 1997 (the "Original Agreement").

WHEREAS, by subsequent amendment and assignment on December 28, 1999, AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of certain rights and obligations (the "Third Amendment") and, further, United, AARP and AARP Trust executed a Royalty Agreement dated December 28, 1999 granting United a license to the AARP Marks defined therein and the amended and assigned agreement was made a part thereof.

WHEREAS, by amendment dated December 23, 2002, ASI and United have agreed to modify the AARP royalty and to execute a subsequent amendment reflecting the agreement of the Parties regarding United compensation (the "Sixth Amendment").

WHEREAS, in addition to the Third Amendment and Sixth Amendment, four other amendments have been made to the Original Agreement (collectively, the

"Agreement").

WHEREAS, to bring United's risk and profit in line with the marketplace to reflect and to continue the superior resources and talent United has brought to the SHIP and to ensure that the SHIP is competitively positioned, the Parties now wish to amend the terms of the Agreement to reflect the agreement of the Parties regarding United compensation.

NOW, THEREFORE, the Parties agree as follows:

1. The first paragraph of section 6.3 is amended by deleting this paragraph in its entirety and replacing it with the following:

   6.3 United Risk and Profit Charges. United shall be entitled to receive compensation for assuming the risk associated with the SHIP. Such risk and profit compensation payable to United for Policy Year 2002 shall be *** of Member Contributions for such Policy Year. For Policy Year 2003, the compensation shall be *** of Member Contributions for such Policy Year.

2. Subsection 6.3.1 is amended by deleting the subsection in its entirety and replacing it with the following:

   6.3.1    Reserved.

3. Subsection 6.3.2 is amended by deleting the subsection in its entirety and replacing it with the following:

   6.3.2 Incentive Percentage. The parties agree that, beginning with Policy Year 2003, *** of United's Risk and Profit Charge for each Policy Year shall be tied to performance standards set forth in Exhibit 3.2.5, which

***    Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2

under the Securities Exchange Act of 1934, as amended.

shall be revised by ASI and United by March 31, 2003 to reflect the parties' mutual understanding of the applicable performance standards and allocated percentages at risk based on performance. The parties agree that *** of the *** at risk annually shall be tied to achieving the pricing standard of maintaining an average rate increase of less than ***. The Incentive Percentage applicable at any time during a Policy Year shall be determined by reference to United's best estimate of the year-to-date performance.

4. By June 30, 2003, the parties shall (1) review the impact of the increase in AARP royalty and United risk and profit compensation on rates and competitive position and (2) reach agreement on a recommendation to the AARP Trust regarding United risk and profit compensation for Policy Years 2004 through 2007 with a target in the range of *** to *** of Member Contributions for each such Policy Year, depending on the treatment of the risk and profit component of the Administrative Service Fee. By November 30, 2003, the parties shall complete their review of the impact of the increase in AARP royalty and United risk and profit compensation on rates and competitive position and agree on implementation.

5. Except as amended hereby, all other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the Parties have executed this Seventh Amendment as of the date and year first above written.


---------------------------               --------------------------------------
AARP Services, Inc.                       United HealthCare Insurance Company


***    Represents text deleted pursuant to a confidentiality treatment request
       filed with the Securities and Exchange Commission pursuant to Rule 24b-2
       under the Securities Exchange Act of 1934, as amended.

exv10wxvy

http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...



EXHIBIT 10

### BUSINESS ASSOCIATE AMENDMENT

This Amendment is made to the AARP Health Insurance Agreement ("Agreement") between United HealthCare Insurance Company ("United"), AARP, AARP Services, Inc. and the Trustees of the AARP Insurance Plan, as amended and assigned ("Agreement"), for the purpose of outlining requirements relating to services provided by AARP Services, Inc. ("Business Associate") on behalf of United. This Amendment shall apply only to the extent that in the performance of the Agreement, Business Associate, or any of its employees, Business Associates or agents, may obtain access to Protected Health Information or Personal Information, as defined below. The terms and conditions of this Amendment required by HIPAA and/or GLB are effective as of the compliance date applicable to United, or this Agreement, under HIPAA and/or GLB, respectively.

1.   The Agreement is hereby amended by the addition of the following section:

Section 7.8. **Protected Health and Personal Information**

1. Business Associate understands and acknowledges that it may receive from or create or receive on behalf of United Protected Health Information, as defined under the privacy regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and/or nonpublic personal information, as defined under the Gramm-Leach-Bliley Act and implementing regulations ("GLB"), during the performance of its obligations under this Agreement. The provisions of this Agreement do not apply to (i) information provided to or created by AARP Services, Inc. and/or AARP prior to the effective date of GLB, or (ii) information provided to or created by AARP Services, Inc. and/or AARP before the HIPAA effective date concerning individuals who had received the United GLB Privacy Notice but did not exercise their rights to "opt out" from information sharing.

2. Except as otherwise specified herein, Business Associate may use or disclosure Protected Health Information received from or created or received on behalf of United ("PHI") and nonpublic personal information received from or created or received on behalf of United ("Personal Information") to perform functions, activities, or services for, or on behalf of, United as specified in this Agreement and Exhibit A (or as otherwise agreed by the parties), provided that such use or disclosure would not violate the HIPAA privacy regulations, GLB or other federal or state privacy laws applicable to United, if done by United.

3. With regard to its use and/or disclosure of PHI or Personal Information, Business Associate hereby agrees and represents and warrants to United that Business Associate shall:

   (a)   not use or further disclose any PHI or Personal Information other than as permitted by this Agreement or required by law.

   (b)   at all times maintain and use appropriate safeguards to prevent uses or disclosures of any PHI or Personal Information other than as permitted by this Agreement or required by law;

   (c)   ensure that any subBusiness Associate or agent to whom it provides any PHI or Personal Information agrees in writing to the same conditions and restrictions that apply to Business Associate with regard to the PHI or Personal Information, including, without limitation, all of the requirements of this Section.

4. With regard to its use and/or disclosure of PHI, Business Associate hereby agrees and represents and warrants to United that Business Associate shall:

   (a)   report promptly to United any use or disclosure of any PHI of which it becomes aware that is not permitted by this Agreement;

   (b)   mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement; in the time and manner designated by United, make available PHI in a Designated Record Set, to United, or as directed by United, to an individual, in order for United to respond to individuals' requests for access to information about them in accordance with the HIPAA privacy regulation;

   (c)   in the time and manner designated by United, make any amendments or corrections to the PHI in a Designated Record Set that United directs in accordance with the HIPAA privacy regulation;

    (d)    in the time and manner designated by United, document such disclosures of PHI and information related to such disclosures as would be required for United to respond to a request by an individual for an accounting of disclosures of PHI in accordance with the HIPAA privacy regulations;

    (e)    in the time and manner designated by United, make available to United, or as directed by United, to an individual, the information documented in accordance with subsection (d) above, to permit United to respond

BA Amendment (United is CE)

---

to a request by an individual for an accounting of disclosures, in accordance with the HIPAA privacy regulations;

(f)     in the time and manner designated by United or the Secretary of HHS, make its internal practices, books and records relating to the use and disclosure of PHI available to the United and to the Secretary of HHS for purposes of determining United's compliance with the HIPAA privacy regulations.

5. Each term and condition of this section required by HIPAA and/or GLB shall be effective on the compliance date applicable to United, or this Agreement, under the HIPAA privacy regulation and/or GLB, respectively.

6. Business Associate agrees that this Agreement may be terminated by United in accordance with the written notice, breach and cure provisions in the Agreement in the event that United determines that Business Associate has violated any material term of this section.

7. Upon the termination of this Agreement for any reason, Business Associate shall return to United or destroy all PHI and/or Personal Information, and retain no copies in any form whatsoever. This provision shall apply to PHI and/or Personal Information that is in the possession of subBusiness Associates, vendors or agents of Business Associate.

8. Unless otherwise specified in this Agreement, all capitalized terms in this section not otherwise defined have the meaning established for purposes of Title 45 parts 160 and 164 of the United States Code of Federal Regulations, as amended from time to time.

9. The Parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for United to comply with the requirements of HIPAA, the HIPAA privacy regulations, GLB and other federal and state privacy and consumer rights laws and regulations applicable to United. Business Associate agrees to cooperate with and assist United in order for United to meet its obligations under applicable privacy laws and regulations.

10. This section shall survive any termination of this Agreement.

11. The terms and conditions of this section required by HIPAA shall be construed in light of any applicable interpretation of and/or guidance on the HIPAA privacy regulation issued by HHS from time to time. Any ambiguity in this section shall be resolved in favor of a meaning that permits United to comply with applicable laws and regulations.

2.     All other provisions of the Agreement shall remain in full force and effect.


**United HealthCare Insurance Company**                          **AARP Services, Inc.**

Signature    /s/ DAVID P. INGRAHAM                              Signature    /s/ DAWN M. SWEENEY
_____                            _____

Title        SVP                                                Title        President
_____                            _____

Date         4/11/03                                            Date         4-11-03
_____                            _____


BA Amendment (United is CE)

exv10wxvy                                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

EXHIBIT A
BUSINESS ASSOCIATE AMENDMENT

| Function | Process | Frequency | Required Data |
|---|---|---|---|
| Royalty Verification | Verify member premium and provider royalty payments | Monthly | Individual member names, demographic contact information, specific product participation, enrollment/term dates, premium amounts by product, any and all Insurance Trust activity related information |
| Customer Service | Respond to member requests for issue or dispute resolution, maintain ombudsmen services to help resolve claims, disputes and other issues with service providers, responding to complaint correspondence regarding the service providers | Daily | Individual member names, specific product participation, enrollment/term dates, premium amounts by product, member age, Medicare status, demographic contact information, claim payment history and status, reasons for claim denial, explanations for benefit authorization, benefit amounts, premium/EFT billing, account status, prescription purchase and pricing information, status of prescription orders, prescription billing information, status of accounts, copies of scripts as requested to verify incorrect orders. |
| Quality Assurance | Create and monitor performance and service standards for HCO, monitor providers for compliance with agreed upon standards, develop and complete ASI member satisfaction surveys. Review/approve strategic operating and marketing plans, review and approve all marketing and website copy. Audit and inspect management reports, complaints, finances and statistical data of providers, perform internal audits of providers, review product development, budgets and pricing by the providers, and provide general quality control under the Agreement | Monthly | Claims inventory, claims received, claims processed, claims pended, days to complete claim processing, enrollment inventory, enrollments received, enrollments processed by product, numbers of members transferred to UHC for claim issue resolution, timeliness of answering and responding to these calls and member inquiries, numbers of pieces of correspondence received, percent of correspondence resolved in 5 business days, percent resolved in 10 business days, related outstanding issues; numbers of underwriting appeals, percent resolved in 10 days and related outstanding issues, all customer satisfaction surveys and results from each survey, all marketing plans, operating plans, marketing copy, strategic plans, financial reports and statistical data, product development, budgets and pricing information, new product planning and any other related information. |

exv10wxvy                                          http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

## EIGHTH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT

This Eighth Amendment to the AARP Health Insurance Agreement (this "Amendment"), effective as of July 24, 2003 (the "Effective Date"), is made by and between AARP Services, Inc., a Delaware corporation ("ASI") and United HealthCare Insurance Company, a Connecticut corporation ("United"). The parties hereto shall collectively be referred to as the "Parties".

