O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERALD FRIEDMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>   v.<br><br>AARP, INC., AARP SERVICES, INC., AARP INSURANCE PLAN, UNITEDHEALTH GROUP, INC., and UNITED HEALTHCARE INSURANCE COMPANY,<br><br>                Defendants. | Case No. 14-00034 DDP (PLA)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>[Dkts. 119, 150] |

    Presently before the court are Defendants' Motion to Dismiss and Plaintiffs' Motion for Class Certification. (Dkts. 119, 150.) Having considered the submissions of the parties and heard oral argument, the court grants Defendants' motion, denies Plaintiffs' motion, and adopts the following Order.

## I. BACKGROUND

Plaintiffs Jerald Friedman ("Friedman") and Carol McGee ("McGee") (collectively, "Plaintiffs") bring this putative class action against defendants AARP, Inc., AARP Services Inc., AARP Insurance Plan, UnitedHealth Group, Inc., and United Healthcare Insurance Company (collectively, "Defendants"). (Dkt. 111, First Amended Complaint ("FAC") ¶¶ 32-41.) The court has set forth the basic facts of the case in its prior Orders, (Dkts. 50, 78), which it repeats here in relevant part.

In or around 2011, Plaintiffs purchased a type of health insurance policy, known as a "Medigap" policy, which is designed to offer extra coverage to Medicare beneficiaries beyond the basic Medicare benefits, including coverage of copays and deductibles that would otherwise be the patient's responsibility. (FAC ¶¶ 32-33, 46.) Plaintiffs purchased a Medigap policy that was endorsed by AARP,[1] with UnitedHealth[2] as the insurer. (Id. ¶¶ 32-33, 48.) "AARP [Insurance Plan] is the group policyholder under the Policy." (Id. ¶ 10.) Additionally, for every AARP/UnitedHealth Medigap policy sold, AARP receives a payment of 4.9%[3] of the amount paid by the insured individual. (Id. ¶ 6.) All UnitedHealth Medigap policies are endorsed by AARP. (Id. ¶ 48.) Though Defendants' agreements cast this payment as a royalty, paid in exchange for UnitedHealth's use of AARP's intellectual property in marketing and selling its Medigap coverage, Plaintiffs allege that this characterization of the 4.9% payment is false. (Id. ¶¶ 73, 77.) On behalf of a putative class, Plaintiffs allege that the 4.9% royalty that AARP

---

[1] The court refers to AARP, Inc., AARP Services Inc., and AARP Insurance Plan collectively as "AARP."
[2] The court refers to UnitedHealth Group, Inc., and United Healthcare Insurance Company collectively as "UnitedHealth."
[3] Plaintiffs allege that the amount of the royalty has changed over time, "recently changing from 4.95% to 4.9%." (FAC at n.1.)

2

receives is (1) an unlawful commission; and/or (2) an unlawful rebate/kickback. (*Id*. ¶¶ 3, 6, 18.)

In support of Plaintiffs' first claim that the royalty fee is an unlawful commission, Plaintiffs allege that AARP improperly acts as an unlicensed insurance agent in actively soliciting insurance purchases for Medigap policies on behalf of UnitedHealth. (*Id*. ¶¶ 6, 15-17, 21, 24, 77-78, 87, 92-93, 95-97, 104, 106.) Plaintiffs allege that the 4.9% payment that AARP receives on every AARP/UnitedHealth Medigap policy is an unlawful insurance commission paid to AARP for its role in marketing, soliciting, and selling or renewing the Medigap policies. (*Id.* ¶¶ 6, 15, 16.) Plaintiffs further allege that "while Defendants disclose the existence of a payment in general to AARP which they term a 'royalty' paid for the use of AARP's intellectual property, Defendants hide the fact that the cost of AARP Medigap insurance includes a percentage-based commission to AARP that is funded by consumers, in addition to the insurance premium paid to UnitedHealth for coverage." (*Id.* ¶ 99 (emphasis omitted).)

For Plaintiffs' second claim that the royalty fee is an illegal rebate/kickback, Plaintiffs allege that the royalty is a "'contract . . . promising returns and profits as an inducement' for the group policyholder AARP to insure its group plan with [UnitedHealth]." (*Id.* ¶ 109.) Plaintiffs further allege that AARP is "induced to the tune of hundreds of millions of dollars per year to keep AARP Medigap plan with [UnitedHealth] and Defendants worked out a scheme whereby consumers unwittingly fund [the illegal rebate]." (*Id.*) Therefore, Plaintiffs allege, even if UnitedHealth's payment to AARP is determined to be a royalty payment for the use of AARP's intellectual property, the payment would remain an illegal rebate paid to induce AARP to insurance. (*Id.* ¶ 113.)