### RECITALS

WHEREAS, the AARP, the Trustees of the AARP Insurance Plan, and United are parties to a certain AARP Health Insurance Agreement dated as of February 26, 1997 (the "Original Agreement").

WHEREAS, by subsequent amendment and assignment on December 28, 1999, AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of certain rights and obligations (the "Third Amendment") and, further, United, AARP and AARP Trust executed a Royalty Agreement dated December 28, 1999 granting United a license to the AARP Marks defined therein and the amended and assigned agreement was made a part thereof.

WHEREAS, in addition to the Third Amendment, six other amendments have been made to the Original Agreement (collectively, the "Agreement").

WHEREAS, pursuant to Subsection 6.4.5, the funds in the SHIP Portfolio have been invested in accordance with a written investment strategy ("AARP Investment Policy").

http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

WHEREAS, the Parties desire to improve SHIP Portfolio performance through a modification in risk tolerance and the elimination of the December 31, 2007 maturity date constraint.

WHEREAS, pursuant to Subsection 6.4.5, United has proposed revisions to the AARP Investment Policy that have been approved by AARP Trust and memorialized in a letter from United to ASI dated July 24, 2003.

WHEREAS, elimination of the December 31, 2007 maturity date constraint necessitates a modification to the Agreement to effectuate this change and mitigate United's resulting risk of loss at the maturity date.

NOW, THEREFORE, the Parties agree as follows:

1.    Subsection 6.4.7 of the Agreement is amended by deleting the subsection in its entirety and replacing it with the following:

6.4.7. Investment Performance; Ownership. United does not guarantee the preservation of the principal amount of the assets comprising the SHIP Portfolio, and does not guarantee the achievement of any specific rate of return on the assets comprising the SHIP Portfolio. United shall not impose any investment liquidation charge in connection with the scheduled termination of this Agreement, except as permitted under Section 10.4.3.8 hereof. The SHIP Portfolio shall not constitute an asset of AARP or AARP Trust, nor shall AARP or AARP Trust have any interest in the income derived therefrom.

2.    Subsection 10.4.3 of the Agreement is amended by the addition of new subparagraph 10.4.3.8, to read as follows:

10.4.3.8. Investments Maturing Beyond Termination Date. The investment strategy described in Subsection 6.4.5 hereof, as approved by AARP Trust, permits the SHIP Portfolio (as defined in Subsection 6.4.1 hereof) to include investments that may have part or all of their principal amount outstanding after the termination date set forth in Section 10.1 of this Agreement. In this event, if this Agreement terminates on the date set forth in Section 10.1:

(a) any transfers made pursuant to Subsection 10.4.3 shall be adjusted for the Portfolio Capital Gain/Loss in the manner described in Subparagraph 10.4.3.4 (including but not limited to the provision of Subparagraph 10.4.3.4 that permits AARP to require an alternative method of transfer) and

(b) the determination of the required RSF Balance pursuant to Subparagraph 10.4.3.7 shall be made prior to the adjustment for the Portfolio Capital Gain/Loss, and this adjustment may serve to decrease the transferred RSF Balance below the minimum level prescribed by Subparagraph 10.4.3.7.

3.   Except as amended hereby, all other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the Parties have executed this Eighth Amendment as of the date and year first above written.

/s/ DAWN M. SWEENEY

AARP Services, Inc.

/s/ DAVID P. INGRAHAM

United HealthCare Insurance
Company

exv10wxvy                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

NINTH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT:
50-64 PLAN

    This Ninth Amendment to the AARP Health Insurance Agreement ("Ninth Amendment" or "Amendment"), effective as of October 1, 2003 (the "Effective Date"), is made by and between AARP Services, Inc., a Delaware corporation ("ASI") and United HealthCare Insurance Company, a Connecticut corporation ("United"). The parties hereto shall collectively be referred to as the "Parties".

RECITALS

    WHEREAS, AARP, the Trustees of the AARP Insurance Plan ("Trustees"), and United are parties to a certain AARP Health Insurance Agreement dated as of February 26, 1997 (the "Original Agreement").

    WHEREAS, by subsequent amendment and assignment on December 28, 1999, AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of certain rights and obligations (the "Third Amendment").

    WHEREAS, various other amendments have been made to the Original Agreement (collectively, the "Agreement").

    WHEREAS, pursuant to subsections 3.2.3 and 3.2.4 of the Agreement, the Parties agreed to undertake product development activities with respect to additional products and services to enhance the value of the SHIP to AARP members and differentiate the SHIP from other insurance programs.

\*\*\*       Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

1

WHEREAS, the Parties have worked together to design a program offering comprehensive insurance products for AARP members age 50 to 64 ("50-64 Plan", as defined below).

WHEREAS, the Trustees have approved the 50-64 Plan and authorized the Parties to implement it on a pilot basis, with a review to occur during the Pilot Period, as defined below, to determine whether the 50-64 Plan will be offered beyond the Pilot Period.

WHEREAS, subsection 3.2.4 of the Agreement requires the terms and conditions associated with the offering of any new products to be documented in amendments or exhibits to the Agreement.

NOW, THEREFORE, the Parties agree as follows:

A. Article 2 of the Agreement is amended by amending sections 2.56, 2.86, 2.118 and 2.123 to read as follows:

"2.56. Policy Year means January 1 through December 31 inclusive. For the 50-64 Plan, the first Policy Year is calendar year 2004. Any 50-64 Plan sales effective as of the end of 2003 and their experience will be included as part of the 2004 Policy Year."

"2.86. SHIP Plan means any health insurance plan, including any Medicare Select plan and any 50-64 Plan, underwritten by United pursuant to this Agreement, including without limitation any such plan described by any master group insurance policy issued to AARP Trust by United (or its affiliates) and insured or reinsured by United (or its affiliates) at any time during the term of this Agreement."

"2.118. Network Provider means any health care provider in the United network that has agreed to participate in (a) a Medicare Select plan made available under the SHIP, other than a Network Pharmacy, Network Pharmaceutical Manufacturer, or Network Pharmacy Benefit Manager or (b) the 50-64 Plan."

***   Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

2

"2.123. SHIP Pharmacy Plan means a Medicare Supplement, pre-standardized Medicare Supplement or Medicare Select policy or certificate, or a 50-64 Plan, offered under the SHIP which provides an outpatient prescription drug benefit."

B.    Article 2 of the Agreement is further amended by the addition of the following sections 2.129 through 2.134:

"2.129. 50-64 Member Contributions for a Policy Year means the sum of the monthly amounts earned for that Policy Year from each insured enrolled in the 50-64 Plan during that Policy Year.

2.130. 50-64 Plan means the preferred provider organization (PPO) insurance products, initially consisting of comprehensive PPO and catastrophic PPO products, that have been developed for AARP members age 50 to 64. These products include the use of Network Providers and coverage for services received from out-of-network providers. These products are further described in Exhibit 2.130, which exhibit may be modified from time to time in writing upon mutual agreement.

2.131. 50-64 Subfund has the meaning set forth in Section 8.2.1 hereof.

2.132. 50-64 Target Benefit Ratio means the quotient obtained by dividing the target Incurred Claims for the 50-64 Plan by the target 50-64 Member Contributions for a Policy Year.

2.133. Marketing Expenses includes those expenses incurred directly for marketing such as postage, advertising, creative development, production, printing, agency fees, model and segmentation development, and campaign implementation costs, exclusive of corporate overhead charges.

2.134. Pilot Period means January 1, 2004 until June 30, 2005. The Pilot Period may be changed upon mutual written agreement. Any 50-64 Plan sales effective as of the end of 2003 and their experience will be included as part of the Pilot Period."

C.    Section 3.2.2 of the Agreement is amended by the addition of new subparagraph (j) to read as follows:

"(j). United shall develop and make available to AARP members the 50-64 Plan in such sites and within such timeframes as agreed to by the Parties. United shall make available a network of Network Providers and manage the Network Provider relationships for the 50-64 Plan.

***     Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

3

exv10wxvy                                                        http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

Additionally, the Parties agree to the following:

(1) Pilot Period Evaluation. The Parties shall conduct a Pilot Period evaluation of the 50-64 Plan to be completed by June 30, 2005. The evaluation will measure the following criteria: (a) the underwriting acceptance rate calculated by dividing the number of accepted applications by the total number of applications received net of withdrawals, (b) the cumulative number of paid sales, (c) lapse rate, (d) 50-64 benefit ratio (loss ratio), (e) the marketing cost per paid response, and (f) such other criteria that may be mutually agreed upon. The benchmarks for conducting the evaluation of criteria (a) through (e) above are set forth in Exhibit 3.2.2(j)(1). The Parties agree that the results of this evaluation may necessitate changes to the program or necessitate the discontinuance of new 50-64 Plan sales. Any changes to the program or the decision to discontinue new 50-64 Plan sales shall be made upon mutual written agreement, except as provided in Subparagraph 3.3.7.1 below. The Parties further agree to conduct preliminary evaluations every six (6) months during the Pilot Period that measure the above criteria to the extent feasible and meaningful.

(2) Reports. United shall provide reports to ASI, at intervals and in a format and medium to be mutually agreed to by the Parties, to monitor and evaluate program performance. The types of reports and frequency of distribution to ASI are set forth in Exhibit 3.2.2(j)(1).

(3) Decisions. Except as provided in Sections 3.2.2(j)(1) and 3.3.7.1, ASI and the Trustees shall have the decision-making authority during the Pilot Period in recognition of the greater risk borne by the 50-64 Subfund. After the first twelve (12) months of the Pilot Period, the Parties shall negotiate and agree on the terms relating to decision making authority that will apply after the Pilot Period, taking into account such factors as claims risk, brand risk, marketing risk and other relevant risk factors identified by the Parties. Notwithstanding the foregoing, United shall retain decision-making authority for all activities required by law and this Agreement to be made by the insurer and claim and service administrator, such as decisions relating to claim adjudication (e.g., benefit payments and denials).

(4) Pharmacy benefit. Determination of the pharmacy benefit design for the 50-64 Plan is the responsibility of United and ASI. United shall utilize its pharmacy management programs in the administration of the pharmacy benefit for the 50-64 Plan for the Pilot Period, including its Retail Pharmacy Network, Drug List (Formulary), Pharmacy and Therapeutics Committee and Drug Utilization programs. United contracts with a pharmacy benefit management company ("PBM") for the purpose of administering these management programs. However, subject to input by

***     Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

4

ASI, United retains responsibility and control of all pharmacy management program decisions. The contracted PBM shall not have the authority to implement clinical or benefit programs without United's written consent.

(5) Performance Standards. United shall meet or exceed the performance standards and measurements set forth in Exhibit 3.2.2(j)(5) in performing its obligations relating to administration of the 50-64 Plan. Exhibit 3.2.2(j)(5) also lists penalties, in percentage terms, that will be applied in the event that United fails to meet a 50-64 Plan performance standard; such penalties are a percentage of 50-64 Member Contributions for the applicable Policy Year. In addition, United will adhere to AARP Health Care Options' brand guidelines and creative development process, which includes 50-64 Plan marketing budget approval."