Plaintiffs allege that they were injured because they paid more for their Medigap policy due to the 4.9% illegal commission/rebate. (*Id*. ¶¶ 28, 63.) Plaintiffs allege that "Plaintiffs and the Class agreed to pay a monthly premium for insurance coverage, not a

3

monthly premium plus a 4.9% surcharge used to fund an illegal scheme between Defendants," (*id.* ¶ 63), and Plaintiffs are harmed by "paying 4.9% above the actual cost of insurance coverage so that [Defendants] can secretly divert this illegal commission/rebate fee to the unlicensed AARP." (*Id*. ¶ 117.)

Plaintiff Friedman filed a putative class action in January 2014 asserting violations of California's Unfair Competition Law ("UCL"), money had and received, and conversion. (*See* Dkt. 1, Compl.) Defendants filed a Motion to Dismiss under Rule 12(b)(6). (Dkt. 27.) On October 6, 2014, this court granted Defendants' Motion concluding that Friedman had not plausibly alleged that AARP was acting as an unlicensed insurance agent collecting an illegal commission. (Dkt. 50.) Friedman appealed. (Dkt. 51.) On May 3, 2017, the Ninth Circuit reversed, holding that Friedman sufficiently pled a claim under the UCL's unlawful, unfair, and fraudulent prongs. (*See* Dkt. 54; *Friedman v. AARP, Inc.*, 855 F.3d 1047, 1053 (9th Cir. 2017).) Specifically, the Ninth Circuit held that Friedman had sufficiently alleged that AARP was acting as an unlicensed insurance agent who collected an illegal commission, and Friedman sufficiently alleged misrepresentations regarding the fee that "induced [Friedman] to purchase Medigap through AARP rather than from other insurers . . . ." (Dkt. 54, at 20; *Friedman*, 855 F.3d at 1056.) On remand, this court was to consider Defendants' additional challenge to the complaint based on the filed-rate doctrine. *Friedman*, 855 F.3d at 1057.

On January 16, 2018, this court concluded that filed rate principles permitted Friedman to proceed.[4] (Dkt. 78, at 4-7.) The court also concluded that Friedman had

---

[4] In its order, this court stated: "[A]ssuming *arguendo* that a state filed-rate doctrine exists in the insurance context, it does not bar Friedman's claims because these claims are more akin to challenges to Defendants' alleged misrepresentations, rather than challenges to the approved rate, or challenges to whether the rate is reasonable in light of the statutorily prescribed loss ratios for Medigap insurance." (Dkt. 78.) Plaintiffs have now

4

standing under the UCL, however, Friedman lacked standing to seek injunctive relief because Friedman no longer held a Medigap policy with Defendants. (*Id.* at 8.)

On August 31, 2018, Plaintiffs filed the First Amended Complaint adding McGee as a named plaintiff and adding additional claims. (*See* FAC.) The First Amended Complaint contains claims for (1) violations of the UCL; (2) money had and received; (3) conversion; (4) breach of contract; (5) breach of the covenant of good faith and fair dealing; (6) financial elder abuse; and (7) violations of the Connecticut Unfair Trade Practices Act ("CUTPA"). (*See* FAC.)

Defendants now move to dismiss the First Amended Complaint under Rule 12(b)(6).[5] (Dkt. 119, Motion to Dismiss ("MTD").) Defendants challenge the sufficiency of Plaintiffs' claims based on the following: (1) Plaintiffs' lack standing under the UCL and CUTPA; (2) Plaintiffs' fail to allege an underlying predicate for the UCL and CUTPA claims; and (3) Plaintiffs fail to plausibly allege any state law claims. (*Id.*)

## II. LEGAL STANDARD

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of

---

abandoned their UCL fraudulent prong claims and with it, have also abandoned the allegations of misrepresentations. (*See* Dkt. 147, Opposition ("Opp.") at 2, n.6 "Plaintiffs are no longer pressing the 'fraud' prong."). Nevertheless, the court declines to revisit the filed-rate doctrine because, as discussed below, Plaintiffs claims fail for the independent reason that Plaintiffs have no standing under the UCL.