D.   Section 3.3 of the Agreement is amended by the addition of new subparagraph 3.3.7.1 to read as follows:

"3.3.7.1. The provisions of Sections 3.3.7 and 3.3.8 shall apply with respect to the determination of 50-64 Member Contribution rates; provided however that, during the Pilot Period, United may propose revisions to 50-64 rates at appropriate times for review and approval by the Trustees. Either party may decide to cease new 50-64 Plan sales at any time."

E.   Section 3.7 of the Agreement is amended by the addition of new subsection 3.7.1 to read as follows:

"3.7.1. The provisions of Section 3.7 shall not apply to the 50-64 Plan."

F.   Section 6.1 of the Agreement is amended by the addition of new subsection 6.1.1 to read as follows:

"6.1.1. AARP Royalty for 50-64 Plan. AARP shall be entitled to receive a royalty for AARP's endorsement of the 50-64 Plan and the license to use the AARP Marks in connection therewith. This royalty shall be \*\*\* of 50-64 Member Contributions initially and is subject to annual review and revision."

G.   Section 6.2 of the Agreement is amended by the addition of new subsection 6.2.6 to read as follows:
"6.2.6. Administration Charges for 50-64 Plan Services; Expenses.

(a) United's Administrative Services Fee for 50-64 Plan Services. United's Administrative Services Fee for Services provided for the 50-64

\*\*\*   Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

5

exv10wxvy                                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

Plan shall be a specified percentage of 50-64 Member Contributions. This percentage shall be *** initially and is subject to annual review and revision upon mutual written agreement. Postage costs for activities other than marketing shall be included as a component of the Administrative Service Fee for the 50-64 Plan rather than included as Pass-Through Expenses. Marketing postage costs shall be included as part of Marketing Expenses under Subparagraph 6.2.6(c) below.

(b) Contingency Margin. Pricing for the 50-64 Plan shall include a contingency margin to cover higher than expected costs for benefits and expenses as mutually agreed by the Parties ("Contingency Margin"). The Contingency Margin shall be *** of 50-64 Member Contributions for the Pilot Period.

(c) Marketing Expenses. Pricing for the 50-64 Plan shall include provision for expected Marketing Expenses. Actual Marketing Expenses shall be charged to the 50-64 Subfund but treated like a loan and repaid with interest on a monthly basis to the 50-64 Subfund as the 50-64 Member Contributions are earned. During the first Policy Year, the repayment with interest will equal *** of 50-64 Member Contributions. For subsequent Policy Years, the provision in pricing for new Marketing Expenses and the percentage of actual 50-64 Member Contributions that is applied to repay the 50-64 Subfund with interest for Marketing Expenses shall be subject to review and approval by the Trustees.

(d) Charges for Claims and Marketing Risks. The 50-64 Subfund shall receive *** of the 50-64 Member Contributions for claims risk and *** of the 50-64 Member Contributions for marketing risk associated with the 50-64 Plan.

(e) Tax-Timing Expenses, premium tax, AARP royalty, United compensation, Contingency Margin, Marketing Expenses and investment income for the 50-64 Plan shall be paid through a retrospective experience rating charge (as described in Section 8.3 hereof). Attached as Exhibit 6.2.6(e) is a pro forma expense summary for the 50-64 Plan which itemizes the expected expenses (on a present value basis) as of the Effective Date."

H.   Section 6.3 of the Agreement is amended by the addition of new subsection 6.3.4 to read as follows:

"6.3.4. United's Risk and Profit Charges for 50-64 Plan. The Parties agree that the first paragraph of Section 6.3 and Subsections 6.3.1 and 6.3.2 shall not apply to the 50-64 Plan. Instead, United's risk and profit compensation for assuming the risk associated with the 50-64 Plan shall

***     Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

6

http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

be the sum of the following components:

(a) Base risk and profit charge: *** of 50-64 Member Contributions;

(b) United charge for claims risk: *** of 50-64 Member Contributions; and

(c) Risk sharing of benefit losses and gains: as set forth in Section 6.12."

I.      Article 6 of the Agreement is amended by the addition of the following new section 6.12 to read as follows:

"6.12. Risk Sharing of Benefit Losses and Gains for the 50-64 Plan.

6.12.1. 50-64 Target Benefit Ratio. Initially, the 50-64 Target Benefit Ratio shall be *** of 50-64 Member Contributions and is illustrated in Exhibit 6.2.6(e). During the Pilot Period, United will recommend appropriate changes to the 50-64 Target Benefit Ratio for the next Policy Year for ASI and Trustee approval.

6.12.2. Stop-Loss Arrangement; Loss Corridor Limit. United shall reimburse the 50-64 Subfund for 50-64 Plan benefit costs above the Loss Corridor Limit in any Policy Year in which the Loss Corridor Limit is exceeded. The Loss Corridor Limit refers to actual 50-64 Plan benefit costs above the 50-64 Target Benefit Ratio in a Policy Year, expressed as a percentage as set forth below:

(a) First Policy Year – The Loss Corridor Limit is actual 50-64 Plan benefit costs that are *** above the 50-64 Target Benefit Ratio;

(b) Second Policy Year – The Loss Corridor Limit is actual 50-64 Plan benefit costs that are *** above the 50-64 Target Benefit Ratio; and

(c) Third and Subsequent Policy Years – The Loss Corridor Limit is actual 50-64 Plan benefit costs that are *** above the 50-64 Target Benefit Ratio in the applicable Policy Year.

6.12.3. Sharing of Benefit Gains; Gains Corridor Limit. United shall receive gain-sharing compensation from the 50-64 Subfund for 50-64 Plan benefit costs below the Gains Corridor Limit in any Policy Year. The Gains Corridor Limit refers to actual 50-64 Plan benefit costs below the 50-64 Target Benefit Ratio in a Policy Year, expressed as a percentage as set forth below:

(a) First Policy Year – The Gains Corridor Limit is actual 50-64 Plan benefit costs that are *** below the 50-64 Target Benefit Ratio;

***        Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange
           Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

7

(b) Second Policy Year – The Gains Corridor Limit is actual 50-64 Plan benefit costs that are *** below the 50-64 Target Benefit Ratio; and

(c) Third and Subsequent Policy Years – The Gains Corridor Limit is actual 50-64 Plan benefit costs that are *** below the 50-64 Target Benefit Ratio in the applicable Policy Year.

6.12.4. Attached as Exhibit 6.12.4 is a document that illustrates how risk sharing of benefit losses and gains will occur as described in this Section 6.12."

J.      Section 8.2 of the Agreement is amended by the addition of the following new subsection 8.2.1 to read as follows:

"8.2.1. 50-64 Subfund. As of the Effective Date of this Ninth Amendment, the 50-64 Subfund ("50-64 Subfund" or "50-64 SF") shall consist of a *** initial allocation of funds in the RSF. The 50-64 Subfund shall increase or decrease over time based on the financial performance of the 50-64 Plan."

K.      The parties shall negotiate in good faith twelve months prior to expiration of the Pilot Period to reach agreement on new terms or a new agreement to be effective upon completion of the Pilot Period, if the parties decide to offer the 50-64 Plan beyond the Pilot Period.

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date and year first above written.

/s/ DAWN M. SWEENEY

AARP Services, Inc.

/s/ DAVID P. INGRAHAM

United HealthCare Insurance
Company

***      Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

8

exv10wxvy                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

EXHIBIT 2.130

### 50-64 PLAN DESCRIPTION

**Background**

The 50-64 Plan has been designed to bring to the market for AARP Members a program tailored to the needs of the 50-64 population,[1] specifically in the areas of broad coverage, innovative intervention-oriented care and disease management and affordability relative to the level of benefit coverage.

Initially, two PPO products (one comprehensive and one catastrophic) designed to address the diverse needs of the target population will be offered. In the first phase, these products will be available in a select number of pilot states, with plans to expand to additional markets.

**Comprehensive PPO Product**

This product provides the insured member with benefits both in and out of network within agreed price points while maintaining an appropriate level of cost sharing to promote responsible usage of the services. Expenses for the insured member and the program are reduced when services are rendered through a Network Provider. In-network benefits are richer in order to encourage the insured member to use a Network Provider. The overall quality of care is enhanced through United's Care Coordination program which is available in and out of network. In-network benefits have caps on the amount the member will share in the cost of health care while out-of-network utilization has no caps on the member's out-of-pocket expenditures. The benefit design for this product is further described below.

**Catastrophic PPO Product**

This product is designed to provide benefits for the high cost items that create the biggest burden for members. It focuses on hospital and surgical benefits as well as catastrophic illnesses. This product lowers premium costs by eliminating benefits for lower-cost services. Therefore, unlike the comprehensive product, this product does not provide coverage for preventive care, physician's office visits, behavioral health, most forms of diagnostic testing, and other services listed below in the chart. This product provides

---

[1] Although the 50-64 Plan is designed for the 50-64 AARP membership, spouses of AARP members, including spouses under the age of 50, are also eligible to participate. Additionally, state and federal laws may require coverage to be continued for insured members once they turn 65; the 50-64 Plans will conform to all applicable state and federal requirements.

---

\*\*\*        Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

9

benefits for services that are potentially more catastrophic to the insured member financially, such as inpatient hospital stays and expensive surgical procedures. The benefit design for this product is further described below.

Value-added Services

The following services shall be provided to members who participate in the 50-64 Plan:

- AARP Nurse HealthLine – This service provides toll-free 24 hour, 365-day access to registered nurses who provide health information, discuss treatment options, and guide individuals to an appropriate level of care. AARP Nurse HealthLine gives individuals information that helps them make educated decisions about their personal health and use of medical resources.
- Web-based tools – Access to myuhc.com and online pharmacy web site. To help members find prescription drug information, the Online Pharmacy provides information on safe drug use, email prescription reminders, drug cost comparisons across retail and mail order channels, and other information. The following references on myuhc.com shall be suppressed:
  (1) The reference to alternative medicine discounted providers shall be suppressed by removing United *Naturally* from the Alternative and Complementary medicine section of myuhc.com under **health topics and tools**; and
  (2) The reference to OTC shall be suppressed by removing Family meds from the OTC/Other products section of myuhc.com under **prescriptions**.
- Care Management – This service provides care management services to members at risk or affected by chronic health conditions. Care coordination offers proactive programs to help individuals manage their condition or disease and improve their health status. Community partners offer services to high-risk members.
- Transplant Benefit Management and Cancer Benefit Management – This service provides individuals with case management support to assist with counseling, physician interaction and referrals to credentialed transplant or cancer resources.
- Behavioral Health Management – This feature provides access to mental health and substance abuse programs to help people live and work well. A network of professionals is available for direct access to the most appropriate care.