[5] Defendants motion was filed as a Joint Motion to Dismiss and Motion for Summary Judgment. (*See* Dkt. 119.) Plaintiffs filed an Ex-Parte Application requesting this court to deny or defer Defendants' Motion for Summary Judgment. (Dkt. 126.) The court granted the motion and vacated Defendants' motion for summary judgment without prejudice. (Dkt. 132.) Therefore, the court addresses Defendants' motion under Rule 12(b)(6) limiting the analysis to the allegations in the operative complaint.

5

material fact and must construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." *Id.* at 679. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. *Id*. at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.* at 679. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." *Twombly*, 550 U.S. at 555, 556. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III. DISCUSSION

On appeal, the Ninth Circuit determined that Friedman had sufficiently alleged that the AARP royalty fee was an illegal commission to an unlicensed insurance agent. (Dkt. 54, at 13; *Friedman*, 855 F.3d at 1053.) The Ninth Circuit also accepted Friedman's allegations that the fee was "in fact, charged on top of [ ] regulator-approved premium," and that "the misrepresentations . . . induced him to purchase Medigap through AARP rather than from other insurers who 'do not secretly charge unlawful insurance agent commissions to consumers.'" (Dkt. 54, at 20; *Friedman*, 855 F.3d at 1055-56 (citing Compl. ¶ 77).) Plaintiffs' First Amended Complaint currently contains similar allegations of fraudulent misrepresentations and concealment, however, in Plaintiffs' Opposition to the present motion, Plaintiffs have abandoned their UCL fraud claims. (*See* Dkt. 147, Opp. at 2, n.6 ("Plaintiffs are no longer pressing the 'fraud' prong.").) Plaintiffs also no longer

6

argue that Defendants' fee is charged "on top of" regulator-approved premiums as was argued on appeal, rather, Plaintiffs now argue that the regulator-approved rate "includes" the alleged illegal commission/rebate. (Opp. at 12:2.) In light of Plaintiffs' abandoned UCL fraud theory, the court finds it necessary to revisit Plaintiffs' UCL standing considering only the unlawful and unfair prongs.[6]

**A. UCL**

*1. Standing*

Defendants argue that Plaintiffs lack UCL standing because Plaintiffs' allegations are insufficient to plausibly allege injury in fact and economic harm. (MTD at 11:22-13:1.) Defendants contend that Plaintiffs did not pay a surcharge "on top of" their premiums because Plaintiffs paid "only and exactly" the Department of Insurance ("DOI") mandated rate and the AARP royalty program is a program expense paid out of the DOI mandated rate. (*Id.* at 12.) Plaintiffs argue that the First Amended Complaint sufficiently pleads injury in fact and economic harm because they allege that the "DOI-approved rate includes an illegal surcharge that harmed Plaintiffs because it was layered on top of the *true premium* required to bind coverage." (Opp. at 12:2-3 (emphasis added) (citing FAC ¶¶ 22, 27-28, 52, 74, 83,114-19, 139, 160, 162).)

"The UCL prohibits 'unfair competition' which is broadly defined to include 'three varieties of unfair competition—acts or practices which are unlawful, or unfair, or

---

[6] There are several cases regarding the AARP royalty throughout the country. *See, e.g.*, *Sacco v. AARP, Inc.*, No. 18-14041-CIV, 2018 WL 502191 (S.D. Fla. July 24, 2018); *Bloom v. AARP, Inc.*, No. 2:18-cv-0-2788 (D.N.J. Nov. 30, 2018); *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1 (D.D.C. 2019). Most similar to the case here is the case *Dane v. UnitedHealthCare Ins. Co.*, No. 3:18-CV-00792 (SRU), 2019 WL 2579261 (D. Conn. June 24, 2019). The court there also concluded that plaintiffs did not have standing. *Id.* at *7 ("The fee that Dane and each insured pays is an expense of the program paid out of United's [regulator]-approved Medigap premiums, and Dane paid only the legally required rate. . . . [H]e cannot plausibly allege any loss caused by United's allocation of its premium revenue to program expenses.").