\*\*\*        Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange
           Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

10

exv10wxvy                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

## 50-64 Plan Design

| Core Plan Design | Comprehensive Plan | | Catastrophic Plan | |
|---|---|---|---|---|
| | In Network | Out-of-Network | In Network | Out-of-Network |
| **Annual Deductible** | $1,000 | $2,000 | $2,000 | $ 3,000 |
| **Annual out-of-pocket Maximum (Coinsurance only)** | $2,500 combined, then 100% | $2,500 combined, then 80% | $2,500 combined, then 100% | $2,500 combined, then 80% |
| **Lifetime Maximum** | $5 Million | | $5 Million | |
| Benefits | | | | |
| **Inpatient Hospital Outpatient Surgery** | | | 80% after deductible | 60% after deductible |
| **Office Visit Primary or Specialist** | 80% after deductible | 60% after deductible | Not Covered | |
| **Preventive Care** | | | | |
| **Radiology and Lab** | | | 80% after deductible (Outpatient surgery or Inpatient only) | 60% after deductible (Outpatient surgery or Inpatient only) |
| **Prescription Generic** | $10 Copay/ (Unlimited) | 50% of Network Amount (Unlimited) | $10 Copay after $5K deductible (Unlimited) | 50% after $5K deductible (Unlimited) |
| **Brand** | 50% Coinsurance (Unlimited) | 50% of Network Amount (Unlimited) | 50% after $5K deductible (Unlimited) | 50% after $5K deductible (Unlimited) |
| **Behavioral Health/ Substance Abuse** | 80% after deductible | 60% after deductible | Not Covered | |
| **Emergency Care** | 80% after deductible | 80% after deductible *(in network deductible)* | 80% after deductible | Same as network *(in network deductible)* |

*** Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange        11
Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

exv10wxvy

http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

| Core Plan Design | Comprehensive Plan | | Catastrophic Plan | |
|---|---|---|---|---|
| | In Network | Out-of-Network | In Network | Out-of-Network |
| **Skilled Nursing Facility / Inpatient Rehabilitation Facility Service** | 80% after deductible (60 days combined calendar year max) | 60% after deductible (60 days combined calendar year max) | 80% after deductible (60 days combined calendar year max) | 60% after deductible (60 days combined calendar year max) |
| **Durable Medical Equipment** | 80% after deductible $2,500 combined calendar year max | 60% after deductible $2,500 combined calendar year max | 80% after deductible $2,500 combined calendar year max only for Covered Health Services ordered at time of treatment in hospital | 60% after deductible $2,500 combined calendar year max only for Covered Health Services ordered at time of treatment in hospital |
| **Home Health** | 80% after deductible (60 visit combined max) | 60% after deductible (60 visit combined max) | Not Covered | |
| **IV Therapy** | 80% after deductible | 60% after deductible | 80% after deductible (Covered Health Service) | 60% after deductible (Covered Health Service) |
| **Ambulance – Emergency Only** | 80% after deductible | Same as network | 80% after deductible | Same as network |
| **Dental Services – Accident Only** | 80% after deductible | Same as network | 80% after deductible | Same as network |
| **Hospice** | 80% after deductible 360 day max | 60% after deductible | 80% after deductible 360 day max | 60% after deductible |
| **Prosthetic Devices** | 80% after deductible/5k combined calendar year max | 60% after deductible/5k combined calendar year max | 80% after deductible/5k combined calendar year max | 60% after deductible/5k combined calendar year max |
| **Reconstructive Procedures (non-cosmetic)** | 80% after deductible | 60% after deductible | 80% after deductible | 60% after deductible |
| **Rehabilitation Services** | 80% after deductible; 20 | 60% after deductible; | Not Covered | |

exv10wxvy                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

| | visits of each PT, OT, ST allowed Cardiac Rehab – 36 visits; no chiropractic | 20 visits each of PT, OT, ST allowed Cardiac Rehab – 36 visits; no chiropractic | | |
|---|---|---|---|---|
| **Transplantation** **Services** | 80% after deductible | Non-network not available (unless mandated by state) | 80% after deductible | Non-network not available (unless mandated by state) |
| **Urgent Care Services** | 80% after deductible | 60% after deductible | | Not Covered |

\*\*\*  Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange       12
       Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

exv10wxvy                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

| Core Plan Design | Comprehensive Plan | | Catastrophic Plan | |
|---|---|---|---|---|
| | In Network | Out-of-Network | In Network | Out-of-Network |
| **Health & Well Being Services** | | | | |
| - Behavioral Health Mgmt | Yes | | | No |
| - NurseLine | Yes | | | Yes |
| - Care Management | Yes | | | Yes |
| - Transplant & Cancer Benefit Management | Yes | | | Yes |

\*\*\* Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange           13
Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

exv10wxvy                                          http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

EXHIBIT 3.2.2(j)(1)

### PILOT EVALUATION BENCHMARKS

| Criteria | 0 – 6 Months | 7 – 12 Months | 13 – 18 Months | Evaluation | Comments |
|---|---|---|---|---|---|
| **Cumulative Sales** | *** | *** | *** | Evaluate by pilot market segment | • Pilot product in approved states where deemed competitive |
| **Cost Per** **Paid Response** | *** | *** | *** | Evaluate by Pilot Market state<br><br>- Establish target by market state<br><br>- Actual marketing expenditures by state | • Higher cost per paid response is tied to lower sales<br><br>• Target varies based on average level of premium collected for each new sale. Factors influencing this are:<br><br>  • Plan Mix between comprehensive and catastrophic<br><br>  • Average duration of business<br><br>  • Average age of new sales |
| **50-64 Incurred Benefit Ratio** | *** | *** | *** | Evaluate by:<br><br>• Pilot market segment<br><br>• Calendar duration | • 50-64 Target Benefit Ratio is *** including active life reserves.<br><br>• Target will vary by state due to state specific premium tax.<br><br>• Review by ratio and time period |
| **Lapse Rates** | *** | *** | *** | Evaluate:<br><br>• Average length of policy<br><br>• Average policy | |

***     Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

14

exv10wxvy                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

| Criteria | 0 – 6 Months | 7 – 12 Months | 13 – 18 Months | Evaluation | Comments |
|---|---|---|---|---|---|
| | *** | *** | *** | duration by issue year, service area, and in aggregate | |
| | | | | • Number lapsing prior to a rate change | |
| | | | | • Track terminations monthly | |
| | | | | • Track Free Looks | An abbreviated lapser report will be done at each time interval, with a full report after 12 months |
| | | | | • Conduct a lapser report at quarterly intervals | |
| Underwriting (Distribution of Applicants) | • Level 1: *** | Level 1: *** | Level 1: *** | Evaluate level distributions quarterly by: | • The distribution will be impacted by the level of "self underwriting" by the applicants (i.e., if applicants know they will not pass underwriting, they will not apply). |
| | • Level 2: *** | Level 2: *** | Level 2: *** | • Age category | |
| | • Level 3: *** | Level 3: *** | Level 3: *** | • Pilot market & age | |
| | • Denied: *** | Denied: *** | Denied: *** | Cumulatively over the time periods | |
| | | | | Evaluate by each product (comprehensive and catastrophic) and the total (both products combined). | • The key goal for the underwriting is to increase accessibility while protecting the program |
| 50-64 Subfund (SF) Impact | | | | Track the following items across each quarter (3 month time period): | |
| | | | | • Beginning and ending period SF balances | |
| | | | | • Member contributions received | |
| | | | | • Marketing dollars spent | |

***     Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

15

exv10wxvy                                        http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

| Criteria | 0 – 6 Months | 7 – 12 Months | 13 – 18 Months | Evaluation | Comments |
|---|---|---|---|---|---|
| | | | | • Repayment of Marketing Expenses | |
| | | | | • Claim experience | |
| | | | | • Any risk sharing of benefit gains/losses | |
| | | | | • Contingencies (*** contingency margin was included in the premium as a cushion for claims and expenses. For the Pilot Period, this will be paid to the SF.) | |
| | | | | • Claims Risk Provision (*** of premium that will be paid to the SF for taking claims risk) | |
| | | | | • Marketing Risk Provision (*** of premium that will be paid to the SF for taking marketing risk) | |
| | | | | • Other expenses (includes administration, premium tax, royalty, risk/profit, investment income) | |

Note: Except for the 50-64 Subfund Impact, information will be tracked and reported separately for each product (comprehensive and catastrophic) and in total (both products combined).

### Report Chart

| Report | Monthly | Quarterly | Semiannually | Annually | End of Pilot |
|---|---|---|---|---|---|
| Enrollment & Underwriting Statistics | X | X | X | X | X |
| Cumulative Sales | X | X | X | X | X |
| Active Insureds | X | X | X | X | X |
| Cost Per Paid Response | | X | X | X | X |
| Lapser Report | | X | X | X | X |

***        Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

16

exv10wxvy                                              http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

| Report | Monthly | Quarterly | Semiannually | Annually | End of Pilot |
|---|---|---|---|---|---|
| Incurred Benefit Ratio | | X | X | X | X |
| 50-64 Subfund Report | | X | X | X | X |

\*\*\*    Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

17

exv10wxvy

http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

**EXHIBIT 3.2.2(j)(5)**

| Functions/Services | 50-64 Plan Service Standard | Penalty (Percent of 50-64 Plan Contributions) |
|---|---|---|
| **Claim Member Services Functions** | | |
| Speed to Answer Calls | | |
| n within 20 seconds | 80% | *** |
| Call Resolution | | |
| n within first day | 75% | *** |
| n within 72 hours | 98% | *** |
| Correspondence | | |
| n within 5 business days | 90% | *** |
| n within 10 business days | 98% | *** |
| **Underwriting and Issue Functions** | | |
| Appeals | | |
| n within 10 business days | 98% | *** |
| **Claims Processing Functions** | | |
| Claim Turnaround Time | | |
| n within 10 business days | 95% | *** |
| Payment Accuracy | 95% | *** |
| **Enrollments** | | |
| Enrollment Turnaround Time | | |
| n within 10 business days | 90% | *** |
| Enrollment Accuracy | 97.5% | *** |
| **Billing and Collections** | | |
| Payment Application Turnaround | | |
| n within 3 business days | 95% | *** |
| Payment Application Accuracy | 98% | *** |

*** Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

18

exv10wxvy                                                     http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

**Fulfillment**

| | Fulfillment Turnaround Time | | |
|---|---|---|---|
| § | within 5 business days | 90% | *** |

**Customer Satisfaction —
First Quarter Results**

| Claim Service | Included in larger SHIP sample | *** |
|---|---|---|

Note: Penalties will be calculated based on 50-64 Member Contributions, and shall be as defined and agreed in Exhibit 3.2.5 as revised effective March 31, 2003.

***   Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

19

exv10wxvy                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

EXHIBIT 6.2.6(e)

**50-64 PLAN**
**PRO FORMA EXPENSE SUMMARY**

|  |  | Percent of Premium |
|---|---|---|
| Marketing Expenses | | *** |
| Royalty | | *** |
| United Base Risk and Profit | | *** |
| Claim Administration | *** | |
| Enrollments, Underwriting and Other Administration | *** | |
| Subtotal | | *** |
| Premium Tax | | *** |
| Tax Timing including DAC tax | | *** |
| United Charge for Claims Risk | | *** |
| 50-64 SF Claims Risk Provision | | *** |
| 50-64 SF Marketing Risk Provision | | *** |
| Contingencies | | *** |
| Investment Income | | *** |
| **Total Expense Ratio** | | *** |
| **Target Benefit Ratio** | | *** |

All items are shown on a present value basis as a level percent of premiums over ten years. Percentages for premium tax, tax timing and investment income may vary based on actual expenses.

*** Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

20

exv10wxvy                                   http://www.sec.gov/Archives/edgar/data/731766/000095013404003522/...