7

fraudulent.'" *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (quoting *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999)). Under the UCL, a plaintiff must have "suffered injury in fact and [ ] lost money or property[ ] as a result of unfair competition." *Kwikset Corp. v. Sup. Ct.*, 246 P.3d 877, 886 (Cal. 2011). A "loss of money or property" is "[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu[ally] in an unexpected or relatively unpredictable way." *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1592 (2008) (internal quotations omitted) (quoting *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 853 (2008)). "Notably, lost money or property—economic injury—is itself a classic form of injury in fact." *Kwikset*, 246 P.3d at 886. "'[T]he quantum of lost money or property necessary to show standing' under [the UCL] is only so much as would satisfy federal standing." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1049 (9th Cir. 2017) (quoting *Kwikset*, 246 P.3d at 886). "[A]n economic injury-in-fact requirement, [ ] demands no more than the corresponding requirement under Article III of the U.S. Constitution." *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) (citing *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013)). Under Article III, an injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1543 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Allegations of overpayment can be sufficient to plead economic injury in fact. *See Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1087 (Cal. 2010) ("[S]ection 17204 requires only that party have 'lost money or property,' and [plaintiffs] indisputably lost money when they paid an allegedly illegal overcharge."). For example, where UCL claims are based on fraud, economic injury is sufficiently pled with allegations that plaintiff would not have purchased a product or service had plaintiff been aware of the true nature or price

8

of the product or service.[7] *See Kwikset*, 246 P.3d at 890 ("For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately."); *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1375 (2012), *as modified on denial of reh'g* (Feb. 24, 2012) ( "by advertising in gallon units without disclosing the effect of temperature on motor fuel, [Defendant] deceives consumers as to the true price of motor fuel."). Where UCL violations are based on the UCL unlawful or unfair prong, and are not based on fraud or deceit, economic injury may be sufficiently pled with allegations that plaintiff paid more than the product's value, or was otherwise dissatisfied with the product, as a result of the unlawful or unfair conduct. *See, e.g.*, *Clayworth*, 233 P.3d at 1070-71, 1086-87 (holding that plaintiffs suffered economic injury where plaintiffs paid an overcharge because of a price fixing conspiracy to maintain prices at levels 50 to 400 percent higher than for the same products outside of the United States); *Hall*, 158 Cal. App. 4th at 855 (where plaintiff lost no money absent allegations that plaintiff did not want the product, the product was unsatisfactory, or that the product was worth less than what he paid for it).

Additionally, a plaintiff must also demonstrate that the lost money was "as a result of" the unfair competition. *See Kwikset*, 246 P.3d at 884. "[T]here must be a causal connection between the harm suffered and the unlawful business activity[,] [t]hat causal connection is broken when a complaining party would suffer the same harm whether or not a defendant complied with the law." *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1099 (2007) *as modified on denial of reh'g* (July 3, 2007).

---

[7] Additionally, where UCL claims are based on misrepresentations, a plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009).

9

Here, Plaintiffs contend that they sufficiently allege economic harm because the 4.9% royalty fee UnitedHealth pays to AARP is charged to member insureds "on top of the *true premium* . . . ." (Opp. at 12:3 (emphasis added) (citing FAC ¶¶ 22, 27-28, 52, 74, 83, 114-19, 139, 160, 192).) Plaintiffs allege that "Defendants are not entitled to keep this illegal fee charged to consumers on top of the legal portion of the payment necessary to bind coverage (*i.e.*, the true "premium") (FAC ¶ 85). In essence, Plaintiffs allege an overpayment.[8] *Peterson v. Cellco Partnership* is an instructive case involving similar allegations of overpayment in a similar context. 164 Cal. App. 4th 1583 (2008). In *Peterson*, plaintiffs asserted claims under the UCL's unlawful prong alleging that they purchased cell phones and insurance from the defendant, the defendant was not licensed to offer or sell insurance, and the defendant retained a percentage of each insurance premium as an illegal commission. *Id.* at 1586. Plaintiffs there also alleged that they had lost money because "they paid the alleged unlawful commission that was illegally retained or received by defendant as a percentage of plaintiffs' insurance payments." *Id.* at 1591. In other words, plaintiffs there alleged an overpayment because of an unlawful commission illegally charged and retained by the defendant. *See id.* The California Court of Appeal held that plaintiffs had not been injured because plaintiffs "received the

---

[8] The court focuses its economic harm analysis on Plaintiffs' illegal commission theory because Plaintiffs' have sufficiently alleged an unlawful commission. (*See Friedman*, 855 F.3d at 1053; Dkt. 78, at 8.) As discussed *supra*, Plaintiffs have not plausibly alleged a premium rebate. However, the court notes that assuming Plaintiffs have plausibly alleged an unlawful rebate, Plaintiffs would nonetheless lack standing because Plaintiffs paid only the lawfully permitted DOI rate—not 4.9% on top of the regulator-approved premium. *See also, e.g., Dane*, 2019 WL 2579261, at *7 ("Because Dane did not pay more than the [regulator]-approved filed rate for the coverage he received, and he could not have purchased United Medigap coverage for any other rate . . . he cannot plausibly allege any loss caused by United's allocation of its premium revenue to program expenses.")