EXHIBIT 6.12.4

### RISK-SHARING OF BENEFIT LOSSES AND GAINS:

### ILLUSTRATIONS

Risk/Gain sharing is based on actual benefit costs that are higher (+) or lower (-) than expected benefit costs. The risk/gain sharing corridor is *** first year, *** second year and *** in the third year. By capping the 50-64 Subfund risk to a fixed percentage of expected benefit costs each year, the risk of catastrophic claims is shifted to United, especially during the pilot phase when revenue is expected to be relatively low and random shock claims could adversely impact the program. Illustrations of risk sharing of benefit losses and sharing of benefit gains are shown below:

**A. Risk Sharing of Benefit Losses**

- 50-64 SF share of losses capped at corridor limits

- United's share of losses is the remainder (catastrophic risk)

*Example A1 – Benefits *** Higher Than Expected*

|                             | Year 1 | Year 2 | Year 3 |
|-----------------------------|--------|--------|--------|
| A. Expected Benefits        | ***    | ***    | ***    |
| B. Actual Benefits          | ***    | ***    | ***    |
| C. Total Loss = B-A         | ***    | ***    | ***    |
| D. 50-64 SF Share of Loss   | ***    | ***    | ***    |
| E. United Share of Loss     | ***    | ***    | ***    |

*Example A2 – Benefits *** Higher than Expected*

|                             | Year 1 | Year 2 | Year 3 |
|-----------------------------|--------|--------|--------|
| A. Expected Benefits        | ***    | ***    | ***    |
| B. Actual Benefits          | ***    | ***    | ***    |
| C. Total Loss = B-A         | ***    | ***    | ***    |
| D. 50-64 SF Share of Loss   | ***    | ***    | ***    |
| E. United Share of Loss     | ***    | ***    | ***    |

*** Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

21

**B. Sharing of Benefit Gains**

- 50-64 SF share of gains capped at corridor limits

- United's share of benefit gains is the excess outside of the corridor

*Example B1 – Benefits \*\*\* Lower Than Expected*

|                                  | Year 1 | Year 2 | Year 3 |
|----------------------------------|--------|--------|--------|
| A. Expected Benefits             | ***    | ***    | ***    |
| B. Actual Benefits               | ***    | ***    | ***    |
| C. Total Gain = B-A              | ***    | ***    | ***    |
| D. 50-64 SF Share of Gain        | ***    | ***    | ***    |
| E. United Share = C-D            | ***    | ***    | ***    |

*Example B2 – Benefits \*\*\* Lower Than Expected*

|                                  | Year 1 | Year 2 | Year 3 |
|----------------------------------|--------|--------|--------|
| A. Expected Benefits             | ***    | ***    | ***    |
| B. Actual Benefits               | ***    | ***    | ***    |
| C. Total Gain = B-A              | ***    | ***    | ***    |
| D. 50-64 SF Share of Gain        | ***    | ***    | ***    |
| E. United Share = C-D            | ***    | ***    | ***    |

\*\*\* Represents text deleted pursuant to a confidentialy treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

22

exv10wxay                                         http://www.sec.gov/Archives/edgar/data/731766/000095013404011798/...

EXHIBIT 10(a)

### TENTH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT

This Tenth Amendment to the AARP Health Insurance Agreement ("Tenth Amendment" or "Amendment"), effective as of January 1, 2004 (the "Effective Date"), is made by and between AARP Services, Inc., a Delaware corporation ("ASI") and United HealthCare Insurance Company, a Connecticut corporation ("United"). The parties hereto shall collectively be referred to as the "Parties".

RECITALS

WHEREAS, AARP, the Trustees of the AARP Insurance Plan ("Trustees"), and United are parties to a certain AARP Health Insurance Agreement dated as of February 26, 1997 (the "Original Agreement").

WHEREAS, by subsequent amendment and assignment on December 28, 1999, AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of certain rights and obligations (the "Third Amendment").

WHEREAS, various other amendments have been made to the Original Agreement (collectively, the "Agreement").

WHEREAS, the Fifth Amendment to the Agreement, effective January 1, 2002, memorialized the provision of AARP HealthLine Services to members on a pilot basis through December 31, 2003.

WHEREAS, the Parties have completed the AARP HealthLine Services performance evaluation and have agreed to continue the provision of these services to members with modifications to the Agreement as set forth below.

1

exv10wxay                                   http://www.sec.gov/Archives/edgar/data/731766/000095013404011798/...

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the Parties herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.  Subsection 6.11.3 of the Agreement is amended by deleting this subsection in its entirety and replacing it with the following:

    6.11.3. Utilization. The projected annual utilization rate of the AARP HealthLine Services is *** of the total number of SHIP Medicare Supplement Insureds. In the event that the actual utilization rate in a calendar year is below ***, United's compensation shall be reduced by *** per active SHIP Medicare Supplement Insured per month for that year.

2.  Article 6 of the Agreement is amended by the addition of the following subsection 6.11.5:

    6.11.5. Compensation to United After Year Two. After Year Two (beginning January 1, 2004), United shall be paid *** for each active SHIP Medicare Supplement Insured per month. If, at the end of the calendar year, the AARP HealthLine Claim Savings total *** or more for that year, United shall be paid an additional *** for each active SHIP Medicare Supplement Insured per month for that year. If, at the end of the calendar year, the AARP HealthLine Claim Savings total *** or more but less than *** for that year, United shall be paid an additional *** for each active SHIP Medicare Supplement Insured per

*** Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

2

exv10wxay                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404011798/...

month for that year. United's compensation under this subsection shall be treated as a Pass-Through Expense. Refer to Exhibit 6.11.5 for a table that displays United's compensation under this subsection.

3. Subsection 10.1.1 of the Agreement is amended by deleting this subsection in its entirety and replacing it with the following:

   10.1.1. The provisions of the Fifth Amendment shall become effective on January 1, 2002. The provisions of the Fifth Amendment, as modified by the Tenth Amendment, shall remain in effect until December 31, 2007; provided, however, that the compensation set forth in subsection 6.11.5 is subject to renegotiation for calendar years 2006 and 2007.

4. Article 10 of the Agreement is amended by deleting all references to the "Fifth Amendment" and replacing them with "Fifth Amendment and Tenth Amendment."

5. Exhibit 2.127 is deleted in its entirety and a new Exhibit 2.127 (effective as of January 1, 2004), which is attached hereto and incorporated herein by reference, is substituted.

6. Exhibit 3.3.2(i) is amended by deleting the caption "Exhibit 3.3.2(i)" and replacing it with the caption "Exhibit 3.2.2(i)."

3

exv10wxay                                    http://www.sec.gov/Archives/edgar/data/731766/000095013404011798/...

7.   Exhibit 3.2.2(i)(1) is deleted in its entirety and a new Exhibit 3.2.2(i)(1) (effective as of January 1, 2004), which is attached hereto and incorporated herein by reference, is substituted.

8.   The Agreement is amended by the addition of Exhibit 6.11.5, which is attached hereto and incorporated herein by reference.

9.   Subsection 3.2.2, paragraph (i) (6) of the Agreement shall be amended by adding the following: United shall provide ASI with a quarterly reconciliation of the expenses paid for promotional materials developed and produced as a result of the *** payment per month for each active SHIP Medicare Supplement Insured. Such reconciliation shall include a budget versus actual and will include information on result of the promotional efforts.

10.  Except as amended hereby, all other terms and conditions of the Agreement shall remain in full force and effect. This Amendment may be executed in two counterparts, each of which need not contain the signature of more than one Party. Both counterparts taken together will constitute one and the same Amendment.

IN WITNESS WHEREOF, the Parties have executed this Tenth Amendment as of the date and year below written.

*** Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

4

exv10wxay                                          http://www.sec.gov/Archives/edgar/data/731766/000095013404011798/...

AARP Services, Inc.                          United HealthCare Insurance Company

By:         /s/ Dawn Sweeney                 By:         /s/ Jimmie Pogue

Print Name: Dawn Sweeney                     Print Name: Jimmie Pogue

Print Title: President                       Print Title: President Ovations Insurance Solutions

Date:       6/3/03                           Date:       5/19/04

<div align="center">5</div>

exv10wxay                                          http://www.sec.gov/Archives/edgar/data/731766/000095013404011798/...

EXHIBIT 2.127

**Optum Confidential and Proprietary Information**

<div align="center">

**Optum Return on Investment (ROI) Estimation Model
for AARP HealthLine Services**

</div>

The ROI model was designed as a configurable spreadsheet-based estimation tool. The model applies the standardized methods and elements across Optum's product/markets for quantifying ROI. In developing the model, special efforts were made to ensure that the assumptions and methods used in estimating ROI have a substantial empirical basis (i.e., are backed up by empirical research). In addition, comparison of the client to their "same market" normative ROI is a key feature supported by the model.

**Care-path methodology**

Health care claims costs savings are calculated from Optum's proprietary Care-path methodology. This methodology and the major value components that comprise AARP economic value are described below.

\*\*\*

\*\*\*

**Validation and Modification.** This model was initially reviewed and validated by consultants from Watson Wyatt and Mercer. They have stated that the Optum model is industry leading. As a matter of policy, Optum routinely reviews the model and modifies it based on current information, and Optum continues to have the model and its changes reviewed by consultants annually.

In addition to comments and suggestions from consultant reviews, Optum continues to do primary research on improvements for the model and incorporates suggestions from clients. Optum will continue to improve and adapt the ROI methodology to the latest developments in the health care and research fields and have it validated by both consultants and clients such as AARP.

\*\*\* Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

<div align="center">6</div>

EXHIBIT 3.2.2(i)(1)

## QUALITY ASSURANCE PROGRAM
### PERFORMANCE STANDARDS AND MEASUREMENTS

In performing United's obligations relating to AARP HealthLine Services, United shall meet or exceed the following standards:

| Customer Service | Standard | Measurement | Penalty |
|---|---|---|---|
| Average speed of answer | 30 seconds or less | Call Center System | See Below |
| Abandonment rate | 5% or less | Call Center System | See Below |

| Complaint Resolution | | | |
|---|---|---|---|
| Member Complaints —— Percent resolved within 10 business days | Greater than 90% | Complaint Resolution Database | See Below |

| Satisfaction | | | |
|---|---|---|---|
| Percent satisfied Measured quarterly | At least 95% | Member Survey | See Below |

Penalties for non-compliance with performance standards will be assessed as follows:

| Topic | Annual Standard | Annual Penalty |
|---|---|---|
| Average Speed of Answer | 30 Seconds or Less | *** |
| Abandonment Rate | 5% or Less | *** |
| Complaint Resolution | Greater than 90% resolved within 10 business days | *** |
| Satisfaction | 95% or greater | *** |

- Performance statistics shall be measured and reported monthly; penalties shall be assessed on an annual (calendar year) basis;

- No penalty shall be assessed if the cause of the failure to meet a performance standard is due to an unusual utilization spike. An "unusual utilization spike" is a monthly increase in call volume of greater than *** compared to the average of the previous three (3) months that is the result of an event beyond the control of United or Optum. To determine this, United shall conduct an analysis and provide its analysis and conclusions to ASI. If ASI agrees with United's conclusions, the penalty in question shall be waived.

*** Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

7

exv10wxay                                   http://www.sec.gov/Archives/edgar/data/731766/000095013404011798/...