10

benefit of their bargain, having obtained the bargained for insurance at the bargained for price." *Id.* at 1591.

Plaintiffs here attempt to distinguish *Peterson* arguing that plaintiffs in *Peterson* failed to allege that they were "harmed as a result of the defendants' conduct." (Dkt. 193, Pls.' Resp. Suppl. Br. at 7:6-7.) Further, Plaintiffs argue that unlike in *Peterson*, "[w]hile Plaintiffs received the bargained-for insurance, they did not receive it at the bargained-for price: *the premium necessary* to bind coverage (*i.e.*, the 'Gross Premium')." (*Id.* at 6:5-7 (emphasis added).) However, the court finds that the allegations here and the allegations in *Peterson* are substantially similar. In *Peterson*, plaintiffs alleged a harm as a result of defendants' conduct, the same injury Plaintiffs allege here—a loss of money based on an alleged illegal commission retained from the insured's premiums. Plaintiffs in *Peterson* also alleged, as Plaintiffs do here, that the insurance policy they paid for was actually worth less, and that they, essentially, overpaid. *See Peterson*, 164 Cal. App. 4th at 1593 n.5 ("Plaintiffs contend the insurance policy 'was actually worth less than what they paid for [it]' because defendant "extracted a percentage of [their] payment.'"). The court finds no significant difference between the alleged harm here and the alleged harm in *Peterson*. Plaintiffs' allegations of injury are based on the premise that AARP was not entitled to receive a commission, however, "absent allegations by plaintiffs that they could have bought the same policy elsewhere for a lower price, they suffered no actual injury." *Id.* at 1591; *see also Medina v. Safe-Guard Prods., Int'l, Inc.*, 164 Cal. App. 4th 105, 114, *as modified* (July 11, 2008) ("[Plaintiff] hasn't suffered any loss because of [defendant's] unlicensed status.").

Moreover, Plaintiffs' attempt to create economic harm under the theory that they paid more than the "true premium," is unavailing; Plaintiffs' theory is based on speculation. In reaching this conclusion, the court finds it necessary to analyze in more detail Plaintiffs' theory regarding a "true premium." Plaintiffs contend that the "true premium" is the amount necessary or required to bind coverage. (Opp. at 12:3; FAC ¶

11

85.) Plaintiffs appear to contend that even though there were no misrepresentations on which they relied, and though they received the insurance they wished to purchase, at the price they agreed to pay, they still overpaid. In effect, rather than Plaintiffs having responsibility for choosing the coverage they wished to buy and what they wished to pay for it, in our market-based competitive economy, the burden, according to Plaintiffs, is on the Defendants to not charge more than some hypothetical premium *necessary* to bind coverage. There is no such thing as a "true premium" necessary to secure coverage. Plaintiffs' theory is based on the speculative assumption that had UnitedHealth not paid these funds to AARP, the savings would have been passed on to the consumer.[9] Plaintiffs' creative theory that businesses must "pass on the savings" to consumers lacks real world credibility. In lieu of passing on all or some portion of such savings, businesses may, for example, reduce debt, increase employee compensation, increase advertising expenditures, invest in new products or business opportunities—all the while being mindful of what competitors are doing in the marketplace. Plaintiffs' intent to substitute the opinion of an expert to cure the flaws discussed above is insufficient to meet the standard of plausibility. (*See* Opp. at 2, n.3.) The expert, Plaintiffs posit, would look at historical data and say that the Defendants would not exercise business judgment on what to do with hypothetical savings but would instead sell insurance for an amount that matches or correlates in some way to the alleged illegal commission/rebate. In short,

---

[9] Importantly, the DOI approved the premium amount that UnitedHealth charged and that Plaintiffs agreed to pay. The DOI regulates the premium rates that Medigap insurers are permitted to pay. *See* Cal. Ins. Code § 10192.15(c)(1). Further, the DOI may only approve premium rates that are neither "excessive or inadequate." Cal. Code Regs. tit. 10, § 2644.1. Therefore, Plaintiffs paid a lawfully permitted premium rate authorized by the DOI. As discussed above, Plaintiffs theory that the DOI's approved premium should have been lower is speculative and implicates the filed rate doctrine. However, because the court finds that Plaintiff's lack standing, the court does not revisit the filed rate doctrine here.