EXHIBIT 6.11.5

**Compensation to United Under Subsection 6.11.5
and Utilization Penalty Under Subsection 6.11.3**

After Year Two (beginning January 1, 2004), United's compensation and the Utilization Penalty shall be as follows:

| **Aggregate AARP HealthLine Claim Savings ("Aggregate"*)** | **Compensation to United**** |
|---|---|
| *** or more | *** |
| *** or more but less than *** | *** |
| less than *** | *** |
| **Utilization Penalty** | **Penalty to United**** |
| If actual utilization rate in calendar year is less than *** of the total number of SHIP Medicare Supplement insureds | *** |

\* Aggregate is defined as the total AARP HealthLine Claim Savings calculated using the Care-path methodology described in Exhibit 2.127.

\*\* Compensation and Penalty shown are on a "per active SHIP Medicare Supplement Insured per month" basis.

\*\*\* Represents text deleted pursuant to a confidentiality treatment request filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

8

11th Amendment to the AARP Health Insurance Agreement                http://www.sec.gov/Archives/edgar/data/731766/000119312505039947/...

EX-10.DD 4 dex10dd.htm 11TH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT

**Exhibit 10(dd)**

### ELEVENTH AMENDMENT TO THE AARP HEALTH INSURANCE

### AGREEMENT:

### CHRONIC CARE PROGRAM

This Eleventh Amendment to the AARP Health Insurance Agreement ("Eleventh Amendment" or "Amendment"), effective as of January 1, 2005 (the "Effective Date"), is made by and between AARP Services, Inc., a Delaware corporation ("ASI") and United HealthCare Insurance Company, a Connecticut corporation ("United"). The parties hereto shall collectively be referred to as the "Parties".

### RECITALS

WHEREAS, AARP, the Trustees of the AARP Insurance Plan, and United are parties to a certain AARP Health Insurance Agreement dated as of February 26, 1997 (the "Original Agreement").



WHEREAS, by subsequent amendment and assignment on December 28, 1999, AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of certain rights and obligations (the "Third Amendment").

WHEREAS, various other amendments have been made to the Original Agreement (collectively, the "Agreement").

WHEREAS, pursuant to subsections 3.2.3 and 3.2.4 of the Agreement, the Parties agreed to undertake product development activities with respect to additional products and services to enhance the value of the SHIP to AARP members and differentiate the SHIP from other insurance programs.

*** Represents text which has been redacted and filed separately with the Securities and Exchange Commission pursuant to a confidential treatment request pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.                1

WHEREAS, United has developed the Personal Service Delivery Program (PSDP) in response to the growing number of Medicare beneficiaries with chronic health conditions and the need for solutions that improve their quality of life in a cost-effective manner.

WHEREAS, the parties have agreed to test the PSDP model described above in a chronic care program made available to a select population of SHIP Medicare supplement insureds (the "Chronic Care Program" or "CCP").

WHEREAS, the Trustees have approved the Chronic Care Program and authorized the Parties to implement it on a pilot basis, with a review to occur following the CCP Pilot Period, as defined below, to determine whether the Chronic Care Program has met its performance objectives and should be offered beyond that CCP Pilot Period.

WHEREAS, subsection 3.2.3 of the Agreement requires the terms and conditions associated with the offering of any Service Enhancements to be documented in amendments or exhibits to the Agreement.

NOW, THEREFORE, in consideration of the covenants, terms and conditions set forth in this Eleventh Amendment, the Parties agree as follows:

A.   Article 2 of the Agreement is amended by the addition of the following sections 2.135 through 2.136:

2.135   CCP Pilot Period means the 24 month period beginning May 1, 2005 and ending on April 30, 2007.

2.136   CCP Services means the services offered by United to SHIP Medicare Supplement Insureds as described in subsection 3.2.2(k) and Exhibit 3.2.2(k).

2.137   Member Data means the name, address, AARP membership number and, at ASI's discretion, any other identifying AARP Member information that ASI makes or has made available to United.

2

B.    Section 3.2.2 of the Agreement is amended by the addition of new subparagraph (k) to read as follows:

(k). United shall develop and make available to certain SHIP Medicare Supplement insureds the Chronic Care Program as set forth in Exhibit 3.2.2(k), which is attached hereto and made a part of the Agreement. Additionally, the Parties agree to the following:

(1) Marketing Plan. United shall develop a Chronic Care Program member communication plan which shall be submitted to ASI for its review and approval. United shall adhere to the then-current AARP Health Care Options review and approval process for all written or scripted oral promotional materials and member communications describing the CCP Services. United shall use the product name agreed upon by the parties when providing the CCP Services under this Amendment.

(2) Monitoring Program Performance. United shall conduct a program performance evaluation of the Chronic Care Program for ASI's prior review. The performance evaluation will measure the following program components: Utilization, Member and Caregiver Satisfaction, Provider Satisfaction, Complaint Resolution, and Quality Outcomes, as more fully set forth in Exhibit 3.2.2(k)(2). The Parties agree that the results of this evaluation may necessitate changes to the program, which may be made upon mutual agreement of the Parties.

(3) Reports. United shall provide reports to ASI, at intervals and in a format and medium to be agreed to by the Parties, to monitor and evaluate program performance. The reports shall include, but are not limited to, reports on Quality, Operational, Enrollment, and Outcome Metrics, Expenses, and Member, Caregiver and Provider Satisfaction.

(4) Third Party Research Validation. In addition, a third party, selected mutually by the Parties, shall serve as a research validator on a confidential basis. Such party shall be involved in reviewing the research methodology, validating the outcomes and issuing three (3) reports to the Parties:

i. an initial report with an assessment of the study design;

ii. a report approximately seventeen (17) months after the operational startup validating outcomes; and

iii. a final, comprehensive report to the Parties.

3

(5) The Parties shall decide mutually whether or not to publicize the activities or findings of the study, based on the reports of the third party validator.

(6) <u>Pilot Financing</u>. Expenses incurred for the Chronic Care Program during the CCP enrollment and assessment period and the CCP Pilot Period are estimated to be \*\*\*. The program shall be provided at no additional premium cost to participating SHIP Medicare supplement insureds. United shall pay \*\*\* of the expenses incurred of the Chronic Care Program and the remaining \*\*\* of the expenses incurred shall be paid out of the RSF as the results of this pilot should provide benefits to AARP insured members. United shall provide ASI with a quarterly reconciliation of expenses incurred. Expenses incurred by Extended Enrollees, as defined in §10.2.4, shall be paid in accordance with the aforementioned \*\*\* allocation.

(7) <u>CCP Pilot Period Evaluation</u>. The Parties shall conduct a CCP Pilot Period evaluation of the Chronic Care Program to be completed by October 31, 2007 for the purposes of determining whether to offer the Chronic Care Program beyond the terms of this Amendment. The evaluation will measure the following program components: Utilization of Service; Provider Satisfaction; Member and Caregiver Satisfaction, and Claim Savings, and Quality Outcomes. Thereafter, the decision whether to extend the Chronic Care Program beyond the terms of this Amendment shall be made upon mutual agreement of the Parties.

C.   Section 7.1 of the Agreement is amended by the addition of the following subsection 7.1.3:

7.1.3 De-identified data related to health outcomes, study findings, study design and characteristics related to the Chronic Care Program shall be shared with ASI by United. For purposes of this paragraph, de-identified data means protected health information that has been de-identified in accordance with the provisions of 45 C.F.R. §164.514. Reports, articles, and/or public notices regarding the Chronic Care Program shall not be released without prior written approval of both ASI and United.

D.   Article 7 of the Agreement is amended by the addition of the following Section 7.8:

7.8 <u>Ownership of Chronic Care Program Intellectual Property and Work Product</u>. Except as otherwise expressly provided for in this Agreement:

(a) Each party shall retain all right, title, and interest in its Marks subject to the licenses to use as set forth above. Each party shall retain all right,

\*\*\*  Represents text which has been redacted and filed separately with the Securities and Exchange Commission pursuant to a           4
       confidential treatment request pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

title, and interest in the content that it authors as part of the advertising and promotion of the Chronic Care Program or pursuant to other activities relating to the Chronic Care Program, including intellectual property rights, trademark, trade dress, copyright, patent and other proprietary rights in the content. Each party shall retain all right, title and interest in its proprietary business information or work product that is related to the advertising, promotion and other activities in support of the Chronic Care Program including but not limited to trade secrets, computer software and applications, and any other proprietary business information or work product that is not available to the general public.

(b) Without limiting the foregoing, AARP and ASI shall retain all right, title, and interest in intellectual property owned by AARP or ASI as of the Effective Date of the Eleventh Amendment, including without limitation Member Data and intellectual property associated with profiling and aggregating Member Data, as well as the intellectual property associated with the supplying of the Member Data, including but not limited to computer software and other tools used to compile the data and to generate the profiling information, and any intellectual property solely authored or developed by AARP and ASI while the Eleventh Amendment is in effect (together, "AARP and ASI Intellectual Property"). United shall retain all right, title and interest in intellectual property owned by United as of the Effective Date of the Eleventh Amendment, including without limitation CCP claims data and intellectual property associated with generating, summarizing, or reporting the CCP claims data, intellectual property associated with United's clinical models for chronic care management or otherwise associated with activities that are part of the design or operation of the Chronic Care Program, including without limitation the Personal Services Delivery Program, and any intellectual property solely authored or developed by United while the Eleventh Amendment is in effect (together, "United Intellectual Property"). United expressly reserves the right to use and disseminate the CCP claims data for any purpose permitted under its own policies and applicable law; provided, however, that United shall not use the CCP claims data for marketing purposes in unrelated programs.

(c) If the parties wish to develop products or services together that are related to the Chronic Care Program ("Joint Intellectual Property"), then the parties will agree in writing in advance that they intend to collaborate on Joint Intellectual Property and such writing will set forth the terms for each party's intellectual property rights in such Joint Intellectual Property. Each party agrees not to disclose to, license to, or permit the use of Joint Intellectual Property by third parties without the other parties' express written permission. Enhancements to AARP and ASI Intellectual Property made as a result of the implementation of the Chronic Care Program belong to AARP or ASI and enhancements to United Intellectual Property

5

made as a result of the implementation of the Chronic Care Program belong to United unless the parties agree in advance of making the enhancements that such enhancements will be treated as Joint Intellectual Property as set forth in this Section.

(d) Upon termination of the Chronic Care Program, each party will return to the other parties all intellectual property and work product belonging to the other parties and shall not retain copies of such data except as shall be necessary under applicable law or otherwise provided for under this Agreement.

E.    Article 10 of the Agreement is amended by the addition of the following subsection 10.2.4:

10.2.4 <u>Term and Termination.</u> The Term of this Amendment is January 1, 2005 through October 31, 2007. Either party may terminate the Chronic Care Program under this Amendment upon not less than ninety (90) days prior written notice to the other party in the event of a material breach by the other party, provided that such breach has not been cured to the non-breaching party's reasonable satisfaction within that ninety (90) day period. Notwithstanding the foregoing, United shall continue to offer the CCP Services to participants enrolled in the Chronic Care Program at the time the program is terminated for as long as the participant's coverage under an AARP Medicare Supplement plan provided by United remains in force ("Extended Enrollees").

F.    Except as amended hereby, all other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the Parties have executed this Amendment effective as of the date and year first above written.

/s/   Dawn Sweeney                                               /s/   Jimmie Pogue
AARP Services, Inc.                                              United HealthCare Insurance
                                                                Company

Date: 2-10-05                                                   Date: 2-10-05

6

11th Amendment to the AARP Health Insurance Agreement          http://www.sec.gov/Archives/edgar/data/731766/000119312505039947/...