12

Plaintiffs' theory that UnitedHealth would pass on any "savings" in the form of a reduced premium would turn the world of business decisions on its head by substituting speculation and the opinions of experts for the decisions of executives who actually run businesses. That is a bridge too far.

To summarize: Plaintiffs do not allege that they were unaware of the cost of insurance; Plaintiffs no longer claim that had they been aware of conduct alleged, they would have sought out different insurance; and Plaintiffs no longer claim that the 4.9% fee was "on top of" the regulator-approved premium. Such allegations would satisfy the nonconjectural injury requirement. While there are cases in which unlawful conduct can result in non-speculative economic harm to consumers, the court concludes that this is not one of those cases. *See, e.g.*, *Clayworth*, 49 Cal. 4th at 765, 775, 789 (holding that plaintiffs were harmed by paying an overcharge where a price-fixing conspiracy resulted in prices 50 to 400 percent higher than the same products outside of the United States); *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138, 1146 (2018) (discussing claim that defendant charged customers over the age of thirty twice as much as younger customers for the same feature); *Monarch Plumbing Co., Inc. v. Ranger Ins. Co.*, 2006 WL 2734391, at *6 (E.D. Cal. Sept. 25, 2006) (discussing injury of higher insurance premiums resulting from biased counsel's decisions to settle meritless claims). Absent allegations that Plaintiffs paid more than the value of the product, measured by a non-hypothetical theory, Plaintiffs have not plausibly alleged economic harm. Thus, the court concludes that Plaintiffs lack standing under the UCL.

    2. *UCL Predicate*

Defendants next contend that Plaintiffs have not sufficiently pled any underlying UCL predicate under the unlawful prong. On appeal, the Ninth Circuit determined that Plaintiffs had sufficiently pled that AARP transacts insurance without a license in violation of California's Insurance Code. *Friedman*, 855 F.3d at 1053 ("At the motion to dismiss stage, we conclude that Friedman has plausibly alleged this payment to be a

13

'commission.'"). Therefore, the illegal commission predicate is sufficiently alleged. However, the First Amended Complaint contains a second UCL predicate: violations of California's and Connecticut's anti-rebating laws. Defendants argue that "Plaintiffs do not, and cannot, offer any plausible theory of how a payment to AARP induces individual AARP members to choose UnitedHealth Medigap insurance over alternatives." (MTD at 15:12-14 (emphasis omitted).)

California's anti-rebating statute provides:

> An admitted life insurer shall not issue or deliver in this State, any securities or any special or advisory board or other contracts of any kind promising returns and profits *as an inducement* to insurance nor shall it permit its agents, officers or employees to do so.

Cal. Ins. Code § 10430 (emphasis added). Connecticut's anti-rebate statute provides:

> No insurance company doing business in this state, or attorney, producer or any other person shall pay or allow, or offer to pay or allow, *as inducement to insurance*, any rebate of premium payable on the policy, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement not specified in the policy of insurance.

Conn. Gen. Stat. Ann. § 38a-825 (emphasis added). The purpose of anti-rebate statutes is to "protect the solvency of the insurance company, prevent unfair discrimination among insureds of the same class, protect the quality of service, avoid concentration of the market in a few insurance companies, and avoid unethical sales practices." 1 Couch on Ins. § 2:32, Rebate Prohibitions.