EXHIBIT 3.2.2(k)

### CHRONIC CARE PROGRAM DESCRIPTION

#### I. Pre-pilot Background

United's proprietary Personal Service Delivery Program (PSDP) was developed by United in response to the growing number of Medicare beneficiaries with chronic health conditions and the need for solutions that improve their quality of life in a cost-effective manner. PSDP delivers high touch intensive services to members with high health risks. The emphasis is on providing personal face-to-face interventions designed to meet clinical, psychosocial, economic and functional needs. The program reaches out to chronically ill individuals and provides them the professional help they need to manage their illness.

The program's proactive, holistic approach addresses:

- Avoidable utilization contributing to unnecessary medical trend.
- Lack of extended family caregivers.
- Communications between physicians, caregivers and patients, for more effective and efficient care.
- Declining functional status.
- Socio-economic challenges.

The parties have agreed to test the PSDP model described above in a Chronic Care Program made available to a select population of SHIP Medicare supplement insureds.

#### II. Chronic Care Program Objective

The objective of the Chronic Care Program is to develop enough clinical evidence for Centers for Medicare and Medicaid Services ("CMS") to fund future chronic care management programs, allowing the SHIP program to receive reduced claim costs on existing members.

It is expected that a successful pilot outcome will bring long-term positive implications for the SHIP program, including:

- Increase quality of care received by AARP members.

7

- Empower members to better manage their care.
- Drive satisfaction for members, caregivers and physicians.
- Promote more effective as well as efficient resource utilization.
- Reduce costs for CMS and the Medicare Supplement program.

### III. CCP Services

The PSDP emphasis is on providing personal face-to-face interventions designed to meet clinical, psychosocial, economic and functional needs of Medicare beneficiaries. The program services include:

- A case begins with an initial assessment. A case ends if the member voluntarily terminates participation in the program; otherwise, the member remains in the program and receives care for as long as he or she is covered under an AARP Medicare Supplement plan provided by United.
- Development of a Plan of Care in collaboration with the member, his or her physician, caretaker and family. For members who have the choice of using multiple physicians, the Plan of Care will identify any fragmented care issues they may be experiencing.
- Ongoing, periodic health assessments, which may result in adjustments to the Plan of Care.
- Intensive interventions provided by PSDP nurses/social workers and/or Community Partner Case Management (CPCM) agencies.
- Partnerships with local CPCM agencies are a key component of the program. These local agencies assist members in accessing grass root support systems like transportation, food pantries, and assistance in activities of daily living not typically covered in a Medicare Supplement plan. Access to these additional community services may or may not involve additional costs for the member.

### IV. Member Selection

To ensure that credible claims/utilization data exists, only those members continuously enrolled in an AARP Medicare Supplement plan for a minimum of 12 months will be considered. The PSDP program identifies program participants based upon claim costs, number of chronic conditions and utilization patterns.

- Enrollment in this pilot is voluntary, and the member may terminate their involvement at any time

8

- There is no additional premium cost to the members who enroll in the program
- The pilot group suffers from four or more impactible chronic conditions, and within the past year required at least one emergency room visit and one hospital stay.
- The pilot will consist of 400 randomly selected members who fit the above criteria, selected from the existing base of current Medicare Supplement members.
- The program will include a control group of 400 members.
- Pilot members will not be replenished

### V. Chronic Care Program Pilot Location: North Carolina

To develop evidence of clinical outcomes and claims saving, the parties have agreed that North Carolina shall be the pilot location. Future expansion, if any, shall be based upon the results of the pilot.

We will target the major metropolitan areas and surrounding counties of Greensboro, Winston-Salem, High Point, Charlotte, Raleigh and Ashville.

### VI. Estimated Expenses

United utilizes both internal and external case management personnel in conducting chronic care management activities. The decision to use contracted personnel is based on enrollee needs, case-load limitations, logistical factors, etc. With the expansion of the pilot screened population beyond major metropolitan areas, the use of tele-monitoring will also be considered where appropriate.

Pilot expenses are expected to approximate \*\*\* each year of the project (approximately \*\*\* per eligible/enrolled member per month (pmpm), divided fairly evenly between external and internal expenses. Proforma pilot expenses (and associated savings) as presented in this summary, represent estimated annualized figures, associated with mature (i.e., 400 member) pilot enrollment levels.

### VII. Expected Outcomes

The PSDP approach supports the primary physician's use of evidence-based clinical guidelines, and will seek to reduce acute exacerbations of chronic diseases and enable more effective, evidence-based self-management of members.

    1. Expected benefits for the SHIP program and the Parties include reduced hospital admissions, reduced medical claims expense for the Medicare Supplement product, and avoided Medicare allowable costs.

\*\*\* Represents text which has been redacted and filed separately with the Securities and Exchange Commission pursuant to a     9
    confidential treatment request pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

2. The 400 members participating in the Chronic Care Program pilot intervention group are expected to enjoy the following outcomes:

- Improved quality of life associated with decreased stress and increased efficacy in dealing with their complex health needs.

- Decrease in avoidable hospitalizations and emergency room visits.

- Decrease in medical complications due to medical errors associated with errors of omission and commission inherent in fragmented medical care.

- Enhanced relationships with their primary physician.

- Increased satisfaction with their AARP Medicare Supplement product.

- Increased use of advance directives.

- All AARP Medicare Supplement Members would be expected to benefit from decreased premium pressure under a successful pilot that resulted in CMS funding approval.

10

11th Amendment to the AARP Health Insurance Agreement          http://www.sec.gov/Archives/edgar/data/731766/000119312505039947/...

EXHIBIT 3.2.2(k)(2)

**Performance Standards and Measurements**

In performing United's obligations to the Chronic Care Program, United shall report on the following standards:

**1. Quality Measurements**

**CHF**

| Metric | Source | Intervention |
|---|---|---|
| ACE Inhibitors | Self-report/Pharmacy | Yes |
| Beta-blockers | Self-report/Pharmacy | Yes |
| Blood Pressure goal (130/85 or 130/80) | Self-report/Physician report | Yes |
| Lipids: LDL < 100 | Self-report/Physician report | Yes |
| Lipids: TG >=200 | Self-report/Physician report | Yes |
| Antiplatelet use | Self-report/Physician report | Yes |
| Daily weight | Self-report | Yes |

**Diabetes Quality Metrics**

| Metric | Source | Intervention |
|---|---|---|
| A1C drawn annually | Claims | Yes |
| A1C < 7% | Self-report/Physician report | Yes |
| Dilated Eye Exam annually | Self-report | Yes |
| Microalbuminuria testing annually | Claims | Yes |
| Foot exam | Self-report/Physician report | Yes |
| Dental exam annually | Self-report/Claims | Yes |
| Antiplatelet use | Self-report | Yes |

11

11th Amendment to the AARP Health Insurance Agreement    http://www.sec.gov/Archives/edgar/data/731766/000119312505039947/...

**General Quality Metrics**

| Metric | Source | Intervention | Control |
|---|---|---|---|
| SF-12 | Survey | Yes | No |
| Smoking Goals | Survey/Self-report | Yes | No |
| Physical Activity (30 minutes) | Survey/Self-report | Yes | No |
| Influenza | Self-report | Yes | If claims available |
| Pneumovax | Self-report | Yes | If claims available |
| Adherence to medication | Self-report | Yes | No |
| Advance Directives | Self-report | Yes | No |
| Member Satisfaction | Survey | Yes | Yes |
| Caregiver Satisfaction | Survey | Yes | Yes |
| Provider Satisfaction | Survey | Yes | No |

12

EX-10.A 2 dex10a.htm TWELFTH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT

**EXHIBIT 10(a)**

### TWELFTH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT:

### PHIP EXTENSION

This Twelfth Amendment to the AARP Health Insurance Agreement ("Twelfth Amendment" or "Amendment"), effective as of June 30, 2005 (the "Effective Date"), is made by and between AARP Services, Inc., a Delaware corporation ("ASI") and United HealthCare Insurance Company, a Connecticut corporation ("United"). The parties hereto shall collectively be referred to as the "Parties".

### RECITALS

WHEREAS, AARP, the Trustees of the AARP Insurance Plan ("Trustees"), and United are parties to a certain AARP Health Insurance Agreement dated as of February 26, 1997 (the "Original Agreement"). 

WHEREAS, by subsequent amendment and assignment on December 28, 1999, AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of certain rights and obligations (the "Third Amendment").

WHEREAS, various other amendments have been made to the Original Agreement (collectively, the "Agreement").

WHEREAS, pursuant to the Ninth Amendment to the Agreement, the Parties have successfully piloted a program offering comprehensive insurance products for AARP members age 50 to 64 ("50-64 Plan").

WHEREAS, the Pilot Period, as defined in the Ninth Amendment, expires on June 30, 2005; and

1

WHEREAS, the parties wish to extend the Pilot Period through December 31, 2005.

NOW, THEREFORE, the Parties agree as follows:

A.   Article 2 of the Agreement is amended by amending section 2.134 to read as follows:

"2.134. Pilot Period means January 1, 2004 until December 31, 2005. The Pilot Period may be changed upon mutual written agreement. Any 50-64 Plan sales effective as of the end of 2003 and their experience will be included as part of the Pilot Period."

B.   No later than the end of the Pilot Period, the parties shall complete negotiations in good faith and reach agreement on new terms or a new agreement governing the 50-64 Plan, if the parties decide to offer the 50-64 Plan beyond the Pilot Period.

C.   Except as amended hereby, all other terms and conditions of the Agreement shall remain in full force and effect. This amendment may be executed in two counterparts, each of which need not contain the signature of more than one party. Both counterparts taken together shall constitute one and the same amendment.

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date and year first above written.

**AARP Services, Inc.**                                    **United HealthCare Insurance Company**

By:   /s/   Nancy Jones for Dawn Sweeney                    By:   /s/   Jim Pogue

Title:   Chief Administrative Officer                        Title:   President, Ovations Insurance Solutions

2

EX-10.LL 2 dex10ll.htm 13TH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT

**Exhibit 10.ll**

### THIRTEENTH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT:

### PHIP EXTENSION

 This Thirteenth Amendment to the AARP Health Insurance Agreement ("Thirteenth Amendment" or "Amendment"), effective as of December 21, 2005 (the "Effective Date"), is made by and between AARP Services, Inc., a Delaware corporation ("ASI") and United HealthCare Insurance Company, a Connecticut corporation ("United"). The parties hereto shall collectively be referred to as the "Parties".

### RECITALS

 WHEREAS, AARP, the Trustees of the AARP Insurance Plan ("Trustees"), and United are parties to a certain AARP Health Insurance Agreement dated as of February 26, 1997 (the "Original Agreement").

 WHEREAS, by subsequent amendment and assignment on December 28, 1999, AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of certain rights and obligations (the "Third Amendment").

 WHEREAS, various other amendments have been made to the Original Agreement (collectively, the "Agreement").

 WHEREAS, pursuant to the Ninth Amendment to the Agreement, the Parties have successfully piloted a program offering comprehensive insurance products for AARP members age 50 to 64 ("50-64 Plan").

 WHEREAS, the Pilot Period, as defined in the Agreement, expires on December 31, 2005; and



1

WHEREAS, the parties wish to extend the Pilot Period through February 28, 2006.