Plaintiffs assert that the anti-rebating "prohibitions apply both to rebates paid to group policyholders and individual insureds." (Opp. at 14:21-22.) Plaintiffs contend that AARP, as the group policyholder, is induced because, but for the rebate payment to AARP, AARP "could move the AARP Medigap program to a different insurer." (Opp. at

14

15:15-16.) Plaintiffs have cited to no cases, and the court was unable to identify any, in which a court determined that the anti-rebating statutes applied to an arrangement such as the one alleged to be unlawful here. Plaintiffs' reliance on *American Association of Meat Processors v. Casualty Reciprocal Exchange*, 588 A.2d 491 (Pa. 1991) and *Associated California Loggers, Inc. v. Kinder*, 110 Cal. App. 3d 673 (1980) is misplaced.[10] In *American Association of Meat Processors*, the Pennsylvania Supreme Court held that its anti-rebating statute was violated where an insurer paid a group policyholder a percentage of the insureds' premiums, and the group policyholder passed on the benefit of these payments to the insured members. 588 A.2d at 493-94. Thus, the individual insureds were receiving insurance at a reduced premium and were induced to insurance. *See id.* at 494. In *Kinder*, the Department of Insurance Commissioner alleged that the arrangement between an insurer and a group policyholder, where the insurer reimbursed the group policyholder for administrative services outside of the policy, was an illegal rebate or an illegal commission. 110 Cal. App. 3d at 676. The California Court of Appeal held that the payments were reasonable in relation to the services rendered and were not unlawful. *Id.* at 680. The Court of Appeal did not specifically address whether the anti-rebating statutes could apply to group policyholders on the theory that the group policyholder, as opposed to individual insureds, could be induced to insurance. Nonetheless, it appears that the Court did not accept the Commissioner's claims that the payments were in violation of the anti-rebating statute because "[the] agreements themselves did not affect the underlying insurance coverage and the payments . . . were reasonable in relation to the services rendered." *See id.* at 681.

---

[10] Plaintiffs also refer the court to the New York State Department of Financial Services Office of the General Counsel to argue that even if the 4.9% taken by AARP is for a licensing fee, the payment is still an illegal premium because it is essentially a referral fee. (*See* Pls.' Suppl. Br. at 14.) The Opinion letters of the NYSDFS OGC are non-binding, and further, the context for which the opinion was written is unknown.

The court concludes that Plaintiffs have not plausibly alleged unlawful premium rebates in violation of California's or Connecticut's anti-rebating statutes. Plaintiffs do not allege that any portion of the 4.9% royalty payment was passed on to the insured members. Plaintiffs have not alleged that they received any discount, or that their premium was less because of UnitedHealth's payments to AARP. The insureds' underlying insurance coverage was unaffected and there are no allegations that the individual insureds were induced to insurance by the arrangement. *See also, e.g.*, *Dane*, 2019 WL 2579261, at *3 ("The alleged rebate is not paid to the ultimate insureds, so United cannot be said to be influencing individual insured's purchasing decisions."). Therefore, Plaintiffs have not plausibly alleged violations of California's or Connecticut's anti-rebating statutes.

**B. CUTPA Claims**

CUTPA, like the UCL, has a standing requirement that requires a plaintiff to have "suffered an ascertainable loss of money or property . . . as a result of . . . ." the prohibited conduct. Conn. Gen. Stat. Ann. § 42-110g(a). For the reasons discussed above, the court concludes that Plaintiffs also do not meet CUTPA's economic harm requirement.

Plaintiffs also lack standing under CUTPA for the independent reason that they are not Connecticut residents nor were they injured in Connecticut. CUTPA provides, in relevant part: "Persons entitled to bring an action under subsection (a) of this section may, . . . bring a class action on behalf of themselves and other persons similarly situated who are residents of this state or injured in this state to recover damages." *Id.* § 42-110g(b). Because Plaintiffs have not alleged that they are Connecticut residents or that they were injured in Connecticut, Plaintiffs lack standing to assert CUTPA claims.

**C. State Law Claims**

Next, Defendants challenge the sufficiency of Plaintiffs' state law claims, money had and received, conversion, breach of contract, breach of the covenant of good faith and fair dealing, and financial elder abuse. As discussed above, Plaintiffs do not allege

16

that they paid more than the DOI-approved rate or that they paid more than they agreed to pay. For the reasons stated above, Plaintiffs' theory that they paid "more than what is required to obtain coverage under the insurance policy," (Opp. at 19:10-11), is not plausible to support the state law claims. Absent any plausible allegations that Defendants charged Plaintiffs more than Plaintiffs agreed to pay, that Defendants provided unsatisfactory coverage, or that the contract prohibited Defendants from the alleged conduct, Plaintiffs state law claims fail.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is Granted. The court hereby DISMISSES the Third Amended Complaint without leave to amend and denies Plaintiffs' motion for class certification.

**IT IS SO ORDERED.**

DATED: November 1, 2019

_____

DEAN D. PREGERSON

UNITED STATES DISTRICT JUDGE

17