NOW, THEREFORE, the Parties agree as follows:

A.  Article 2 of the Agreement is amended by amending section 2.134 to read as follows:

"2.134. Pilot Period means January 1, 2004 until February 28, 2006. The Pilot Period may be changed upon mutual written agreement. Any 50-64 Plan sales effective as of the end of 2003 and their experience will be included as part of the Pilot Period."

B.  No later than the end of the Pilot Period, the parties shall complete negotiations in good faith and reach agreement on new terms or a new agreement governing the 50-64 Plan, if the parties decide to offer the 50-64 Plan beyond the Pilot Period.

C.  Except as amended hereby, all other terms and conditions of the Agreement shall remain in full force and effect. This amendment may be executed in two counterparts, each of which need not contain the signature of more than one party. Both counterparts taken together shall constitute one and the same amendment.

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date and year first above written.

**AARP Services, Inc.**                                **United HealthCare Insurance Company**

By: /s/ Dawn M. Sweeney                                By: /s/ Thomas H. Lindquist
Title:                                                 Title: COO, Ovations

2

EX-10.(A) 2 dex10a.htm 14TH AMENDMENT TO THE AARP HEALTH INSURANCE AGREEMENT

**Exhibit 10(a)**

### FOURTEENTH AMENDMENT TO THE AARP HEALTH INSURANCE
### AGREEMENT:
### 50-64 PLAN

This Fourteenth Amendment to the AARP Health Insurance Agreement ("Fourteenth Amendment" or "Amendment"), effective as of January 1, 2006 (the "Effective Date"), is made by and between AARP Services, Inc., a Delaware corporation ("ASI") and United HealthCare Insurance Company, a Connecticut corporation ("United"). The parties hereto shall collectively be referred to as the "Parties".

### RECITALS

WHEREAS, AARP, the Trustees of the AARP Insurance Plan ("Trustees"), and United are parties to a certain AARP Health Insurance Agreement dated as of February 26, 1997 (the "Original Agreement").

WHEREAS, by subsequent amendment and assignment on December 28, 1999, AARP, AARP Trust and United agreed to the assignment to and assumption by ASI of certain rights and obligations (the "Third Amendment").

WHEREAS, various other amendments have been made to the Original Agreement (collectively, the "Agreement").

WHEREAS, pursuant to the Ninth Amendment to the Agreement, the Parties have successfully launched a program offering comprehensive insurance products for AARP members age 50 to 64 ("50-64 Plan") and wish to expand and extend this program.



***      Represents text which has been redacted and filed separately with the Securities and Exchange Commission pursuant to a confidential treatment request pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

1

14th Amendment to the AARP Health Insurance Agreement                    http://www.sec.gov/Archives/edgar/data/731766/000119312506107853/...

NOW, THEREFORE, the Parties agree as follows:

A.   Article 2 of the Agreement is amended by adding section 2.138 to read as follows:

2.138. Formal Product Offering Period ("Period") for the 50-64 Plan means January 1, 2006 until December 31, 2006. This Period may be changed upon mutual written agreement."

B.   Section 6.1.1 of the Agreement is amended by the addition of a new third sentence to read as follows:

"AARP's royalty for Policy Year 2006 shall be ***% of 50-64 Member Contributions."

C.   Section 6.2 of the Agreement is amended by the addition of a new fifth sentence in subsection 6.2.6(a) to read as follows:

"United's Administrative Services Fee for Services provided for the 50-64 Plan in Policy Year 2006 shall be ***% of 50-64 Member Contributions."

D.   Section 6.3 of the Agreement is amended by amending subsection 6.3.4(a) to read as follows:

"6.3.4(a). United's base risk and profit charge: ***% of 50-64 Member Contributions through December 31, 2005; ***% of 50-64 Member Contributions for Policy Year 2006;"

E.   Exhibit 3.2.2(j)(5) is deleted in its entirety and a new Exhibit 3.2.2(j)(5), attached hereto and incorporated herein by reference, is substituted.

F.   Exhibit 6.2.6(e) is deleted in its entirety and a new Exhibit 6.2.6(e), attached hereto and incorporated herein by reference, is substituted.

G.   If the parties mutually agree to offer the 50-64 Plan beyond December 31, 2006, no later than December 31, 2006, the parties shall complete negotiations in good faith and reach agreement on new terms or a new agreement governing the 50-64 Plan.

---

***   Represents text which has been redacted and filed separately with the Securities and Exchange Commission pursuant to a confidential treatment request pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

2

H.   Except as amended hereby, all other terms and conditions of the Agreement shall remain in full force and effect. This amendment may be executed in two counterparts, each of which need not contain the signature of more than one party. Both counterparts taken together shall constitute one and the same amendment.

IN WITNESS WHEREOF, the Parties have executed this Amendment as of the date below indicated.

| **AARP Services, Inc.** | **United HealthCare Insurance Company** |
|---|---|
| By:   Dawn Sweeney | By:   Jim Pogue |
| Title:   President | Title:   President, Ovations Insurance |
| Date:   February 28, 2006 | Date:   February 28, 2006 |

3

14th Amendment to the AARP Health Insurance Agreement                    http://www.sec.gov/Archives/edgar/data/731766/000119312506107853/...

EXHIBIT 3.2.2(j)(5)

**Effective January 1, 2006**

| Functions/Services | 50-64 Plan Service Standard | Penalty (Percent of 50-64 Member Contributions) |
|---|---|---|
| *Claim Member Services Functions* | | |
| Speed to Answer Calls | | |
| • within 20 seconds | 80% | *** % |
| Call Resolution | | |
| • within first day | 75% | |
| • within 72 hours | 98% | *** % |
| Correspondence | | |
| • within 5 business days | 90% | |
| • within 10 business days | 98% | *** % |
| *Underwriting and Issue Functions* | | |
| Appeals | | |
| • within 10 business days | 98% | *** % |
| *Claims Processing Functions* | | |
| Claim Turnaround Time | | |
| • within 10 business days | 95% | *** % |
| Payment Accuracy | 95% | *** % |
| Payment Financial Accuracy | 97% | *** % |
| *Enrollments* | | |
| Enrollment Turnaround Time | | |
| • within 10 business days | 90% | *** % |
| Enrollment Accuracy | 97.5% | *** % |
| *Billing and Collections* | | |
| Payment Application Turnaround | | |
| • within 3 business days | 95% | *** % |
| Payment Application Accuracy | 98% | *** % |
| *Fulfillment* | | |
| Fulfillment Turnaround Time | | |
| • within 5 business days | 90% | *** % |
| **Customer Satisfaction — First Quarter Results** | | |
| Claim Service | Included in larger SHIP sample | *** % |

Note: Penalties will be calculated based on 50-64 Member Contributions, and shall be as defined and agreed in Exhibit 3.2.5 as revised effective March 31, 2003.

---

***   Represents text which has been redacted and filed separately with the Securities and Exchange Commission pursuant to a confidential treatment request pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

4

14th Amendment to the AARP Health Insurance Agreement          http://www.sec.gov/Archives/edgar/data/731766/000119312506107853/...

EXHIBIT 6.2.6(e)

### 50-64 PLAN
### EXPENSE SUMMARY EFFECTIVE JANUARY 1, 2006

| | Percent of Premium | |
|---|---|---|
| Marketing Expenses | | *** % |
| Royalty | | *** % |
| United Base Risk and Profit | | *** % |
|     Claim Administration | *** % | |
|     Enrollments, Underwriting and Other Administration | *** % | |
| Subtotal Administration | | *** % |
| Premium Tax | | *** % |
| Tax Timing | | *** % |
| United Charge for Claims Risk | | *** % |
| 50-64 SF Claims Risk Provision | | *** % |
| 50-64 SF Marketing Risk Provision | | *** % |
| Contingencies | | *** % |
| Investment Income | | *** % |
| **Total Expense Ratio** | | *** % |
| **Target Benefit Ratio** | | *** % |

All items are shown on a present value basis as a level percent of premiums over ten years. Percentages for premium tax, tax timing and investment income may vary based on actual expenses.

---

***     Represents text which has been redacted and filed separately with the Securities and Exchange Commission pursuant to a confidential treatment request pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

5

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Dean D. Pregerson _____ and the assigned Magistrate Judge is _____ Paul L. Abrams _____ .

The case number on all documents filed with the Court should read as follows:

## 2:14CV34 DDP PLAx

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____ January 2, 2014 _____                    By  J.Prado _____
Date                                                    Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| [x] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---

CV-18 (08/13)                    NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES



AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| JERALD FRIEDMAN, Individually and on Behalf of All Others Similarly Situated | ) ) ) ) |
| _Plaintiff(s)_ | ) ) |
| v. | ) |
| AARP, INC., AARP SERVICES INC., AARP INSURANCE PLAN, UNITEDHEALTH GROUP, INC. and UNITEDHEALTHCARE INSURANCE COMPANY | ) ) ) ) ) |
| _Defendant(s)_ | :) ) |

**CV14-0034DDP(PLAx)**

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

CHRISTOPHER COLLINS
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

JAN – 2 2014

Date: _____

CLERK OF COURT

JULIE PRADO

_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .


I declare under penalty of perjury that this information is true.


Date: _____

_____
Server's signature

_____
Printed name and title

_____
Server's address

Additional information regarding attempted service, etc:

COPY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| JERALD FRIEDMAN, Individually and on Behalf of All Others Similarly Situated | AARP, INC., AARP SERVICES INC., AARP INSURANCE PLAN, UNITEDHEALTH GROUP, INC., and UNITEDHEALTHCARE INSURANCE COMPANY |

| (b) County of Residence of First Listed Plaintiff   Los Angeles | County of Residence of First Listed Defendant   _____ |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |

| (c) Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. | Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. |
|---|---|
| Christopher Collins<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101 Telephone: 619/231-1058 | |

## II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

## V. REQUESTED IN COMPLAINT: JURY DEMAND: ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

CLASS ACTION under F.R.Cv.P. 23:  ☒ Yes ☐ No   ☐ MONEY DEMANDED IN COMPLAINT: $ _____

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332(d)(2)(A)
Complaint for Violation of Cal. Bus. & Prof Code §17200 and for Money Had and Received and Conversion

## VII. NATURE OF SUIT (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | Habeas Corpus: | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | TORTS | TORTS | ☐ 530 General | SOCIAL SECURITY |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | PERSONAL INJURY | PERSONAL PROPERTY | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | Other: | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | BANKRUPTCY | ☐ 560 Civil Detainee Conditions of Confinement | FEDERAL TAX SUITS |
| ☒ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | FORFEITURE/PENALTY | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | LABOR | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | REAL PROPERTY | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

CV14-0034

| FOR OFFICE USE ONLY:   Case Number: | |
|---|---|

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [X] No | [ ] Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| [ ] Yes  [X] No | **A PLAINTIFF?** Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?** Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Los Angeles | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of defendants reside: | [ ] | [ ] | [ ] | [ ] | [X] | [ ] |
| Indicate the location in which a majority of claims arose: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |

**C.1.  Is either of the following true?  If so, check the one that applies:**

[ ] 2 or more answers in Column C

[ ] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2.  Is either of the following true?  If so, check the one that applies:**

[ ] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western Division |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT)**: _____   DATE:   January 2, 2014

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |